UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**ARCHER & GREINER, P.C.**
Stephen M. Packman, Esq.
Douglas G. Leney, Esq.
Natasha M. Songonuga, Esq.
Alexander J. Andrews, Esq.
(*Pro Hac Vice* Admission Pending)
1025 Laurel Oak Road
Voorhees, NJ 08043
Telephone: (856) 795-2121
Facsimile: (856) 795-0574
Email: spackman@archerlaw.com
dleney@archerlaw.com
nsongonuga@archerlaw.com
aandrews@archerlaw.com

*Proposed Attorneys for Debtors*

In re:

POOLIN TECHNOLOGY PTE. LTD., *et al.*,[1]

Debtors.

Chapter 11

Case No. 26-18325
(Joint Administration Requested)

**Bid Procedures Hearing Date: TBD – Expedited consideration requested**

**Bidding Procedures Objections Due: TBD – Expedited consideration requested**

**Sale Hearing Date: TBD**
**Sale Objections Due: TBD**

**DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING CERTAIN BIDDING PROCEDURES AND THE FORM AND MANNER OF NOTICE THEREOF, (B) AUTHORIZING THE DEBTORS TO DESIGNATE THE STALKING HORSE BIDDER, (C) SCHEDULING AN AUCTION AND A HEARING ON THE APPROVAL OF THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (D) AUTHORIZING THE DEBTORS TO**

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are: Poolin Technology Pte. Ltd., a Singapore Private Limited Company; Lonestar Dream Inc. (5105); and Lonestar Taproot LLC (4118). The location of the Debtors' service address for purposes of these Chapter 11 Cases is: c/o Michael DuFrayne, CRO, 2564 US Highway 1, PMB #16884166, Lawrence, NJ 08648.

**ENTER INTO THE PURCHASE AGREEMENTS, (E) ESTABLISHING CERTAIN ASSUMPTION AND ASSIGNMENT PROCEDURES AND APPROVING THE MANNER OF NOTICE THEREOF, AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ENCUMBRANCES, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE POTENTIALLY ASSIGNED CONTRACTS, AND (C) GRANTING RELATED RELIEF**

Poolin Technology Pte. Ltd. ("Poolin") and its affiliated debtors and debtors-in-possession: Lonestar Dream Inc. ("LSD"); and Lonestar Taproot, LLC ("LST" and collectively, the "Debtors"), respectfully state the following in support of this motion (the "Motion")[2]:

## RELIEF REQUESTED

1. The Debtors seek entry of:

a. an order substantially in the form attached hereto as **Exhibit A** (the "Bid Procedures Order"), granting, among other things, the following relief:

i. approving proposed bidding procedures (the "Bidding Procedures") in connection with the sale or sales (collectively, the "Sale") of substantially all of the Debtors' assets or any portion thereof (the "Assets"), in the form attached to the Bid Procedures Order as **Exhibit 1**, and approving the form and manner of notice thereof in the form attached to the Bid Procedures Order as **Exhibit 2** (the "Sale Notice");

ii. authorizing the Debtors to designate the Stalking Horse Bidder (as defined below) in accordance with the Bid Procedures Order;

iii. scheduling an auction (the "Auction") and a sale hearing (the "Sale Hearing") in connection with the Sale;

iv. subject to final court approval at the Sale Hearing, authorizing and approving the Debtors to enter into and perform under purchase agreements consistent with the Bidding Procedures (the "Purchase Agreement(s)");

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the Declaration of Michael DuFrayne in Support of Debtors' First Day Motions [Dkt. No. 2] (the "First Day Declaration"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the First Day Declaration.

v. establishing procedures for the assumption and assignment (the "Assumption and Assignment Procedures") of the executory contracts and unexpired leases (collectively, the "Executory Contracts") as identified in the Assigned Contracts Schedule (as defined below) (each, and the form and manner of notice thereof in the form attached to the Bid Procedures Order as **Exhibit 3** (the "Assumption and Assignment Notice"); and

vi. granting related relief; and

b. at the Sale Hearing the Debtors will seek entry of the Sale Order, which will be filed in advance of the Sale Hearing:

i. authorizing and approving the Debtors' entry into the Asset Purchase Agreement(s) with the Winning Bidder(s) (as defined below) or Back-Up Bidder(s) (as defined below), as applicable;

ii. authorizing the Sale(s) of the Assets to the party or parties that are the Winning Bidder(s) at the Auction, free and clear of all liens, claims, and encumbrances (collectively, the "Encumbrances"), except for certain assumed liabilities and Permitted Liens as defined in the Asset Purchase Agreements;

iii. authorizing and approving the assumption and assignment of the Potentially Assigned Contracts (as defined below) in connection with the Sale, including proposed Cure Amounts (as defined below) (if any); and

iv. granting related relief.

2. In support of the Motion, the Debtors incorporate the statements contained in the First Day Declaration, filed contemporaneously herewith. In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

3. The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the District of New Jersey* dated as of September 18, 2012. The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Motion to the extent that it is later

determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4. Venue of the Chapter 11 Cases and related proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The bases for the relief requested herein are sections 105(a), 363, 365, and 541 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6003, 6004, and 6006, of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1, 6004-2, 9013-1, and 9013-2(c) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

## BACKGROUND

### A. General Background

6. On July 22, 2026 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code commencing these cases (these "Chapter 11 Cases") in the United States Bankruptcy Court for the District of New Jersey (the "Court").

7. The Debtors continue to manage their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner and no committee ("Committee") has been appointed in the Chapter 11 Cases.

8. Prior to cessation of business operations on July 10, 2026, LSD had two core business segments: mining digital assets for its own account; and providing top-tier equipment hosting services at its Mining Facilities (as defined below) for other large-scale mining clients, utilizing advanced technologies like air cooling, hydro cooling, and a proprietary immersion cooling system. As part of its operations, LSD operated two mining facilities: a "land leased' facility located at 4143 N US Highway 285, Pecos, Texas 79772 (the "Tarbush Facility"), and an

owned facility located at 3072 FM 1927 Pyote, Texas 79777 (the "Pyote Facility" and with the Tarbush Facility, collectively, the "Mining Facilities").

9. LST owns the real property (the "Pyote Site") where the Pyote Facility is located, and certain equipment used in the Mining Facilities.

10. Additional information regarding the Debtors' prior business operations, organizational structure, and the events leading to the commencement of these Chapter 11 Cases may be found in the First Day Declaration.

11. As set forth in the First Day Declaration, the Debtors filed these Chapter 11 Cases to effectuate a sale of all or substantially all of their assets, including those located at the Mining Facilities to maximize value for all stakeholders.

**B. Debtors' Marketing and Sale Efforts**

12. On or around November 14, 2025, the Debtors retained Michael DuFrayne of DuFrayne LLC ("DL") as the Chief Restructuring Officer ("CRO") of the Debtors to implement an enterprise-wide restructuring initiative to preserve and enhance its value for the benefit of creditors and other parties-in-interest to the Debtors' estates. *See* First Day Declaration, ¶¶ 4 & 5. Thereafter on or around February 3, 2026, DL was retained as Investment Banker of the Debtors in connection with a potential investment in, financing or sale of a portion, all, or substantially all of the Debtors' businesses and/or assets. *Id.*

13. In these capacities, the CRO and/or DL have assisted the Debtors with, among other things, liquidity management, operations, financial restructuring needs, communications and negotiations with customers, landholders, and creditors, evaluation of strategic restructuring alternatives including potential sale alternatives, and the preparation and filing of these cases, including securing the assets of the Debtors, and finalizing financials and assembling reliable books and records to provide to this Court. *Id.* at ¶ 6.

14. The Debtors determined that facilitating a sale of the Debtors' Assets could potentially offer the best path forward. Accordingly, prior to the filing of the Chapter 11 Cases, and beginning early 2026, the Debtors began soliciting third-party interest in a recapitalization and/or acquisition of the Debtors. *Id.* at ¶ 49-52. Specifically, beginning in March 2026, DL conducted a three plus month process which consisted of preparing marketing material, including an introductory teaser, a Confidential Information Memorandum, and populating a confidential data room, identifying and contacting over 330 strategic, financial and hybrid parties by social media, emails and mailing, with a targeted emphasis on participants in the AI/HPC data center industry, crypto mining operators, REITS, data center infrastructure operators and Private Equity firms. DL also coordinated management responsiveness to buyer inquiries, numerous management presentations and negotiating letter of intent. ("Marketing Process"). *Id.* at ¶¶ 49-52.

15. After considering numerous offers received and engaging in discussions with the interested buyers, the Debtors determined that an in-court sale process pursuant to section 363 of the Bankruptcy Code was the best available structure through which a sale transaction could be completed. After thoroughly evaluating the proposals submitted by interested parties and engaging in follow up discussions, the Debtors, in consultation with the Debtors' professionals, determined that Thor CALAP LLC ("Thor CALAP" or "Stalking Horse Bidder") submitted the highest or otherwise best offers for the Assets. *Id.* As such, on July 13, 2026, Debtors LSD and LST signed Letters of Intent, effective as of July 10, 2026, with Thor CALAP LLC ("Thor") for the purchase of the Pyote Site and associated power rights, equipment and other assets ("Pyote Assets"); and the power rights and equipment and other assets associated with the Tarbush Facility excluding certain specified assets (the "Tarbush Assets"). *Id.* at ¶ 54.

16. Thereafter, on July 22, 2026, the Debtors and Thor CALAP entered into two asset purchase agreements – one for the Tarbush Assets (the "Tarbush APA") and another for the Pyote Assets (the, "Pyote APA", and with the Tarbush APA, collectively, the "Stalking Horse APA"), which are attached hereto as **Exhibit B**. Collectively, the Tarbush APA and the Pyote APA contemplate the sale of substantially all of the Debtors Assets. However, each APA represents a separate and independent asset purchase transaction, and each will proceed on its own terms, with the rights and obligations of the parties under each APA being separate and distinct. The Debtors intend to use the Stalking Horse Bidder's bid, as applicable, as the stalking horse bid for the applicable Assets (each a "Stalking Horse Bid")[3]. *Id.* at ¶ 56.

17. Under the Tarbush APA, Thor CALAP agrees to purchase the Tarbush Assets, as described in the Tarbush APA, for a purchase price of $37 million (the "Tarbush Purchase Price") plus certain assumed liabilities as set forth in the Tarbush APA.

18. Under the Pyote APA, Thor CALAP agrees to purchase the Pyote Assets, as described in the Pyote APA (excluding the Amended Surface Use Agreement ("Amended SUA") as defined in the First Day Declaration), for a purchase price of $15 million (the "Pyote Purchase Price", and with the Tarbush Facility Purchase Price, collectively, the "Purchase Price").

19. Each Stalking Horse APA also provides certain bid protections (the "Bid Protections"), including a break-up fee and expense reimbursement, to the Stalking Horse Bidder. Specifically, in the event that the (i) the Debtors enter into an Alternative Transaction (as defined in the applicable Stalking Horse APA) or terminates the Stalking Horse APA for any reason other than breach by the Stalking Horse Bidder or (ii) the Stalking Horse APA is terminated pursuant to

[3] Any summary of the Stalking Horse APA contained herein is qualified in its entirety by the actual terms and conditions of the Stalking Horse APA attached hereto as **Exhibit B**. To the extent that there is any conflict between the summary contained herein and the actual terms and conditions of the Stalking Horse APA, the terms and conditions of the applicable Stalking Horse APA shall control in all respects.

the terms of the applicable Stalking Horse APA and the Stalking Horse Bidder is not then in default under the Stalking Horse APA, the Stalking Horse Bidder shall be entitled to (a) a breakup fee equal to 3% of the cash and non-cash consideration to be paid under the applicable Stalking Horse APA (collectively, the "Break-Up Fee") and (b) an expense reimbursement in a reasonable amount not to exceed $250,000.00 under the Tarbush APA and $150,000.00 under the Pyote APA, which represents approximately 1% of the cash portion of each Stalking Horse APA (collectively, the "Expense Reimbursement"). Per the Stalking Horse APA, the obligation of the Debtors to pay the foregoing Bid Protections: (a) shall be entitled to administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code, provided that the Bid Protections shall be payable directly out of the proceeds of, and as a precondition to closing a Competing Transaction (as defined in the applicable APA); and (b) shall survive the termination of the Stalking Horse APA.

20. The Bid Protections (which are available only to the Stalking Horse Bidder) are well within the range of bid protections often allowed in this District for sale processes under section 363 of the Bankruptcy Code. Further, the Bid Protections are reasonable in light of, among other things, the Stalking Horse Bidder's considerable efforts in setting a floor for the auction of the Assets. In addition, the Debtors' estates will not be impacted by the Bid Protections because the Bidding Procedures provide that any overbid must include an amount of cash consideration equal to or exceeding the sum of the applicable Purchase Price, plus the amount of the Bid Protections, plus an overbid increment to be set by the Debtors.

21. Local Rule 6004-1 requires, among other things, that the debtor include the "material terms of the proposed sale" in a sale motion. The Debtors submit that the summary in the paragraphs above memorializes the material terms of the Stalking Horse APA for purposes of Local Rule 6004-1.

**THE PROPOSED SALE PROCESS AND SELECTION OF STALKING HORSE BIDDER**

22. In connection with the Sale of the Assets, the Debtors submit that conducting an Auction in accordance with the Bidding Procedures will obtain the highest or otherwise best offer for the Assets and will maximize the value of the Debtors' estates. A summary of some of the significant provisions of the Bidding Procedures is set forth below.[4]

**A. Stalking Horse APA**

23. As noted above, following arm's-length and good-faith negotiations, the Debtors and the Stalking Horse Bidder have agreed upon the Stalking Horse APA whereby the Stalking Horse Bidder will purchase certain of the Assets. A true and correct copy of the Stalking Horse APA(s) are attached hereto as **Exhibit B**. The Debtors submit that the Stalking Horse APA promotes competitive bidding and maximizes value by establishing a baseline bid for the Assets, which is subject to higher or otherwise better offers at the Auction.

24. The Stalking Horse APA contains certain key provisions, each of which were specifically negotiated by the Stalking Horse Bidder and which are a condition required by the Stalking Horse Bidder for the deal encapsulated in the Stalking Horse APA. As set forth in the First Day Declaration, the Debtors have concluded that these provisions were necessary to secure the Stalking Horse Bidder's commitment to acquire the Assets in accordance with the terms of the applicable Stalking Horse APA.

25. In addition, the Debtors have concluded that the Bid Protections set forth in the Stalking Horse APA, are (i) an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code, (ii) reasonably tailored to encourage, rather than hamper, bidding for the Assets by providing a baseline of value,

[4] If there exists any omission or discrepancy between the following summary and the actual terms of the Bidding Procedures, the actual terms of the Bidding Procedures shall control.

increasing the likelihood of competitive bidding at the auction, and facilitating participation of other potential bidders in the sale process, thereby increasing the likelihood that the Debtor will receive the best possible price and terms for the Assets subject to the APA, (iii) reasonable and appropriate, (iv) a material inducement for, and conditions necessary to, ensure that the Stalking Horse Bidder will continue pursuit of the proposed agreement to purchase the Assets subject to the applicable Stalking Horse APA, and (vi) reasonable in relation to the substantial investment of time and money Stalking Horse Bidder made prepetition and Stalking Horse Bidder's lost opportunities resulting from the time and money spent pursuing such transaction.

26. Accordingly, the Debtors proposed entry into the Stalking Horse APA(s) is in the best interest of the Debtors' estates, constitute a sound exercise of the Debtors' business judgment, and should be approved.

**B. <u>The Bidding Procedures</u>**

27. To maximize the value of the Assets for the benefit of the Debtors' estates and stakeholders, the Debtors seek to implement a competitive bidding process. The Debtors submit that conducting an Auction in accordance with the Bidding Procedures will obtain the highest or otherwise best offer for the Assets. Accordingly, the Debtors request that competing bids for the Assets be governed by the Bidding Procedures and Bid Procedures Order, which, among other things, collectively establish:

- the requirements that a Potential Bidder (as defined below), other than the Stalking Horse Bidder, must satisfy to be entitled to participate in the bidding process, conduct due diligence, and become a Qualified Bidder (as defined below) (*see, generally,* Bidding Procedures);
- the requirements for Qualified Bidders to submit bids and the method and criteria by which such bids become Qualified Bids;
- the deadline by which bids must be submitted;
- the procedures for conducting the Auction;

- the assumption and assignment procedures for executory contracts and unexpired leases; and

- various other matters relating to the sale process generally, including, but not limited to, the Sale Hearing, deposit and return of any Good Faith Deposits, and designation of a Back-Up Bidder.

The Bidding Procedures contain the following provisions, some of which are required to be highlighted pursuant to Local Rule 6004-1(c), and which are more fully described in the Bidding Procedures and the Bid Procedures Order:[5]

i. **Provisions Governing Qualifications of Potential Bidders.** To participate in the bidding process or otherwise be considered for any purpose hereunder, including to receive access to due diligence materials, a person or entity interested in purchasing the Assets or part of the Assets (other than the Stalking Horse Bidder) must deliver or have previously delivered to counsel to the Debtors and their advisors the following preliminary documentation (collectively, the "Preliminary Bid Documents"):

a. an executed confidentiality agreement (a "Confidentiality Agreement") in form and substance reasonably acceptable to the Debtors;

b. sufficient information to show that the Potential Bidder has sufficient cash on hand or has received sufficient non-contingent debt and/or equity funding commitments to consummate a purchase of the Assets subject to the contemplated bid; and

c. a statement detailing whether the Potential Bidder is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint bid to the extent reasonably practicable.

After provision of the Preliminary Bid Documents, the adequacy of which the Debtors and their advisors shall determine in their sole discretion, such submitting person or entity shall be deemed a (a "Potential Bidder"). For the avoidance of doubt, the Stalking Horse Bidder shall be a Potential Bidder.

[5] If there exists any omission or discrepancy between the following summary and the actual terms of the Bidding Procedures, the actual terms of the Bidding Procedures shall control.

ii. **Due Diligence Provision**.

a. The Debtors have established a confidential electronic data room concerning the Assets (the "Data Room") and will grant each Potential Bidder access to such Data Room. ***No Potential Bidder will be permitted to conduct any due diligence without entry into a Confidentiality Agreement***.

b. Up to and including the Bid Deadline, the Debtors shall afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their business judgment, determine to be reasonable and appropriate under the circumstances. The Debtors may designate a representative or representatives to coordinate all reasonable requests for additional information and due diligence access from such Potential Bidders. In the event that any such due diligence materials are prepared by the Debtors in written form and have not previously been provided to any other Potential Bidder, the Debtors will simultaneously provide access to such materials to all Potential Bidders. Each Potential Bidder shall be required to acknowledge that it has had an opportunity to conduct any and all due diligence regarding the Assets in conjunction with submitting its Bid (as defined below).

c. Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any person or entity who is not a Potential Bidder who does not otherwise comply with the participation requirements set forth above.

iii. **Qualified Bid Requirements**. To participate in the Auction, a Potential Bidder (other than the Stalking Horse Bidder) must deliver to the Debtors and their advisors an irrevocable offer for the purchase of all, substantially all, or some of the Assets (each, a "Bid"), and shall meet the following criteria (collectively, the "Qualified Bid Requirements"), in each case**, by no later than Friday, September 8, 2026** (the "Bid Deadline"), that:

a. State that the Bid includes an offer by the Potential Bidder to effectuate a Sale and identify with specificity which Assets are included in the Bid. Each Potential Bidder must specify whether the Bid is conditioned on purchasing all Assets included in the Bid or whether the Bid should be viewed as separate Bids for one or more sets of Assets (in which case, the Bid must specify such sets).

b. Includes a binding, definitive and fully executed asset purchase agreement, which (1) shall be in form and substance substantially similar to the Stalking Horse APA and marked to reflect only those

changes required as a condition of such Qualified Bidder closing the Sale, (2) shall not contain any provisions entitling such Qualified Bidder to any break-up fee, expense reimbursement or other bid protections of any kind, (3) waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of the bid or participation in any auction, and (4) otherwise contains terms and conditions that are more favorable to the Debtors than those set forth in the Stalking Horse APA. An asset purchase agreement, together with its schedules and exhibits, submitted in accordance with these Bidding Procedures, shall be referred to herein as a "Qualified Bidder APA."

c. Set forth the cash purchase price (the "Cash Consideration") and identify any non-cash consideration included in such Bid (together with the Cash Consideration, the "Bid Purchase Price"), including, without limitation, which Executory Contracts the Potential Bidder expects the Debtors to assume and assign to the Bidder and which liabilities, if any, of the Debtors the Potential Bidder is agreeing to assume (the "Assumed Liabilities"). The Bid Purchase Price associated with each Bid may include only cash and/or other consideration acceptable to the Debtors. The Cash Consideration of any Qualified Bid with respect to all or any portion of the Assets must be no less than an amount necessary to satisfy the Expense Reimbursement, as defined herein, and be a Topping Bid with respect to the applicable Assets. In order for the Bid to qualify as a "Topping Bid," it must provide for consideration at Closing (as defined herein) that is equal to or in excess of the sum of: (i) the Stalking Horse Bid; (ii) the Expense Reimbursement; and (iii) an incremental overbid of $250,000 for the Pyote Assets and $500,000 for the Tarbush Assets (the "Minimum Increment"), which may be adjusted for any Bid relating to Assets not contemplated to be sold under the Stalking Horse APA. Any bid must also include a statement as to whether the bid is conditioned on purchasing all Assets or whether the Bid should be viewed as separate bid for one or more sets of Assets.

d. Other than a Stalking Horse Bid, be accompanied by a good faith deposit by wire transfer or certified check (payable to the order of the Debtors), in an amount equal to five percent (5%) of the cash consideration of the Bid (each, a "Good Faith Deposit"); *provided that*, to the extent a Bid is modified at or prior to the Auction in any manner that increases the proposed purchase price contemplated by such Bid, the Debtors reserve the right to require that such Potential Bidder increase its Good Faith Deposit so that it equals five percent (5%) of the increased aggregate purchase price promptly and in no event no later than one (1) business day following the conclusion of the Auction. The Good Faith Deposits shall be **deposited no later**

**than September 8, 2026, at 5:00 pm (EST)** with the Debtors or the escrow agent identified by the Debtors (the "Escrow Agent").

e. Provides that such Bid is not subject to contingencies of any kind, including, without limitations, contingencies related to financing, internal approval, or due diligence.

f. Provides that such Bid is binding, unconditional, and irrevocable until the earlier of: (a) such Bid being determined by the Debtors not to be a Qualified Bid; (b) if such Bid is not chosen by the Debtors at the Auction to be the Winning Bid or Back-Up Bid, the date of entry by the Bankruptcy Court of an order approving the Sale to another Qualified Bidder; (c) if such Bid is chosen by the Debtors to be the Winning Bid or the Back-Up Bid, the date which is the earlier to occur of (i) the first business day after the closing of the Sale with the Winning Bidder, or (ii) thirty (30) days following the date the order approving the Sale to the Winning Bidder shall have become a final, non-appealable, order ("Final Order").

g. Contain evidence that the Potential Bidder has obtained the necessary authorizations or approvals, as required by that Bidder's governing documents, with respect to the submission of the Bid and the consummation of the Sale.

h. Include a statement or evidence reflecting (1) that the Potential Bidder is prepared to consummate the Sale upon entry of the Sale Order by the Court approving the Sale to the Winning Bidder and (ii) consummation shall not be contingent on obtaining requisite government, regulatory, or other third-party approvals.

i. Each Bid must include evidence of the Potential Bidder's (or any other relevant assignee's) ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Bidder's (or any other relevant assignee's) ability to perform future obligations arising under any Executory Contracts included in its bid. The Debtors may require the following information in connection with demonstrating adequate assurance of future performance: (a) information evidencing the Bidder's (or any other relevant assignee's) financial wherewithal and willingness to perform under any Executory Contracts included in the bid, which information may include (1) a corporate organizational chart or similar disclosure identifying corporate ownership and control, (2) financial statements, (3) tax returns, and (4) annual reports; and (b) the Bidder's (or any other relevant assignee's) proposed use of any leased premises or other property, if any, included in the bid (the "Adequate Assurance Information"). All Adequate Assurance Information must be in a

form that will permit its immediate dissemination to Contract Counterparties (as defined below).

j. Certifies that the Potential Bidder: (1) has not engaged in any collusion with respect to any Bid or the Sale, specifying that it did not agree with any Qualified Bidders or Potential Bidders to control price; (2) agrees not to engage in any collusion with respect to any Bids, the Auction, or the Sale; and (3) by submitting a Bid is agreeing, and shall be deemed to have agreed to abide by and honor the terms of the Bidding Procedures.

k. Includes an acknowledgement and representation that the Potential Bidder has had an opportunity to conduct all due diligence regarding the Debtors' Assets prior to submitting its Bid and that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or assets in making its Bid.

l. Includes an acknowledgment that by submitting a Bid, the Potential Bidder agrees to be a Back-Up Bidder in accordance with the terms of the Bid Procedures, should such Bid be so selected.

m. If the Potential Bidder was formed in whole or part for the purpose of acquiring all or part of the Assets, provides evidence which is reasonably satisfactory to the Debtors, from each of the equity holders of such Potential Bidder demonstrating that such Bidder has, or will have access to, the financial resources needed to consummate the Sale if it becomes the Winning Bidder, and that the use of such resources to consummate the Sale has been authorized and approved by such entity's board of directors (or comparable governing body); *provided*, that the Debtors reserve the right to limit or waive this requirement for one or more Potential Bidders.

n. Provides that the Debtors have the right to pursue all available damages in the event of the Bidder's breach of, or failure to perform under, the Qualified Bidder's APA.

iv. **Evaluation of Qualified Bids**.

a. The Debtors will review each Bid received from a Potential Bidder to determine whether it meets the requirements set forth above. A Bid received from a Potential Bidder for any portion of the Assets that is determined by the Debtors to meet the above Qualified Bid Requirements will be considered a "Qualified Bid," and each Potential Bidder that submits such a Qualified Bid will be considered a "Qualified Bidder." The Debtors will make a determination regarding which Bids qualify as Qualified Bids and will notify Potential Bidders whether they have been selected as

Qualified Bidders on an ongoing basis but no later than **September 9, 2026, at 5:00 p.m. (EST)**. For the avoidance of doubt, the Stalking Horse Bid is deemed a Qualified Bid, and the Stalking Horse Bidder is deemed a Qualified Bidder, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that a Potential Bidder must satisfy to be a Qualified Bidder.

b. A Qualified Bid will be valued by the Debtors based upon any and all factors that the Debtors deem pertinent in their reasonable business judgment (in consultation with the Committee, if any), including, among other things: (a) the amount of the Qualified Bid; (b) the risks and timing associated with consummating the transaction(s) with the Qualified Bidder; (c) any excluded Assets or potentially Assumed Contracts; (d) the number, type, and nature of any changes to the Stalking Horse APA; (e) the net benefit to the Debtors' estates; (f) the tax consequences of such Qualified Bid; and (g) any other factors that the Debtors (in consultation with the Committee, if any), reasonably may deem relevant.

v. **Disposition of Good Faith Deposits**. The Debtors shall return the Good Faith Deposits of all Qualified Bidders, other than the Winning Bidder and the Back-Up Bidder, within five (5) business days following entry by the Bankruptcy Court of an order authorizing the Sale to the Winning Bidder; provided, however, that (i) the Good Faith Deposit of a Qualified Bidder shall be forfeited if the Qualified Bidder attempts to withdraw its Qualified Bid, except as may be permitted by the Bidding Procedures, during the time the Qualified Bid remains binding and irrevocable under the Bidding Procedures, and (ii) the Debtors and their estates shall be entitled to retain the Qualified Bidder's Good Faith Deposit as partial compensation for the damages caused to the Debtors and their estates as a result of the Qualified Bidder's failure to adhere to the terms of the Bidding Procedures and/or the relevant Qualified Bid. Deposit of the Winning Bidder shall be credited to the Purchase Price. If the Winning Bidder (or Back-Up Bidder, as applicable) fails to consummate the Sale, however, then such Bidder's Deposit will be irrevocably forfeited to the Debtors and may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, pursuant to the applicable asset purchase agreement. The Good Faith Deposit of the Back-Up Bidder shall be returned to the Back-Up Bidder within five (5) business days following the date its bid is no longer required to be open and irrevocable.

## C. Proposed Sale Schedule

28. The Debtors propose that the bidding, auction, and sale process be conducted in accordance with the following proposed timeline ("Sale Timeline"):

| **Event** | **Deadline** |
|---|---|
| Bid Procedures Hearing | August 12, 2026 |
| Submission of Non-Binding Indication of Interest | Ongoing but no later than August 27, 2026 |
| Qualified Bid Deadline | September 8, 2026 |
| Auction | September 10, 2026 |
| Notice of Winning Bid and Back-Up Bid | September 11, 2026 |
| Sale Objection Deadline | September 14, 2026 at 5:00 p.m. (EST) |
| Assumption and Assignment Objection Deadline | September 14, 2026 at 5:00 p.m. (EST) |
| Sale Hearing (no later than) | September 16, 2026 |
| Deadline to Close Proposed Sale Transactions | November 30, 2026 |

29. The Debtors believe that the Sale Timeline is reasonable in time and scope and affords parties and creditors with sufficient time to gather information necessary to formulate a competitive bid that should maximize the value of the Assets for the benefit of the Debtors' estates and their stakeholders. In addition to the Debtors' marketing efforts thus far—which have been ongoing since February 2026—the Debtors will use the time prior to, and after, entry of the Bid Procedures Order to continue marketing the Assets to expedite the solicitation of bids for the Debtors' Assets in advance of the Bid Deadline. In light of the foregoing, the Debtors believe that the proposed schedule is in the best interests of the Debtors' estates, will assist in establishing whether and to what extent a market exists for the Assets, and provides interested parties with sufficient opportunity to participate in any Sale transaction(s) and ultimately, will result in the highest or otherwise best bid for the underlying Assets under the circumstances.

**D. <u>Auction</u>**

30. If the Debtors receive more than one Qualified Bid (as defined in the Bidding Procedures), the Debtors will conduct an Auction on **September 10, 2026** either (i) at the offices of Archer & Greiner, P.C., 1025 Laurel Oak Road, Voorhees, NJ 08043, (ii) virtually, or (iii) at such other date, time, and location as designated by the Debtors, in accordance with the Bidding Procedures. The Auction, if any, shall be governed by the following procedures (the "<u>Auction Procedures</u>"):

i. Except as otherwise determined by the Debtors in their business judgment, only the Debtors, the U.S. Trustee, any Qualified Bidders, the Committee (if any), and, in each case, the respective representatives and professionals of the foregoing parties, shall be entitled to attend the Auction.

ii. Except as otherwise provided herein, only Qualified Bidders shall be entitled to bid at the Auction.

iii. The Qualified Bidders may appear virtually themselves or through duly-authorized representatives at the Auction.

iv. At the commencement of the Auction, the Debtors may announce additional procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive Bid(s).

v. Bidding at the Auction shall commence at the amount of the Baseline Bid. Prior to 5:00 p.m. (prevailing Eastern Time) on the day that is one calendar days before the Auction (the "<u>Baseline Bid Deadline</u>"), the Debtors will provide all Qualified Bidders (including the Stalking Horse Bidder), with a notice identifying which Qualified Bid is the Baseline Bid. Subsequent Bids (each an "<u>Overbid</u>") shall be an increase over the Baseline Bid or previous Overbid, in an amount equal or greater than the Minimum Increment. The Debtors reserve the right to reduce or increase the Minimum Increment in their discretion at the Auction.

vi. To the extent the Stalking Horse Bidder submits a higher bid, the Stalking Horse Bidder shall have the right (but not the obligation) to increase its bid by using, as a credit, the amount of the Bid Protections when determining whether the Stalking Horse Bidder has topped the previous bid by the required amount.

vii. Any Overbid made from time to time by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (a) the Debtors accept a



231973324 v2

bid submitted by another Qualified Bidder during the Auction, and (b) such prior Overbid is not selected as the Back-Up Bid.

viii. During the course of the Auction, the Debtors shall, after submission of each Overbid, promptly inform each Qualified Bidder of the terms of the previous bids and inform each Qualified Bidder which Overbid(s) reflect, in the Debtors' view, the highest or otherwise best Bid(s) for the applicable Assets. Each Qualified Bidder will be permitted a reasonable time to respond to previous bids at the Auction, as determined by the Debtors.

ix. The Debtors will not consider Bids made after the Auction has been closed.

x. The Debtors, in their reasonable business judgment, may reject, at any time before entry of an order of the Court approving a Winning Bid, any Bid (other than the Stalking Horse Bid) that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders, (iv) likely to lack the support of their stakeholders in seeking Court approval thereof, or (v) otherwise violative of any of the Debtors' fiduciary obligations.

xi. The Debtors have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any bid made by a Qualified Bidder during the Auction.

xii. The Debtors reserve the right, in their reasonable business judgment, to adjourn the Auction one or more times to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require that the Qualified Bidder has sufficient cash on hand or has received sufficient noncontingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount. The Debtors shall promptly file notice of such adjournment with the Court.

xiii. The Debtors, in their business judgment, reserve the right to amend, waive, or otherwise modify the Auction Procedures at any time, including without limitation, the time, place, attendance, and format of the Auction in a manner that they determine will maximize value.

31. Nothing in the Auction Procedures will prevent the Debtors from exercising their respective fiduciary duties under applicable law.

**E. Acceptance of Winning Bid(s) and Notice of Action Results**

32. Upon the conclusion of the Auction (if such Auction is conducted), the Debtors, in the exercise of their reasonable, good-faith business judgment, shall identify the Winning Bidder(s), which is the highest and best Qualified Bid(s) submitted at the Auction. The Debtors shall also identify the Qualified Bidder(s) that submitted the next highest or otherwise best Qualified Bid(s) as Back-Up Bidder(s) and such bid(s) as the Back-Up Bid(s).

33. As soon as reasonably practicable after the closing of the Auction, the Debtors shall file with the Court notice of the auction results ("Notice of Auction Results"), serve such Notice on the Notice Parties (as defined below), and cause such Notice to be published on the Debtors' restructuring website at: https://www.veritaglobal.net/Poolin (the "Verita Global Website"), which Notice shall (a) identify each of Winning Bidder(s) and Back-Up Bidder(s); and (b) set forth the Sale Objection Deadline (as defined below), the date, time, and location of the Sale Hearing, and any other relevant dates or other information necessary to reasonably apprise the parties of the outcome of the Auction.

**F. Assumption and Assignment Procedures**

34. As part of the Sale, the Debtors are seeking approval of the below procedures (the "Assumption and Assignment Procedures") for notifying counterparties to Executory Contracts (each a "Contract Counterparty," collectively, the "Contract Counterparties") of proposed Cure Amounts (as defined below) with respect to those Executory Contracts that the Debtors propose to assume and assign to the Winning Bidder. To the extent any Executory Contract is determined not to be an executory contract or unexpired lease subject to section 365 of the Bankruptcy Code,



231973324 v2

the Debtors seek authority to transfer all of the Debtors' rights and obligations under such Executory Contract to the Winning Bidder, pursuant to section 363 of the Bankruptcy Code.

i. **Notice of Potential Assumption and Assignment**. As soon as reasonably practicable after entry of the Bid Procedures Order, the Debtors will file with the Court and serve on each Contract Counterparty to an Executory Contract listed therein, a notice substantially in the form annexed to the Bid Procedures Order as **Exhibit 3** (the "Assumption and Assignment Notice"), which shall include a schedule identifying each of the Debtors' Executory Contracts that may be assumed and assigned in connection with the Sale (the "Assigned Contracts Schedule"). The Assumption and Assignment Notice will state (i) the cure amount, if any, that the Debtors believe is necessary to cure all monetary defaults, if any, under each Executory Contract (the "Cure Amount"), (ii) identify any proposed adequate assurance of future performance ("Adequate Assurance"), if any, and (iii) inform such Contract Counterparty of the requirement to file any Assignment Objection (defined below) by the Assumption and Assignment Objection Deadline (as defined below). Service of the Assumption and Assignment Notice upon a Contract Counterparty does not constitute an admission that a particular Executory Contract constitutes an executory contract or unexpired lease of property pursuant to section 365 of the Bankruptcy Code or confirm that the Debtors are required to assume and/or assign such Executory Contract.

ii. **Assumption and Assignment Objection Deadline**. The Debtors request that the Court set the deadline for Contract Counterparties to file objections, if any, to the assumption and assignment of an Executory Contract, for **5:00 p.m. (EST) on September 14, 2026** (the "Assumption and Assignment Objection").

iii. **Requirements for Assumption and Assignment Objection**. An Assumption and Assignment Objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Rules, and any order governing the administration of these Chapter 11 Cases; (iii) state with specificity the nature of the objection and, if the objection pertains to (x) the proposed Cure Amount, state the cure amount alleged to be owed to the objecting Contract Counterparty, or (y) the proposed Adequate Assurance, state the adequate assurance amount purportedly required, together with any applicable and appropriate documentation in support thereof, (clauses (i)-(iii), the "Assumption and Assignment Objection Requirements"); and (iv) be filed with the Court no later than the Assumption and Assignment Objection Deadline.

iv. **Resolution of Assumption and Assignment Objection**. If a Contract Counterparty files an Assumption and Assignment Objection and the Winning Bidder has designated that it wishes to take assignment of such Executory Contract, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then such objection will be resolved at the Sale Hearing, but

such Executory Contract shall be assumed and assigned only upon satisfactory resolution of the Assumption and Assignment Objection, to be determined in the Winning Bidder's discretion, ***provided, however,*** that if an Assumption and Assignment Objection is resolved by the Court in a manner that is not satisfactory to the Winning Bidder, the Winning Bidder shall retain the right to remove the applicable Executory Contract subject to such objection from the Assigned Contract Schedule, and such Contract shall not constitute an Assigned Contract and the Winning Bidder shall not be responsible for any Cure Amount or Adequate Protection with respect to such Contract.

v. **Supplemental Assumption and Assignment Notice**. The Debtors reserve the right, with the consent of the Stalking Horse Bidder or Winning Bidder, as applicable, to: (a) supplement the Assigned Contracts Schedule attached to the Assumption and Assignment Notice with previously omitted Executory Contracts; (b) remove any Executory Contracts from the Assigned Contracts Schedule; and (iii) modify the previously stated Cure Amount and/or Adequate Assurance associated with any Executory Contract (each a "Supplemental Assigned Contracts Schedule") at any time prior to the closing of the Sale. In the event that the Debtors exercise any of such rights reserved herein:

a. The Debtors shall promptly file with the court and serve on each affected Contract Counterparty a supplemental notice of assumption and assignment (a "Supplemental Assumption and Assignment Notice"). Each Supplemental Assumption and Assignment Notice shall include the same information with respect to listed Executory Contracts as would have been included in the Assumption and Assignment Notice (each a "Supplemental Assigned Contracts Schedule").

b. A Contract Counterparty listed on a Supplemental Assumption and Assignment Notice may file an objection (a "Supplemental Assignment Objection"). All Supplemental Assignment Objections must comply with the Assumption and Assignment Objection Requirements and be filed with the Court on the later of (x) the Assumption and Assignment Objection Deadline and (y) the Sale Hearing, which date will be set forth in the Supplemental Assumption and Assignment Notice.

c. If a Supplemental Assignment Objection is not satisfactorily resolved, the Winning Bidder shall retain the right to remove the Executory Contract subject to such objection from the Supplemental Assigned Contracts Schedule, and such Executory Contract shall not constitute an Assigned Contract and the Winning Bidder shall not be responsible for any Cure Amount or Adequate Protection with respect to such Executory Contract.

vi. **Failure to File Assumption and Assignment Objection**. If a Contract Counterparty listed on an Assigned Contracts Schedule or a Supplemental Assigned Contracts Schedule fails to timely and properly file and serve an Assumption and Assignment Objection or a Supplemental Assignment Objection, as applicable, and absent a subsequent order of the Court establishing an alternative Cure Amount: (a) the Cure Amount and Adequate Assurance, if any, set forth in the Assumption and Assignment Notice (or Supplemental Assumption and Assignment Notice) shall be controlling, notwithstanding anything to the contrary in any Contracts or any other document, and such Contract Counterparty will be deemed to have consented to the assumption and assignment of the Executory Contract and the Cure Amount and Adequate Assurance, if any, and will be forever barred from objecting to the assumption and assignment of such Contract and rights thereunder, including to the Cure Amount and Adequate Assurance, if any, and from asserting any other claims related to such Executory Contract against the Debtors and/or the Winning Bidder.

35. The inclusion of an Executory Contract on the Assigned Contracts Schedule or Supplemental Assigned Contracts Schedule, will not obligate the Debtors to assume any Executory Contract listed thereon, obligate the Winning Bidder to take assignment of such Executory Contract, or constitute any admission or agreement of the Debtors that such Executory Contract is an executory contract or unexpired lease. Only those Executory Contracts that are included on an Assigned Contracts Schedule or Supplemental Assigned Contracts Schedule attached to the Sale Order approving the Sale to the Winning Bidder will be assumed and assigned to the Winning Bidder as an Assigned Contract (each an "Assigned Contract", and collectively, the "Assigned Contracts"). To the extent an Executory Contract is not assumed and assigned to the Winning Bidder, the Debtors will, in their reasonable discretion, either reject such unassigned Executory Contract, or sell or transfer such unassigned Executory Contract to the extent permitted by applicable law. In no event will the Winning Bidder be responsible for any unassigned Executory Contracts.

36. At the Sale Hearing, the Debtors or the Winning Bidder shall (i) present evidence necessary to demonstrate adequate assurance of future performance by the Winning Bidder and

(ii) request entry of an order approving the assumption and assignment of any or all Executory Contracts to be assumed and assigned to the Winning Bidder. For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

## G. The Proposed Noticing Procedures

### *i. Notice of Sale, Auction, and Sale Hearing*

37. The Bidding Procedures provide the following "Noticing Procedures":

a. **Sale Notice**. Within two (2) business days following the entry of the Bid Procedures Order or as soon as reasonably practicable thereafter (the "Mailing Date"), the Debtors shall serve a Sale Notice in the form annexed to the Bid Procedures Order as **Exhibit 2**, the Bid Procedures Order, and the Bidding Procedures by e-mail, first-class mail, postage prepaid, or, for those parties who have consented to receive notice by the Electronic Case Files ("ECF") system, by ECF, upon (i) all entities reasonably known to have expressed an interest in a transaction with respect to all or part of the Assets, (ii) all entities known to have asserted any lien in or upon any of the Assets, (iii) the Office of the United States Trustee for the District of New Jersey, (iv) the United States Attorney's Office for the District of New Jersey, (v) the Internal Revenue Service, (vi) counsel for Stalking Horse Bidder, (vii) counsel for the Committee; and (viii) all parties who have requested notice pursuant to Federal Rules of Bankruptcy Procedure Rule 2002 (collectively, the "Notice Parties").

b. **Notice of Determination of Qualified Bids**. The Debtors will make a determination regarding which bids qualify as Qualified Bids and will notify potential bidders whether they have been selected as Qualified Bidders on an ongoing basis but no later than **September 9, 2026, at 5:00 p.m. (EST)**.

c. **Sale Objection**. Any objections to the Sale, including (a) any objection to a sale of the Assets free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and (b) the entry of any Sale Order must be: (i) in writing; (ii) state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (iii) filed with the Court on or before the Sale Objection Deadline set forth in the Bidding Procedures; and (iv) served on (1) the counsel to the Debtors, (2) the Office of the United States Trustee

for the District of New Jersey, (4) counsel for the Stalking Horse Bidder, (5) counsel for the Committee, and (6) if applicable, counsel for the relevant Winning Bidder and/or counsel for the relevant Back-Up Bidder (collectively, the "Objection Notice Parties") so as to be reached by such Objection Notice Parties no later than **September 14, 2026 at 5:00 p.m. (EST)** (the "Sale Objection Deadline").

d. **Assumption and Assignment Notice**. The Debtors will provide all notices regarding the proposed assumption and assignment of Executory Contracts in accordance with the Assumption and Assignment Procedures set forth above and in the Bid Procedures Order.

38. The Debtors believe that the Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including the dates and deadlines identified in paragraph 28 above. Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

**H. The Sale Hearing**

39. As set forth above, in light of the Debtors' limited liquidity, the Debtors request that this Court set the Sale Hearing for **September 16, 2026**. The Sale Hearing may, in accordance with the Bid Procedures Order, be adjourned or rescheduled without notice. At the Sale Hearing, the Debtors will seek Court approval of the Winning Bid and the Back-Up Bid (if any). Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale and there will be no further bidding at the Sale Hearing. In the event that the Winning Bidder cannot or refuses to consummate the Sale because of the breach or failure on the part of the Winning Bidder, the Back-Up Bidder will be deemed the new Winning Bidder and the Debtors shall be authorized, but not required, to close with the Back-Up Bidder on the Back-Up Bid without further order of the Court.

## BASIS FOR RELIEF REQUESTED

### I. The Court Should Approve The Bidding Procedures And The Debtors' Entry Into The Stalking Horse APA.

40. Adoption of the Bidding Procedures is a valid exercise of the Debtors' business judgment. Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from its estate. *See, e.g., In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In evaluating whether a sound business purpose justifies sale of property under Section 363, courts consider a variety of factors, which essentially represent a "business judgment" test"). This standard prohibits other parties from second-guessing the debtor's business judgment if the debtor has shown that the proposed use will benefit the debtor's estate. *See In re Johns-Manville Corp.,* 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near Herculean task.")

41. The paramount goal in any sale of property of a debtor's estate is to maximize the proceeds realized by the estate. *See In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3rd Cir. 2004) (debtor "had a fiduciary duty to protect and maximize the estate's assets"). To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. *See Off. Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re*

*Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"). Where there is a court-approved auction process, the assets are presumed to sell for a full and fair price because the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

42. Here, the proposed Bidding Procedures will promote active bidding from seriously interested parties and will maximize the value of the Assets for the benefit of the Debtors' estates. The proposed Bidding Procedures will allow the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who can demonstrate the ability to close the Sale. In particular, the Bidding Procedures contemplate an open and public marketing process and provide potential bidders with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid. The Debtors believe that substantially all, if not all, parties that may be interested in acquiring a material portion of the Debtors' assets are already aware of the ongoing sale and marketing process due to the Debtors' prepetition efforts.

43. Accordingly, the Debtors request that the Court approve the Bidding Procedures as a valid exercise of the Debtors' business judgment and entry by the Debtors into the Stalking Horse APA.

## II. The Stalking Horse Bid Protections Are Necessary And Appropriate And Should Be Approved.

44. The Debtors submit that the Break-Up Fee is a normal and often times necessary component of sales outside the ordinary course of business under § 363 of the Bankruptcy Code. In particular, such protection encourages a potential purchaser to invest the requisite time, money, and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process. *See, e.g., In re Comdisco, Inc.*, Case No. 01 24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, inter alia, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); *Integrated Res., Inc.*, 147 B.R. at 660 (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid, for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers). As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (internal quotations omitted); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010); *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999). The Debtors believe that approval of payment of the Break-Up Fee to the Stalking Horse Bidder is in the best interests of the Debtors' estates and their creditors, as the Stalking Horse Bidder will establish a floor for further bidding that may increase the consideration given in exchange for the Assets for the benefit of the Debtors' estates.

45. In the Third Circuit, bidding protections, such as the Break-Up Fee and Expense Reimbursement, are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code. *Energy Future*, 904 F.3d at 313 (*citing O'Brien*, 181 F.3d at 535). Thus, "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Reliant Energy*, 594 F.3d at 206 (internal quotations omitted) (*quoting O'Brien*, 181 F.3d at 535).

46. Without the Bid Protections, a potential bidder may elect not to participate in the process at all to the detriment of the Debtors' estates. Granting the Debtors authority to offer the Bid Protections sends a strong signal to the market that the Debtors are serious about running a competitive sale process to generate the best result for the Debtors and their estates.

47. Moreover, the Break-Up Fee will not exceed three percent of any proposed purchase price. This is an amount that is well within market for transactions of this type, and which has been routinely approved by courts in this district. *See, e.g.*, *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. April 25, 2023) [Docket No. 92] (approving stalking horse bid protections, including a break-up fee and expense reimbursement, not to exceed three percent of the proposed purchase price in the aggregate); *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. April 17, 2023) [Docket No. 72] (approving break-up fee of up to three percent of the proposed purchase price); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Jan. 30, 2023) [Docket No. 441] (same); *In re RTW Retailwinds, Inc.*, No. 20-18445 (JKS) (Bankr. D.N.J. Aug. 8, 2020) [Docket No. 192] (same); *In re New England Motor Freight, Inc.*, No. 19-12809 (JKS) (Bankr. D.N.J. April 8, 2019) [Docket No. 427] (same); *In re Aceto Corp.*, No. 19-13448

(VFP) (Bankr. D.N.J. Mar. 19, 2019) [Docket No. 174] (approving breakup fee of up to two percent of the cash component of the proposed purchase price).

48. Accordingly, for the reasons set forth above, the Debtors respectfully submit that the Court should grant the Debtors the authority to incur and pay the Bid Protections to the extent the Stalking Horse Bid Protections are necessary to preserve the value of the Debtors' estates.

## III. The Form and Manner of Notice of the Proposed Sale is Reasonable Under the Circumstances and Should be Approved.

49. In order to receive the highest and/or best price for the Assets under the circumstances, the Debtors are seeking to conduct the Sale and hold the Sale Hearing to enable a closing on by no later than November 30, 2026. The Debtors believe that the sale process proposed herein is warranted and necessary. This is especially true when considering that the Debtors' estates have limited liquidity.

50. Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Sale and Auction. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the deadline for filing any objections to such a Sale. As set forth above, the Debtors have established a detailed and comprehensive process for providing notice to all interested parties. The Sale Notice: (a) will be served in a manner that provides parties in interest notice of the date, time, and location of the Auction, if any, and the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale.

51. The Debtors submit that notice of this motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, and the Assumption and Assignment Notice as provided for herein, constitutes good and adequate notice of the Sale

Transactions and any proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice and Assumption and Assignment Notice.

**IV. The Assumption and Assignment Procedures Should be Approved**

52. To facilitate and effectuate the Sale, the Debtors are seeking approval of the Assumption and Assignment Procedures. The Assumption and Assignment Procedures are reasonable and necessary to properly notify parties of potential assumptions and/or assignments and provide the Contract Counterparties with sufficient time to determine the accuracy of the proposed Cure Amount and whether the Debtors have provided adequate assurance of future performance.

53. The Debtors will demonstrate at the Sale Hearing that the requirements for assumption and assignment of the Assigned Contracts to the Winning Bidder will be satisfied. As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder or Winning Bidder. Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Winning Bidder to provide Adequate Assurance and object to the assumption of the Assigned Contracts or proposed Cure Amounts. The Court therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts.

54. Accordingly, the Debtors submit that the Assumption and Assignment Procedures should be approved as reasonable and necessary measures to adequately notify parties in interest and conduct the proposed sale process in a fair, efficient, and proper manner.

## V. The Proposed Sale of the Assets Should be Approved as a Product of the Debtors' Exercise of Sound and Reasonable Business Judgment

### A. *Approval of Sale of the Assets is Warranted Under Section 363 of the Bankruptcy Code*

55. Ample authority exists for approval of the Sale contemplated by this Motion. Section 363(b)(1) of the Bankruptcy Code provides: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Section 105(a) of the Bankruptcy Code provides in relevant part: "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Pursuant to Bankruptcy Rule 6004(f)(1), sales of property may be by private sale or public auction. The paramount goal of either process is to maximize the proceeds of such sale and the recovery for the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (noting that the debtor "had a fiduciary duty to protect and maximize the estate's assets.").

56. Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of a debtor's estate, courts have approved the authorization of a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992).

57. Courts have applied the following four factors in determining whether a sound business justification exists: (a) whether a sound business justification exists for the sale; (b) whether the sale will produce a fair and reasonable price for the property; (c) whether adequate and reasonable notice of the sale was provided to interested parties; and (d) whether the parties have acted in good faith. *In re Sea Oaks Country Club, LLC*, No. 20-17228 (CMG), 2020 WL 6588412, at *10 (Bankr. D.N.J. Nov. 10, 2020). Where debtors demonstrate a valid business

justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Integrated Res., Inc.*, 147 B.R. at 656.

58. First, as set forth above, a strong business justification exists for the sale of all, substantially all, or a portion of the Assets as described herein. The Debtors are winding down their business and an orderly and expeditious sale of the Assets is critical to maximizing the value of the Debtors' estates and recoveries for the Debtors' creditors. *See* First Day Decl., ¶¶ 9 & 56. Additionally, the ability for a robust bidding and auction process will allow the Debtors to seek out the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practically available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure[, t]he auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction."). Prior to the Bid Deadline, the Debtors will continue to market the Assets and solicit other offers consistent with the Bidding Procedures. In this way, the number of bidders will be maximized.

59. Second, the proposed Sale will yield a fair and reasonable purchase price for the Assets. Any proposed purchase agreement(s) will be the product of good faith, arm's length negotiations between the Debtors and the highest and/or best bidder(s) with respect to the price and other terms of the sale(s) of the Assets. It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); see also *Trans World Airlines, Inc.*, 2001 WL 1820326, *4 (while a "section 363(b) sale transaction does not require an auction procedure .

. . auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

60. Here, the Debtors believe that any Sale governed by the Bidding Procedures will yield a fair and reasonable price for the Assets in these circumstances. The Bidding Procedures, which are designed to facilitate a competitive bidding process, promote transparency, good faith, and fairness throughout the entire sale process. They also provide an appropriate framework for the Debtors to review, analyze, and compare bids for the Assets and to engage with bidders on an arm's-length basis to work to improve the quality of their bids for the benefit of all parties in interest. Accordingly, a sale governed by the Bidding Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase price for the Assets, but also the highest or otherwise best value for the Assets.

61. Third, as set forth above, the proposed Noticing Procedures for the Sale are reasonable and appropriate. Bankruptcy Rules 2002 and 6004 require the Debtors to notify creditors of the proposed sale, provide a description of the Assets, and disclose the time and place of the Auction, the terms and conditions of any proposed Sale, and the Sale Objection Deadlines. *See* Fed. R. Bankr. P. 2002(a), 2002(c), 6004(a). The Noticing Procedures described herein are reasonably calculated to provide all of the Debtors' known creditors and all other parties in interest with adequate and timely notice of, among other things, the proposed Sale, the Bidding Procedures, the Auction, and the Sale Hearing. Further, the Publication Notice is designed to capture any creditors and parties in interest not currently known to the Debtors.

62. Fourth, the sale of the Assets to the Stalking Horse Bidder has been proposed in good faith. The Stalking Horse APA is the product of extensive good faith, arm's length negotiations between the Debtors, on the one hand, and Purchaser, on the other. The Stalking

Horse Bidder does not share common ownership with any of the Debtors and is not otherwise affiliated with the Debtors or their officers and directors. All parties are represented by separate and independent counsel. The Sale of the Assets to the Stalking Horse Bidder pursuant to the terms and conditions of the Stalking Horse APA is not the product of collusion or bad faith. No evidence suggests that the Stalking Horse APA is anything but the product of arm's length negotiations between the Debtors and Stalking Horse Bidder. Under the circumstances, Stalking Horse Bidder (or the Winning Bidder) should be afforded the protections of section 363(m) of the Bankruptcy Code. *See generally Marin v. Coated Sales, Inc. (In re Coated Sales, Inc.),* 1990 WL 212899, at *2 (S.D.N.Y. Dec. 13, 1990) (holding that to show lack of good faith, a party must demonstrate "fraud, collusion [...], or an attempt to take grossly unfair advantage of other bidders"); *see also In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) ("The misconduct which would destroy a buyers 'good faith purchase' status at a judicial sale ordinarily involves fraud, collusion between the purchaser and the other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.").

63. Accordingly, the Debtors, in their business judgment, believe that a prompt sale of the Assets to any Winning Bidder(s) presents the best opportunity to realize the maximum value of the Assets and will provide a greater recovery for the Debtors' estates and their creditors than would be provided by any alternative, and respectfully request that the Court approve the sale of the Assets.

### B. *The Sale of the Assets Should be Approved Free and Clear of Liens Pursuant to Section 363(f) of the Bankruptcy Code*

64. Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to sell and transfer the Assets free and clear of all encumbrances, claims, interests (collectively, the "<u>Liens</u>") with such Liens to attach to the proceeds of the sale in the same order of priority, and to

the same extent as such Liens were valid, perfected, and/or enforceable immediately prior to the Sale, subject to the rights and defenses of the Debtors, the Debtors' estates, or any party in interest.

65. Section 363(f) of the Bankruptcy Code is written in the disjunctive and provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this Section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

66. Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed Sale free and clear of Liens. *See In re Messina*, 687 F.3d 74, 77 n. 4 (3d Cir.2012) (noting that a bankruptcy trustee can "sell property free and clear of an interest in the property provided that one or more of the provisions under Section 363(f) is satisfied."); *see also, In re Collins*, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of the enumerated conditions must be met in order for the Court to approve the proposed sale"); *Scherer v. Fed. Nat'l Mortg. Ass'n (In re Terrace Chalet Apts., Ltd.)*, 159 B.R. 821, 827 (N.D. Ill. 1993) (sale extinguishes liens under section 363(f) as long as one of the five specified exceptions applies).

67. The Debtors submit that section 363(f)'s standard for a sale free and clear of Liens is easily met here. Any Lien that exists immediately prior to the closing of the Sale will attach to the net Sale proceeds with the same validity, priority, force, and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in interest. Moreover, any holder of a Lien that receives notice of the proposed sale and which fails to object should be deemed to consent to the proposed sale, thereby complying with section 363(f)(2) of the Bankruptcy Code. Thus, the proposed Sale satisfies section 363(f) of the Bankruptcy Code.

**C. *The Assumption and Assignment of the Contracts Should be Approved***

68. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. 11 U.S.C. § 365(a)-(b). "[A]dequate assurance of future performance" is fact and circumstance specific to each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989).

69. A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of a lease "will be a matter of business judgment. . ."); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); *In re Extraction Oil & Gas*, 622 B.R. 608, 614 (Bankr. D. Del. 2020) ("Courts generally authorize debtors to assume or to reject executory contracts and unexpired leases where the debtors appropriately exercise their 'business judgment.'"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507,

511 (Bankr. D. Del. 2003) (finding a debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim, or caprice). In this context, the business judgment test only requires that debtors demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estates. *Sharon Steel*, 872 F.2d at 40.

70. In addition, section 365(f)(1) of the Bankruptcy Code permits a debtor to assign executory contracts and unexpired leases free from any anti-assignment restrictions contained therein. 11 U.S.C. § 365(f). Section 365(f)(1) renders unenforceable provisions that prohibit, restrict, or condition an assignment of an executory contract or unexpired lease. Section 365(f)(3) of the Bankruptcy Code prohibits the termination or modification of an executory contract or unexpired lease because of the assumption or assignment of such contract or lease.

71. In this case, because the Debtors' Executory Contracts may enhance the value of the Assets, the Debtors propose to provide Potential Bidders, including the Stalking Horse Bidder, the opportunity to take an assignment of the Executory Contracts in connection with their bids for the Assets. Moreover, after the sale of the Assets, the Contracts would be of no value to the Debtors or their estates as the Debtors are liquidating. To the contrary, they would represent a potentially significant burden to the estates from and after the closing date. For all these reasons, the Debtors have determined, in the exercise of their sound business judgment, to assume and assign the Assigned Contracts designated by the successful bidder for the Assets to the Winning Bidder, effective as of the closing date.

72. The Debtors propose to cure any outstanding defaults under the Assigned Contracts, in the amounts set forth in the schedule(s) attached to the Assumption and Assignment Notice, the Supplemental Assumption and Assignment Notice, or otherwise agreed to by and among the

Debtors, the applicable Contract Counterparty, and the Winning Bidder, as applicable. In addition, the Debtors submit that because any potential purchaser of the Assets, including the Stalking Horse Bidder, must have demonstrated to the Debtors' satisfaction its financial wherewithal and its access to sufficient financing to consummate the contemplated transaction and to qualify as a Qualified Bidder, any such purchaser will have the wherewithal and resources to complete performance of the Assigned Contracts and thereby comply with the requirements of section 365(f)(2)(B) of the Bankruptcy Code.

73. As demonstrated above, the Debtors have compelling justifications for the Court to authorize them to sell the Assets and assume and assign the Assigned Contracts related to the Assets.

**D. *The Automatic Fourteen-Day Stay Under Bankruptcy Rule 6004(h) and 6006(d) Should Be Waived***

74. Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order. *See* Fed. R. Bankr. P. 6004(h). Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of executory contracts or unexpired leases are automatically stayed for fourteen days after entry of the order.

75. Although Bankruptcy Rule 6004(h) and 6006(d) and the Advisory Committee Notes thereto are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, Collier on Bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. 10 *Collier on Bankruptcy* ¶ 6004.09 (15th ed. 1999). Furthermore, *Collier on Bankruptcy* provides that if an objection is filed and overruled, and the objecting party informs the

court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

76. To preserve and maximize the value of the Assets, the Debtor seeks to close the Sale immediately after all closing conditions have been met or waived. Accordingly, waiver of any applicable stays afforded by the Bankruptcy Rules is appropriate under the facts and circumstances of this case.

**NOTICE**

77. The Debtors propose to serve notice of this Motion on the Notice Parties, including the Office of the United States Trustee for the District of New Jersey and counsel for any Committee appointed in the case, any party known or reasonably believed to have asserted any Lien in the Assets, and any party known or reasonably believed to have expressed an interest in acquiring some or substantially all of the Assets, counsel for the Stalking Horse Bidder, and any other party entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 9014-3. Considering the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary or required prior to entry of the proposed Bid Procedures Order and proposed Bidding Procedures.

**NO PRIOR REQUEST**

78. No prior motion for the relief requested herein has been made to this or any other Court.

WHEREFORE, for the foregoing reasons, the Debtors respectfully request that the Court enter the Bid Procedures Order, the Sale Order, and further relief as the Court may deem just and appropriate.

Dated: July 22, 2026

**ARCHER & GREINER, P.C.**

*/s/ Stephen M. Packman*
Stephen M. Packman, Esq.
Douglas G. Leney, Esq.
Natasha M. Songonuga, Esq.
Alexander J. Andrews, Esq.[6]
1025 Laurel Oak Road
Voorhees, NJ 08043
Telephone: (856) 795-2121
Facsimile: (856) 795-0574
Email: spackman@archerlaw.com
dleney@archerlaw.com
nsongonuga@archerlaw.com
aandrews@archerlaw.com

*Proposed Counsel to the Debtors*

[6] *Pro Hac Vice* admission pending.