UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**ARCHER & GREINER, P.C.**
Stephen M. Packman, Esq.
Douglas G. Leney, Esq.
Natasha M. Songonuga, Esq.
Alexander J. Andrews, Esq.
(*Pro Hac Vice* Admission Pending)
1025 Laurel Oak Road
Voorhees, NJ 08043
Telephone: (856) 795-2121
Facsimile: (856) 795-0574
Email: spackman@archerlaw.com
dleney@archerlaw.com
nsongonuga@archerlaw.com
aandrews@archerlaw.com

*Proposed Attorneys for Debtors*

| | |
|---|---|
| In re: | Chapter 11 |
| POOLIN TECHNOLOGY PTE. LTD., *et al.*,[1] | Case No. 26-18325 |
| Debtors. | (Joint Administration Requested) |
| | **Hearing Date: August 20, 2026 at 10:00 a.m (ET)**<br>**Objection Deadline: August 13, 2026** |

# DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING REJECTION OF CERTAIN CONTRACTS AND/OR LEASES, APPROVING SETTLEMENT AGREEMENT PURSUANT TO F.R.B.P. 9019, AND GRANTING RELATED RELIEF

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Poolin Technology Pte. Ltd. ("Poolin") and its affiliated debtors and debtors-in-possession: Lonestar Dream Inc. ("LSD"); and Lonestar Taproot, LLC ("LST" and collectively, the

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are: Poolin Technology Pte. Ltd., a Singapore Private Limited Company; Lonestar Dream Inc. (5105); and Lonestar Taproot LLC (4118). The location of the Debtors' service address for purposes of these Chapter 11 Cases is: c/o Michael DuFrayne, CRO, 2564 US Highway 1, PMB #16884166, Lawrence, NJ 08648.

"Debtors"), by and through their undersigned proposed counsel, hereby respectfully move (this "Motion") this Court for entry of an order substantially in the form attached hereto as **Exhibit A**: (i) authorizing the Debtors to reject certain unexpired contracts and/or leases identified on **Schedule 1**[2] attached hereto (collectively referred to herein as the "Rejected Agreements" or the "Hosting Agreements" as applicable) effective as of the Petition Date (as defined herein): (ii) approving the Debtors' settlement agreement with Actinide-89-103-Systems LLC and Seaborgium-106 Systems LLC (collectively, "Elektron"), pursuant to Federal Rule of Bankruptcy Procedure 9019, and (iii) granting related relief. In support of this Motion, the Debtors respectfully submit the *Declaration of Michael DuFrayne in Support of the Debtors' Motion for Entry of an Order Authorizing Rejection of Certain Contracts and/or Leases Effective as of the Petition Date, Approving Settlement Agreement, and Granting Related Relief* (the "DuFrayne Declaration") which is attached hereto as **Exhibit B** and fully incorporated herein by reference. In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1. The Court (defined below) has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the District of New Jersey* as of September 18, 2012. The Debtors hereby consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Motion, to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

[2] The Debtors reserve the right to reject other contracts and leases, and to remove any of the Rejected Agreements from Schedule 1 prior to entry of an order with respect to this Motion. In addition, the inclusion of any Rejected Agreements on Schedule 1 does not constitute an admission by the Debtors that any such contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code

2. Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, 6006, 6007, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 6004-1, 6004-2, 9013-1, 9013-3, 9013-5, and 9019-3 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

**FACTUAL AND PROCEDURAL BACKGROUND**

4. On July 22, 2026 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "Court"), thereby commencing the above-captioned cases (these "Cases" or these "Chapter 11 Cases"). The Debtors continue to manage their assets as debtors in possession. As of the filing of this Motion, no official committee of unsecured creditors or statutory committee has been appointed in the Debtors' Cases, and no request has been made for the appointment of a trustee or examiner.

5. Additional factual background regarding the Debtors' current and historical business operations and the events leading to these Chapter 11 Cases is set forth in the *Declaration of Michael DuFrayne in Support of Debtors' Chapter 11 Petitions and First Day Motions* [ECF No. 2] (the "First Day Declaration") filed substantially contemporaneously herewith and incorporated by reference herein.

6. As more fully set forth in the First Day Declaration, the Debtors historically offered a variety of cryptocurrency and technology-related services. The Debtors' business activities included two core segments: (i) mining digital assets for their own account, and (ii) providing

cryptocurrency equipment hosting services at their two Texas facilities for large-scale mining clients. As discussed below, on July 10, 2026, the Debtors substantially completed the wind-down of their hosting business.

7. Before the Petition Date, the Debtors explored strategic transactions involving discussions with potential purchasers of their respective equity and assets. The LSD and LST intend to conduct a competitive bidding and sale process for substantially all their assets in these Chapter 11 Cases, as further described in the First Day Declaration and the *Debtors' Motion Pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 6004-1, 6004-2, and 9013-5 for entry of an order (I) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (II) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (III) Approving Assumption and Assignment Procedures, (IV) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief* (the "Sale Motion").

8. The Sale Motion includes (A) a copy of the form asset purchase agreement ("Tarbush Stalking Horse APA") executed by Thor CALAP LLC or an entity to be formed (the "Tarbush Stalking Horse"), for itself and any designees, and (B) a copy of the form asset purchase agreement ("Pyote Stalking Horse APA") executed by Thor CALAP LLC or an entity to be formed ("Pyote Stalking Horse," and collectively with the Tarbush Stalking Horse, the "Stalking Horse Purchasers"), for itself and any designees, in each case providing for, among other things, consideration of cash, as well as the assumption of certain liabilities for the assets to be purchased under each thereof. During the pendency of these Chapter 11 Cases, the Debtors may, on a consensual or non-consensual basis, assume, assume and assign, or reject certain of their unexpired executory contracts and leases. The Debtors and the Stalking Horse Purchasers intend that certain

of the Debtors' unexpired executory contracts and leases be assumed and assigned as part of the sale(s).

9. Prior to July 10, 2026, the Debtors' primary crypto-hosting client was Elektron. The relationship is governed by four Hosting Agreements, each as more particularly described on **Schedule 1** attached hereto. Following good-faith, arm's-length settlement negotiations, the Debtors and Elektron (collectively, the "**Parties**") have agreed to terminate the Hosting Agreements and to resolve all claims, defenses, and other matters between them arising from or relating to the Hosting Agreements, as set forth in that certain Settlement Agreement, dated on or about June 22, 2026, by and between Elektron and LSD (the "Settlement Agreement"). A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit C** and is fully incorporated herein by reference.

10. The essential terms of the Settlement Agreement are as follows:

*i.* *Power Usage Effectiveness Reconciliation*. LSD accepts Elektron's recalculation of power usage effectiveness ("PUE")[3] for the period March 24, 2025 through March 4, 2026, reflecting a balance of $1,344,788.13 (the "Initial Recon Amount") due and owing to LSD, which Elektron shall deposit in escrow subject to certain release conditions. For periods on and after March 4, 2026, the Maximum Monthly Power Usage margin factor changes from 1.03 to 1.10, which factor is final and binding on the Parties. Any portion of the Initial Recon Amount due and owing to the utility shall not be deemed Debtor property but shall be held in attorney escrow solely for remittance to the utility. The Parties will continue daily settlement practices and reach a final reconciliation, which remains subject to final utility billing.

*ii.* *Warehouse Charges*. LSD shall provide Elektron a fifty percent (50%) discount of invoiced warehouse charges in the amount of $403,000. Elektron shall remit the discounted amount of $201,500 within ten (10) business days of execution of the Settlement Agreement in full and final satisfaction of warehouse-related claims. Elektron shall retrieve its stored property within ten (10) business days of execution of the Settlement

[3] PUE is an industry standard metric comparing a facility's total energy draw to the energy actually delivered to the customer's computing equipment and determines the amount of overhead charged to the customer.



232320632 v2

Agreement, leaving the space broom clean. LSD shall waive any lien, setoff, recoupment, or possessory claim against such property.

iii. *Pyote Pre-Bill*. A TNMP utility metering issue at the Pyote Site from October 2025 through February 2026 caused LSD to pre-bill Elektron an estimated $476,788 for unmetered electricity (the "Pre-Bill Amount"). LSD shall segregate this Pre-Bill Amount into the attorney trust account of Archer & Greiner, P.C., identified as "Elektron Escrowed Funds." Such funds shall be held in escrow and constructive trust—expressly not property of LSD or its bankruptcy estate—solely for remittance once final utility billing is received and the final reconciliation is agreed. If the actual metered charges are less than the Pre-Bill Amount, LSD shall be reimbursed from the Pre-Bill Amount for the applicable FlowX/ERCOT charges arising from the metering failure, and the balance shall be returned to Elektron. If the actual metered charges are more than the Pre-Bill Amount, the full Pre-Bill Amount shall be remitted to LSD, and Elektron shall deposit the overage into escrow for release to LSD.

iv. *Backup-Pool Reconciliation.* Elektron shall separately pay the amount of $53,920.20, which constitutes the amount due by Elektron to LSD with respect to the backup pool reconciliation within ten (10) business days of execution of the Settlement Agreement.

v. *Rejection of Hosting Agreements.* The Parties will continue operating under the Hosting Agreements until the agreements terminate on the earlier of: (i) July 10, 2026, or (ii) the date the Court approves a sale of LSD's assets under Section 363 of the Bankruptcy Code (the "Termination Date"). LSD agrees to cause to be filed a motion to reject each of the Hosting Agreements, effective as of the Termination Date.

vi. *Mutual Releases*. Effective on the Termination Date, the Parties exchange mutual releases of all claims, known or unknown, arising out of the Hosting Agreements, including any historical service-level (uptime) and liquidated-damages claims. The releases do not extinguish the obligations created by the Settlement Agreement, the surviving obligations under the Hosting Agreements (as modified), or LSD's obligation to return Elektron's power deposits.

11. In connection with these Chapter 11 Cases, the Settlement Agreement, the proposed sale transaction, feedback from potentially interested parties, and the wind-down of operations, the Debtors undertook an analysis of their unexpired executory contracts and leases. As a result of this analysis, and as required under the Settlement Agreement, the Debtors determined, in their business judgment, that certain contracts relating to the Debtors' business activities, namely: the

Hosting Agreements, will not be included in the Debtors' proposed sale, are unnecessary and burdensome to the Debtors' estates, and should be rejected immediately. *See* First Day Declaration ¶ 40.

## **RELIEF REQUESTED**

12. By this Motion, the Debtors seek entry of an order, substantially in the form of the proposed order attached hereto as **Exhibit A** authorizing the Debtors to reject the Rejected Agreements as identified on **Schedule 1**, effective as of the Petition Date, approving the Settlement Agreement by and between Elektron and LSD, and granting related relief.

13. As set forth in the Settlement Agreement, the Debtors and Elektron consensually agreed the Hosting Agreements were to terminate on the earlier of: (i) July 10, 2026, or (ii) the date the Court approves a sale of LSD's assets under Section 363 of the Bankruptcy Code. Accordingly, the Termination Date has already occurred. This termination should be approved by the court in light of the Parties' mutual agreement to part ways. For the avoidance of doubt, the Debtors do not believe or concede that the Hosting Agreements are unexpired executory contracts as of the Petition Date. Rather out of an abundance of caution and to comply with their obligations under the Settlement Agreement, the Debtors hereby seek entry of an order authorizing rejection of the Hosting Agreements ***solely to the extent they did not terminate prior to the Petition Date***.

## **BASIS FOR RELIEF REQUESTED**

### A. **The Court Should Approve the Settlement Pursuant to Bankruptcy Rule 9019**

14. Bankruptcy Rule 9019(a) provides, in relevant part:

> On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee . . . as provided in Rule 2002 and to any other entity as the court may direct.

15. The United States Court of Appeals for the Third Circuit has emphasized that "to minimize litigation and expedite the administration of a bankruptcy estate 'compromises are favored in bankruptcy.'" *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); *see also*, *In re Culmtech, Ltd.*, 118 B.R. 237, 238 (Bankr. M.D. Pa. 1990) ("[C]ompromises are favored in bankruptcy and … much of litigation in bankruptcy estates results in settlements"). Likewise, section 105 of the Bankruptcy Code empowers a court to issue any order that is "necessary or appropriate." 11 U.S.C. § 105(a).

16. "[T]he authority to approve a compromise settlement is within the sound discretion of the bankruptcy court." *In re Key3Media Group, Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005); *see also, In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997). When exercising such discretion, the bankruptcy court must determine whether the compromise is "fair, reasonable, and in the best interest [sic] of the estate." *Key3Media*, 336 B.R. 87, 92; *see also, Fry's Metals, Inc. v. Gibbons (In re RFE Industries, Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002); *In re Louise's, Inc.*, 211 B.R. at 801; *In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 249 (Bankr. D. Del. 1998).

17. The bankruptcy court is not required to determine that the proposed settlement is the best possible compromise. *In re Key3Media Group*, 336 B.R. at 92–93 (citing *In re Coram Healthcare Corp.*, 315 B.R. 321, 329 (Bankr. D. Del. 2004)). Rather, the settlement should be approved as long as it does not fall below the lowest point in the range of reasonableness. *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983). In this respect, it is unnecessary for the court to consider the information necessary to resolve the factual dispute, nor is it necessary for the bankruptcy court to "conclusively determine claims subject to a compromise." *Key3Media Group*, 336 B.R. at 92 (quoting *In re Martin*, 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997)).

18. Courts consider the following four "*Martin*" factors when determining whether a settlement is in the best interests of the estate: (i) the probability of success in the litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attendant thereto; and (iv) the paramount interest of the creditors and a proper deference to their reasonable opinions. *Martin*, 91 F.3d at 393; *Aetna Casualty & Surety v. Jasmine, Ltd. (In re Jasmine, Ltd.)*, 258 B.R. 119, 123 (Bankr. D.N.J. 1999); *Key3Media Group*, 336 B.R. at 93; *In re Marvel*, 222 B.R. at 249. "[C]ourts should not have a 'mini-trial' on the merits, but rather should canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." In re W.R. Grace & Co., 475 B.R. 34, 77–78 (Bankr. D. Del. 2012).

19. In this case, the factors used by courts each favor approval of the Settlement Agreement. Both Elektron and LSD have claims, counterclaims, and defenses arising out of disputes of various economic terms in the Hosting Agreements and performance of covenants thereunder. Complicating matters is the estimation of amounts due to third parties, such as utility services, which must be paid and reconciled between the Parties. While these disputes are essentially matters of contract interpretation, the underlying calculations are technical. As set forth in the Settlement Agreement, the Parties wish to amicably and efficiently reconcile the amounts due and owing to each Party, and third parties, under the Hosting Agreements. Although each side maintains confidence in the strength of its legal and factual positions, the Settlement Agreement provides a pragmatic and value-maximizing resolution by eliminating the substantial litigation risk, cost, and delay inherent in litigation. Specifically, the proposed compromise avoids the legal cost of motion practice and a complex and fact-intensive trial involving disputed issues of competing reconciliation methodologies and exceptions. Further, outcomes of litigation are

fundamentally uncertain, and any adverse ruling on one or more of the issues will materially increase administrative expenses and divert estate resources otherwise available for distributions to creditors. The Settlement avoids these risks and ensures a prompt, efficient, and equitable resolution of the Parties' claims. Based on the foregoing, the first factor regarding probability of success favors approval of the Settlement Agreement.

20. The second factor regarding collectability of any favorable judgment weighs in favor of the requested relief. Given that the Parties have arrived at a fair and reasonable, arm's-length compromise, the costs of collection are unreasonably burdensome for both sides. Any adverse judgment for the Debtors would be difficult to collect, given the Debtors' limited resources and constraints of these Chapter 11 Cases. Conversely, if the Debtors were successful, they would still incur significant attorneys' fees and costs that would reduce the assets available to creditors. Ultimately, both sides face practical barriers to realizing any meaningful recovery through continued litigation. This mutual collectability risk further supports approval of the Settlement Agreement as the most fair and efficient alternative under the circumstances.

21. As noted, the dispute is a traditional matter of contract interpretation. However, the underlying issues involve technical calculations. Given the Parties' willingness to proceed consensually, the Parties, rather than a finder of fact, are better situated to resolve these calculations. The Parties believe the Settlement Agreement incorporates and memorializes the relative strength of the Parties' respective positions on each issue. The net result of a court determination may not materially differ from the present compromise but would intrinsically involve increased litigation costs. The Settlement Agreement therefore eliminates any further accrual of litigation expenses and delay on all sides, associated with having a finder of fact reassess

the Parties' positions. Accordingly, the third factor weighs in favor of approval of the Settlement Agreement.

22. Finally, the paramount interests of creditors factor strongly support approval of the Settlement Agreement. The Settlement Agreement was the product of good faith, arm's-length negotiations between the Parties, resulting in a fair and equitable compromise of the amounts due under the Hosting Agreements. The Settlement Agreement spares the Debtors' estates and, by extension, the Debtors' creditors, the significant expense and uncertainty associated with the litigation of these issues.

23. In determining whether a compromise is in the best interests of an estate, the Bankruptcy Court must "'assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal.'" *In re Key3Media Group*, 336 B.R. at 93 (quoting *In re Martin*, 91 F.3d at 393 (citing *TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968))); *see also In re Nationwide Sports Distributors, Inc.*, 227 B.R. 455, 460 (Bankr. E.D. Pa. 1998) ("[I]n deciding whether to approve a particular compromise, courts utilize various criteria designed to achieve the objective of having the Defendant or debtor in possession act in [the] best interests of the estate."). To properly balance these values, the Court should consider all factors "relevant to a full and fair assessment of the wisdom of the proposed compromise." *In re Marvel*, 222 B.R. at 249 (quoting *TMT Trailer Ferry, Inc.*, 390 U.S. at 424); *see also Key3Media Group*, 336 B.R. at 92 ("[t]he bankruptcy court must be apprised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate.") (quoting *In re Martin*, 91 F.3d at 393).

24. The Debtors respectfully submit that the economic value of the Settlement Agreement is fair and reasonable, given the Parties' respective claims and defenses. The Debtors

believe that the economic terms included in the Settlement Agreement are highly favorable to the Debtors and their bankruptcy estates. In addition to the above-described reconciliations, Elektron waived certain damages claims, including a hefty liquidated damages claim that it may otherwise have asserted under the Hosting Agreements. Accordingly, the Settlement Agreement unquestionably represents the most value-maximizing alternative reasonably available under the circumstances. The Settlement Agreement also represents the most efficient resolution of the Parties' disputes in terms of administrative costs and delay, thereby further maximizing the value of the Debtors' estates. Based on the foregoing, in light of each of the Martin factors, the Settlement Agreement should be approved in all respects.

### A. The Court should Approve Rejection of the Rejected Agreements under Section 365 of the Bankruptcy Code as a Proper Exercise of the Debtors' Business Judgment

25. Section 365(a) of the Bankruptcy Code provides that a debtor in possession "may assume or reject any executory contract or unexpired lease of the debtor" subject to the court's approval. *In re S.A. Holding Co., L.L.C.*, 357 B.R. 51, 56 (Bankr. D.N.J. 2006) (*quoting In re Rickel Home Centers, Inc*., 209 F.3d 291, 298 (3d Cir. 2000) (Section 365 of the Bankruptcy Code "enables the [debtor] to maximize the value of the debtor's estate by assuming executory contracts that benefit the estate and rejecting those that do not.")). Courts generally authorize debtors to assume or reject executory contracts and unexpired leases where the debtors appropriately exercise their "business judgment." *See, e.g., NLRB v. Bildisco & Bildisco (In re Bildisco), 465 U.S. 513, 521 (1984*) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test." (citation omitted)); *In re Nickels Midway Pier, L.L.C.*, 341 B.R. 486, 493 (Bankr. D.N.J. 2006); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989); *In re Fed. Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003); *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal*

*Finishers, Inc.)*, 756 F.2d 1043, 1047 (4th Cir. 1985) (holding that, absent bad faith or abuse of discretion, deference is given to debtor's business judgment); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 849 (Bankr. W.D. Pa. 1987); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994). Courts generally will not second-guess a debtor's business judgment concerning the rejection of an executory contract or unexpired lease. *See In re Trans World Airlines*, 261 B.R. 103, 121 (Bankr. D. Del. 2003). The "business judgment" test merely requires a showing that rejection of the executory contract or unexpired lease will benefit the debtor's estate. *Id.* ("A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'") (quoting *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. at 849–50) ("Ordinarily, courts accord the debtor's business judgment a great amount of deference since the decision to assume or reject an executory contract is an administrative not a judicial matter."); *see also Computer Sales Int'l, Inc. v. Fed. Mogul Global, Inc. (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003) ("The business judgment test dictates that a court should approve a debtor's decision to reject a contract unless that decision is the product of bad faith or a gross abuse of discretion.").

26. Notwithstanding that the Debtors believe the Rejected Agreements terminated before the Petition Date, and after a careful review of the Debtors' business, and in consultation with the Stalking Horse Purchasers and other potentially interested parties, the Debtors have determined that the Rejected Agreements are burdensome to the Debtors' estates and will not be assigned as part of a sale transaction. As set forth in the First Day Declaration, absent rejection, the Rejected Agreements may impose ongoing obligations on the Debtors that will unnecessarily drain the Debtors' resources relative to any benefits associated therewith, which are relatively slight, particularly in light of the proposed sale and wind-down process. Additionally, the Parties

to the Rejected Agreements have mutually agreed that termination of the Hosting Agreements is in their respective best interests. As such, the Settlement Agreement with Elektron requires the Debtors to pursue Court approval of the rejection and termination. Accordingly, to avoid incurring unnecessary administrative expense claims with respect to the Rejected Agreements, the Debtors seek to reject the Rejected Agreements, effective as of the Petition Date. The Debtors respectfully represent that rejecting the Rejected Agreements is appropriate under the circumstances and reflects the Debtors' sound business judgment.

27. The Debtors also respectfully submit that it is appropriate for the Court to deem the Debtors' rejection of the Rejected Agreements effective as of the Petition Date. Section 365 of the Bankruptcy Code does not specifically address whether courts may order rejection to be effective retroactively. However, courts in this and other districts have held that bankruptcy courts may exercise their equitable powers in granting such a retroactive order when doing so promotes the purposes of section 365(a) of the Bankruptcy Code. *See In re Chi-Chi's, Inc.*, 305 B.R. 396, 399 (Bankr. D. Del. 2004) ("[T]he court's power to grant retroactive relief is derived from the bankruptcy court's equitable powers so long as it promotes the purposes of § 365(a)."); *Thinking Machs. Corp. v. Mellon Fin. Servs. Corp. (In re Thinking Machines Corp.)*, 67 F.3d 1021, 1028–29 (1st Cir. 1995) ("rejection under section 365(a) does not take effect until judicial approval is secured, but the approving court has the equitable power, in suitable cases, to order a rejection to operate retroactively."); *see also Pacific Shores Dev., LLC v. At Home Corp. (In re At Home Corp.)*, 392 F.3d 1064, 1071 (9th Cir. 2004) (same).

28. Courts may approve retroactive rejection of executory contracts and unexpired leases "after balancing the equities" and concluding that they weigh in favor of the debtor. *See In re Extraction Oil & Gas*, 622 B.R. 608, 630 (Bankr. D. Del. 2020), aff'd, No. 20-11548 (CSS),

2021 WL 3722229 (D. Del. Aug. 23, 2021) (citing *In re Rupari Holding Corp.*, No. 17-10793 (KJC), 2017 WL 5903498, at *6 (Bankr. D. Del. Nov. 28, 2017)); *In re Chi-Chi's, Inc.*, 305 B.R. at 399 (acknowledging that a bankruptcy court may approve a rejection retroactive to the date the motion is filed after balancing the equities in the particular case); *In re Fleming Cos.*, 304 B.R. 85, 96 (Bankr. D. Del. 2003) (finding that rejection has been allowed *nunc pro tunc* to the date of the motion); *see also Thinking Machs. Corp.*, 67 F.3d at 1028 ("In the section 365 context, . . . bankruptcy courts may enter retroactive orders of approval, and should do so when the balance of equities preponderates in favor of such remediation."); *In re Jamesway Corp.*, 179 B.R. 33, 37 (S.D.N.Y. 1995) (discussing that section 365 does not include "restrictions as to the manner in which the court can approve rejection.").

29. The balance of equities favors the relief requested herein. Without a retroactive date of rejection, the Debtors could incur unnecessary administrative expenses for the Rejected Agreements that, as described above, provide no benefit to the Debtors' estates. *See* 11 U.S.C. § 365. Moreover, the non-debtor counterparties under the Rejected Agreements will not be unduly prejudiced if the rejection is deemed retroactively effective. As set forth in the Settlement Agreement between LSD and Elektron, the Parties have agreed to terminate the Hosting Agreements on the earlier of July 10, 2026 and the date of a sale of LSD's assets pursuant to Section 363 of the Bankruptcy Code. Contemporaneously with the filing of this Motion, the Debtors will cause notice of this Motion to be served on the relevant parties-in-interest, including Elektron, thereby allowing each party-in-interest sufficient opportunity to respond. The Debtors have sought the relief requested at the earliest practicable moment in these Chapter 11 Cases and do not seek to reject the Rejected Agreements retroactively due to any delay on their own part.

30. Courts in the Third Circuit have approved relief similar to that requested herein. *See, e.g.*, *In re First Guaranty Mortgage Corp., et al.*, No. 22-10584 (CTG) (Bankr. D. Del. Aug. 23, 2022) (authorizing rejection of unexpired leases effective as of the petition date); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Oct. 28, 2019) (same); *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. Sep. 19, 2019) (authorizing rejection of unexpired leases and executory contracts effective as of the prior notice date); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 28, 2019) (authorizing debtors' rejection of certain license agreements effective as of the prior notice date); *In re Charming Charlie Holdings Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 10, 2018) (authorizing rejection of unexpired leases effective as of the prior notice date).

31. Accordingly, the Debtors respectfully submit that it is fair and equitable for the Court to authorize, but not direct, rejection of the Rejected Agreements (effective as of the Petition Date) identified on **Schedule 1** annexed hereto.

## RESERVATION OF RIGHTS

32. Nothing contained in this Motion or any order granting the relief requested in this Motion, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (c) a promise or requirement to pay any particular claim; (d) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365

of the Bankruptcy Code; (e) an admission that a contract is an executory contract under section 365 of the Bankruptcy Code or that such contract was or was not terminated or expired prior to the Petition Date; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates, and the Debtors expressly reserve their right to contest the extent, validity, or perfection or seek avoidance of all such liens; (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest to dispute any claim on any grounds or to assert any right against any person or entity under the Bankruptcy Code or any other applicable law; or (h) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

33. The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## WAIVER OF MEMORANDUM OF LAW

34. The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

## NO PRIOR REQUEST

35. No prior motion for the relief requested herein has been made to this or any other court.

## NOTICE

36. Pursuant to Local Rule 9013-5(f), notice of this Motion will be provided to the following parties: (i) the Office of the United States Trustee for the District of New Jersey; (ii) any statutory committee appointed in these Cases; (iii) counsel to Elektron; (iv) Debtors' consolidated list of 30 largest unsecured creditors; (v) the Internal Revenue Service; (vi) the United States Attorney's Office for the District of New Jersey; (vii) counsel for the Stalking Horse Purchasers; and (viii) any other party entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013-5. The Debtors submit that such notice is sufficient, and no other or further notice need be provided.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form submitted herewith, authorizing the Debtors to reject the Rejected Agreements as identified on **Schedule 1**, effective as of the Petition Date, approving the Settlement Agreement, and granting such other and further relief as the Court deems just and proper.

[*Space intentionally left blank*]

Dated: July 23, 2026

**ARCHER & GREINER, P.C.**

*/s/ Stephen M. Packman*
Stephen M. Packman, Esq.
Douglas G. Leney, Esq.
Natasha M. Songonuga, Esq.
Alexander J. Andrews, Esq.[4]
1025 Laurel Oak Road
Voorhees, NJ 08043
Telephone: (856) 795-2121
Facsimile: (856) 795-0574
Email: spackman@archerlaw.com
dleney@archerlaw.com
nsongonuga@archerlaw.com
aandrews@archerlaw.com

*Proposed Counsel to the Debtors*

[4] *Pro Hac Vice* admission pending.

**Schedule 1**
**(Rejected Agreements)**

| Non-Debtor Party | Agreement Title |
|---|---|
| Actinide-89-103-Systems LLC | Hosting Agreement dated March 24, 2025 between LSD and Actinide as from time to time amended, modified, or supplemented |
| Actinide-89-103-Systems LLC | Hosting Agreement dated April 22, 2025 between LSD and Actinide as from time to time amended, modified, or supplemented |
| Seaborgium-106 Systems LLC | Hosting Agreement dated April 21, 2025 between LSD and Seaborgium as from time to time amended, modified, or supplemented |
| Seaborgium-106 Systems LLC | Hosting Agreement dated August 20, 2025 between LSD and Seaborgium as from time to time amended, modified, or supplemented |