**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW JERSEY

IN RE: POOLIN TECHNOLOGY PTE. LTD., et al.,

Debtors.

Chapter 11

Case No. 26-18325 (EJO)

Judge: Eamonn J. O'Hagan

* * * * * * * * * * * * * * *

THE BIDDING PROCEDURES were taken stenographically by Shannon P. Yost and Alan Peacock, Certified Court Reporters, via Zoom on the 10th day of September, 2026, commencing at 10:00 a.m., EST.

* * * * * * * * * * * * * * *

APPEARANCES:
Michael DuFrayne
Stephen Packman
John Magliano
Julia Jiang
Douglas Leney
Alexander Andrews
Bradford Sandler
Robert Feinstein
Shirley Cho
Jason Rosell
Kenneth Ehrler
Jack Sitts
Alec Amar
Chang Oichen
Amy Huber
Qi Su
Yuang Song
Zhang HongXing
Asher Genoot
Jimmy Martini
Michael Perez
Patrick Dussol
Greg Irwin
Kathy Zang
Kevin Pam
Jack Battersby
Robert Montejo
Wayne Morris
Natasha Songonuga
Tim
Greg Behrman
Raj
Christian Flocos
Jake Gordon
Steven Jones
Andrew Dunlap
Sam Sapnar
Brad Whitehead
Megan Young-John
Illana Volkov
Steven Cohen
R.E. Grossman
Pei-Hsuan Chiu



MR. PACKMAN: Good morning. Good morning, committee members. My name is Steve Packman from Archer & Greiner. We're here today for the auction in the Poolin case before Judge O'Hagan, United States Bankruptcy Court.
Oh, is the court reporter recording? I'm sorry.
THE COURT REPORTER: Yes.
MR. PACKMAN: Okay. Did you get all that, or should I start again?
THE COURT REPORTER: I got it.
MR. PACKMAN: We're here in the Poolin bankruptcy, Chapter 11, proceedings, United States Bankruptcy Court, New Jersey, for the auction, Case Number 26-18325. We're here for the auction of what we are referring to as the Pyote assets and the Tarbush assets of the Lonestar debtors pursuant to a bid-procedures order that was entered by the Court on August 17, 2026.
So the way we're going to do this, just to make sure we have everybody, is I have an attendance list that I'm going to go through. Hopefully everybody's here, but if you notice



somebody on your team's not here, you can let us know.
So, first, we have DigiPower. A lot of counsel is here, and we should have online Alex Amar.
UNIDENTIFIED SPEAKER: Alec.
MR. PACKMAN: Oh, I'm sorry. Alec.
MR. AMAR: I'm here.
MR. PACKMAN: Okay. Then we have the unsecured creditors committee members. We have five names: Chang Qichen -- I'm going to mispronounce all of these. I'm sorry. I apologize. Hua Ruo Ping -- Hua Ruo Ping.
MR. SU: He's not available.
MR. PACKMAN: Qi Su.
MR. SU: Yeah, I'm here.
MR. PACKMAN: Yuan Song. Mr. Song?
MR. SONG: Yeah.
MR. PACKMAN: And Zhang HongXing.
MR. HONGXING: Yes, here.
MR. PACKMAN: Okay. Anyone else for -- any other members?
(No response.)
MR. PACKMAN: Hut8, we have Asher Genoot.



UNIDENTIFIED SPEAKER: Genoot.
MR. PACKMAN: Genoot.
UNIDENTIFIED SPEAKER: I don't think --
(Unreportable crosstalk.)
UNIDENTIFIED SPEAKER: -- at this time, but we expect him.
MR. PACKMAN: All right. Let us know if he joins, please.
Jimmy Martini.
MR. MARTINI: Here. I also have Michael Perez in the room on this call with me.
MR. PACKMAN: Got it.
Patrick --
Thank you. Sorry.
Patrick Dussol.
MR. IRWIN: I don't believe he's on either, but he may join. I will let you know if he does.
MR. PACKMAN: Okay. And Mr. Carty is here. And Greg Irwin is --
MR. IRWIN: Yeah, Greg Irwin. Yep.
UNIDENTIFIED SPEAKER: Greg Irwin is counseling.
MR. PACKMAN: No. He's --
MR. IRWIN: I'm Hut8.

UNIDENTIFIED SPEAKER: Oh, a business?
MR. IRWIN: Yep.
MR. PACKMAN: Okay. We have our Stalking Horse Thor Calap. Greg Behrman.
MR. BEHRMAN: Here with Raj in the room.
MR. PACKMAN: Okay. Is Christian on?
MR. FLOCOS: Yes, I'm here.
MR. PACKMAN: Christian Flocos. Jack Sitts?
MR. BEHRMAN: No. He -- he will probably not be on.
MR. PACKMAN: Okay. Giga Energy. We have Jake Gordon here as counsel, and Steven Jones, counsel as well, from Foley should be on.
MR. JONES: Yeah, I'm online. Thank you.
MR. PACKMAN: And then we have Brandon Martin.
UNIDENTIFIED SPEAKER: No, we don't.
MR. PACKMAN: No? He's not joining?
UNIDENTIFIED SPEAKER: He's not going to join.
MR. PACKMAN: Okay. Andrew Dunlap.
UNIDENTIFIED SPEAKER: He is on the



line.
MR. PACKMAN: Brad Whitehead.
MR. JONES: He will not be joining. Sam Sapnar will be joining in his place, and he is on the line.
MR. PACKMAN: Spell that, please. S-A-P-N-A-R?
UNIDENTIFIED SPEAKER: Yeah.
MR. PACKMAN: All right. Sam Sapnar. Pachulski. Counsel for the committee: Brad Sandler.
UNIDENTIFIED SPEAKER: He's here. I see him.
UNIDENTIFIED SPEAKER: Me, too.
MR. PACKMAN: Shirley Cho.
MS. CHO: Yes, I'm here. Morning.
MR. PACKMAN: Morning.
Robert Feinstein.
MR. FEINSTEIN: I'm here.
MR. PACKMAN: Jason Rosell.
MR. ROSELL: Present.
MR. PACKMAN: Anyone else?
UNIDENTIFIED SPEAKER: Tim (unintelligible).
UNIDENTIFIED SPEAKER: Well, that would



be --
UNIDENTIFIED SPEAKER: Oh, we have him assigned to the Chelsea room?
UNIDENTIFIED SPEAKER: No. He's on his way, we think. Why don't we just do him -- why don't you guys just introduce yourselves, please. For some reason, I ran out of room.
UNIDENTIFIED SPEAKER: Jack --
MS. JIANG: Julia Jiang.
MR. PACKMAN: How do you spell your last name?
MS. JIANG: J-I-A-N-G.
THE COURT REPORTER: I'm sorry. I didn't hear them, what they said their names --
UNIDENTIFIED SPEAKER: Can you repeat that?
MR. PACKMAN: Sure. For M3, the financial advisors: John Magliano, M-A-G-L-I-A-N-O -- excuse me -- and Julia Jiang, J-I-A-N-G.
MR. EHRLER: Ken Ehrler, M3. I'm not going to be able to make it there in person, so I'm on the Zoom. E-H-R-L-E-R. Thank you.
MR. PACKMAN: So we should assign you to



a room, Ken.
UNIDENTIFIED SPEAKER: I have him assigned to the Chelsea room.
(Unreportable crosstalk.)
MR. PACKMAN: Brad, do you care if Ken's in your room?
MR. SANDLER: No, no, no. That's totally fine.
(A DISCUSSION WAS HELD OFF THE RECORD.)
UNIDENTIFIED SPEAKER: We have one more member in the waiting room.
MR. PACKMAN: Is that Brad Whitehead?
UNIDENTIFIED SPEAKER: Yes. He's got two instances open. I'm just going to assign both.
MR. PACKMAN: Yeah. Okay. So we have Mike DuFrayne, our debtor CRO and auctioneer today. Mike, you here?
MR. DUFRAYNE: I'm here.
MR. PACKMAN: Good. Are you ready to roll?
MR. DUFRAYNE: I made it.
MR. PACKMAN: All right. We have Archer & Greiner people in addition to Steve Packman, P-A-C-K-M-A-N, live. We have Doug

Page 10

Leney, L-E-N-E-Y, and Alex Andrews, and online, we have Natasha Songonuga, S-O-N-G-O-N-U-G-A. Tasha's here. I see her. And Amy Huber, H-U-B-E-R. Amy?

MS. HUBER: I'm here.

MR. PACKMAN: Amy's our paralegal working on this case.

Is there anybody I did not call that's on the Zoom feed?

MS. YOUNG-JOHN: Hey. Good morning. This is Megan Young-John from DBR Land, LLC observing.

MR. PACKMAN: Okay. Good morning.

MS. YOUNG-JOHN: Good morning.

MR. PACKMAN: Yeah. We agreed to permit DBR's counsel to be an observer today based on some interest that some of the bidders had in the -- in talking to DBR about a landing spot, let's just say, potential landing spot.

MR. COHEN: Steve, it's Steven Cohen. Just making sure you have my appearance for Thor.

MR. PACKMAN: Oh, Steven Cohen -- I'm sorry -- counsel for Thor. I apologize.

Page 11

Anyone else?

(No response.)

MR. PACKMAN: So we do have a court reporter here today who's going to transcribe. We're not -- we're not recording video of this, but we will have a transcript. And we're going to -- this is going to be -- after the analysis, Mike's going to read the rules in addition to the procedures set forth in the bid procedures order. We're going to start with the Pyote assets. This is going to be a continuing bid auction for each set of assets. We are not going to take breaks between each bid unless a bidder asks for a break and wants to go discuss, you know, whatever it is about the last bid and potentially the next bid with their clients. So with that --

MR. LENEY: And do you want me to put the number in the chat?

MR. PACKMAN: Oh, yeah. Why don't you do that.

MR. LENEY: I'm going to put my cell number in the chat. If, at any point, we go to breakout and the party that requested

Page 12

breakout is finished, we will have, obviously, no way of knowing, so please text the number that you'll see in the chat. Just text that you're ready to come out of breakout, and I'll bring everyone back. Okay? It will be my cell phone number. It's 856-296-8185. Thank you.

MR. PACKMAN: So let me, again, introduce Michael DuFrayne. He's going to be conducting the auction today. He is going to read some announcements about the auction today, some procedures and rules that we think will work today.

Since most of the bidders are online, if you have -- if there is a glitch, okay, the best thing to do is to start by texting Doug Leney at the number he just gave you. Okay? We'll try to get you back on. We'll try to fix whatever's going on.

Mike.

MR. DUFRAYNE: Good morning. Mike DuFrayne. I'm the CRO of debtor -- or debtors and today's approved auctioneer. We're going to cover a few comments before just to make sure we're clear on them.

Page 13

So this is the auction of the bankruptcy assets of the debtors Lonestar Dream and Lonestar Taproot in connection with the Chapter 11 bankruptcy proceedings of Poolin Technology PTE Limited and associated debtors pending in the United States Bankruptcy Court for the District of New Jersey, Case Number 26-18325, Judge Eamonn J. O'Hagan presiding.

UNIDENTIFIED SPEAKER: Go a little bit slower for her since --

MR. DUFRAYNE: By submitting a bid, all bidders agree, without condition, to the bid procedures order and bid procedures approved by the bankruptcy court on August 17, 2026 and to these rules and announcements. This auction is being memorialized in a transcript taken by -- being taken by Golkow Court Reporters. We have taken an attendance sheet prior to the commencement of today's auction. Anyone joining the auction after it starts must identify themselves to me so that we can add you to the attendance sheet. The auction will proceed today until completed by -- until completed, but the debtors, in good consultation with the committee, reserve the

Page 14

right to adjourn or continue the auction as they may determine.

A few procedures: The auction will be conducted on an open, continuing, next-highest-bid basis until bidding has been completed and the highest bid and next-highest backup bid have been confirmed by the offering bidders and accepted by the debtors in consultation with the committee. Once a bid has been submitted and accepted, it is irrevocable.

Each party -- each party bidding must designate one person to bid and only that person shall be permitted to make a bid for that party. All bids must be presented verbally. There will be no sealed bids, written bids, silent bids, or other private bidding. The debtors and the committee have the right, at any time, to ask for clarification of a bid.

Breaks will be taken during the auction by announcement. In the event the debtors' committee or any bidder requests a pause in the auction, they shall do so by request to the auctioneer and state why the pause is

Page 15

needed.

All bid parties, the debtors' committee have their own private online breakout rooms. This is an online auction, and as such, each bidder representative shall, with each successive bid, identify themselves and the name of the bidder they are offering the bid on behalf of prior to making a bid.

If anyone has technical difficulties, please let the auctioneer know immediately so that Archer can address the issue.

Archer will track and memorialize each successor bid for the auctioneer. The winning bidder must deposit with Archer or other designated depository 5 percent of the total bid amount with credit received for its prior deposit amount in accordance to the bid procedures. All bidders, including the prevailing bidders and backup bidders, agree to execute all required documentation in furtherance of their bids today and as may be required by the debtors or Court in order to bid today and obtain confirmation and approval of their bid today at the sale hearing and furtherance of closing on the bid

Page 16

transaction.

The debtors, in consultation with the committee, reserve the right to review APAs, exhibits, supporting submissions, markups, and other related documents to a prior bid -- to a bid prior to permitting bidding today in conjunction with confirming and accepting any bid as a highest and best-offer or a backup bid.

First, Pyote assets will be offered for sale consisting of the purchased assets as defined in the prior APA. Next, the Tarbush assets will be offered for sale consisting of the purchase assets as defined in the Tarbush APA, as amended by the first amendment. All bidders on Tarbush confirm by bidding that they agree to the first amendment to the Tarbush APA and the attached indemnity agreement without qualification.

Next, the Pyote and Tarbush assets will be offered on a combined basis to bidders who qualified the bid on both sets of assets. The baseline bid for Pyote assets is $16 million. The baseline bid for the Tarbush assets is $46 million. Bidding on

Page 17

Pyote assets will start at $16,250,000, and subsequent overbids must exceed the existing accepted bid by no less than $250,000 per bid. Bidding on the Tarbush assets will start at $46,500,000, and subsequent overbids must exceed the existing bid by no less than $500,000 per bid.

All bids must be in cash and in U.S. dollars unless otherwise stated. Noncash bid components or conditional bids may be considered at the discretion of the debtors in consultation with the committee. The value of noncash bid component or conditional bids must be fully explained by the bidder to the auctioneer so that the debtors' committee and other bidders have the opportunity to understand and evaluate that component of the bid.

We're going to take a break for a moment. I need to speak to Mr. Packman that we have -- we have all the required documentation from each bidder to allow bidding to commence.

MR. PACKMAN: Yeah. So I just want to confirm that all of the bidders here today --

I believe there's five because we have three bidders who are bidding on multiple assets -- have sent us the signed escrow agreements. Is there anybody who hasn't sent those signed escrow? I believe we have all of them.

UNIDENTIFIED SPEAKER: I don't think you have our signatures yet, but we're going to get those.

MR. PACKMAN: Okay. That's Hut8?

UNIDENTIFIED SPEAKER: Yes.

MR. PACKMAN: So Hut8 agrees to sign the documents?

UNIDENTIFIED SPEAKER: Yes, yes.

MR. PACKMAN: Okay. We have everyone's deposits, and what we intend to do with the deposits -- they're not an interest-bearing, but they will go into interest bearing if you're the successful bidder or the backup bidder because the other deposits have to be returned within, I think, five days or something like that.

As far as the APAs, we -- the APA dialogue with most of you went pretty late last night. And there are revised APAs that I have received from most of the bidders, and



we have gone through them. I'm not going to delay the auction now unless there's an objection from anyone to get started with the bidding. However, the debtors and the committee, as Mike said, reserve the right to go through the markups before we confirm a bid as an accepted bid or a backup bid. Are there any objections to that?

MR. COHEN: I have a potential objection. I have a question. Steven Cohen for Thor. In order to competitively bid, we need to know, at least in some fashion, how the proposed revised APAs deviate from the Stalking Horse APAs. So I'll leave it to you how you want to handle that, but it will be difficult to make --

MR. PACKMAN: You mean other than --

MR. COHEN: -- without knowing what conditions exist and what conditions have been removed from the APA, which is the Stalking Horse APAs.

MR. PACKMAN: Well, Steven, I understand that, but we're bidding on dollars. I mean, we're bidding cash. So I think we'll just go as -- we'll see who is the highest bidder



cashwise on each set of assets, and then we'll turn to the APAs. Otherwise, we're going to be waiting -- I mean, it will take at least an hour to go through all these with you, some of which came in this morning.

MR. COHEN: No, I --

MR. PACKMAN: If you want to delay the auction, we'll do that, but it's going to take about an hour.

MR. COHEN: No, I don't want to delay the auction. I'm just looking for -- making sure we're dealing with a complete set of facts when we make competing bids. So if conditions don't exist or have been added from other competitive bids, we need to make sense of that.

MR. PACKMAN: You will get that sense. We fully intend to go back to Thor with certain revisions that are not typos or whatnot. We are going to do that. If you want to do that now, then we'll take a break, and we'll spend as long as you need to do that. It's just going to delay the start of the auction.

MR. COHEN: No, Steve. I just wanted to



make sure we had -- Thor had ample time to make competitive additional bids based upon the disclosures of what those changes look like to the APAs.

MR. PACKMAN: We'll have that time.

MR. COHEN: Okay. That's fine.

MR. PACKMAN: Unless anybody objects to that procedure. Please let me know now because I'd prefer to get started.

(No response.)

MS. VOLKOV: So this is Ilana Volkov for DigiPower. I have what may be potentially two questions. One is, exactly how is the bidding going to work on Pyote? Are you going to go to each individual bidder, like around a virtual table, or how would -- would you just explain how that's going to work?

MR. PACKMAN: So it's an open bid. Everybody will be on the line. They'll --

UNIDENTIFIED SPEAKER: Let me explain. So the starting bid is 16,250,000. Whoever voices the next topping bid, that's the next top bid.

MS. VOLKOV: But is the bidder who is not accepting the next highest bid still in

Page 22

the auction or out?
MR. PACKMAN: Oh, I see what you're saying. So in other words, if, on Pyote, there's a bidder who doesn't agree to the 16,250-, if they don't make a higher bid, they're out.
MS. VOLKOV: But do they have to agree to the 16,250-?
MR. PACKMAN: To stay in, sure.
MS. VOLKOV: Yeah. Do they have to agree to 16,5- to stay in?
MR. PACKMAN: Well, sure. If they're not bidding higher, yes.
MS. VOLKOV: So my -- again, my question is, does each individual bidder who is bidding on Pyote have to agree to the next subsequent bid that's made by another bidder?
MR. PACKMAN: Yes.
MS. VOLKOV: Okay. That's my --
UNIDENTIFIED SPEAKER: So you're going to ask each party -- I think we're going to have to as opposed to just going round and round.
MS. VOLKOV: Okay. So that's helpful. Secondly, of the four qualified bidders on

Page 23

Pyote besides Thor, who is the Stalking Horse, who else is bidding on Tarbush?
MR. PACKMAN: Tarbush? We have Hut8, Fluidstack, and Thor.
MS. VOLKOV: Okay. So just Hut8 is the only other qualified bidder besides Thor who's bidding on both.
MR. PACKMAN: Fluidstack is not bidding on Pyote. Do you have an issue with them sitting in on Pyote?
MS. VOLKOV: No.
UNIDENTIFIED SPEAKER: I mean, they don't have to.
MS. VOLKOV: No. I just wanted to get -- so it's basically just two bidders who are bidding on both assets?
MR. PACKMAN: Correct.
MS. VOLKOV: All right. And so my question, then, becomes -- because I think you said that, first, you're going to do Pyote, then you're going to do Tarbush, and then you're going to aggregate. You're going to aggregate between Thor and --
MR. PACKMAN: Correct. They bid on both, so they can bid on both. They're

Page 24

qualified to bid on both.
MS. VOLKOV: And are you starting with the -- is the minimum bid on both going to be the aggregate of Pyote and Tarbush following the auction?
MR. PACKMAN: Yes.
MS. VOLKOV: Okay. And so what if it turns out that based on that aggregate bid, the Pyote bidders want to bid more than, perhaps -- perhaps want to bid more to --
UNIDENTIFIED SPEAKER: Wait. I'm sorry. To be clear, you're saying that we could win this initial Pyote auction and not ultimately be the winner for the Pyote assets. We are offering the assets on all the bidders who want those assets, yes. Correct.
MS. VOLKOV: I mean, that's a little bit problematic to be honest with you.
UNIDENTIFIED SPEAKER: Because we've been -- we've been -- we were told that there was no benefit to purchasing both sets of assets together.
UNIDENTIFIED SPEAKER: Who told you that?
UNIDENTIFIED SPEAKER: I never said

Page 25

that.
UNIDENTIFIED SPEAKER: So now we're saying we could have the highest bid on Pyote assets --
UNIDENTIFIED SPEAKER: Right. You bid the highest bid that your client wants to bid.
UNIDENTIFIED SPEAKER: So you have another bid -- you have another auction at the end that also includes the Pyote assets?
MR. PACKMAN: Correct. I mean, auctioneers do this all the time. They take bids on the whole, or they take separate bids. It's done all the time. Now, if you want the opportunity to come back in and bid higher, then I have to discuss that with the debtors and the committee, which I'm happy to do.
UNIDENTIFIED SPEAKER: So we're not a qualified bidder on Tarbush?
UNIDENTIFIED SPEAKER: Correct.
UNIDENTIFIED SPEAKER: So we can't do anything. If someone comes in --
UNIDENTIFIED SPEAKER: You could bid higher on Pyote.

Page 26

UNIDENTIFIED SPEAKER: Allocate their purchase price, that is a person at the end --

UNIDENTIFIED SPEAKER: They have allocated a purchase price.

(Unreportable crosstalk.)

MS. VOLKOV: It a little bit doesn't make sense because you have the two bidders who are doing both, bidding on both -- bidding on both assets. And so it seems to me that the aggregate is going to be essentially self-evident at the end of each -- at the end of the auction for each asset. So just by way of example, let's say, you know, Thor bidded 17 million for Pyote and 50 million, whatever it is, for Tarbush, that should be their final bid. And if Hut bids 18 million and 51 million, that should be their final bid. I understand that, you know, it does happen all the time very frequently when you do it like that, but, you know, oftentimes it happens, let's say, on, like, lease packages or -- it doesn't really -- these are two very discreet assets, and so it's unfair, I think -- I don't know

Page 27

your name. I apologize.

MR. GORDON: Jake Gordon from Foley & Lardner.

MS. VOLKOV: Jake agrees that it's not fair to the Pyote bidders who, you know, are going to be bidding just on the Pyote assets to then -- to then say, okay, now, Thor and Hut, you have a second bite at the apple. I mean, it's really giving them a --

MR. GORDON: I understand what you're saying.

MS. VOLKOV: So it's not fair.

UNIDENTIFIED SPEAKER: It's not fair, and it doesn't make sense from a value-maximizing perspective. Why wouldn't you want both parties to bid -- both the parties who are bidding on both sets of assets to bid their highest amount on the Pyote and their highest amount on the --

UNIDENTIFIED SPEAKER: Well, we're going to take a break, and we're going to -- the debtors are going to discuss this with the committee. But I could give you an example of why that would be.

UNIDENTIFIED SPEAKER: Okay. What would

Page 28

that example be?

UNIDENTIFIED SPEAKER: Well, if I have 70 million from Hut8 and I have 70 million from Thor, I may rather have one buyer for those assets. That may be a better value to the estate than an individual.

UNIDENTIFIED SPEAKER: So they should be willing to meet our highest bid on Pyote.

MR. PACKMAN: So we're going to take a break, and we'll talk about it. Okay?

MS. VOLKOV: Okay. The only other thing, Steve, that I would add is that you have two separate asset purchase agreements. Again, when you have this situation where you're, like, you know, allowing bidders separately to bid together, it's usually -- usually, you have one asset purchase agreement, which is the Stalking Horse, which, let's say, has ten leases on it. Right? And then I come in and I want to buy five; Jake comes in, wants to buy the other six. So if you're aggregating --

MR. PACKMAN: I'm not saying that -- I'm not saying that I don't understand what you guys -- I've got to talk to other people

Page 29

about it. You don't have to make further points. I get it.

MS. VOLKOV: Okay. Thank you.

MR. PACKMAN: And then we'll come back to you. I promise.

MS. VOLKOV: Okay. So we go into --

UNIDENTIFIED SPEAKER: We go in the break rooms.

MS. VOLKOV: Okay. So we go into our break rooms? You're going to stay --

MR. PACKMAN: I need to talk to the committee first.

MS. VOLKOV: So how do we know when we should come back?

MR. PACKMAN: We'll come and get you. Thank you.

UNIDENTIFIED SPEAKER: One more before we break out. Who is R.E. Grossman, appearing to be from Wayne Morris', trying to enter?

UNIDENTIFIED SPEAKER: He's with Fluidstock.

UNIDENTIFIED SPEAKER: Thank you. Thank you so much.

MR. COHEN: Steven, Steve Cohen. Can

Page 30

you hear me? Just going forward, I think whoever is speaking should announce who they are and who they are speaking on behalf of. It's hard to follow online a lot of people speaking.

(A RECESS WAS HELD.)

MR. PACKMAN: Sorry for the delay, and thanks for the input from everyone. It was helpful to have this discourse so that we didn't have to do this in the middle of the auction. So the debtors have decided -- here's what we're going to do. We are going to start with bidding in the aggregate. We have two bidders, Hut8 and Thor, who are aggregate bidders. We are going to allow them to bid separately to the debtors and the committee, and we are going to do that successively. It's not going to be open bidding for everybody. The reason for that is that there are different -- we understand there's going to be different components of these bids. And then we're going to come back at the end, and we're going to let the lot bidders know. When I say lot bidders, let Pyote and Tarbush know exactly what the

Page 31

allocation is, including whether it's dollars or non-dollars, and then you'll have a chance to bid on your lot. The aggregate bidders will have the chance to bid on those lots as well but not in the aggregate again. That's it.

UNIDENTIFIED SPEAKER: Will you allow us to stay in here for the aggregate bid?

MR. PACKMAN: No. In other words, Thor won't be in here for Hut8's, and we're going to go back and forth. I apologize. It may take a little bit of time, but we are going to hear their bids at the end.

(Unreportable crosstalk.)

UNIDENTIFIED SPEAKER: I don't think that's going to work. I think that the aggregate bidder's preference is to not do that.

UNIDENTIFIED SPEAKER: Steve, we now have sort of the reverse of the issue. We had the lot bidders, which is that we could have the aggregate bidding. We could have a top aggregate bid. You could then go to the lot bidders and they could aggregate to a higher amount than our aggregate bid, but we

Page 32

actually would be willing to top that.

UNIDENTIFIED SPEAKER: And you have a chance in a joint --

(Unreportable crosstalk.)

UNIDENTIFIED SPEAKER: They wanted a chance. They wanted a chance after.

UNIDENTIFIED SPEAKER: Not as an --

MS. VOLKOV: Correct.

UNIDENTIFIED SPEAKER: So you have to win on each individual one.

UNIDENTIFIED SPEAKER: Why wouldn't you just do it by lot?

UNIDENTIFIED SPEAKER: The two -- the two asset -- I'm sorry.

(Unreportable crosstalk.)

UNIDENTIFIED SPEAKER: Assets are discreet enough. They're not interdependent on one.

UNIDENTIFIED SPEAKER: Well, to you, they're not, but to other bidders, they may be.

MR. PACKMAN: So let me put it to you this way, because I think that's how we're going to do it. If you come back lotwise and your bid's a dollar lower, that doesn't mean

Page 33

that we are not going to consider it at the aggregate if it's a dollar lower.

UNIDENTIFIED SPEAKER: Sorry. Can you clarify what you mean by that?

MR. PACKMAN: So, hypothetically, okay, the highest bid for -- for Pyote is a hundred bucks, theirs is 99, but they bid in the aggregate. We get to make the decision what's the highest and best offer.

UNIDENTIFIED SPEAKER: So are you going to put a --

MR. PACKMAN: Otherwise, you have to let them bid.

UNIDENTIFIED SPEAKER: Are you going to put a -- are you going to put a -- are you going to tell the lot bidders how much value you're putting on -- they get stacked on top of their lot bids? Maybe he's willing to up his bid. Maybe he's only down by a dollar. Maybe I --

MR. PACKMAN: That's up to them.

UNIDENTIFIED SPEAKER: But then maybe I can answer a million to keep -- to get the lot.

MR. PACKMAN: You'll have that chance.

That's what I'm saying.
UNIDENTIFIED SPEAKER: So I'll keep having the chance over and over?
MR. PACKMAN: Yeah. We'll just keep going.
UNIDENTIFIED SPEAKER: Okay.
MR. PACKMAN: We'll keep going, but your point was, Jake, will the aggregate bidders get the bid after the lot bidding.
MR. GORDON: Right. That's my point.
MR. PACKMAN: And if they're lower, then what's the point?
UNIDENTIFIED SPEAKER: I agree.
UNIDENTIFIED SPEAKER: Okay. I just want to be -- we may be bidding throughout joint conditional bids based on winning those bids? We're back to the same --
UNIDENTIFIED SPEAKER: But they're bidding on both lots.
MS. VOLKOV: You can't bid on one contingent on the other.
MR. PACKMAN: We're doing them separately, though. They're separate lots. You can run separate lot auction. I just want to be clear. Later in the auction --



after the aggregate bids are done, we may still be bidding on the lots, but our bids may be conditioned on winning both lots. Now, you may say, well, we don't want to offset those bids. That's fine.
UNIDENTIFIED SPEAKER: You guys, you might be a little bit higher on one of the lots, but we're not going to get the sale approved over their objection, the bankruptcy court, if their aggregate is five, 10 million dollars higher.
MR. PACKMAN: I want everybody to be in agreement before we start. Here's what we've got: Aggregates first, then lots. And then what specifically is your issue? You want to bid aggregate again?
UNIDENTIFIED SPEAKER: I want -- the scenario that I see in my head is that we have our best aggregate bid, but then there are two lot bids, separate lots, that aggregate higher than us. I want to be able -- if we want to bid a joint bid on both lots that's subject to conditioned on winning both, I want to be able do that.
UNIDENTIFIED SPEAKER: Do I get to team



up with a Tarbush bidder and bid against you?
MR. PACKMAN: So you don't want to bid individually by lots as it goes along?
UNIDENTIFIED SPEAKER: I may. I want to have the flexibility of doing that.
UNIDENTIFIED SPEAKER: Why don't we work on a joint bid with the Tarbush bidder side?
MS. VOLKOV: Steve, I don't think that works, because it's not -- they're going to potentially artificially inflate the price because every time -- you know, I could say, listen, especially after I know who the successful, you know, package bidder is -- let's say it's a hundred-million dollars, whatever. Okay? And I'm sorry. I don't know who you represent, Thor or --
UNIDENTIFIED SPEAKER: Hut.
MS. VOLKOV: Okay. So they get 50 -- 50 million for each asset, right, and then we come in and we're bidding only for Pyote, and so Hut then comes back and says 51 million but only if I get everything. That artificially inflates the next highest bid. We are not bidding apples to apples.
MR. PACKMAN: No. I understand what you



guys are saying.
MS. VOLKOV: I'm just responding to this -- I'm just responding to counsel and saying that that just completely does not work because it's artificial inflation of your bid for Pyote. We're not bidding in the same apples-to-apples situation in that.
MR. PACKMAN: Okay. But we're going to consider the bid in the aggregate at the end of the day. I'm not going to preclude a higher bid in the aggregate. So the issue that Jake had, which I think you're saying as well, is how long is this going to go on.
UNIDENTIFIED SPEAKER: That's part of it. Do I have to stick around as a backup?
MR. PACKMAN: So at some point -- at some point, we have to end the bidding. And I understand what you're saying, but I guess I'm having trouble getting there in the aggregate after the lots are bid on, because you get a chance to bid on both lots.
MS. VOLKOV: Why are you even doing bulk bidding? I mean, why? That makes no sense.
MR. PACKMAN: But we're going to do that.

UNIDENTIFIED SPEAKER: I can't wrap my head around why.
MR. PACKMAN: Look, if you don't want to -- if your clients don't want to bid, they don't have to.
MS. VOLKOV: No, no, no. They do, obviously.
MR. PACKMAN: We're going to start with bidding in the aggregate with those two bidders, okay, those two bidders.
UNIDENTIFIED SPEAKER: Fluidstock would also like the right to bid in the aggregate.
MS. VOLKOV: Who?
UNIDENTIFIED SPEAKER: Fluidstack.
MS. VOLKOV: Why would they -- who's Fluid?
(Unreportable crosstalk.)
UNIDENTIFIED SPEAKER: Are we on the record?
UNIDENTIFIED SPEAKER: I assume so.
UNIDENTIFIED SPEAKER: The court reporter is in the room.
UNIDENTIFIED SPEAKER: Can you ask her to go off, please?
MR. COHEN: Steven Cohen for Thor. I'm



not clear on that last comment. Fluidstock did not submit a joint bid, did it?
UNIDENTIFIED SPEAKER: We did not because we understood that we could bid on the lots in isolation and didn't have to make an aggregate, but we think it would be disadvantageous to our bid on the towers property if we were not able to at least have the right to participate in the bid in the aggregate.
(Unreportable crosstalk.)
UNIDENTIFIED SPEAKER:
MR. GORDON: Let's go off the record for a second.
(A RECESS WAS HELD.)
MR. PACKMAN: We're going to start the bidding. We'll start with you.
MR. GROSSMAN: So my client is precluded from bidding at this step; correct?
MR. PACKMAN: We're bidding in the aggregate between two parties. That's right.
MR. GROSSMAN: He is precluded from bidding on the asset that you're now putting up for sale, the aggregate. I just want the record to be very clear.



MR. PACKMAN: Judge, we have two qualified bidders that submitted bid packages and deposits. Your client has not on both assets. I'm sorry.
MR. GROSSMAN: He is not being permitted to bid; first line in the objection to this process. You guys may win that. You may lose that.
MR. PACKMAN: He's not qualified. He hasn't qualified.
MR. GROSSMAN: You keep saying that. I understand the English language. All you have to do is let him bid. You may end this process quickly with the most money coming in for the creditors. For some reason, you don't want to do that. That can be made very clear and will be made very clear. So all we're going to do is postpone this process. All you've got to do is say, you want a bid; bid and we'll take into consideration.
MR. PACKMAN: That's not fair to the other bidders. He hasn't submitted a bid package.
MR. GROSSMAN: I don't care. You make that argument that it wasn't fair to other



bidders that we precluded a guy who may have put up more money. You go ahead and make that argument.
MR. PACKMAN: Let me ask the -- let me ask the auctioneer CRO. Has Fluidstack been given the opportunity to do due diligence in the data room and bid on both sets of assets?
MR. DUFRAYNE: Yes.
MR. PACKMAN: On both sets of assets?
MR. DUFRAYNE: Yes.
MR. PACKMAN: For how long?
MR. DUFRAYNE: I would have to check.
MR. PACKMAN: Okay. So they had the opportunity to do this. Okay?
MR. GROSSMAN: We've all been through these hearings.
MR. PACKMAN: Judge, we are starting the auction.
MR. GROSSMAN: He potentially is willing to pay more than you're going to get. You don't want to allow him to do that. We've all been through where this comes out. You know where this comes out. You want that fight; you'll get it.
MR. PACKMAN: I'm trying to do my best

here to be as respectful as I can, but in two minutes, I'm going to lose my patience and we're just going to end this conversation rudely.
MR. GROSSMAN: Go ahead. End it.
MR. PACKMAN: Then I'll end it, rudely.
MR. GROSSMAN: Take it up another place.
MR. PACKMAN: Fine.
(A RECESS WAS HELD.)
MR. PACKMAN: Mike, for the court reporter, can you just say the aggregate bid?
MR. DUFRAYNE: The aggregate bid on a cash basis was $55,482,500 for Hut8. So combined higher and published bids.
MR. PACKMAN: Those are the cash-only bids we put in connection with getting qualified. So has Thor rebid on that?
UNIDENTIFIED SPEAKER: No.
UNIDENTIFIED SPEAKER: Okay. Have we done a restructure yet?
MR. PACKMAN: No. But that proposal we put out there is a proposal we put out there, so Thor is now bidding against that.
UNIDENTIFIED SPEAKER: No. We want you to submit your -- we want you to submit your



next bid. You want us to start with Thor?
UNIDENTIFIED SPEAKER: No. We're happy to submit a new bid.
UNIDENTIFIED SPEAKER: Okay. So then we'll submit a revised bid.
(Court Reporter Shannon Yost exited the auction and Alan Peacock resumed reporting duties.)
MR. DUFRAYNE: Before we start, can the court reporter hear?
THE COURT REPORTER: This is Alan. I'm the court reporter now. I can hear, yes.
MR. DUFRAYNE: So we're on the record.
Asher, this is going to be on the record, meaning it will be available to anyone that wants to pull the transcript and read it, including any other bidder.
MR. PACKMAN: The reason we're doing this way, you guys qualify at a certain dollar amount but you want to submit a revised, I take it, starting bid; right?
MR. CARTY: Yeah. We are going to put in a bid that we think is higher than that other bid.
MR. GENOOT: So the combined bid for



both sites, the total aggregate is $80.5 million.
MR. PACKMAN: Okay.
MR. GENOOT: What we have structured is we believe that the current bids across the auction have a contingency for mineral rights. We believe that mineral rights adds a risk to the debtor because if they are unable to receive those, the auction would not have been successful and we would start at the same place.
So if you reduce the risk of mineral rights, we will remove that CP initially for initial payment, and the initial payment up front. Without the CP and mineral rights will be for 34 and a half million dollars.
Regardless of mineral rights or not, partial at the site -- either site -- it doesn't have to have been both -- either one -- there will be an additional payment of $46 million.
The total aggregate is $80.5 million, which I believe is $17.75 million higher than where you guys started off this morning.
MR. DUFRAYNE: With the lot?



MR. PACKMAN: Do you want to start?
MR. DUFRAYNE: Go ahead.
MR. PACKMAN: So when you said without the $34.5 million, that's a guaranteed bid subject to what conditions?
MR. GENOOT: We get the transfer of TNMP Power agreement, right, and then just the clean title.
MR. PACKMAN: Well, there's two different sets of assets. So let's start with --
MR. CARTY: It basically they're conditions except the mineral rights conditions under both EPAs we're going to remove that condition.
MR. PACKMAN: Okay.
MR. GENOOT: The reasoning is because the current case on the site. Holding was using it for bitcoin mining. We have a bitcoin mining business. So we feel comfortable with the continuity of that business line. And we're going to commercialize this site for AI. And so that's why I think we can provide a unique figure. Because we get comfortable with the

Page 46

current situation as is rather than having contingencies with the mineral rights because we need to do the next thing.
And so you guys basically -- If TNMP's power signing and central marking, you guys already have an ability to do that and then title probably. You guys walk out today with a guaranty number on hand with a pretty big number to the ratification of what was raised in the auctions.
MR. PACKMAN: So good service, title and power on both sites transferred. So that assumes -- does it assume the 176 megawatt approval by closing?
MR. GENOOT: Yes. This is not contingent on any remainder of financial relationship.
MR. PACKMAN: All right. One more question before I turn it over to Blake and then Brad. Commercialization of either site, what do you mean by that?
MR. GENOOT: We sign a customer lease onsite.
MR. PACKMAN: Customer -- like posting or whatever it is?

Page 47

MR. GENOOT: Yeah, it's like long-term leases. But, yes. So that's why you need proper authorizations. But, yes.
MR. SANDLER: Let me just ask one question. This is Brad Sandler from Pachulski on behalf of the committee.
In terms of commercializing the sites, over what time period are you talking about?
MR. GENOOT: I think we can do it in sub six months. We commercialize over structural 1.3 gigawatts. And the last commercial attribute was 500-megawatt, from starting to getting the inspection lease. So we have like paper and state of execution there, and the debtors are online. Commercially the site for AI is much more value for us as well, so we want to invest it as quickly as possible. And there's demand in the market today.
I think we're uniquely positioned because this site is located in the central area. The site is smaller, but we also commercialize the site -- true site where people are saying impossible to commercialize, and we commercialize it over

Page 48

huge contracts, so we think we're uniquely positioned to do so. And I think we can get it done in five or six months.
MR. DUFRAYNE: So what is your position with regard to the Lindsey tract? And at the same time, you're going to relocate the substation?
MR. GENOOT: We're going to buy that land, and then we're going to negotiate with the existing land and see if we can buy that as well. But ideally, we can buy it before we do it, but we will walk through it.
MR. DUFRAYNE: So is the approach towards DBR a contingency?
MR. GENOOT: No.
MR. GENOOT: Just so we're on the same page, TNMP at BLK would like to reload the substation on the front unit of that power. That's, I believe, the case already. But the continuity of power is why we're --
MR. DUFRAYNE: What is your allocation between Pyote and Tarbush?
MR. GENOOT: We haven't. Just --
MR. PACKMAN: When we get to the end of this round of negotiations, we have to

Page 49

allocate it because that's how we're doing this.
MR. GENOOT: Right. You have to combine the individual bidders. You can also take the higher and combine it. If it's lower than our bid, then we should be the best and highest; right?
MR. PACKMAN: There's two separate APAs you're going to have allocate.
MR. GENOOT: At the very end, we can aggregate however -- we can have a discussion for allocation.
MR. DUFRAYNE: So the allocation needs to take place prior to opening up the bidding to the lots. It doesn't have to be done this moment.
MR. GENOOT: Right. We will bid on two separate processes. We see them as one combined process. So if we are the highest and best bid, how we allocate those dollars on each lot, you guys can decide. I don't really care. But leases have one combined basically fit process.
MR. DUFRAYNE: So I guess -- so I understand that. And that's fair. The

Page 50

additional bids we have from you -- I know they total $75 million and change. But we do have an allocation. My suggestion would be table that for the moment, and we will go back to -- is there anything else?
MR. DUFRAYNE: So the initial bids, they were at the overbid level on each property. That's how you get to the 55 thing?
MR. CARTY: Right. Got it. Thank you.
MR. PACKMAN: So as its submitted, a similar bid, right -- this one first. Just hang tight.
SPEAKER1: Do you guys have anything before we bring Thor in?
MS. CHO: What was the part about the $34.5 million? I didn't quite hear that.
MR. DUFRAYNE: He offered $80.5 million, broken down to two payments. The first payment is $34.5 million. And then the second payment is when they commercialize a customer. So that could be -- I mean, he's saying six months but --
UNIDENTIFIED VOICE: You're also waiving mineral rights, so we have to deal with all of that.

Page 51

MR. FEINSTEIN: Is there an end date by which they have to commercialize it? And if they don't commercialize it by that date, is it fair to say they don't owe anything else? They can keep the property and don't pay the estate anymore?
I mean, I was wondering whether the liquidated damages clause -- if they don't develop the property, they have to pay the estate some modest amount, not $50 million, but something to keep them honest, if nothing else.
MR. MAGLIANO: We're even setting up along the way intermediate steps, so you're getting some of that up front.
UNIDENTIFIED VOICE: This is on Thor?
MR. SANDLER: They can wait until six months and one day and they saved themselves $46 million. Is Thor here?
MR. BEHRMAN: Hey, everybody. We're here.
MR. DUFRAYNE: For the court reporter, we're going in to Thor now. Their initial bid was $52,750,000 on a combined basis.
UNIDENTIFIED VOICE: Jack just joined

Page 52

the Zoom.
MR. PACKMAN: Okay. To start, we have a revised bid from Hut8. Like why don't you let the Thor people know their aggregate's revised bid so that we can then talk intelligently with Thor.
MR. DUFRAYNE: Hut8's revised bid is $80,500,000 combined.
MR. PACKMAN: I think you need to break it down.
MR. DUFRAYNE: Okay. The components to that, the initial payment of $34.5 million and then a $46 million payment when commercialized. The commercialization means when a tenant goes live. It will be a clean title with respect to the --
MR. PACKMAN: Mineral rights are waived. And transfer amounts, those are contingencies.
MR. COHEN: I'm sorry. You have to repeat that.
MR. DUFRAYNE: Okay. So it's at $80.5 million combined bid.
MR. COHEN: Eight zero? 80.5?
MR. DUFRAYNE: 80 point five hundred

Page 53

thousand combined bid.
MR. BEHRMAN: Hold on, guys. I don't think Jack is in here.
Jack's not in here. Let's just take the notes and we can discuss it.
UNIDENTIFIED VOICE: I don't see Jack on the Zoom. Go ahead we will catch him up.
MR. BEHRMAN: So again, $80,500,000 combined bid. The initial payment would be $34.5 million. The second payment would be $46 million based on commercialization. The waiver of the surface rights, mineral rights and surface, are issues.
MR. PACKMAN: Let's make sure we're clear. Waiver of the mineral rights but clean title to the surface on both properties.
MR. COHEN: And then no contingency on DVR.
MR. PACKMAN: So they're taking the Lindsey property. They want to negotiate further with DBR. And I'm presenting it this way, guys -- I'm sorry -- so just hear me out. This is just how we have to do it.
So they may cut a deal with DBR for

Page 54

release of the existing property or buy it or whatever they're going to do. But that is not a contingency of their offer; okay?

Commercialization, we are told, means within a certain time period, which we have yet signified or agreed to, that they will have one contract on either property in the nature of, you know, a hosting agreement or such other paper contract that we, I guess, jointly agreed to.

So basically we're saying we're going to guarantee -- I have to go back to my notes -- $34.5 million in cash, and we haven't allocated it yet. They're going to have to allocate these offers. And they're waiving the -- the mineral issues of both Lindsey and Pyote, and they're offering increases to a total of $80.5 million to either sites commercialized within a time period that we have yet to define or agree.

Did I miss anything?

MR. DUFRAYNE: No.

MR. COHEN: First question. Is that component that uncertain "to be commercialized" component a condition to

Page 55

closing?

MR. PACKMAN: That's a very good point. I don't think they flushed that out sufficiently yet when that has to happen. So I would assume, though, it has to happen --

MR. COHEN: That sounds like -- I'm sorry. That sounds like an incomplete bid. I don't even understand it, so it's difficult to bid against it when there's so much uncertainty with it.

MR. DUFRAYNE: So when we inquire they anticipate being able to commercialize the property within six months. It has to be six months of closing. We will go back and you guys can answer right now.

MR. COHEN: I need to understand what commercialization means. Is there a floor for a payment of a license fee or a rent? What does that mean?

MR. PACKMAN: We will get you the answer right now. Will that help?

MR. COHEN: Somewhat. I can't respond to what I'm hearing.

MR. PACKMAN: I want to make sure we go back and get the information you want so you

Page 56

can respond.

MR. COHEN: Jack, Greg, while we're up talking --

MR. PACKMAN: I just want to confirm. $34.5 initially and 46 at commercialization, so that's $80.5 total?

MR. PACKMAN: We had questions about commercialization as well. I'm fine with, you know, clarifying that.

MR. PACKMAN: Can you admit Jack Sitt and put him in our breakout room?

MR. LENEY: I don't see anyone by that name.

MR. PACKMAN: He's going to try to rejoin now.

MR. LENEY: There he is. Give me one second.

MR. PACKMAN: I still didn't hear specific question as to commercialization. I just want to get a general sense of what exactly you're offering.

MR. EVANS: Roger is going to respond.

UNIDENTIFIED VOICE: Commercialization fees, we need to understand Steve's point is that unlimited, what are the minimum

Page 57

conditions. Yeah. Just so I understand, I get what they're saying. They want a customer/tenant, but it just sounds very open-ended. What other kind of minimum conditions are around that around the time and structural perspective so we can just understand how to process that.

MR. COHEN: Conditions have to include the minimum amount of rent or fee payable to meet the definition of commercialization.

MR. PACKMAN: You do understand that you don't have to -- in other words, that's part of their bid. It doesn't necessarily have to be part yours. But we will have --

MR. EVANS: We just want to understand what their -- we just want to understand that structure because we want to understand how to think about it, like, in our own bed, right? We may or may not do anything with it, frankly, but it will be helpful for us to understand just knowing how it is as we think about it as a counter.

MR. COHEN: We want to understand if that commercialization condition is a condition to closing.

Page 58

MR. PACKMAN: On their end?
MR. COHEN: Yeah.
MR. PACKMAN: They don't know the assets yet.
MR. COHEN: Are they paying 34 and a half million dollars for both assets with a kicker of $46 million if they commercialize it? Is that what the offer is?
MR. PACKMAN: Yes.
MR. COHEN: Okay. So they're closing -- they're offering to close for $34.5 million for both assets with an additional potential kicker; correct?
MR. PACKMAN: Free and clear title, surface only, plus the equipment and the substation.
MR. EVANS: Do they have the same power condition? Are they keeping the power?
MR. PACKMAN: Yes. Generally, it's the same. It's generally the same.
MR. PACKMAN: It's not contingent on an increase in power?
MR. PACKMAN: It's not contingent on an increase in power.
MR. EVANS: Are there conditions about

Page 59

the Lindsey tract purchase from --
MR. PACKMAN: So what -- their additional consideration is that, as to the Lindsey track and Pyote, they will waive any title impediments that have to do with renewal reservations leases or what have you.
MR. EVANS: But other than that, they're keeping the same language?
MR. PACKMAN: Yeah. They want surface title free and clear.
MR. EVANS: All right. We will meet on commercialization, so we will wait for you guys to come back to us.
MR. PACKMAN: Thanks.
(A BRIEF RECESS FOR BREAKOUT ROOMS WAS HELD.)
MR. DUFRAYNE: We would like to get as much background on the notion of commercialization.
MR. GENOOT: How do you want me to start?
MR. DUFRAYNE: So what would be your conditions for commercialization and when?
MR. GENOOT: Yeah. It's pretty simple is we sign a tenant lease for the AI data

Page 60

center for data center with the conditionality on it.
There's two states to this site. Money sites in which the value is not that high, which is it's in the current situation it's in, or it can be become an AI data center and there's things that you have to be done there.
I think we have shown the ability to make that happen across all the sites being commercialized in just this year alone. And so here I think we give the debtor the best of both worlds, the economics up front without any contingencies, without anyone else trying to see if they can make this an AI center, and then, when we do this, we get a lot more money on the back end as well.
MR. DUFRAYNE: Sure. So currently we anticipate November 30 being functioning under the existing conditions. So do you see that as the same time frame for a close?
MR. GENOOT: We could push very quickly. I guess I'm trying to understand where your question is driving towards.
MR. DUFRAYNE: Timing and payments.

Page 61

MR. GENOOT: Yes. I mean -- like, I think if today, for example, we win the bid at the end of the day. I'm going to call four people that I know that have been asking us for capacity. And if there was interest then, sorry, next week we will move very quickly.
UNIDENTIFIED VOICE: Is there a specific size contract that's required?
MR. GENOOT: Zero.
MR. DUFRAYNE: Is there a minimum amount associated with that commercialization?
MR. GENOOT: No.
MR. CARTY: Are you asking if we hit the commercialization target by November 30?
MR. SANDLER: When does the six months end? Because that's what you said before, it would take about six months or maybe less. So when does the six months end? Is it from the date of closing or from the date of the auction?
MR. GENOOT: What you guys want, in my mind, if we put an end date that's better for us, not you, right, I see this as an infinite liability. When we get it commercialized, we

Page 62

have to pay no matter what. I believe that we can get commercialized very quickly. I said six months because we like to overdeliver in everything we do. And so we don't want to start rumors of extrication as well in case -- again, in case something comes up that we have to work through.
This issue is of the mineral rights piece. We think we have a unique way to solve the mineral rights issue if we have other sites in Texas that we're in the process of commercializing right now. And we're sawing through those issues today. And only one part of me is looping these items into that overall of we're doing now, which is why I'm saying -- controlling the speed of how we approach this.
MR. PACKMAN: Let me just see if I can expedite it. So whatever we decide for the closing date, right, be it two weeks or two months, the company makes payment $34 million; right?
MR. GENOOT: Yes.
MR. PACKMAN: Okay. And that's -- that goes to the estate.

Page 63

MR. CARTY: That's ours.
MR. PACKMAN: And then you're going to commercialize a lease or --
MR. CARTY: Yeah. After.
MR. PACKMAN: And what if you don't? What if you just use the property for a golf course? I'm being facetious.
MR. GENOOT: We could put in some kind of language --
MR. CARTY: We can put in a covenant that we use commercially reasonable efforts to commercialize the safe sort of data center within six months of close. Our economic interests are fully aligned to do that.
MR. GENOOT: Part of the language is, like, is it in our interests to commercialize this.
MR. CARTY: That's the most value for us.
MR. EHRLER: For the liability -- so like if year seven or year two, it would still take place. You're just saying you would -- you explain the six-month part?
MR. GENOOT: I'm trying to make this very simple with the least amount of

Page 64

contingencies and hurdles and so forth and make it like -- the more nuances we add, the more unrealistic it feels like we're going to be able to do this. And that's why I said -- if we commercialize one site, we will take the whole thing even if we don't commercialize the other. If we commercialize one site, we won't need those protections.
MR. PACKMAN: If it takes us longer because of these transactional claims of these individuals that appear on the title search, that doesn't affect --
MR. GENOOT: In this structure, like, we could potentially commercialize it even if we didn't figure out the surface rights. Even if we commercialize one, the other one gets paid 12. That's why we treat this as one package.
MR. PACKMAN: So what do we do with the $34 million in the meantime? Because it may take us a bit of time to get clean surface title on Pyote, so what do we do with the $34 million in the meantime?
MR. GENOOT: On the surface title?
MR. PACKMAN: This is something we did

Page 65

touch on with you guys. There's fractional -- individual fractional alleged ownership interests that may affect Pyote. We have to clear that. And that's going to take us, even on a summary basis, a couple of months; okay?
MR. GENOOT: Typically a great way to solve that.
MR. PACKMAN: Flesh out these individuals, most of which don't even know they have the interest, and get rid of them.
MR. GENOOT: Structurally, what do you think is like the most fair way to --
MR. PACKMAN: That's why I need you to apportion your bid.
MR. GENOOT: So apportion of 34 so that whatever the allocation of the 34 for Pyote gets --
MR. PACKMAN: Yeah. You waive the mineral rights having to do with Lindsey.
MR. GENOOT: I don't think there is a title issue there.
MR. PACKMAN: Lindsey owns the property. We think that's more value. So you allocate however you want, but --

Page 66

MR. GENOOT: We're going to figure that out. We can try to solve for that. We will support and try to clear that out as well to the extent we can support.
MR. PACKMAN: We're pretty confident with our title counsel in Texas that we will get that done. So it's just a matter of how long it's going to take to flush them all out and get rid of.
MR. GENOOT: Like, are you comfortable with Archer putting the $34.5 million in escrow and as soon as that gets along -- so the money is saving in escrow as soon as you guys figure out who gets paid?
MR. PACKMAN: I think we have to allocate a portion of it to Pyote and then probably larger portion to Tarbush. And my other question is: If, for some reason, you don't commercialize either site, then under this scenario, whatever the time period is that you have to commercialize even one, you know, customer, that's it, we're done, there's no further consideration and it's still as it sits now.
MR. GENOOT: As it sits now, obviously,

Page 67

I don't believe that's going to be the scenario. But as it sits now, correct.
MR. MAGLIANO: Got it. Thanks. But if, for some reason, you -- you didn't do a data center, but it would come in to play in terms of --
MR. GENOOT: We're in the process of converting -- in this room, we're in the process of converting some opportunities. Again, that drama -- if you run the numbers, that's not a realistic concern.
MR. PACKMAN: Just so we're clear, before we go back to Thor, let's say we give power approval for -- well, it's really 300 megawatts to 176 within a certain time frame, and then once they build out the infrastructure --
MR. GENOOT: I think you guys have 176 today. Right? The 300 -- with everything happening probably, it's very close to it. It's kind of like a 50/50.
MR. PACKMAN: So conditional approval for the 176.
MR. GENOOT: Right. So we're just saying the 176 and 54 you have today, just

Page 68

give us some contracts and you're good. You don't have to worry about anything.
MR. PACKMAN: Just hear me out, because I want to make sure we understand. If the final approval for the power upgrade comes through by a date certain, whether it's November 30 or December 10 or whatever the date is, I don't -- I'm not sure how we would go to closing with you prior to that even if you do have --
MR. GENOOT: Right. Then by that point, the title should be --
MR. PACKMAN: Surface title, yeah.
MR. GENOOT: So killing two birds with one stone.
MR. PACKMAN: You're good with that?
MR. DUFRAYNE: Questions. Do you have any with us?
MR. SANDLER: My questions have been answered.
MR. DUFRAYNE: Thank you. That helps.
MR. GENOOT: One thing that we pride ourselves on is this is not the first thing that (inaudible) has been a part of. And I think it creates significant value to be a

Page 69

part of. So in these, like, Celsius -- like, it hit me pretty deeply when we went through it and probably lost a lot of money. There were a lot of good normal people. And I think the outcome of that was very successful.
So we can commercialize the site for sure and, at the same time, like, we wouldn't put up what we don't think we could hit. But we probably have credibility in this room because we have been able to do what we say we're able to do, and we expect to be able to continue that as well.
MR. DUFRAYNE: Okay.
MR. GENOOT: Thank you.
MR. DUFRAYNE: I'm not sure we got the answer, but --
(A DISCUSSION WAS HELD OFF THE RECORD.)
MR. DUFRAYNE: So we had an opportunity to further explore the lease issues that we have handed to us.
Steve, do you want to summarize it?
MR. PACKMAN: Yeah. So I think that the question that you had was what is commercialization. That was in general. And

what we're told by Hut8 is it's any customer, whether it's by lease or otherwise, contract, that they come into after closing.
So they can negotiate it, I guess, prior to closing. But there's no definite time period. They said it could take two weeks and could take six months. But it's a professional liability on their part for the balance of the purchase price. That's where they are.
MR. BEHRMAN: Is it hypothetically? I'm just thinking about the construct of their bid. Is it hypothetical where they only end up paying $34.5 because they have to have the customer?
MR. PACKMAN: That would be very hypothetical. But possible. But technically yes. We said yes to that.
MR. COHEN: Perpetual liability means the bankruptcy case can never close.
MR. PACKMAN: That's not true.
MR. COHEN: What does that mean, perpetual liability?
MR. PACKMAN: It sits on their books. They have a liability to the creditors' trust



at that point for an additional $46 million, if and when they commercialize. They have no interest to have it on their books. Again, we're not asking you to bid necessarily against that.
MR. BEHRMAN: In comparison, that's --
MR. PACKMAN: We would love to have much more up front and not have to deal with the mineral rights.
MR. COHEN: Just lay out again exactly what they are prepared to waive with respect to the mineral rights.
MR. PACKMAN: Title objections. There won't be a title objection on either property based upon a claim that there was a reservation of mineral rights outstanding, a mineral lease, or what have you.
MR. BEHRMAN: Just to be clear, that's the only item regarding the Lindsey tract that they're waiving is the mineral rights. They're not waiving any other language that you have to enter a contract and et cetera.
MR. PACKMAN: There has to be good title to the property, right, and that's not waived. Yeah. And they're not waiving the



energization part.
MR. BEHRMAN: Do you all have an opinion on waiver of the energy conditions versus waiver on the mineral right conditions?
MR. PACKMAN: Yes. Explain that one to me, please.
MR. BEHRMAN: It means we're considering waiving some of the energy conditions, but mineral rights conditions are still important from a balanced perspective, a general opinion on what is more preferable to the other.
MR. PACKMAN: I guess it depends on what the waiver is. I'm sorry to be -- what's the right word? Is "obtuse" the right word? I'm sorry to be -- yeah. It depends on what it is.
MR. BEHRMAN: Okay.
MR. PACKMAN: It could be more valuable, yes, but I don't know what it is.
MR. BEHRMAN: Understood. That's all.
MR. DUFRAYNE: So at this stage, do you have a proposal?
MR. BEHRMAN: I think we would like to regroup now that we understand the



commercialization aspect of it. We had that discussion, but we would like to read through and form our proposal. If you can give us a few minutes.
MR. PACKMAN: How long do you think you'll need?
MR. BEHRMAN: Ten, 15 minutes.
MR. PACKMAN: Let's do 15. Sure. 15 minutes.
(A BRIEF RECESS WAS HELD.)
MR. COHEN: We're back on behalf of Thor Cal, Thor Cal will raise its bid in the aggregate to $75 million.
And if the debtor and the committee determine that commercialization this afternoon, this evening, becomes an element to be added as a subset of considered bids, Thor would be willing to consider adding the figure for commercialization.
MR. SANDLER: Is that on top of -- again, this is Brad Sandler. Is that on top of the $75 million?
MR. COHEN: We consider making it on top of the --
MR. SANDLER: Understood. But if you

were to do that, it would be on top of the $75 million?

MR. COHEN: Yes.

MR. SANDLER: And then how is the $75 million allocated?

MR. CARTY: We actually did not have time to discuss that.

MR. COHEN: Well, I didn't hear the allocation from the other bid.

MR. PACKMAN: Table that for now. We have to get there pretty quick. But $75 million with the same conditions that are in the APAs now.

MR. COHEN: Correct.

UNIDENTIFIED VOICE: I thought you guys were going to waive the Tarbush energy approval. Kidding. Kidding.

MR. COHEN: All right. Smiley face emoji.

MR. PACKMAN: Any wiggle room on the mineral rights, particularly as to Lindsey?

MR. COHEN: Not at this juncture, but let's see what happens.

MR. DUFRAYNE: Just to confirm, $75 million cash?



MR. COHEN: Yes.

MR. BEHRMAN: The timing element is important. But with commercial lease structure, the high-demand market, things can drag out six months to a year. So we are willing to potentially entertain that structure, but we think this is actually better of all structures from a timing perspective.

MR. DUFRAYNE: Any other contingencies?

None. Okay.

Anybody have any questions?

MR. DUFRAYNE: Brad, do you have any questions?

MR. SANDLER: No.

MR. DUFRAYNE: Thank you.

MR. BEHRMAN: So you're going to talk and come back to us?

MR. PACKMAN: Yeah. We're going to try to speed it up a bit though.

MS. CHO: Steve, did they remove the adjacent property closing?

MR. LENEY: Hold on. Thor is back in the breakout. Is your question for Thor? I'm sorry.



MR. PACKMAN: It's for us.

MS. CHO: It's for Steve, yeah. Where did they land on that adjacent property closing? They're still in absolute discretion. Did they get rid of that?

MR. PACKMAN: That is gone. It's gone. It's gone because they didn't object to the markup of the sale order, but that's going to have to be incorporated not only in the sale order, but I'm going to ask them to agree to that in writing in the APA for sure.

I guess the big issue still is -- I'm very intrigued by Greg's comment about potentially waiving certain aspects of the energy. But it's only on Pyote that I care about much. I'm not sure what else he can waive on Tarbush.

MS. CHO: We'll take whatever CP waivers we can get.

MR. PACKMAN: I think we are able to extract mineral rights favor in some fashion for them as well, if we pushed it, unless you guys have something else.

MR. DUFRAYNE: So what are you going to tell them?



MR. FEINSTEIN: Yeah. We missed a step here. Can we all agree that 75 in cash is better than was offered by Hut8?

MR. SANDLER: Yeah. It was interesting. They said they would consider putting more on the table, you know, if we wanted the commercialization above the 75; so --

MR. FEINSTEIN: I was going to suggest they just add five now so we have two $80 million offers. But 75 cash is still better.

MR. SANDLER: Yeah.

(A DISCUSSION WAS HELD OFF THE RECORD.)

MR. PACKMAN: We seem to have lost your counsel. He said he was grabbing some lunch, which we thought was in our little conference room here.

MR. IRWIN: Yeah. I can get it. Here, let me call him real quick, and I'll have him join.

(A DISCUSSION WAS HELD OFF THE RECORD.)

MR. IRWIN: I just called him and went to voicemail, and I shot him a text and let him know that we're waiting for him.

MR. DUFRAYNE: I emailed him as well.

(A BRIEF RECESS WAS HELD.)

Page 78

THE COURT REPORTER: Back on the record.
MR. DUFRAYNE: Thor has responded with a $75 million cash offer at closing along with a commercialization kicker. So they've not changed their view on the mineral rights at the moment.
MR. PACKMAN: They haven't changed anything contingency-wise.
MR. DUFRAYNE: So they increased their bid 30 percent and kept it in cash.
MR. PACKMAN: The kicker is not defined. We will consider that if that's where this is going.
MR. CARTY: How do you value the bid we put on the table versus how are you valuing that?
MR. PACKMAN: $75 million cash.
MR. CARTY: How do you value our bid?
MR. PACKMAN: So when we look at your bid, this $34 million, it's not guaranteed. You still have to meet those same contingencies sans the mineral rights; right?
MR. CARTY: Yeah.
MR. PACKMAN: So the rest of it is sort of just not defined for us sufficiently to

Page 79

get a lot of value. I mean, we could give it some value. I think we need to nail down the terms a little more before we get any substantial value.
MR. CARTY: The 75 still has the same closing conditions as they always have.
MR. DUFRAYNE: As yours?
MR. CARTY: With the mineral rights.
MR. PACKMAN: Right. It does have some value.
MR. CARTY: Right. So you're ascribing no value or de minimus value to the earn-out component.
MR. PACKMAN: Not de minimus, no. But if you want us to value it, it's not going to be significant because we have -- it's just not fleshed out enough. There's too much wiggle room there for it to go away, even through no fault of -- I mean, it could just not materialize.
MR. IRWIN: Would it be helpful if we proposed language, Andrew?
MR. PACKMAN: Yeah. It would also be helpful if you came up with the up-front dollars for the up-front. I'm not suggesting

Page 80

what you do.
MR. CARTY: But I'm trying to understand how to bid back on this. You know, you're just saying, look, all we really care about is the up-front number and you need to come up because you're way short of $75 million, then that's your decision to make. But I'm trying to understand here if that's the message here.
MR. PACKMAN: I think for us to attribute -- yeah, we can't attribute $40 million yet to the back end of your --
MR. DUFRAYNE: It's $46 million.
MR. PACKMAN: They came up $23 million.
You guys are at 34 without the mineral rights issues.
MR. CARTY: Yeah.
MR. PACKMAN: So I don't think -- I think there's too much of a Delta between your up-front cash and where they are, even with the contingencies for minerals and energy, they do.
So I do think there's two parts to it. One is coming up with more up-front cash, and then we need to -- we do need to clarify --

Page 81

not just clarify, but define exactly what this back end does for us, what it means when it happens, you know, what's your -- how are you locked in at all. I mean, I'm happy to do it today, and I think we should, but it's hard to give value to it right now.
MR. CARTY: I'm happy to do it as well. I just want to understand if you guys are going to attribute real value -- if we spend the time defining it and building it out, are you guys going to say, great, we're ascribing 75 percent discount because --
MR. PACKMAN: No. Right now we're subscribing a significant discount because it seems that it's -- it's -- I don't know whether it's going to be something that we even ever get. So I don't know what the trigger is.
MR. CARTY: Part of -- you know, we described it, and we kept it. And we thought, as a benefit to the estates, that the triggering mechanisms were very loose, right. Any lease that's signed at the site would trigger the payment. And I'm just trying to understand what you want us to put

on paper that would get you comfortable to value this appropriately.

MR. PACKMAN: Well, you know what? I'm going to let either Brad or Robert have that. I have some clear ideas, but I --

MR. FEINSTEIN: It's Rob. Look, it's easy for us to compare 75 in cash to an offer of 80 where a big chunk of that 80 is down the road, is possibly never. So that's why the emphasis is on the up-front cash.

This is an easy choice. So if you want guidance, yeah, you should try to meet or exceed the up-front cash. And if you can't get there and want to button your back end with language, we will look at it. But we don't value the back debt as being worth more than $5 million today.

MR. PACKMAN: I mean, that's the creditor speaking, and the vast majority of this is going to the creditors here. So, you know, the debtors really have value only because I'm just not clear on how it's going to work other than, you know, the basics that came out earlier.

MR. SANDLER: From our perspective, we



want more cash and less uncertainty. And so, right, there is a lot of uncertainty in your bid.

MR. IRWIN: But how do you think about the mineral rights uncertainty of getting that versus us --

MR. SANDLER: Look, that's definitely a positive of your bid. But there's still a lot of uncertainty; right?

MR. IRWIN: Understood. Let me ask it this way. On the $75 million, because there's the mineral right condition, are you digging that at all because of that CP? And if so, are you able to say by how much?

MR. PACKMAN: Sure. On the Lindsey tract not much at all. We think that reservation of rights is going to be dealt with. This is just my opinion, right. I don't know what is going to happen. But that's my opinion of on how to live with it.

Pyote, whether or not there's mineral rights, ultimately really -- A, interfere or B, are legally permitted to interfere with existing use is debatable.

Do I think we're going to clear -- we're



going to try to clear what we can through waivers or limitation? Yeah. Whatever they call it, these documents that prevent you from interfering with drilling down sideways, you know, at least -- whatever.

Yeah, we're going to deal with all of that. So it takes a little bit of time. We will probably get there with the ones that matter. So, yes, there's some appeal to that. But it's -- yeah, there's appeal to that, and it's worth some dollars in terms of time and legal costs and uncertainty.

But, you know, if you're going to ask me to put a dollar figure on it, I don't know that I can. I mean, is it millions and millions of dollars? I don't think so.

MR. IRWIN: Okay.

MR. PACKMAN: I don't think so. I mean, Pyote definitely would be -- it would be nice to have that provision.

On Lindsey, I'm not quite as concerned. I think we will there.

MR. CARTY: Should we discuss any more questions?

MR. IRWIN: Let us huddle up. Thanks,



guys.

MR. SANDLER: How long do you guys need, just so we can plan and we can tell Thor?

MR. CARTY: Well, we're going to try to get Asher, who might be in a meeting. Give us maybe like 20 minutes, and then hopefully we will have something either way and then we can go from there.

MR. PACKMAN: We're not quite there yet. But just think about starting to, you know, get closer to where you guys can ultimately go here. I'm not saying you have to.

MR. CARTY: I understand.

(A DISCUSSION WAS HELD OFF THE RECORD.)

(A BRIEF RECESS WAS HELD.)

MR. GENOOT:

MR. GENOOT: Good to see everyone.

I will start with a couple of questions, because we have a few different approaches here. And we spent a good amount of time really thinking about, like, it's already 3:00 p.m. Everyone wants to go home. So where is the best place we can get to rather than going back and forth.

I have a question to start because this

Page 86

is important. So there are two things that we believe, and if you guys don't, then there's a disconnect in value, and that drives how we approach this next update.

The first is we think removing the mineral rights CP is a massive, like de-risking for everybody here. Because we are currently going through that process with other sites that we have and, like, we were having issues.

And so we found unique ways to try to work around it from a commercialization approach. But we think that that risk is a non-trivial risk. And so if you all don't believe that is true, then we will remove -- we will keep that contingency and -- we will keep that contingency and we won't remove it.

So that's the first piece. Because then we can put more up front, but it's based on you guys getting the mineral rights. Because, frankly, I think it gives us like a bigger option that we don't have to actually pay it if we don't want to. So that's the honest truth, just laying kind of all of our thoughts out on the table. That's the first.

Page 87

And if we don't have the same alignment on the value we're giving by removing the CP for the mineral rights, then we can think that that can put a bigger dollar amount up-front amount.

The second, we believe that we can commercialize this site. We have specific kind of risk thresholds internally because we Greenfield and develop a lot of things ourselves so there's kind of a philosophical investment.

This is internal, so why would we structure it the way that we did in terms of what we spent up front versus when we commercialize. But frankly, I wouldn't personally be on this call, nor would we be spending time on these opportunities if we thought they were only for -- so we do think there's an option to commercialize. We think there's some hair, but we can figure it out.

So kind of the back-end structure is something that we believe we can execute and execute in a -- like, definitely before November but in a short amount of time.

And we have a broader thing we're

Page 88

working on with our current projects that, I think, this is going to fall into, which is why it's interesting. There is no intent to, like, have this kind of burn-out structure have any, like, loopholes or trickery or anything in it. So however we want to structure the language to give the most confidence to everyone that -- like, as soon as we commercialize that site, we sign the lease, that payout will happen. We're happy to kind of work through any of those because that is kind of the mindset.

There's some internal things that we have to work through, which is how much we spend on per megawat. And we're a Greenfield organization. We don't bite size. We develop them ourselves. So that's why we're trying to fit this mold in this structure.

But it's good to start with the first, which the value of removing the mineral rights CP or not. Because that will then change how we think about where we bucket the dollars. Because, like, we're happy if there's a CP there that, I think, gives us like some optionality if we want to pull out

Page 89

later versus we're fully committed today.

MR. PACKMAN: It has more value on Pyote than Tarbush.

MR. GENOOT: Pyote is a bigger value here anyway; right? So that works.

Sorry. You said it has more value on Pyote?

MR. PACKMAN: The title is much more, you know -- the title is messier.

MR. GENOOT: Got it.

MR. PACKMAN: Lindsey is not on it. So I would say yes and no. Yes on Pyote, probably not as much on Lindsey.

MR. GENOOT: Got it. Okay. So, yeah. So I think that is kind of the first piece of the equation. That's the first piece of the equation. I'm just thinking through.

So in terms of the bid, why don't I do this maybe. I will give you guys two separate bid structures that align to the same overall number. But the split of the economics up front versus later on change based on the CP mineral rights. And then you can decide what is the value of that. And that's the easiest way to be able to kind of

Page 90

drive this conversation.

So keeping to the existing bid we have on the same structure, we will increase the overall bid structure. And, again, this -- the purpose of this is -- it's 3:30, and I think we're getting to the end of this.

But the purpose, and I'm personally -- I have to be fully offline from -- I have to be fully offline from 3:45 to 9:00 p.m. Eastern. I'm out-of-pocket. But I can kind of ping the team in the background, but I won't be able to pop on anymore.

But the current bid structure we have, we put $80.5 million. And there's $34.5 and 46 million. We will increase the overall bid to $115 million. So that's $40 million higher than the current bid.

The split, if we still have the waiver of the mineral rights, where we are not asking for that to be a condition precedent, the same $34.5 million up front with $80.5 million on the back end.

Alternatively, if you say, hey, we don't actually think that that's that valuable, we think we're going to get it and we're fine

Page 91

taking the risk, then we will increase the up-front to $57.5 million, and we will have the earn-out be $57.5 million; so it's just 50/50.

Obviously, we think that the mineral rights are a lot riskier than you guys do, so that's reflected in how we're pricing this.

And, again, I think in our structure, if we commercialize this in the first scenario, even if we never get the mineral rights and we commercialize it, you still get paid. So it's not about you having to get the mineral rights on the earn-out. If we can get a lease without figuring out the mineral rights, you also get paid.

MR. SANDLER: Asher, it's Brad. And what happens if you guys end up flipping it? Somebody comes along and they say, right, so you're at $150 million and somebody comes along and says, Asher, you know what, here is $230 million, right? We will give it to you next day that you close. You say, wow, that sounds great.

MR. GENOOT: You can get paid out. That's not the intent here. So we will pay

Page 92

you guys out first before any other commercialization.

MR. SANDLER: Okay. Because to use the term -- there are so many ways you can get around.

MR. GENOOT: Exactly.

MR. SANDLER: So we're trying to de-risk the transaction; right? So that's why I said we want as much cash and as little risk as possible.

MR. GENOOT: Any pieces like that, feel free to bring up. Because this deal is not the largest deal for us, and like our reputation means a lot. So I'm trying to simplify and de-risk a lot of these things, which is why we're saying, no matter what lease we sign, we don't need to have a threshold, et cetera.

The purpose of that is to give more comfort and certainty of the overall economics here. So if there are other things you guys have fears on, I'm happy to mitigate against them just like you just brought up.

MR. FEINSTEIN: It's Rob. Would you be open to having the backup obligations secured

Page 93

by mortgages on the properties?

MR. GENOOT: Sure. We're a $13 billion public company, but sure. We will pay. That's fine.

I think the mortgages we have to work through, just because if we're going to sign a data center lease, we have to go financing on there and it just gets complicated. But I mean, we have a very big balance sheet and we have almost a billion dollars of cash money in the balance sheet today. Like, if we have an obligation, we will pay that obligation. But if we are -- if things will make you more comfortable, we are happy to work together on that.

MR. SANDLER: So the security can come in some lower form? It doesn't have to come as management on the property?

MR. GENOOT: We can get a guaranty on it if we have a subsidiary.

MR. SANDLER: Kind of cards on the table, this was not so much about collectability because I believe you could pay. It's about kind of marking our territory. But if that property is going to

Page 94

get commercialized, you have to come to us for consent because we're the mortgage holder, or if you're going to flip it. Whatever. You know?

MR. GENOOT: There are folks here that have worked with us before. We take our reputation very seriously. Like, we're not going to hurt our reputation over a deal like this.

So when you say we're going to do something, we're going to do it, and that's it. We have done a lot of things we have done today as a company. So I think if there are areas where we can give you guys more comfort, as long as it doesn't hurt or commercialize it, we're happy to partner together on that.

MR. FEINSTEIN: Understand our mind-set and the reason why we're kind of grappling at this. We're in bankruptcy, we're cash creditors; right? Brand and I represent creditors. They just want cash and go home. And having to wait for a backup obligation, in and of itself, means we have to keep our trust open longer, monitor the situation,

Page 95

worry about the downside, which is why there's an emphasis on up-front cash, just so you understand. And, honestly, not moving off of the $34.5 is not much of an improvement. I understand the improvement on the back end.

MR. GENOOT: No. We moved up to $77.5. If we keep the -- if we make it apples to apples and we keep the mineral CP in there.

MR. FEINSTEIN: Yeah. But without the CP, you're still at 34 and a half.

MR. GENOOT: Then your $75 million is not a real $75 million because it could never happen.

MR. FEINSTEIN: I understand.

MR. GENOOT: We have dozens of sites we're offering and building and so forth. We're very intimately familiar with land development in Texas. And the mineral rights issue is big given in our mind. And if it's not being valued by the group, then we're happy to pay more up front but keep that option for ourselves.

MR. FEINSTEIN: Just speaking for myself, it's more, I think, a matter of risk

Page 96

allocation. If it gets priced into an all-cash bid now and it gets waived or we have to structure something like this because it's not getting waived, in which case the risk falls on us as opposed to a buyer, where he prices it for the price.

MR. GENOOT: That's my point. And that's why I feel like every other bid has that CP, so it's not a real cash bid because all of those CPs exist in every other bid. It's not apples to apples. That's why I have a bid that is apples to apples and a bid that is not apples to apples.

MR. PACKMAN: Any chance that you guys would consider the split with the waiver, or is that too rich for you?

MR. GENOOT: What's the waiver?

MR. PACKMAN: $57.5, $57.5.

MR. GENOOT: No.

MR. PACKMAN: Because that's a lot of value on Pyote on a 22-acre mineral waiver. I'm just saying.

MR. GENOOT: Like, we have sites where we have one person will waive that that person -- and we're, like, look, the reality

Page 97

is everybody thinks AI is the rich person in town that can pay for everything. And so all of these Texas landowners, whether they own the surface or mineral rights, want their portion.

We deal with that on a day-to-day basis. So it doesn't matter how many you have. You just need one asshole who won't get out of the way and they will create an issue for you to commercialize.

I speak from, like, scar tissue because we're going through a lot of this on a lot of our projects. So that's why we put -- we think that, like, waiving that we don't create issues for us that I think we can solve or can live with them, versus you guys clean it up and we don't have to deal with that whatsoever.

MR. PACKMAN: This is your highest and best?

MR. GENOOT: Yeah.

MR. EHRLER: How would you see the mineral rights risk resolved? Is that by a yes, no, we can go forward with the site? Or does that just become a price -- a hold-down

Page 98

value to someone?

MR. GENOOT: So when I think about -- so I'll talk practically in this bid process. And, again, all cards on the table.

Practically speaking, we are solving ways to be able to monetize AI data centers even with mineral right issues. Because we have to do that on our other sites because we can't get over the hump.

So I see a path to monetizing the site even if we don't solve that. So that's why, in the first bid, we're willing to waive it because we think we can monetize it even if we don't figure that out.

However, if we're pumping in $75 million in cash that has the mineral rights CP, I don't think that's a real bid. Because I think if that CP doesn't get solved, then ultimately what happens is you lose that bid or they renegotiate. And as a result, they're essentially getting a free option for the next couple of months to go and talk about the site and try to commercialize it. And if the mineral rights don't get there, they don't have to close.

Page 99

So to make an apples-to-apples comparison. We can take that same thing -- we don't even have to put up any risk capital. I think the $34 million is like -- we can't get out of that. Like, that is there. That is locked in, et cetera, regardless of any scenario.

We're here, yeah, we will give you $57.5. But there's a high likelihood you guys can't solve the CP and then in that scenario it doesn't get a free option to pull out if we don't like it.

So that's how I'm thinking about it. Again, being very, very open. Because I don't think the 75 is a real apples-to-apples cash comparison. But if you guys don't value that as much as we do, then we will compete against that number and take away the thing that you guys don't value.

MR. EHRLER: If we weren't able to get the mineral rights, let's assume a different world structure here. If you weren't able to get the mineral rights, you would still develop the site but you would do it differently so it wouldn't be worth as much,

Page 100

or it would be a different structure or --

MR. GENOOT: We would commercialize it anyways. Like, for us, there's two things we focus on. One is how we spend dollars; and two is how we spend time. We have, fortunately, a lot of sites and things right now. And so if we didn't think that we had a shot at commercializing this -- because the mineral rights you guys are handling is out of our control. Like signing a lease is in our control. We need to figure whether you guys are in or not. We wouldn't option today. We would be work on commercializing this tomorrow. And, frankly, I think by ending next week, I could give you a hint what it's going to look like. We're already working on a couple of things fitting this nicely into a portfolio of other things that we're doing.

So that's why in the first scenario -- in the first scenario or the second, there might be a world we commercialize it. In the first scenario [audio lags] -- in the second scenario we're waiting for the CP first, and once that happens, then we will go

Page 101

commercialize it. So we approach it a little bit differently.

MR. EHRLER: But it would cost you the same. It would cost you the 115 in any of those. So are you really any worse off -- we're aware where the starting point is with or without the CP. You're going to commercialize the site, and the end price would still be the same.

MR. GENOOT: It's a little different for our board. Because I see the $57.5 as a contingent because there's a CP on mineral rights. So from an approval process internally, it's a little easier because I don't think that's a hard $57.5, where the $34.5 is a hard number because there's no contingencies.

So there's a little internal dynamics. Like, we are a Greenfield development company by trait. We don't like spending money that we don't have to. Like, we go and we build and we develop, and if there's hair on sites, we figure out those issues and don't commercialize them. And we have done them for $28 billion in deals this year alone.

Page 102

MR. DUFRAYNE: Asher, I'm sorry to interrupt. We need to move on to our other candidate. Okay?
We appreciate it. We appreciate your counteroffer. We will be back to you shortly.
MR. GENOOT: Okay. Thank you. Do you guys want us to send you anything?
MR. SANDLER: If you could send a terms sheet, I think that would be helpful, right, because the term -- at least where I'm getting hung up, Asher, and I think we can -- from what you're saying, I think we can contract around it, but it's really understanding the commercialization term.
MR. GENOOT: Yeah. So can you talk through that a little bit real quick? When you say -- so scenario one is the default, right, and that's our basic scenario.
Scenario two is we commercialize the site. We are planning to sign a long-term tenant lease on the site. If we're trying to get cute and sell the site or whatever, you guys get paid. Like, if that's not the intent whatsoever, so you get paid in that

Page 103

scenario. But signing a lease -- and more public company announcing are announcing a lease, so --
MR. SANDLER: Understood. But I want to make sure, when you say commercialize it, right -- before, I think somebody said like only an AI tenant-- like, only an AI data center. So if you happen to lease it for some other purpose, okay, you're commercializing it; so --
MR. GENOOT: Any commercialization outside at this point is going to -- they're only going to commercialize to do a data center. We're not trying to get cute there.
MR. IRWIN: Are you just looking for to propose some language?
(A DISCUSSION WAS HELD OFF THE RECORD.)
MR. DUFRAYNE: You guys here?
MR. COHEN: Sorry.
MR. DUFRAYNE: Sorry for the long delay. It took awhile to get to the landing squad. And we're told this is, for now anyway, their highest and best offer, talking about Hut8.
So the total offer is $115 million broken down into two different scenarios.

Page 104

$34.5 million at closing without any mineral right contingencies on either property; and then $80 million on the back end on this commercialization concept, which has been defined very broadly for us. So it covers any type of commercialization whatsoever on either property, mainly with some security as well pledged, and a parent company guaranty. But that's not clear to me that that's actually been offered. We've asked for a term sheet, and we will see if we get it.
Alternatively, $57.5 million at closing with mineral rights staying in place and have to be dealt with at closing -- to deal with at closing and then $57.5 million on the back side.
So that's where they are. If there's anything that's not clear about that, just let us know.
MR. BEHRMAN: Is there any commercial development? Is there any back-stop on commercialization, or is are they saying this for a certain "X" number of months or could that drag on?
MR. PACKMAN: As far as we know, there's

Page 105

no timetable on that. But if anyone else heard differently, they should talk now.
So we're looking for -- obviously everyone is looking for more cash at closing. And we're looking for some comfort on mineral rights, particularly -- well, as to both properties.
You had mentioned earlier possibly, you know, maybe doing something on the energy side. But, you know, at this point, we're going to ask you to try and give us your -- for now your highest and best counter to that, I'll say.
MR. SITT: I'm in the building. Do you know what floor I should go to?
MR. LENEY: Yeah. Someone is coming to the lobby for you.
MR. SITT: Hi, everybody.
Coming around. Nice to me meet you.
MR. PACKMAN: That's kind of where we are. Jack, did you hear that?
So Hut8 is at $115 million with $34.5 at closing with a waiver of the mineral rights, title exceptions on the Lindsey tract and the Pyote property; $80 on the back end, subject

to this commercialization concept that is fairly broad in terms of any type of commercialization that's done on either property, be it industry related or not. They also can't flip it without paying us possible collateral to secure that.

MR. SITT: So a flipping would not trigger the commercialization; it would --

MR. PACKMAN: It would flip -- it would trigger their payment. And the parent company guarantying they're going to give us a term sheet. And then if they don't waive the title mineral issues on either property, it's $57.5 at closing.

MR. SITT: If they don't waive the --

MR. PACKMAN: The mineral reservations, the mineral releases, the title exception for mineral rights on those two properties, then it's $57.5 at closing, but the title issues are on the estate to deal with on the debtors, and $57.5 on the back end.

MR. SITT: Okay.

MR. COHEN: The back end being commercialization description as to the first option?



MR. PACKMAN: Yes.

MR. LENEY: It's valued all at $115, right, just whacked up differently?

MR. PACKMAN: Right. Anybody else who thinks I didn't get that, please chime in now because I want to make sure we're all on the same page.

MS. CHO: It's Shirley Cho. For the record, I think it's $80.5 million on that first part of it.

MR. DUFRAYNE: On the back end?

MR. PACKMAN: 80.5. Yeah.

MR. COHEN: Without the benefit of the term sheet concerning commercialization, how does the estate value this bid? What's the process by which the estate values this bid?

MR. PACKMAN: So I look at it that we're getting -- we're getting $34.5 million with a waiver. And then on the back end, we're getting $80.5 million provided at --

MR. SITT: Additional 80.5?

MR. PACKMAN: Provided there's any commercialization whatsoever, for whatever time period it takes, with security in the guarantee. So that's a pretty significant



offer.

Now, is it worth $80.5 million? I guess there is some risk because you want a buyer that is substantial, is public. There's still detail that would have to be worked out, and it has substantial value. Like, we're not talking $10 million.

MR. SANDLER: The committee views it the same way. We view it as a very strong offer from a public company that's willing to give guarantys, you know, security with a broad definition of commercialization.

So we view it as, you know, is it $115 million? It's probably a little bit less than that when you factor in a little bit of the back side risk, but we view it as a very strong offer.

MR. FEINSTEIN: Well, the back side -- it only needs to be worth more than 17 and a half million to top the offer because you're at 75, and they're at 57.5 plus the back end. So we definitely view that as more than $17.5 million.

MR. PACKMAN: Yes. And it's apples to apples. That's right.



MR. COHEN: Are you looking for to us give you also an option A or option B or something in between? I mean, I'm not really --

MR. PACKMAN: We're looking for you guys to minimize our risk and get us more cash if you can.

MR. SITT: Minimize the risk where specifically?

MR. PACKMAN: Well, what they've offered is waiver of mineral rights, title exception. That's really what they offered to minimize the risk. The rest is just cash. And then there's the back side risk.

MR. SITT: But the up-front dollars still have the other closing conditions just not the mineral rights and --

MR. PACKMAN: Correct.

MR. SITT: Okay. What questions do you guys have?

MR. BEHRMAN: Jack, why don't you go --

MR. SITT: I will go into Zoom and step out.

MR. BEHRMAN: Different room.

MR. SANDLER: Just for planning

Page 110

purposes, how much time do you guys need?
Jack, how much time do you think you guys need just for planning purposes?
MR. SITT: I'd say 10 to 15 minutes.
(A BRIEF RECESS WAS HELD.)
THE COURT REPORTER: On the record.
MR. SITT: So the last group offered two different financial deals, one with the mineral rights and one without. We're going to give you one set of conditions and two different options in terms of up-front money and then back-end money and for commercialization.
But as the financial deal is as follows: We'd like to offer 90 up front and 26 on the back end post commercialization in option A.
MR. PACKMAN: Okay.
MR. SITT: And option B, a straight-up 105 up front. And the conditions I'm going to let the team speak to if it's okay. One set of conditions goes for both offers.
MR. LENEY: I was just going to ask.
MR. DUFRAYNE: Go ahead.
MR. BEHRMAN: Basically we're just keeping the current conditions the same. We

Page 111

obviously came in way better than them on their second offer where they are, if you have the mineral rights condition in there. So it's still -- we're just keeping the conditions in.
MR. SITT: To be clear, the conditions that are in APA presently?
MR. BEHRMAN: Correct.
MR. SITT: So I'm assuming -- I'm guesstimating a $10 million -- I'm sorry -- $11 million in the bottom line. And what the value is to you guys, you have that up front in the back-end money.
If that is way off and you tell me that's going to be unacceptable, I would love to get another bite of the apple, but that's just -- I'm trying to pin the tail on the donkey.
MR. PACKMAN: But why split it up if you're not -- so it's 90 -- I'm missing -- what's option A get us?
MR. SITT: It gets you 90 up front and 26 post commercialization.
MR. PACKMAN: Ten million more consideration but no waivers.

Page 112

MR. SITT: But no waivers.
MR. DUFRAYNE: What are your conditions on commercialization? How do you define commercialization?
MR. SITT: I will let the team address that question.
Steve, do you want to go there?
MR. BEHRMAN: Judging by what is happening in the same framework is a revenue generating of that to a third-party on our behalf. If we create a revenue-generating event, lease or sale or on the type of commercial agreement and allow us to monetize that property, that would be a commercial event.
MR. SITT: And to offer waiver?
MR. PACKMAN: So if we don't do the back-end, it's 105 in cash at closing, assuming that you're comfortable on the title and the energy.
MR. BEHRMAN: Correct.
MR. SANDLER: What about security and a parent guaranty?
MR. SITT: So we're comfortable giving you guaranty. That guaranty is that 26.

Page 113

MR. PACKMAN: On commercialization?
MR. SITT: I will let Raj speak to that.
MR. BEHRMAN: I don't want to leave it open-ended.
MR. SANDLER: I'm sorry. What was that Steve? Open-ended?
MR. COHEN: We don't know what the commercialization terms and conditions are of the other bidder. Why is ours any worse than theirs?
MR. PACKMAN: Got it. Thank you, Steve. What's the hesitation on the waiver as to Lindsey and/or Pyote?
MR. BEHRMAN: Meaning on the (inaudible) piece?
MR. PACKMAN: Yeah. We've had lots of conversations about it. I guess I need to understand -- you know the situation on both properties. You know Lindsey has a reservation of rights we're working on, you're working on, and Pyote has a bunch of them.
So, you know, there's certainly some value to what Hut8 is saying there. But, you know, I guess I need to understand why you

Page 114

guys don't want to budge on that at all. I just want to understand and get your thoughts.

MR. BEHRMAN: I mean, it's trending in the right direction, going in the right direction. It's going. But there needs to be a little bit of progress made there.

We are hoping we can get there, but you know, we -- it's a material issue. Nothing gets solved if there's zero progress made; right?

MR. SITT: I will answer it a little bit more directly. We had high degree of confidence it will be solved. The problem is, if it doesn't get solved, it's a little bit of a nail in the coffin.

If it's a potential catastrophic issue if somebody wants to make a mess for us down the road. But we have very high degree of confidence in getting it solved. But we just can't give it up because we don't want to go into it off-ended with the project.

MR. PACKMAN: I guess -- we're going to ask you to allocate your offer privately so we can start getting to the next step of

Page 115

this.

Pyote is more of a title problem when it comes to mineral rights, and it's worth much less, both land value and power-wise. So I guess our question is on the Lindsey tract, and I don't understand that. That to me is -- unless you're aware of a reservation of rights other than the one that we've been talking about for quite some time, it's a one -- it seems like one-party thing. So that one I don't quite understand. But okay.

MR. FEINSTEIN: Well, it's worth pointing out, I think, that Hut8 gave us the option of taking the offer with $35 million roughly up front unconditionally with no mineral condition and the balance on the back end, or 57 and 57 with the condition.

We haven't decided. But I have to tell you as the committee, the unconditional up-front cash is a very attractive feature, and it sounds like you guys simply don't want to compete on that front at all.

MR. SITT: We would be willing to compete on that front. I would need more time, and I'm trying to be -- you know, if

Page 116

you guys get a good offer, respectful of time, and keep the process moving, if you tell us that's the direction you got want to take, I'm happy to put an offer in front of you guys that has that consideration as part of the offer.

MR. FEINSTEIN: I think, just speaking for me, I think it would be helpful to see that and consider it among all of the other options here.

MR. SITT: Okay. Got it. Do you want us to --

MR. PACKMAN: Well, we're going to start with the individual lots, but you guys can work on whatever you want to work on.

MR. SITT: All together. Easy enough.

MR. COHEN: What's the realistic time for this? What are we envisioning? Is this going to be midnight?

MR. PACKMAN: It takes as long as it takes.

MR. SITT: Is this a one-day thing or is it --

MR. PACKMAN: If we have to continue to the next day, we will. We're doing our best.

Page 117

MR. PACKMAN: I personally have no cut-off. If somebody does, they will need to tell us and we will deal with it.

And please allocate your bid.

MR. SITT: Will do.

MR. PACKMAN: Now we're good. Thank you.

(A BRIEF RECESS WAS HELD.)

MR. PACKMAN: Here is where we are in the aggregate. Thor has offered $90 million at closing; the remainder of the terms that are APA is unchanged; $26 million after closing upon commercializing either one of the assets, meaning entering into any type of commercial contract relative to either property, either set of assets; or $105 million in cash at closing, no back end, no waivers, 105. Either/or. They may come back with an offer with waivers, but whatever. There was a portion in this $20 million on Pyote and the balance on --

MS. VOLKOV: $85 million.

MR. SITT: Correct. That $20 million, the split is the same independently of whether it's all at closing or some kicked

Page 118

out to commercialization?
MR. PACKMAN: Wait. Say that again.
MR. SITT: If we go with the back end --
MR. PACKMAN: And Hut8 is $115 million total for both sets of assets. $34.5 million at closing without any mineral -- they're waiving any mineral title entitlements. So any mineral right issues are waived on the Lindsey tract and Pyote and $80 million as a back-end payment upon commercialization of either property.
UNIDENTIFIED VOICE: 80.5.
MR. PACKMAN: I'm sorry. 80.5. Let me change that. The term sheet to be provided upon commercialization terms or 57 and a half -- that's $57,500,000 -- at closing without waiver of mineral --
UNIDENTIFIED VOICE: Can you say that one more time?
MR. PACKMAN: Yeah. Sorry. $57,500,000 at closing cash, without waiver of any title issues, and $57,500,000 on the back end on commercialization of one or more of the assets. No allocation. With no allocation?
You're going to bid on each of your

Page 119

respective asset, okay. And one of the bidders has allocated and the other does not choose to allocate.
UNIDENTIFIED VOICE: I understand. So, I guess, what is the baseline bid for --
MR. PACKMAN: Well, we have $20 million for Pyote.
UNIDENTIFIED VOICE: And you're saying that that's superior?
MR. PACKMAN: I didn't say that. We don't have to make that decision. How do I bid that? You have an allocation.
MR. GROSSMAN: It's nonsensical.
MR. SITT: So I'm going to bid against this number, and then at the end you're going to tell me we actually like Pyote better, sorry.
MR. DUNLAP: My issue is that at the end you can just reverse engineer the allocations.
MR. SITT: What do you mean reverse?
MR. PACKMAN: You're saying you want us to take more time and decide whether that's the highest and best? We're not disqualifying. Sorry.

Page 120

MR. GROSSMAN: Guys, I'm missing something. There's an aggregate bid and the bidder refuses to say, even going back to where we were before, how he's allocating; and then you want people to bid on the individual, which is basically bidding against themselves, and that guy then gets to say my bid on allocating a dollar more than that. That's why this whole theory was crazy. Is that what you're really saying?
MR. PACKMAN: Well, I don't understand what you're saying.
MR. GROSSMAN: What I'm saying is not that complicated. You have an aggregate bid. An aggregate consists of the properties that are being sold, whether it's two or three, and I'm not sure there were. Each one has a component. What is the component? Because you're now putting them up for separate bids.
MR. PACKMAN: I already said that we don't believe that the bid from Hut8, which has been allocated to Pyote, is a higher or better bid, but it's not a final bid. So what more do you want us to say?
MR. SITT: I want to bid against the

Page 121

best bid. So if I bid $21 million and no one matches it, that's it.
MR. GROSSMAN: No. They get to come back.
MR. SITT: I will get to come back -- instead of saying take my 105 for both --
MS. VOLKOV: The bidders come back and bid. I thought that's where we ended up before when we started this whole thing.
MR. GROSSMAN: You guys are rewriting history.
MR. SITT: We can't do this without allocating. So is it possible to bid when you haven't determined a winner between the two current bids? Have you two current bidders.
MR. GROSSMAN: You have a fixed option. Either you want to do it fairly or you don't. If you want to do it fairly, you know how to do it. If you don't, stop wasting everybody's time and let the court decide.
MR. SITT: You kind of have separate line options going as an aggregate bidder. We don't know whether -- you may still think that Hut8 is the superior bid. We don't know

Page 122

that.
MR. GRAY: But it could. Their bid is so different because it's a guaranteed payment to the estate. It's a totally different animal than being -- you have a baseline for each asset.
MR. SITT: You have a baseline and --
MR. PACKMAN: Your objection is to Hut8 coming back, right -- not forward -- coming back and bidding because they didn't allocate?
MS. VOLKOV: Yeah. 100 percent. Because exactly whoever said it, they can come back and say, okay, now that I know what the bids were for Pyote and Tarbush, I'm going to bid a dollar more than whatever crap they put on the table.
MR. PACKMAN: Wait. We don't have to go there.
MS. VOLKOV: Whatever contingent bid they put on the table, okay, and be the backup bidder.
MR. SITT: My concern is now you're asking us to bid apples to oranges. Because you just told me that's a completely separate

Page 123

bid. So we're having an auction and now the bidding process is really two bid processes because you guys haven't decided how this is really working.
MR. PACKMAN: You guys raised the objection. The genesis of this is you guys, and we're trying to work through this.
MR. SITT: We decided and you guys told us that they're going to allocate. They're refusing to comply. They should be disqualified or --
MR. PACKMAN: Look, this isn't a mediation and I'm not a judge.
MR. SITT: But you're --
MR. PACKMAN: Wait a second. Okay? I hear everybody saying we're going to go to the judge and do this. It's fine if that's what you want to do.
I want to hear what -- I want to hear from the bidder. I want to hear from Hut8.
Andrew, do you have a position on this or do you want us to just make a decision?
MR. CARTY: We don't intend to allocate the bidding. You guys want to allocate value for purposes of the lot bid and the debtor's

Page 124

business judgment, that's your right to do that.
MR. PACKMAN: Well, we're going to do that, regardless. The question is whether you get to bid first. And I understand their point. The word is allocated, and you guys don't want to do that. So it is a problem.
MR. SITT: It's two separate issues.
MR. PACKMAN: I just wasn't --
MS. VOLKOV: I have no issue with the $20 million/$85 million. I have no issue with that because I know what the number is. I know what I need to bid; okay?
And I guess it's -- after all the bids are aggregated, so to speak, and Thor wants to come back and make a higher bid, which I have a problem -- I know that's what is decided --
MR. PACKMAN: That's what we're going to do.
MS. VOLKOV: That's fine. I'm just putting my objection on the record. I have a problem with that. I think that is extremely unfair, and that is not how an auction should be run.

Page 125

Putting that aside for a minute, the Hut8 bid and their refusal to allocate -- I don't care if they get disqualified. They should not be allowed to come back and bid.
MR. PACKMAN: Yeah. Andrew, I agree with that. I think it is what it is.
MS. VOLKOV: Yeah, you're stuck with it.
MR. PACKMAN: I don't think we can come back and sort of allocate. I doesn't make sense.
MS. VOLKOV: Now they have the ability to come back and bid individually on each asset. But why do they need to --
MR. LENEY: Because maybe their bid as a package had certain considerations in it, and then if they realize they don't lose one, they still want the other, they're willing to make more concessions. It's pretty -- right?
MS. VOLKOV: You can do that on an individual basis so that everybody who is bidding on lots --
MR. SITT: Can we go off the record?
THE COURT REPORTER: Going off.
(A DISCUSSION WAS HELD OFF THE RECORD.)
THE COURT REPORTER: Back on the record.

Page 126

MR. DUFRAYNE: We will start with the Pyote properties. The opening bid would be $20,250,000 and we will start off.
UNIDENTIFIED VOICE:
MR. GORDON: Giga will bid $20,250,000.
MR. DUFRAYNE: Just to confirm, it is --
MR. SITT: For the Pyote assets, it's $20.5 million U.S.
MR. DUFRAYNE: Any questions from anybody?
MR. LENEY: I would suggest, just for the sake of time, unless you're offering any sort of waiver of any -- if you're changing the status quo from --
MR. SITT: On the terms of -- did they -- did Thor waive --
MR. DUFRAYNE: That's the default unless otherwise submitted.
MR. SITT: Then on the terms that they gave, as submitted, we increase our bid to $20,250,000.
MR. LENEY: DigiPower's bid is $20,500,000.
Can you confirm that?
MS. VOLKOV: Confirming.

Page 127

UNIDENTIFIED VOICE:
MR. LENEY: Thor?
The next bid on Pyote is $20,750,000.
Anybody here from Thor?
UNIDENTIFIED VOICE: Sorry. Can we go off the record?
UNIDENTIFIED VOICE: Wait a minute. Thor needs a minute.
MR. SITT: Thor needs a minute.
MR. DUFRAYNE: Hold on. You said it before, so every voice is there, it's their bid.
MR. SITT: I think that's fair.
MS. VOLKOV: Are they out?
MR. DUFRAYNE: $20,750,000
MR. SITT: No. We are entitled to a minute. Excuse me.
MR. DUFRAYNE: Okay. Take a minute.
MR. SITT: Hold on.
(A DISCUSSION WAS HELD OFF THE RECORD.)
MR. DUFRAYNE: The next bid is $20,750,000.
MR. SITT: Is that aggregate at all?
MR. PACKMAN: The aggregate bid is being considered on its own merit.

Page 128

MR. SITT: So I bid 22 if it doesn't increase the aggregate.
MR. PACKMAN: It does increase the aggregate.
So please bid on the Pyote asset. Okay. If you want to bid higher than Pyote asset, please bid on it.
MR. SITT: Okay. We bid $21 million.
MS. VOLKOV: I'm sorry. Can I --
MR. SITT:
MR. PACKMAN: I'm not going to answer any more questions. I'm just going to keep going here. Okay?
UNIDENTIFIED VOICE:
MR. GORDON: The present bid is $20,750,000. Correct?
UNIDENTIFIED VOICE: Correct.
MR. SITT: We bid 21.
MR. PACKMAN: Thor or $21 million?
MR. SITT: $21 million.
MR. DUFRAYNE: Giga Energy?
UNIDENTIFIED VOICE: Giga bids $21,250,000.
MR. DUFRAYNE: Giga's bid is $21,250,000.

Page 129

DigiPower?
MS. VOLKOV: $21,500,000.
MR. DUFRAYNE: DigiPower has bid $21,500,000.
Thor?
MR. SITT: 23.
MR. DUFRAYNE: Thor has bid $23 million.
MR. SITT:
MR. GORDON: $23,250,000.
Giga has bid $23,250,000.
DigiPower?
MS. VOLKOV: $23,500,000.
MR. DUFRAYNE: DigiPower's bid is $23,500,000.
Thor?
UNIDENTIFIED VOICE:
MR. SITT: 24.
MR. DUFRAYNE: Thor has bid $24 million.
Giga.
MR. GORDON: $24,250,000.
MR. DUFRAYNE: Giga has bid $24,250,000.
Digi Power?
MS. VOLKOV: $24,500,000.
MR. DUFRAYNE: DigiPower has bid $24,500,000.

Page 130

UNIDENTIFIED VOICE:
MR. SITT: $25 million.
MR. DUFRAYNE: Thor has now bid $25 million.
MR. GORDON: We request a 5-minute break.
MR. DUFRAYNE: Return at 5:30. See you in five minutes.
(A BRIEF RECESS WAS HELD.)
MR. SITT: I would like to amend my aggregate bid of 105 to the mineral rights closing (inaudible).
MR. DUFRAYNE: Just so we're clear, the aggregate bid is $105 million for Thor, cash closing, subject to the APA contingencies, but you're waiving the mineral right contingencies on both contracts?
UNIDENTIFIED VOICE: Correct.
MR. PACKMAN: What does that do to the --
UNIDENTIFIED VOICE: That would mean -- so it's a $25 million bid on Pyote lot of assets. Does that include the contingencies on that?
MR. PACKMAN: On both sets of assets,

Page 131

right?
UNIDENTIFIED VOICE: The contingency -- whether you're bidding on each asset or whether you're bidding in aggregate, the contingency for the mineral rights is what you're waiving; correct?
UNIDENTIFIED VOICE: Correct.
That also should answer your question about how to value any back-end payments. Because that to me is -- well, subject to the committee's input, that seems like --
MS. VOLKOV: Are you requiring the other bidders to make the same waiver?
MR. PACKMAN: No.
MR. SANDLER: The committee will factor that in, obviously.
UNIDENTIFIED VOICE: Do you have an incremental value that you're putting that waiver at so we can continue bidding?
UNIDENTIFIED VOICE: If I were to bid $25.25 million right now, would I beat his $25 million and waiver of mineral rights?
MR. DUFRAYNE: I can't see how you would, but we would have to discuss that.
MR. COHEN: Excuse me. On behalf of

Page 132

Thor, to be clear, you can't -- that's an internal decision for the committee to make with the debtor and company, what value you put on the waiver of the mineral rights. We're not assigning, to be clear, a dollar value to that waiver.
MR. SITT: Right. But I need to assign a dollar value for me to continue bidding. How do I know what to bid next?
MR. COHEN: Well, I'm not going to argue.
MR. SITT: If I give the waiver, what do I bid?
MR. PACKMAN: You know what? So is your client going to give the waiver?
MR. SANDLER: It doesn't matter how they make their decision. You have to make your decision. Your client has to decide do they want to waive the CP or not.
MR. SITT: I appreciate that. I'm saying, if I don't, I need to know what number incrementally I have to bid next to remain in the auction.
UNIDENTIFIED VOICE: Unless you're waiving the same contingency, then it's going

Page 133

to be dollar amount.
MR. DUFRAYNE: We're not arbitrarily assigning a value.
MR. SITT: So then how I can remain -- if I want to remain in the auction and not waive the mineral rights, what amount do I have to bid next? That's the only answer I want.
MS. VOLKOV: Isn't it at 25,250?
MR. DUFRAYNE: He wants to discuss it with the committee.
That's good. Thank you.
(A BRIEF RECESS WAS HELD.)
MR. SITT: $25 million with contingencies.
MS. VOLKOV: For DigiPower, $25,500,000. I don't think we need to keep repeating the waiver.
MR. PACKMAN: Agreed. We're going to stop bidding. We're not going to bid.
MS. VOLKOV: We were at $25,500,000.
MR. SITT: We will bid $25,750,000.
MR. DUFRAYNE: Illana?
MS. VOLKOV: $26 million.
MR. SITT: $26,250,000.

MS. VOLKOV: $26,500,000.
MR. SITT: $26,750,000.
MS. VOLKOV: $27 million.
MR. SITT: $27,250,000.
MS. VOLKOV: Sorry. I can't write this fast. I have to keep track of it myself. I'm an old fart.
$27,500,000.
MR. DUFRAYNE: Giga?
MR. SITT: $27,750,000.
MR. DUFRAYNE: Digi?
MR. DUFRAYNE: $27,500,000.
MR. SITT: I just bid --
MR. DUFRAYNE: Giga just bid $27,750.
MS. VOLKOV: Oh, you see? Sorry about that. I told you I can't write as fast.
$28 million.
MR. SITT: We request a bathroom break.
MR. DUFRAYNE: Great. The current bid is $28 million.
(A BRIEF RECESS WAS HELD.)
MR. DUFRAYNE: On the record; correct?
THE COURT REPORTER: On the record.
MR. DUFRAYNE: Before we do that, Mr. Court Reporter, are you good on time? We



may be here a bit.
THE COURT REPORTER: I'm here with you. Yes, sir.
MR. SITT: So we are at 28,250 to us.
Digi would like to bid $28,250,000.
MS. VOLKOV: $28,500,000.
MR. SITT: $28,750,000.
MR. DUFRAYNE: Digi is $28,750,000.
MS. VOLKOV: 29.
MR. SITT: $29,250,000.
MR. DUFRAYNE: Giga's bid is $29,250,000.
MS. VOLKOV: $29,500,000.
MR. DUFRAYNE: DigiPower's bid is $29,500,000.
Giga.
MR. SANDLER: $29,750,000.
MR. DUFRAYNE: Giga's bid is $29,750,000.
DigiPower?
MS. VOLKOV: $30 million.
MR. DUFRAYNE: DigiPower's bid is $30 million.
Giga?
MR. SANDLER:



MR. SITT: $30,250,000.
MR. DUFRAYNE: Giga's bid is $30,250,000.
MS. VOLKOV: Now I need a break. I'll be right back.
(A BRIEF RECESS WAS HELD.)
MR. DUFRAYNE: DigiPower?
MS. VOLKOV: $30,500,000.
MR. DUFRAYNE: DigiPower is at $30,500,000.
Giga?
MR. GORDON: $30,750,000.
MR. DUFRAYNE: Giga is at $30,750,000.
DigiPower?
MS. VOLKOV: $31 million.
MR. DUFRAYNE: DigiPower is at $31 million.
Giga?
MR. SITT: $31,250,000.
MR. DUFRAYNE: Giga is at $31,250,000.
DigiPower?
MS. VOLKOV: $31,5.
MR. DUFRAYNE: DigiPower is at $31,500,000.
Giga?



MR. SITT: $31,750,000.
MR. DUFRAYNE: Giga is at $31,750,000.
DigiPower?
MS. VOLKOV: $32 million.
MR. DUFRAYNE: DigiPower is at $32 million.
MR. SITT: $32,250,000.
MR. DUFRAYNE: Giga is at $32,250,000.
DigiPower?
MS. VOLKOV: $32,5.
MR. DUFRAYNE: DigiPower is at $32,500,000.
MR. SITT: $32,750,0000.
MR. DUFRAYNE: DigiPower is at $32,750,000.
MS. VOLKOV: We'll be back.
(A BRIEF RECESS WAS HELD.)
MR. DUFRAYNE: The last bid was $32,750,000.
MS. VOLKOV: The answer?
UNIDENTIFIED VOICE: The answer is that Giga's bid is substantially below, at this point, the amount of the account proof of agents.
MS. VOLKOV: The question is -- I

Page 138

mean --
UNIDENTIFIED VOICE: The issue is whether Giga -- we took a look at the account that was posted, okay. What you gave us is still substantially in excess of your bid.
MS. VOLKOV: It's my turn?
MR. DUFRAYNE: Yes.
MS. VOLKOV: $33 million.
MS. VOLKOV: DigiPower is at $33 million.
MR. SITT: $33,250,000.
MR. DUFRAYNE: Giga is at $33,250,000.
DigiPower?
MS. VOLKOV: $33,5.
MR. DUFRAYNE: DigiPower is $33,500,000.
Giga?
MR. SITT: $33,750,000.
MR. DUFRAYNE: Giga is at $33,750,000.
DigiPower?
MS. VOLKOV: $34 million.
MR. DUFRAYNE: DigiPower is $34 million.
MR. SITT: $34,250,000.
MR. DUFRAYNE: Giga is at $34,250,000.
DigiPower?
MS. VOLKOV: $34,5.

Page 139

MR. DUFRAYNE: Digi is at $34,500,000.
Giga?
MR. SITT: Sorry. Can you repeat that?
MR. DUFRAYNE: $34,500,000.
MR. SITT: $34,750,000.
MR. DUFRAYNE: Giga is at $34,750,000.
DigiPower?
MS. VOLKOV: $35 million.
MR. DUFRAYNE: DigiPower is at $35 million.
MR. SITT: $35,250,000.
MR. DUFRAYNE: Giga is at $35,250,000.
(A DISCUSSION WAS HELD OFF THE RECORD.)
MS. VOLKOV: $35,500,000.
MR. DUFRAYNE: DigiPower? We have $35,500,000.
MR. SITT: Hang on.
(A BRIEF RECESS WAS HELD.)
MR. SITT: $35,750,000.
MR. DUFRAYNE: Giga bids $35,750,000.
MS. VOLKOV: $36 million.
MR. DUFRAYNE: DigiPower bids $36 million.
MR. SITT: $36,250,000.
MR. DUFRAYNE: Giga bids $36,250,000.

Page 140

MS. VOLKOV: We need a brief break.
(A BRIEF RECESS WAS HELD.)
MS. VOLKOV: $36,500,000.
MR. DUFRAYNE: DigiPower bids $36,500,000.
Giga?
MR. SITT: $36,750,000.
MR. DUFRAYNE: Giga bids $36,750,000.
MS. VOLKOV: We're out.
MR. GORDON: DigiPower is out.
MR. PACKMAN: So Pyote for Giga--
MR. DUFRAYNE: $36,750,000. With the waiver.
MR. PACKMAN: Bidding on Pyote --
MS. VOLKOV: So who are the back-up bidders?
MR. PACKMAN: On a lot basis, do you agree to that?
MS. VOLKOV: Yeah. We would agree to that. But do you want to just put that on the record then?
MR. DUFRAYNE: So, for the record, Giga's bid of $36,750,000 is the winning bidder; and DigiPower bid $36,500,000 is the backup bidder.

Page 141

MR. SITT: So can we discuss -- so Tarbush is --
MR. GORDON: And then Thor and update -- so just Thor will have an opportunity to come in and --
MR. SITT: They're not out on the aggregate. They're out on bidding -- pulled out the bid of lots.
MR. LENEY: Right. They didn't allocate so --
MR. GORDON: So then do I need to say -- are you going to bid higher? Our bid would have to then be paired with a Tarbush bidder; is that correct? Because in order for them --
MR. PACKMAN: Let us talk about that and let you know.
MS. VOLKOV: I thought you wanted --
MR. CARTY: We are never going to be buyers on just Pyote or on just Tarbush. So we're never going to allocate. We're just going to -- if aggregate bids come in higher, that's great. If we can top it on an aggregate basis, then --
MR. GORDON: So then they can't bid on

Page 142

lots because --
MS. VOLKOV: That was their best and final bid.
MR. PACKMAN: We're going to let them bid in the aggregate. You will have a chance to bid with the Tarbush bidder and reserve rights on the record.
MS. VOLKOV: You should go back into the transcript and confirm this because --
MR. PACKMAN: If I have to, I will. They can say what they want and you can object if you want.
We're going to allow you to continue. I remember differently.
MR. PACKMAN: So let's move on to Tarbush.
MR. GORDON: Do you guys mind if we stay here for Tarbush?
MR. DUFRAYNE: We're going to proceed with the Tarbush lot bid.
So the two bidders will be Fluidstack and Thor.
The opening bid is $85 million by Thor.
MR. SITT: Without the waiver?
MR. PACKMAN: Please identify

Page 143

yourselves.
MR. SITT: Jack Sitt with (inaudible).
Yes, we are waiving our mineral rights for Tarbush.
MR. DUFRAYNE: Thank you.
MR. SITT: That bid is just on Tarbush. It's not contingent on Pyote. This is only Tarbush.
MR. DUFRAYNE: Is Fluidstack on the line?
MR. BATTERSBY: Yes. Jack Battersby, Fluidstack.
MR. DUFRAYNE: Jack, are you ready?
Fluidstack, the opening bid is $85,500,000.
MR. SITT: Fluidstack will bid 85,5 (inaudible).
UNIDENTIFIED VOICE: 86.
MR. DUFRAYNE: Thor bids 86.
Fluidstack?
MR. SITT: $86,5.
MR. DUFRAYNE: Fluidstack bids $86,500,000.
Thor?
MR. SITT: 90.

Page 144

MR. DUFRAYNE: Thor bids $90 million.
Fluidstack?
MR. SITT: 91.
MR. DUFRAYNE: Fluidstack bids $91 million.
Thor?
MR. SITT: 95.
MR. DUFRAYNE: Thor bids $95 million.
MR. BATTERSBY: 96.
MR. DUFRAYNE: Fluidstack bids $96 million.
Thor?
MR. SITT: 97.
MR. DUFRAYNE: Thor bids $97 million.
MR. BATTERSBY: Fluidstack needs to break five minutes.
(A BRIEF RECESS WAS HELD.)
MR. SITT: We're ready when you are.
MR. DUFRAYNE: Are we on?
THE COURT REPORTER: We're on the record.
MR. DUFRAYNE: Fluidstack, the floor is yours.
MR. BATTERSBY: Can you remind me what the last bid was?

Page 145

MR. DUFRAYNE: $97 million.
MR. SITT: 97,5.
MR. DUFRAYNE: Thor?
MR. SITT: 99.
MR. DUFRAYNE: Thor's bid is $99 million.
MR. SITT: 99,5.
MR. DUFRAYNE: Fluidstack's bid is $99,500,000.
Thor?
MR. SITT: 100.
MR. DUFRAYNE: Thor's bid is $100 million.
Fluidstack?
MR. SITT: Break, please.
(A BRIEF RECESS WAS HELD.)
MR. DUFRAYNE: The floor is yours.
MR. SITT: Fluidstack will bid 100.5. That's $100,500,000.
MR. DUFRAYNE: Fluidstack's bid is $100,500,000.
MR. SITT: $103 million.
MR. DUFRAYNE: Thor's bid is $103 million.
MR. BATTERSBY: Fluidstack is out on

Page 146

this one.
MR. DUFRAYNE: Fluidstack is withdrawn. Okay. Thank you.
MR. GROSSMAN: Jack, do you want to be the backup bidder on this?
MR. SITT: Yeah.
MR. GROSSMAN: They will remain as the backup bidder.
MR. DUFRAYNE: Fluidstack will be the backup bidder. Is that confirmed?
MR. SITT: Yes.
MS. VOLKOV: What was that price?
MR. SITT: I'm sorry. $103 million.
MR. DUFRAYNE: So the backup bidder is $100,500,000 and the prevailing bidder on Tarbush as a lot is 103 million even; correct?
MR. DUFRAYNE: Yes.
Let's take a short break before we go back to the aggregate.
(A BRIEF RECESS WAS HELD.)
MR. DUFRAYNE: Now they're considering the auction the combined bid. Two qualified. That's Hut8 and Thor.
Is there anybody else that's considering

Page 147

to participate?
MR. SITT: In the overall auction?
MR. DUFRAYNE: Yes.
MR. BATTERSBY: We are not qualified to bid on Tarbush. We would like the opportunity, following how this works -- the question is is there going to be a counter? We want to participate. We're not sure on what terms.
MR. PACKMAN: Right now let's start the aggregate bidding and then see where that goes.
UNIDENTIFIED VOICE: That's fine. Go ahead.
MR. DUFRAYNE: So, Thor, the initial bid would be an additional $500,000. The incremental would be $500,000.
MR. PACKMAN: I think we need, at this point, to take a break.
(A BRIEF RECESS WAS HELD.)
MR. DUFRAYNE: The next bid should be -- do you guys have any dispute with that? Increments of $500,000.
MR. CARTY: So we will do $500,000. And we're at --

Page 148

MR. DUFRAYNE: 140,250.
MR. CARTY: Yeah. We will agree to the Phase 1 waiver, Steve, that you mentioned Tarbush and also the newer waiver that everybody is agreed to. We will agree to that as well. So apples to apples.
UNIDENTIFIED VOICE: Has Thor already agreed to the things on waiver?
MR. SITT: It was a condition we put in our APA.
We want to talk.
MR. DUFRAYNE: Take a break.
MR. SITT: Thank you very much.
(A BRIEF RECESS WAS HELD.)
MR. SITT: Can I ask a question? Sorry. So in the event that the (inaudible) proceed with the aggregate bid, am I right in understanding that means Fluidstack would no longer be the backup bidder on Tarbush property? You would go to the second highest aggregate bid by default?
MR. DUFRAYNE: Yeah.
MR. SITT: Okay. Thanks.
(A DISCUSSION WAS HELD OFF THE RECORD.)
(A BRIEF RECESS WAS HELD.)

Page 149

MR. DUFRAYNE: The current bid is $140,250 million.
MR. SITT: Our bid is 144 million.
MR. DUFRAYNE: That is a combined bid?
MR. GORDON: That's an aggregate bid for full -- With our bid at an increase of their $103 million portion to cover the delta?
MR. PACKMAN: They're bidding --
MR. GORDON: We can submit a joint bid our number. As a qualified bidder, we can submit a joint bid with my 36,750 combined with your hundred and --
MR. SITT: Then I'm 144 minus his.
MR. PACKMAN: First of all, let's make sure we're on the record. And second of all, let's make sure we understand -- Also could you identify yourself when you speak? Because the record is not clear who is bidding.
MR. GORDON: GigaEnergy. We have teamed up with Thor to submit a joint bid for both the Pyote and Tarbush assets, a combined bid of 36,750 from GigaEnergy for the Pyote property combined with a bid of 100 and -- they're increasing their target price to

cover.
(Overlapping.)
MR. SITT: Our joint bid is 143 million and my bid is 106,250 and your bid is 36,750.
MR. GORDON: 36,750 and 106,250,000 Between Giga and Thor.
MR. SITT: Correct.
MR. PACKMAN: Before we go forward, assuming that Hut8 decides to bid higher -- so Hut8 is bidding by themselves -- what's your anticipation of how you're going to work this going forward?
MR. GORDON: We will continue to discuss with them at -- every bid that they make, we will have to have another session with Thor.
MR. PACKMAN: Okay. So if we're going to do that, which is fine, we're going to probably -- let's say Hut8 wants to bid it. And so we already confirmed on the record what the current bid is. It's $144 million --
MR. CARTY: $143 million.
So just for the record Andrew Carty on behalf of the bidders. I'm sorry. It's 143 and so the bidding half a million, so 143,5?



UNIDENTIFIED VOICE: Yes.
MR. CARTY: We will do 143,5.
MR. SITT: We will go to 144 with us taking on the additional --
MR. PACKMAN: So now we're at 144?
UNIDENTIFIED VOICE: Yes.
MR. PACKMAN: So Thor is the balance of that?
MR. SITT: We're at 106,750.
MR. CARTY: Is the bid is 144,500? Yeah. 144,500.
MR. GENOOT: You guys are missing a million dollars here.
UNIDENTIFIED VOICE: Who is this?
MR. GENOOT: Can you guys add your numbers?
MR. CARTY: We just want to make sure that the breakdown -- the two bids are --
MR. SITT: So I will make it -- I'm going to bid now of $144 million and Giga is 36,750. So what's the difference of that?
UNIDENTIFIED VOICE: 107,250. Okay.
MR. DUFRAYNE: And so we go to 145 total, of which Giga is 36,750 and Thor -- whatever. We have to get that on the record.



What the record is now.
MR. CARTY: It's 145. We will do 145,5.
UNIDENTIFIED VOICE: Let's go on the bridge.
(A BRIEF RECESS WAS HELD.)
MR. DUFRAYNE: The prevailing bid at the moment is $145,500. That's your bid.
MR. PACKMAN: Thor, you just you need to put on the record that Thor is now bidding --
MR. SITT: Thor is now bidding on their own account as Thor, and their partner has left the bidding process.
MR. PACKMAN: Right. Giga has left the building.
MR. SITT: Thor would like to bid $146 million.
Greg and Raj, you guys on the phone? Just want to make sure you guys are here.
UNIDENTIFIED VOICE: We're here.
UNIDENTIFIED VOICE: Okay. Great.
MR. SITT: Thor bids 146.
MR. CARTY: So, for the record, Andrew Carty on behalf the Hut bidders.
Hut will bid 146 and a half.
MR. PACKMAN: Thor has bid 147.



MR. CARTY: Hut will bid 147 and a half.
MR. DUFRAYNE: Thor?
MR. SITT: 149.
MR. CARTY: 149 and a half.
MR. DUFRAYNE: Thor?
MR. SITT: 150.
MR. DUFRAYNE: Thor is at 150.
MR. CARTY: 150 and a half.
MR. DUFRAYNE: Hut8 is at 150,500.
MR. SITT: 151.
MR. DUFRAYNE: Thor is at 151.
MR. CARTY: 151 and a half.
MR. DUFRAYNE: Hut is 151,500.
MR. SITT: 152.
MR. DUFRAYNE: Thor is 152.
MR. CARTY: 152 and a half.
MR. DUFRAYNE: 152,500.
MR. SITT: 153.
MR. DUFRAYNE: Thor is at 153.
MR. CARTY: 153 and a half.
MR. DUFRAYNE: Hut8 is at 153,500.
MR. SITT: Can I request a short break?
We're going to try to keep it to around five minutes.
(A BRIEF RECESS WAS HELD.).

Page 154

MR. DUFRAYNE: The current bid is 153,500 by Hut8.
MR. SITT: 155.
MR. CARTY: Can we take a short break?
MR. DUFRAYNE: Sure.
(A BRIEF RECESS WAS HELD.)
MR. DUFRAYNE: Back on the record.
MR. SITT: Steve, are you on?
MR. PACKMAN: Give him a break.
The last version we changed, the predicament -- this just has to do with the language that I think we already addressed, which was sole and absolute discretion. I'm pretty sure that was already addressed and that came out, but I need to look at it.
MR. PACKMAN: What is it in reference to?
UNIDENTIFIED VOICE: The sole and absolute discretion. There were a couple. I think 7.2C.
UNIDENTIFIED VOICE: Was that the one that knew you posted in the amended --
MR. PACKMAN: That's correct. Somebody from the committee counsel is bringing it up. Just want to make sure.

Page 155

(A DISCUSSION WAS HELD OFF THE RECORD.)
MR. SITT: $155 million.
MR. DUFRAYNE: Hut8?
MR. CARTY: We will bid 156 subject to the modifications that we emailed debtor's counsel earlier regarding the net lot issue.
MORRIS: Can you explain the modifications that are being requested to be made?
UNIDENTIFIED VOICE: Did you circulate the modification?
MORRIS: I did. If you explain what the change means, we would appreciate that.
MR. GENOOT: I'm happy to.
MR. PACKMAN: I'm just going to read the language.
MORRIS: If you don't mind, can someone just explain what the language means so we're on the same page? Not trying to confuse anybody.
MR. PACKMAN: Go ahead.
MR. GENOOT: It's just a clarification. We think there's two areas in the current bid that contradict each other.
One is that there's 176 megawatts of

Page 156

power at the facility, and then there's another provisory here that it's 160 megawatts by 2028. So we're just removing that additional language because that has to do with the RAM schedule with the utilities to get the power, not when the power bill comes on, so we just had conditions on power approval.
MR. PACKMAN: Any questions?
MORRIS: I need to review the language. Is there a way for us to take a break and then come back on?
UNIDENTIFIED VOICE: I sent it to him. Do you want me to send it to you though?
MORRIS: Yes. If somebody could send it to me, that would be helpful. And then if you can give us 10 minutes, that would be wonderful. Is that okay?
UNIDENTIFIED VOICE: Yes.
MORRIS: Then I guess we will dial backing in at -- let's just say 9:05.
MR. PACKMAN: Okay. Thank you. That's fine.
(A BRIEF RECESS WAS HELD.)
MR. DUFRAYNE: So the debtors -- I just

Page 157

want to put on the record that the, you know, debtor, the Solivers, they're not going to agree to the requested deletion language.
You can continue bidding with or without that request. I just need you to clarify whether you are or not before -- if you've rethought it, is what I'm saying.
UNIDENTIFIED VOICE: So we will all just sit tight for a few minutes.
(A BRIEF RECESS WAS HELD.)
MR. DUFRAYNE: Morris, are you back on?
MR. BEHRMAN: Morris is on. Can you hear us?
MORRIS: I can hear you. Can you hear me?
MR. LENEY: Still waiting on one more.
MORRIS: Long day, huh?
THE WITNESS: Guys?
MR. GENOOT: We want to just clarify one of the diligence questions. Because the reason it was taking so long, we were going through all of the diligence we did pre-auction. And in one of --
MR. CARTY: This is Hut8 speaking by the way, for the court reporter.

Page 158

MR. GENOOT: Yeah. So on August 20th, there were kind of responses. We're trying to figure out why the Energy Council is not comfortable with the change, if I can get clarity expectation.

In the response, the question is what is the latest load rate communicated from Canaan. And it said June 20, 2026, 176 megawatts. The North McCamey, to The Sand Lake 3.45 kb transmission project was completed at the end of June and is currently pending approval June 2029 for 300 megawatts.

So we're trying to bridge that discrepancy of the language in the DD versus the language that Thor had in their stalking horse bid. And if the Energy Council is not willing to remove it, we are trying to understand why. And apologies if it's taking so long. We're trying to go back and do our diligence. But it seems like everything that we're looking at points to powers available there, and we need the approval. So we are trying to reconcile why there's a pushback on this language.

MORRIS: Can I jump in here? It

Page 159

seems -- and this is an objection and a statement and whatever else you want to call it. It feels like Thor has been bid up by another party who is not comfortable and who's never been comfortable with the contract that has been agreed to by the parties.

We feel a little bit taken advantage of in that sense. So we would ask, Steve, that you call all the parties on the carpet now, make the decision. But I do want to lodge an objection for the record that we believe the other party's bid was made on false pretenses thereby increasing our bid astronomically.

And so we're prepared to do this deal, as you know. We've been prepared to do this deal. And either the counter party, the other party, increases their bid, accepts the contract, or they don't.

MR. GENOOT: Correct. I'm trying to get a clarification.

MORRIS: We don't need any more clarifications. We need -- Excuse me. Excuse me. We're asking for a clarification, sir.

Page 160

MR. PACKMAN: The objection is noted. I think there was a bit of --

Hut8 had a bid of 153,5 with no contingency. So this came up when they got to 156.

MR. CARTY: Did Energy Council, prior the reasons why they were rejecting our proposed --

MR. GENOOT: We can keep going on with the bid.

MR. PACKMAN: First of all, there's two changes. And you have the ramp-up is due to closing.

MR. CARTY: That's not --

MR. PACKMAN: Well, it could happen, I guess, I suppose, if tomorrow the final approval comes through; right? But right now officially the earliest would be a separate attempt.

MR. GENOOT: Can you unpack that a little bit? December 10th is for what?

MR. PACKMAN: December 10th is the tentative date which we understand is the earliest that the final approval would be granted.

Page 161

MR. GENOOT: Right.

MR. PACKMAN: By ERCOT. And that's 300 megawatts, but it's only 176 megawatts to start.

MR. GENOOT: Correct.

MR. PACKMAN: I'm a layman at this unfortunately, but that's what it is.

All right. So we -- I mean, I'm not laughing at you. I'm just laughing at myself. So we have a buyer that has said, hey, look, if the ramp-up takes longer, meaning if the actual time which the improved energization, right, of 176 megawatts takes longer than December 10th, that's okay with us. Right?

And we had a bidder last night, Fluidstack, that asked us to change the date in that provision in December of 2027. And we said no.

So now you asking us to delete it, and the Energy Council said, yeah, that is probably an outside date. But even if we change the date, now we have to do it for Thor, and Thor is not asking us to do that.

So if you're talking about fiduciary

Page 162

duties to the estate, we have a bidder who is not asking the debtors to make that change. We're comfortable with, hey, for some reason, you get final approval for the energy but it doesn't get fully ramped up, meaning it's available but these other things have to happen, whatever they are, during December of 2028, we're okay with that.

So I don't know that I need another reason. Because that's a better deal. And it's been in there for quite some time.

So I understand Morris's point. I get his point. I'm not agreeing with it or disagreeing with it, but I get his point. So that's primarily why we're not willing to take it is we have a buyer that, not insisting on the ramp-up happening until that date. Yeah, it's an outside date. And everyone hopes that it doesn't take that long. So it's not just Energy Council. It's also --

MR. GENOOT: Has there been any other communication from TNMP? Because I think that all of the language we have seen with TNMP is that the power is available this

Page 163

year, right? Like there's no ramp to 2028.

I understand the protection. I just want to make sure that if we continue forward that there's no additional kind of -- we've received information in the diligence process that make us comfortable that the power is available. I want to make sure there's no new information that we don't know about.

But if this just, hey, if we can get the protection if Thor is willing to give it to us, why not, why would we not keep it versus there's additional information that folks know that we don't know. That's what we're trying to understand here.

MR. PACKMAN: I can't tell you today and our Energy Council and, I think, no one here today can say whether that ramp-up is going to be December 11th, April -- you know, May, June. We really don't know on that account. So it's very difficult to answer that question.

MR. GENOOT: But every communication thus far has been what we have been talking about currently.

MR. PACKMAN: What communication? You

Page 164

have to show me the communication. I'd have to look at it, I'd have to read it, and see what it actually says.

MR. GENOOT: (Inaudible) had sent an email in the data room that confirmed basically what the Q&A was answered two weeks ago, which was that the 178 is conditioned precedent on the line upgrade which was done in June of this year. I'm just confirming there's no new information outside of that.

MR. DUFRAYNE: So subsequent to that date, the government issued a proclamation that said --

MR. GENOOT: Yeah. We're very familiar with that. That we're comfortable that.

MR. DUFRAYNE: That's fine. But the 130 megawatts is captured in that governor's proclamation. So, you know, 10 days ago we received -- I'm sorry -- a week ago we received a note or we received a letter from TNMP that the 300 megawatts -- that's the total project -- the 300 megawatts is conditionally approved. And that too is written up.

MR. GENOOT: Exactly. Yeah.

Page 165

MR. DUFRAYNE: So we're now conditionally approved. There are dinks or any modifications needed to be made to the dynamic modeling. And the best information we have is that ERCOT will make a determination on accepting the ramp-up by December 10th.

MR. PACKMAN: Excepting the giving final approval on the back 300 megawatts by December 10th. That's currently our information.

The question that they're asking is why would there be additional time if the final approval is given? Let's just pick that date up.

And the answer from our Energy Council is because there could be -- there could be the other interim requirements that we don't know about that could come into play. And I have a buyer who said, yeah, we're willing to take that risk. We will push it out just in case. Nobody wants it to happen. Nobody thinks it's going to happen, so I'm repeating myself.

MR. GENOOT: Yeah. I understood. I

think we can -- I'm just confirming internally. I would like to move forward if you will give us one second. We're just confirming internally.

MR. GENOOT: In the dynamic model, that's what is pending right now; right?

MR. DUFRAYNE: No.

MR. PACKMAN: No.

MR. GENOOT: That's already been approved or that's pending?

MR. PACKMAN: There were no changes on the dynamic model. There's an audit procedure and then the final approval. So not at the moment.

MR. GENOOT: Do you have any other questions here? And I think we just make a call on our adjustment.

MR. MARTINI: Give me two seconds. The dynamic models, they have -- they had some deficiencies that were pending. That submitted the updating model but it was pending confirmation so that contradicts what they're saying just now.

MR. PACKMAN: We updated the data room.

MR. MARTINI: I see that now. Thank



you.

MR. GENOOT: Sorry, you guys. We have more room to bid. We're just trying to get along momentarily.

(A DISCUSSION WAS HELD OFF THE RECORD.)

MR. GENOOT: I just need one more person to comment internally right now.

Let's continue.

Andrew, we can remove the redline?

MR. CARTY: Andrew Carty. So our 156 bid stands. We will remove the conviction on the language change.

MR. PACKMAN: 157.

MR. DUFRAYNE: 157,5?

Morris, are you there?

MORRIS: What's the question? Sorry?

MR. SITT: We're bidding again. Bid is to us.

MORRIS: Can we have an offline call? I want to ask Steve a question.

MR. PACKMAN: Sure. Make it really quick.

MORRIS: Really quick.

UNIDENTIFIED VOICE: Because we're going to continue bidding.



(A BRIEF RECESS WAS HELD.)

MR. DUFRAYNE: The last bid was Hut8, 157,500.

MR. SITT: 169.

MR. DUFRAYNE: Thor bid 169.

MR. CARTY: We're going to continue bidding. However, we think that one of the benefits of our bid is our balance sheet. We can do this bid without any questions.

We shared our concerns articulated by my colleague about getting bid up. So from here on out, we will continue to bid, but our bids from here on are conditioned on we are not going to serve as a back-up bidder for a holistic bid.

So you can go with them if you're ready to put in a bid, but we're not going to be a backup bid from here on out. That's a condition of our bidding.

Our bids that we submitted are -- we're billing to have those as backup bids, the bids that we were just submitting with our bids here. But that's a condition to our bidding now going forward.

MR. LENEY: So you're capping your



backup bid at 157,5?

MR. CARTY: If you accept our bid, that's done.

MR. SITT: But they can't do that. That's not proper.

MR. CARTY: We are willing to continue bidding.

MORRIS: That's not what the bankruptcy order provides.

MR. DUFRAYNE: I think you would have to remain as a backup bidder if you're the second guy standing. I don't think you can do that. I have it here.

MR. CARTY: The order says what it says. I'm telling you this is what we're saying for us to continue to participate. If you're going to say no, we're not going to do that, then I have to go talk to -- I mean, I don't think I can do that.

UNIDENTIFIED VOICE: If you are going to continue bidding and get outbid --

MR. CARTY: Let me just confirm.

(A BRIEF RECESS WAS HELD.)

MR. CARTY: Andrew Carty. We will go 171.

Page 170

MR. PACKMAN: So the backup bid, that's all --
MR. CARTY: Yeah.
MR. CARTY: 163.
MR. SITT: 164.
MR. CARTY: 165.
MR. DUFRAYNE: $165 million. Thor?
MR. SITT: Thor bids 166.
MR. CARTY: Just one minute.
(A BRIEF RECESS WAS HELD.)
MR. GENOOT: Hey everybody where are we at now?
MR. DUFRAYNE: 166.
MR. GENOOT: Okay. 167.
MR. DUFRAYNE: Hut8 has bid $167 million.
MR. SITT: 168.
MR. GENOOT: 169.
MR. DUFRAYNE: Hut8 bid $169 million.
MR. SITT: 170.
MR. DUFRAYNE: Thor bid $170 million.
MR. GENOOT: Hold on one second.
(Pause.)
MR. GENOOT: What is it at right now?
MR. DUFRAYNE: 161.

Page 171

MR. GENOOT: 171.
MR. SITT: Thor bids 172.
MR. GENOOT: 173.
MR. SITT: 174.
MR. DUFRAYNE: Hut8?
MR. GENOOT: All right, Thor. You win. You got it.
MR. SITT: Thank you. One second.
MR. DUFRAYNE: So can we just confirm some numbers? So on a combined basis, Thor is the winning bidder $174 million.
As a backup, Hut8 at $173 million.
On Pyote, GigaEnergy prevailed $136,750,000.
MR. GENOOT: Hold on. Sorry. One second, guys.
MORRIS: I got cut off. It's Morris. Did we win the bid at 173?
MR. CARTY: We're at 174.
MR. DUFRAYNE: On Pyote, the winning bidder was beginning GigaEnergy at $36,750,000. And the backup bidder was DigiPower X at $36,500,000.
And on Tarbush, the winning bidder was Thor, $103 million. And the backup bidder is

Page 172

Fluidstack at $100,500,000.
MR. LENEY: You said Thor was one 103?
MR. GENOOT: Where are we at now?
UNIDENTIFIED VOICE: The top bid right now is 174.
MR. GENOOT: All right. 175.
UNIDENTIFIED VOICE: I thought we were done.
MR. GENOOT: 175. Hut8 is willing to bid 175. You didn't close the auction.
MORRIS: Come on, guys. You closed it.
MR. GENOOT: It's is 175 bid on the table right now.
MR. PACKMAN: It's putting us in a difficult position. Because we did accept. We did, subject to some documentation discussion issues with Thor which, you know, we will deal with, we did. We accepted -- that was the final bid. Your client dropped out. So I mean, what are we doing here?
MR. GENOOT: That's why I kept saying one second, one second.
UNIDENTIFIED VOICE: He clearly said "one second."
MORRIS: After it was called.

Page 173

MR. GENOOT: We can keep going. We have an overbid.
UNIDENTIFIED VOICE: Steve, please. Enough of this.
MR. CARTY: I have a problem with this.
UNIDENTIFIED VOICE: It's a better bid. It's a topping bid.
MR. PACKMAN: But what was the point of the statement, you know, "congratulations," you know.
MR. CARTY: He plainly said "hold on one second," and he picked up the phone and he went on hold. And then you guys went on and read stuff.
MR. PACKMAN: Can we read back what happened?
UNIDENTIFIED VOICE: Can we ask the reporter?
(THE REPORTER READ BACK THE REQUESTED TESTIMONY.)
(A DISCUSSION WAS HELD OFF THE RECORD.)
MR. CARTY: The auction is still open.
We have a $171-million bid on the table.
I'll ask you. This is probably not appropriate, but what was that all about?

Page 174

MR. CARTY: I think there was a miscommunication. And once he got the clarification one his end, he was able to put the $175 million bid in.
MR. PACKMAN: So the part about "Congratulations, you win, we should do dinner in New York," that was just a whole line of --
MR. GENOOT: I can drop in. I was trying to get hold of somebody and we couldn't. And so before getting hold of that person, that was going to be our ceiling. And as I was talking, that person called me and said, "One second, sorry."
So it's up to you guys. I mean, like, I hear what you guys are saying. We can mark a new ceiling and then we can keep on going. If you guys choose not to, I mean --
MR. FEINSTEIN: Can we consult in the committee breakout room with the committee, please?
MR. DUFRAYNE: We're going to have to.
MORRIS: Just for the record, Thor objects to reopening the bidding.
(A BRIEF RECESS WAS HELD.)

Page 175

MR. DUFRAYNE: We're going to continue be auction, but your objection or protest is noted.
MR. PACKMAN: Let me just say further that that won't happen again. If you congratulate somebody on the winning bid --
MR. GENOOT: Apologies. Understood. Fully. All right.
MR. DUFRAYNE: So I think it's 175.
Thor?
UNIDENTIFIED VOICE: 176.
MR. GENOOT: What was the last bid?
MR. DUFRAYNE: $176 million.
MR. GENOOT: 177.
MR. DUFRAYNE: Thor?
MR. SITT: 178.
MR. DUFRAYNE: Hut8?
MR. GENOOT: 179.
MR. DUFRAYNE: Thor?
MR. SITT: 180.
MR. DUFRAYNE: Hut8? Hut8?
MR. GENOOT: One second. I don't want to say the wrong thing again.
What's the bid right now? Can you repeat?

Page 176

MR. PACKMAN: $180 million.
MR. DUFRAYNE: Hut8?
MR. GENOOT: We will not keep on going.
Thank you, guys. Sorry for the earlier mixup.
MR. DUFRAYNE: The auction is closed.
UNIDENTIFIED VOICE: Can we have a roll call as to the numbers, please?
MR. DUFRAYNE: On the combined bids, Thor is winning bidder at $180 million.
Hut8 is the backup bidder at $179 million.
Pyote Energy is the prevailing bidder at $36,750,000.
DigiPower X is the backup at $36,500,000.
On Tarbush, Thor Cal is the winner at $103 million, and Fluidstack is the backup sat $100,500,000.
MR. FEINSTEIN: Just for the sake of clarity on the record, these individuals lot bids are irrelevant, right? I mean, we're talking the bulk -- the backup bulk bid, so that's interesting data, but they're not the winning bids, just to be clear.

Page 177

MR. GORDON: And the deposits will be returned to those lot winners to the extent they're not; right?
MR. PACKMAN: I'm not sure if I agree with that or not.
MR. GORDON: Giga's deposit should be returned.
UNIDENTIFIED VOICE: Oh, you're back on?
MR. GORDON: Yeah. My plane got delayed. But Giga's deposit should be returned.
MR. PACKMAN: We will get back to you on that. I'm not disagreeing with you. I'm not agreeing with you. But yes. Period.
MR. GORDON: For the record, we're reserving our rights to file any motion or objection.
MR. PACKMAN: Fine. Got it.
MR. PACKMAN: So we can let the court reporter go?
Take care.
(PROCEEDINGS CONCLUDED AT 10:40 P.M.)
- - -

C E R T I F I C A T E

I Alan Peacock and Shannon P. Yost, Certified Court Reporters, do hereby certify that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place, and on the date hereinfore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

________________________ ________________________

SHANNON P. YOST, CCR ALAN PEACOCK, CCR
Certified Court Reporter Certified Court Reporter
Dated: 9-21-26 Dated: 9-21-26

**&**

**&** 3:3 9:24 27:2

**1**

**1** 148:3
**1.3** 47:11
**10** 35:10 68:7 108:7 110:4 111:10 156:17 164:18
**100** 122:12 145:11,12 149:24
**100,500,000** 145:19,21 146:15 172:1 176:19
**100.5.** 145:18
**103** 145:22,23 146:13,16 149:7 171:25 172:2 176:18
**105** 110:19 112:18 117:17 117:18 121:6 130:11,14
**106,250** 150:4
**106,250,000** 150:5
**106,750** 151:9
**107,250** 151:22
**10:00** 1:16
**10:40** 177:22
**10th** 1:15 160:21,22 161:14 165:7 165:10
**11** 1:6 3:14 13:4 111:11
**115** 90:16 101:4 103:24 105:22 107:2 108:14 118:4
**11th** 163:18
**12** 64:17
**13** 93:2
**130** 164:17
**136,750,000** 171:14
**140,250** 148:1 149:2
**143** 150:3,22,24
**143,5** 150:25 151:2
**144** 149:3,13 150:21 151:3,5 151:20
**144,500** 151:10 151:11
**145** 151:23 152:2
**145,5** 152:2
**145,500** 152:7
**146** 152:16,21 152:24
**147** 152:25 153:1
**149** 153:3,4
**15** 73:7,8,9 110:4
**150** 91:19 153:6 153:7,8
**150,500** 153:9
**151** 153:10,11 153:12
**151,500** 153:13
**152** 153:14,15 153:16
**152,500** 153:17
**153** 153:18,19 153:20
**153,5** 160:3
**153,500** 153:21 154:2
**155** 154:3 155:2
**156** 155:4 160:5 167:10
**157** 167:13
**157,5** 167:14 169:1
**157,500** 168:3
**16** 16:24
**16,250** 22:5,8
**16,250,000** 17:1 21:21
**16,5** 22:11
**160** 156:2
**161** 170:25
**163** 170:4
**164** 170:5
**165** 170:6,7
**166** 170:8,13
**167** 170:14,16
**168** 170:17
**169** 168:4,5 170:18,19
**17** 3:21 13:14 26:15 108:19
**17.5** 108:23
**17.75** 44:23
**170** 170:20,21
**171** 169:25 171:1 173:23
**172** 171:2
**173** 171:3,12,18
**174** 171:4,11,19 172:5
**175** 172:6,9,10 172:12 174:4 175:9
**176** 46:13 67:15 67:18,23,25 155:25 158:8 161:3,13 175:11,13
**177** 175:14
**178** 164:7 175:16
**179** 175:18 176:12
**18** 26:18
**180** 175:20 176:1,10

**2**

**20** 85:6 117:21 117:23 119:6 124:11 158:8
**20,250,000** 126:3,5,21
**20,500,000** 126:23
**20,750,000** 127:3,15,22 128:16
**20.5** 126:8
**2026** 1:15 3:21 13:14 158:8
**2027** 161:18
**2028** 156:3 162:8 163:1
**2029** 158:12
**20th** 158:1
**21** 121:1 128:8 128:18,19,20
**21,250,000** 128:23,25
**21,500,000** 129:2,4
**22** 96:21 128:1
**23** 80:14 129:6 129:7
**23,250,000** 129:9,10
**23,500,000** 129:12,14
**230** 91:21
**24** 129:17,18
**24,250,000** 129:20,21
**24,500,000** 129:23,25
**25** 130:2,4,22 131:22 133:14
**25,250** 133:9
**25,500,000** 133:16,21
**25,750,000** 133:22
**25.25** 131:21
**250,000** 17:3
**26** 110:15 111:23 112:25 117:12 133:24
**26,250,000** 133:25
**26,500,000** 134:1
**26,750,000** 134:2
**26-18325** 1:7 3:16 13:8
**27** 134:3
**27,250,000** 134:4
**27,500,000** 134:8,12
**27,750** 134:14
**27,750,000** 134:10
**28** 101:25 134:17,20
**28,250** 135:4
**28,250,000** 135:5
**28,500,000** 135:6
**28,750,000** 135:7,8
**29** 135:9
**29,250,000** 135:10,12
**29,500,000** 135:13,15
**29,750,000** 135:17,19

**3**

**3.45** 158:10
**30** 60:19 61:15 68:7 78:10 135:21,23
**30,250,000** 136:1,3
**30,500,000** 136:8,10
**30,750,000** 136:12,13
**300** 67:15,19 158:12 161:3 164:21,22 165:9
**31** 136:15,16
**31,250,000** 136:19,20
**31,5** 136:22
**31,500,000** 136:24
**31,750,000** 137:1,2
**32** 137:4,5
**32,250,000** 137:7,8
**32,5** 137:10
**32,500,000** 137:12
**32,750,000** 137:15,19
**32,750,0000** 137:13
**33** 138:8,10
**33,250,000** 138:11,12
**33,5** 138:14
**33,500,000** 138:15
**33,750,000** 138:17,18
**34** 44:16 58:5 62:22 64:20,23 65:16,17 78:20 80:15 95:11 99:4 138:20,21
**34,250,000** 138:22,23
**34,5** 138:25
**34,500,000** 139:1,4

**34,750,000** 139:5,6
**34.5** 45:4 50:16 50:19 52:12 53:10 54:13 56:5 58:11 66:11 70:14 90:14,21 95:4 101:16 104:1 105:22 107:18 118:5
**35** 115:14 139:8 139:10
**35,250,000** 139:11,12
**35,500,000** 139:14,16
**35,750,000** 139:19,20
**36** 139:21,22
**36,250,000** 139:24,25
**36,500,000** 140:3,5,24 171:23 176:16
**36,750** 149:11 149:23 150:4,5 151:21,24
**36,750,000** 140:7,8,12,23 171:22 176:14
**3:00** 85:22
**3:30** 90:5
**3:45** 90:9

**4**

**40** 80:12 90:16
**46** 16:25 44:21 51:19 52:13 53:11 56:5 58:7 71:1 80:13 90:15
**46,500,000** 17:5

**5**

**5** 15:15 82:17 130:5
**50** 26:16 36:18 36:18 51:10
**50/50** 67:21 91:4
**500** 47:12
**500,000** 17:7 147:16,17,23 147:24
**51** 26:18 36:21
**52,750,000** 51:24
**54** 67:25
**55** 50:8
**55,482,500** 42:13
**57** 115:17,17 118:15
**57,500,000** 118:16,20,22
**57.5** 91:2,3 96:18 101:11 101:15 104:12 104:15 106:14 106:19,21 108:21
**57.5.** 96:18 99:9
**5:30** 130:7

**7**

**7.2c.** 154:20
**70** 28:3,3
**75** 50:2 73:13 73:22 74:2,5,12 74:25 77:2,7,10 78:3,17 79:5 80:6 81:12 82:7 83:11 95:12,13 98:15 99:15 108:21
**77.5.** 95:7

**8**

**80** 52:25 77:9 82:8,8 104:3 105:25 118:9
**80,500,000** 52:8 53:8
**80.5** 44:2,22 50:17 52:23,24 54:18 56:6 90:14,21 107:9 107:20,21 108:2
**80.5.** 107:12 118:12,13
**85** 117:22 124:11 142:23
**85,5** 143:16
**85,500,000** 143:15
**856-296-8185** 12:7
**86** 143:18,19
**86,5** 143:21
**86,500,000** 143:23

**9**

**9-21-26** 178:18 178:18
**90** 110:15 111:20,22 117:10 143:25 144:1
**91** 144:3,5
**95** 144:7,8
**96** 144:9,11
**97** 144:13,14 145:1
**97,5** 145:2
**99** 33:7 145:4,5
**99,5** 145:7
**99,500,000** 145:9
**9:00** 90:9
**9:05** 156:21

**a**

**a.m.** 1:16

**ability** 46:6 60:9 125:11 178:7
**able** 8:23 35:22 35:24 39:8 55:12 64:4 69:11,12,12 76:20 83:14 89:25 90:12 98:6 99:20,22 174:3
**above** 77:7
**absolute** 76:4 154:13,19
**accept** 169:2 172:15
**accepted** 14:8 14:10 17:3 19:7 172:18
**accepting** 16:7 21:25 165:6
**accepts** 159:18
**accordance** 15:17
**account** 137:23 138:3 152:11 163:19
**acre** 96:21
**action** 178:11 178:13
**actual** 161:12
**actually** 32:1 74:6 75:7 86:22 90:24 104:10 119:16 164:3
**add** 13:22 28:12 64:2 77:9 151:15
**added** 20:14 73:17
**adding** 73:18
**addition** 9:24 11:9
**additional** 21:2 44:20 50:1 58:12 59:3 71:1 107:21 147:16 151:4 156:4 163:4,12 165:13
**address** 15:11 112:5
**addressed** 154:12,14
**adds** 44:7
**adjacent** 75:22 76:3
**adjourn** 14:1
**adjustment** 166:17
**admit** 56:10
**advantage** 159:8
**advisors** 8:19
**affect** 64:12 65:3
**afternoon** 73:16
**agents** 137:24
**aggregate** 23:22,23 24:4,8 26:11 30:13,15 31:3,5,8,17,22 31:23,24,25 33:2,8 34:8 35:1,10,16,19 35:21 37:9,11 37:20 38:9,12 39:6,10,21,24 42:11,12 44:1 44:22 49:11 73:13 117:10 120:2,14,15 121:23 127:23 127:24 128:2,4 130:11,14 131:4 141:7,22 141:24 142:5 146:20 147:11 148:17,21 149:5
**aggregate's** 52:4
**aggregated** 124:15
**aggregates** 35:14
**aggregating** 28:22
**ago** 164:7,18,19
**agree** 13:12 15:19 16:17 22:4,7,11,16 34:13 54:20 76:10 77:2 125:5 140:18 140:19 148:2,5 157:3 177:4
**agreed** 10:15 54:6,10 133:19 148:5,8 159:6
**agreeing** 162:13 177:14
**agreement** 16:19 28:18 35:13 45:7 54:8 112:13
**agreements** 18:3 28:13
**agrees** 18:11 27:4
**ahead** 41:2 42:5 45:2 53:7 110:23 147:14 155:21
**ai** 45:23 47:16 59:25 60:6,16 97:1 98:6 103:7 103:7
**al** 1:4
**alan** 1:13 43:7 43:11 178:3,17
**alec** 2:8 4:6,7
**alex** 4:5 10:1
**alexander** 2:4

**align** 89:20
**aligned** 63:14
**alignment** 87:1
**alleged** 65:2
**allocate** 26:1 49:1,9,20 54:15 65:24 66:16 114:24 117:4 119:3 122:11 123:9,23,24 125:2,9 141:9 141:21
**allocated** 26:5 54:14 74:5 119:2 120:22 124:6
**allocating** 120:4,8 121:13
**allocation** 31:1 48:21 49:12,13 50:3 65:17 74:9 96:1 118:24,24 119:12
**allocations** 119:20
**allow** 17:22 30:15 31:7 41:21 112:13 142:13
**allowed** 125:4
**allowing** 28:15
**alternatively** 90:23 104:12
**amar** 2:8 4:5,8
**amend** 130:10
**amended** 16:15 154:22
**amendment** 16:15,17
**amount** 15:16 15:17 27:18,19 31:25 43:20 51:10 57:9 61:11 63:25 85:20 87:4,5,24 133:1,6 137:23
**amounts** 52:18
**ample** 21:1
**amy** 2:9 10:4,4
**amy's** 10:6
**analysis** 11:8
**andrew** 2:19 6:24 79:22 123:21 125:5 150:23 152:22 167:9,10 169:24
**andrews** 2:4 10:1
**animal** 122:5
**announce** 30:2
**announcement** 14:22
**announcements** 12:11 13:15
**announcing** 103:2,2
**answer** 33:23 55:15,20 69:17 114:12 128:11 131:8 133:7 137:20,21 163:20 165:16
**answered** 68:20 164:6
**anticipate** 55:12 60:19
**anticipation** 150:11
**anybody** 10:8 18:4 21:7 75:12 107:4 126:10 127:4 146:25 155:20
**anymore** 51:6 90:12
**anyway** 89:5 103:22
**anyways** 100:3
**apa** 16:12,15,18 18:22 19:20 76:11 111:7 117:12 130:15 148:10
**apas** 16:3 18:22 18:24 19:13,14 19:21 20:2 21:4 49:8 74:13
**apologies** 158:18 175:7
**apologize** 4:13 10:25 27:1 31:11
**appeal** 84:9,10
**appear** 64:11
**appearance** 10:22
**appearances** 2:1
**appearing** 29:19
**apple** 27:8 111:16
**apples** 36:24,24 37:7,7 95:8,9 96:11,11,12,12 96:13,13 99:1,1 99:15,15 108:24,25 122:24 148:6,6
**apportion** 65:15,16
**appreciate** 102:4,4 132:20 155:13
**approach** 48:13 62:17 86:4,13 101:1
**approaches** 85:19
**appropriate** 173:25
**appropriately** 82:2

**approval** 15:24 46:14 67:14,22 68:5 74:17 101:13 156:8 158:12,22 160:17,24 162:4 165:9,14 166:13
**approved** 12:23 13:13 35:9 164:23 165:2 166:10
**april** 163:18
**arbitrarily** 133:2
**archer** 3:3 9:23 15:11,12,14 66:11
**area** 47:22
**areas** 94:14 155:23
**argue** 132:11
**argument** 40:25 41:3
**articulated** 168:10
**artificial** 37:5
**artificially** 36:10,23
**ascribing** 79:11 81:11
**asher** 2:11 4:24 43:14 85:5 91:16,20 102:1 102:12
**aside** 125:1
**asked** 104:10 161:17
**asking** 61:4,14 71:4 90:20 122:24 159:24 161:20,24 162:2 165:12
**asks** 11:14
**aspect** 73:1
**aspects** 76:14
**asset** 26:14 28:13,17 32:14 36:19 39:23 119:1 122:6 125:13 128:5,6 131:3
**assets** 3:18,18 11:11,13 13:2 16:10,11,13,14 16:20,22,23,25 17:1,4 18:2 20:1 23:16 24:14,15,16,22 25:4,10 26:10 26:24 27:6,18 28:5 32:16 40:4 41:7,9 45:10 58:3,6,12 117:14,16 118:5,24 126:7 130:23,25 149:22
**asshole** 97:8
**assign** 8:25 9:14 132:7
**assigned** 8:3 9:3
**assigning** 132:5 133:3
**associated** 13:5 61:12
**assume** 38:20 46:13 55:5 99:21
**assumes** 46:13
**assuming** 111:9 112:19 150:9
**astronomically** 159:14
**attached** 16:18
**attempt** 160:19
**attendance** 3:24 13:18,22
**attorney** 178:10,12
**attractive** 115:20
**attribute** 47:12 80:11,11 81:9
**auction** 3:4,16 3:17 11:12 12:10,11 13:1 13:16,19,20,22 14:1,3,21,24 15:4 19:2 20:8 20:11,24 22:1 24:5,13 25:9 26:13 30:11 34:24,25 41:18 43:7 44:6,9 61:21 123:1 124:24 132:23 133:5 146:23 147:2 157:23 172:10 173:22 175:2 176:6
**auctioneer** 9:17 12:23 14:25 15:10,13 17:15 41:5
**auctioneers** 25:12
**auctions** 46:10
**audio** 100:23
**audit** 166:12
**august** 3:21 13:14 158:1
**authorizations** 47:3
**available** 4:14 43:15 158:21 162:6,25 163:7
**aware** 101:6 115:7
**awhile** 103:21

**b**

**b** 10:4 83:23 109:2 110:18
**back** 12:5,18 20:18 25:15

29:4,14 30:23 31:11 32:24 34:17 36:21 50:5 54:12 55:14,25 59:13 60:17 67:13 73:11 75:18,23 78:1 80:3,12 81:2 82:14,16 85:24 87:21 90:22 95:6 102:5 104:3,15 104:21 105:25 106:21,23 107:11,19 108:16,18,21 109:14 110:12 110:16 111:13 112:18 115:16 117:17,19 118:3,10,22 120:3 121:4,5,7 122:9,10,14 124:16 125:4,9 125:12,25 131:9 136:5 137:16 140:15 142:8 146:20 154:7 156:12 157:11 158:19 165:9 168:14 173:15,19 177:8,12

**background** 59:18 90:11
**backing** 156:21
**backup** 14:7 15:19 16:8 18:18 19:7 37:15 92:25 94:23 122:22 140:25 146:5,8 146:10,14 148:19 168:18 168:21 169:1 169:11 170:1 171:12,22,25 176:11,15,18 176:23
**balance** 70:9 93:9,11 115:16 117:21 151:7 168:8
**balanced** 72:10
**bankruptcy** 1:1 3:6,14,15 13:1 13:4,6,14 35:9 70:20 94:20 169:8
**based** 10:16 21:2 24:8 34:16 53:11 71:15 86:19 89:23
**baseline** 16:23 16:24 119:5 122:6,7

**basic** 102:19
**basically** 23:15 45:12 46:4 49:23 54:11 110:24 120:6 164:6
**basics** 82:23
**basis** 14:5 16:21 42:13 51:24 65:5 97:6 125:20 140:17 141:24 171:10
**bathroom** 134:18
**battersby** 2:14 143:11,11 144:9,15,24 145:25 147:4
**bearing** 18:16 18:17
**beat** 131:21
**bed** 57:18
**beginning** 171:21
**behalf** 15:8 30:3 47:6 73:11 112:11 131:25 150:24 152:23
**behrman** 2:17 6:4,5,10 51:20 53:2,8 70:11 71:6,18 72:2,7 72:18,21,24 73:7 75:2,17

104:20 109:21 109:24 110:24 111:8 112:8,21 113:3,14 114:4 157:12
**believe** 5:16 18:1,5 44:5,7 44:23 48:19 62:1 67:1 86:2 86:15 87:6,22 93:23 120:21 159:12
**benefit** 24:21 81:21 107:13
**benefits** 168:8
**best** 12:16 16:8 33:9 35:19 41:25 49:6,20 60:12 85:23 97:20 103:23 105:12 116:25 119:24 121:1 142:2 165:4 178:7
**better** 28:5 61:23 75:8 77:3 77:10 111:1 119:16 120:23 162:10 173:6
**bid** 3:20 11:10 11:12,14,16,17 13:11,12,13 14:5,6,7,10,13 14:14,20 15:2,6

15:7,8,13,16,17
15:23,24,25
16:5,6,8,9,22
16:23,24 17:3,4
17:6,7,9,13,18
19:7,7,7,11
21:18,21,22,23
21:25 22:5,17
23:24,25 24:1,3
24:8,9,10 25:3
25:5,6,7,9,15
25:24 26:17,19
27:16,18 28:8
28:16 30:16
31:3,4,8,23,25
33:6,7,13,19
34:9,20 35:16
35:19,22,22
36:1,2,7,23
37:6,9,11,20,21
38:4,12 39:2,4
39:7,9 40:2,6
40:13,19,20,22
41:7 42:11,12
43:1,3,5,21,23
43:24,25 45:4
49:6,17,20
50:11 51:24
52:3,5,7,23
53:1,9 55:7,9
57:13 61:2
65:15 70:13
71:4 73:12 74:9
78:10,14,18,20
80:3 83:3,8
89:18,20 90:2,4
90:13,15,17
96:2,8,9,10,12
96:12 98:3,12
98:17,19
107:15,16
117:4 118:25
119:5,12,14
120:2,5,8,14,21
120:23,23,25
121:1,1,8,13,25
122:2,16,20,24
123:1,2,25
124:5,13,16
125:2,4,12,14
126:2,5,20,22
127:3,12,21,24
128:1,5,6,7,8
128:15,18,24
129:3,7,10,13
129:18,21,24
130:3,11,14,22
131:20 132:9
132:13,22
133:7,20,22
134:13,14,19
135:5,11,14,18
135:22 136:2
137:18,22
138:5 140:23
140:24 141:8
141:12,12,25
142:3,5,6,20,23
143:6,14,16
144:25 145:5,8
145:12,18,20
145:23 146:23
147:5,15,21
148:17,21
149:1,3,4,5,6,9
149:11,21,22
149:24 150:3,4
150:4,9,14,18
150:20 151:10
151:20 152:6,7
152:15,24,25
153:1 154:1
155:4,23
158:16 159:3
159:13,14,18
160:3,10 167:3
167:11,17
168:2,5,8,9,11
168:12,15,17
168:18 169:1,2
170:1,15,19,21
171:18 172:4
172:10,12,19
173:6,7,23
174:4 175:6,12
175:24 176:23
**bid's** 32:25
**bidded** 26:15
**bidder** 11:14
14:23 15:5,7,14
17:14,22 18:18
18:19 19:25
21:15,24 22:4
22:15,17 23:6
25:20 36:1,7,13
43:17 113:9
120:3 121:23
122:22 123:20
140:24,25
141:13 142:6
146:5,8,10,14
146:15 148:19
149:10 161:16
162:1 168:14
169:11 171:11
171:21,22,24
171:25 176:10
176:11,13
**bidder's** 31:17
**bidders** 10:17
12:14 13:12
14:8 15:18,19
15:19 16:16,21
17:16,25 18:2
18:25 22:25
23:15 24:9,15
26:8 27:5 28:15
30:14,15,24,24
31:3,21,24
32:20 33:16
34:8 38:10,10
40:2,22 41:1
49:4 119:2
121:7,16
131:13 140:16
142:21 150:24

152:23
**bidding** 1:12 14:5,12,18 16:6 16:16,25 17:4 17:23 18:2 19:4 19:23,24 21:14 22:13,16 23:2,7 23:8,16 26:9,10 27:6,17 30:13 30:19 31:22 34:9,15,19 35:2 36:20,24 37:6 37:17,23 38:9 39:17,19,20,23 42:23 49:14 120:6 122:10 123:2,24 125:21 131:3,4 131:19 132:8 133:20 140:14 141:7 147:11 149:8,19 150:10,25 152:9,10,12 157:4 167:17 167:25 168:7 168:19,24 169:7,21 174:24
**bids** 14:15,16 14:17,17 15:21 17:8,10,14 20:13,15 21:2 25:13,14 26:18 30:22 31:13 33:18 34:16,17 35:1,2,5,20 42:14,16 44:5 50:1,6 73:17 120:19 121:15 122:15 124:14 128:22 139:20 139:22,25 140:4,8 141:22 143:19,22 144:1,4,8,10,14 151:18 152:21 168:12,20,21 168:22,23 170:8 171:2 176:9,22,25
**big** 46:8 76:12 82:8 93:9 95:20
**bigger** 86:22 87:4 89:4
**bill** 156:6
**billing** 168:21
**billion** 93:2,10 101:25
**birds** 68:14
**bit** 13:9 24:17 26:7 31:12 35:7 64:21 75:20 84:7 101:2 102:17 108:14 108:16 114:7 114:12,16 135:1 159:8 160:2,21
**bitcoin** 45:19 45:20
**bite** 27:8 88:16 111:16
**blake** 46:19
**blk** 48:17
**board** 101:11
**books** 70:24 71:3
**bottom** 111:11
**brad** 2:20 7:2 7:10 9:5,12 46:20 47:5 73:21 75:13 82:4 91:16
**bradford** 2:5
**brand** 94:21
**brandon** 6:18
**break** 11:15 17:19 20:21 27:21 28:10 29:8,10,18 52:9 130:6 134:18 136:4 140:1 144:16 145:15 146:19 147:19 148:12 153:22 154:4,9 156:11
**breakdown** 151:18
**breakout** 11:25 12:1,5 15:3 56:11 59:15 75:24 174:20
**breaks** 11:13 14:21
**bridge** 152:4 158:13
**brief** 59:15 73:10 77:25 85:15 110:5 117:8 130:9 133:13 134:21 136:6 137:17 139:18 140:1,2 144:17 145:16 146:21 147:20 148:14,25 152:5 153:25 154:6 156:24 157:10 168:1 169:23 170:10 174:25
**bring** 12:5 50:14 92:12
**bringing** 154:24
**broad** 106:2 108:11
**broader** 87:25
**broadly** 104:5
**broken** 50:18 103:25
**brought** 92:23
**bucket** 88:22
**bucks** 33:7

**budge** 114:1
**build** 67:16 101:21
**building** 81:10 95:17 105:14 152:14
**bulk** 37:22 176:23,23
**bunch** 113:21
**burn** 88:4
**business** 6:1 45:20,22 124:1
**button** 82:14
**buy** 28:20,21 48:8,10,11 54:1
**buyer** 28:4 96:5 108:3 161:10 162:16 165:20
**buyers** 141:20

**c**

**c** 9:25 178:1,1
**cal** 73:12,12 176:17
**calap** 6:4
**call** 5:11 10:8 61:3 77:18 84:3 87:16 159:2,10 166:17 167:19 176:8
**called** 77:21 172:25 174:13
**canaan** 158:8
**candidate** 102:3
**capacity** 61:5
**capital** 99:4
**capping** 168:25
**captured** 164:17
**cards** 93:21 98:4
**care** 9:5 40:24 49:22 76:15 80:4 125:3 177:21
**carpet** 159:10
**carty** 5:19 43:22 45:12 50:9 61:14 63:1 63:4,10,18 74:6 78:14,18,23 79:5,8,11 80:2 80:17 81:7,19 84:23 85:4,13 123:23 141:19 147:24 148:2 150:22,23 151:2,10,17 152:2,22,23 153:1,4,8,12,16 153:20 154:4 155:4 157:24 160:6,14 167:10,10 168:6 169:2,6 169:14,22,24 169:24 170:3,4 170:6,9 171:19 173:5,11,22 174:1
**case** 1:7 3:4,16 10:7 13:7 45:18 48:19 62:6,6 70:20 96:4 165:22
**cash** 17:8 19:24 42:13,15 54:13 74:25 77:2,10 78:3,10,17 80:20,24 82:7 82:10,13 83:1 92:9 93:10 94:20,22 95:2 96:2,9 98:16 99:16 105:4 109:6,13 112:18 115:20 117:17 118:21 130:14
**cashwise** 20:1
**catastrophic** 114:17
**catch** 53:7
**ccr** 178:17,17
**ceiling** 174:12 174:17
**cell** 11:23 12:6
**celsius** 69:1
**center** 60:1,1,6 60:16 63:12 67:5 93:7 103:8 103:14
**centers** 98:6
**central** 46:5 47:21
**certain** 20:19 43:19 54:5 67:15 68:6 76:14 104:23 125:15
**certainly** 113:23
**certainty** 92:20
**certified** 1:14 178:3,18,18
**certify** 178:4,9
**cetera** 71:22 92:18 99:6
**chance** 31:2,4 32:3,6,6 33:25 34:3 37:21 96:14 142:5
**chang** 2:8 4:11
**change** 50:2 88:22 89:22 118:14 155:13 158:4 161:17 161:23 162:2 167:12
**changed** 78:5,7 154:10
**changes** 21:3 160:12 166:11
**changing** 126:13

**chapter** 1:6 3:14 13:4
**chat** 11:20,24 12:3
**check** 41:12
**chelsea** 8:3 9:3
**chime** 107:5
**chiu** 2:23
**cho** 2:6 7:15,16 50:15 75:21 76:2,18 107:8,8
**choice** 82:11
**choose** 119:3 174:18
**christian** 2:18 6:6,8
**chunk** 82:8
**circulate** 155:10
**claim** 71:15
**claims** 64:10
**clarification** 14:20 155:22 159:21,24 174:3
**clarifications** 159:23
**clarify** 33:4 80:25 81:1 157:5,19
**clarifying** 56:9
**clarity** 158:5 176:21
**clause** 51:8
**clean** 45:8 52:15 53:16 64:21 97:17
**clear** 12:25 24:12 34:25 39:1,25 40:17 40:17 53:15 58:14 59:10 65:4 66:3 67:12 71:18 82:5,22 83:25 84:1 104:9,18 111:6 130:13 132:1,5 149:18 176:25
**clearly** 172:23
**client** 25:6 39:18 40:3 132:15,18 172:19
**clients** 11:17 38:4
**close** 58:11 60:21 63:13 67:20 70:20 91:22 98:25 172:10
**closed** 172:11 176:6
**closer** 85:11
**closing** 15:25 46:14 55:1,14 57:25 58:10 61:20 62:20 68:9 70:3,5 75:22 76:4 78:3 79:6 104:1,12 104:14,15 105:4,23 106:14,19 109:16 112:18 117:11,13,17 117:25 118:6 118:16,21 130:12,15 160:13
**coffin** 114:16
**cohen** 2:22 10:21,21,24 19:9,10,18 20:6 20:10,25 21:6 29:25,25 38:25 38:25 52:20,24 53:18 54:23 55:6,16,22 56:2 57:8,23 58:2,5 58:10 70:19,22 71:10 73:11,23 74:3,8,14,18,22 75:1 103:19 106:23 107:13 109:1 113:7 116:17 131:25 132:10
**collateral** 106:6
**colleague** 168:11
**collectability** 93:23
**combine** 49:3,5
**combined** 16:21 42:14 43:25 49:19,22 51:24 52:8,23 53:1,9 146:23 149:4,11,22,24 171:10 176:9
**come** 12:4 25:15 28:20 29:4,14,15 30:22 32:24 36:20 59:13 67:5 70:3 75:18 80:5 93:16,17 94:1 117:18 121:3,5,7 122:14 124:16 125:4,8,12 141:4,22 156:12 165:19 172:11
**comes** 25:23 28:21 36:21 41:22,23 62:7 68:5 91:18,19 115:3 156:7 160:17
**comfort** 92:20 94:15 105:5
**comfortable** 45:21,25 66:10

82:1 93:14 112:19,24 158:4 159:4,5 162:3 163:6 164:15
**coming** 40:14 80:24 105:16 105:19 122:9,9
**commence** 17:23
**commencem...** 13:19
**commencing** 1:15
**comment** 39:1 76:13 167:7
**comments** 12:24
**commercial** 47:11 75:3 104:20 112:13 112:14 117:15
**commercializ...** 46:20 52:14 53:11 54:4 55:17 56:5,8,19 56:23 57:10,24 59:12,19,23 61:12,15 69:25 73:1,15,19 77:7 78:4 86:12 92:2 102:15 103:11 104:4,6,22 106:1,3,8,24 107:14,23 108:12 110:13 110:16 111:23 112:3,4 113:1,8 118:1,10,15,23
**commercialize** 45:23 47:10,23 47:25,25 50:20 51:2,3 55:12 58:7 63:3,12,16 64:5,7,7,14,16 66:19,21 69:7 71:2 87:7,15,19 88:9 91:9,11 94:16 97:10 98:23 100:2,22 101:1,8,24 102:20 103:5 103:13
**commercializ...** 52:14 54:19,25 60:11 61:25 62:2 94:1
**commercializ...** 47:7 62:12 100:8,13 103:10 117:13
**commercially** 47:15 63:11
**committed** 89:1
**committee** 3:2 4:10 7:10 13:25 14:9,18,23 15:2 16:3 17:12,15 19:5 25:17 27:23 29:12 30:17 47:6 73:14 108:8 115:19 131:15 132:2 133:11 154:24 174:20 174:20
**committee's** 131:11
**communicated** 158:7
**communication** 162:23 163:22 163:25 164:1
**company** 62:21 93:3 94:13 101:19 103:2 104:8 106:11 108:10 132:3
**compare** 82:7
**comparison** 71:6 99:2,16
**compete** 99:17 115:22,24
**competing** 20:13
**competitive** 20:15 21:2
**competitively** 19:11
**complete** 20:12
**completed** 13:23,24 14:6 158:11
**completely** 37:4 122:25
**complicated** 93:8 120:14
**comply** 123:10
**component** 17:13,17 54:24 54:25 79:13 120:18,18
**components** 17:10 30:21 52:11
**concept** 104:4 106:1
**concern** 67:11 122:23
**concerned** 84:21
**concerning** 107:14
**concerns** 168:10
**concessions** 125:18
**concluded** 177:22
**condition** 13:12 45:15 54:25 57:24,25 58:18 83:12 90:20 111:3 115:16 115:17 148:9 168:19,23

**conditional** 17:10,13 34:16 67:22
**conditionality** 60:2
**conditionally** 164:23 165:2
**conditioned** 35:3,23 164:7 168:13
**conditions** 19:19,19 20:14 45:5,13,14 57:1 57:5,8 58:25 59:23 60:20 72:3,4,8,9 74:12 79:6 109:16 110:10 110:19,21,25 111:5,6 112:2 113:8 156:7
**conducted** 14:4
**conducting** 12:10
**conference** 77:15
**confidence** 88:8 114:14,20
**confident** 66:5
**confirm** 16:16 17:25 19:6 56:4 74:24 126:6,24 142:9 169:22 171:9
**confirmation** 15:23 166:22
**confirmed** 14:7 146:10 150:19 164:5
**confirming** 16:7 126:25 164:9 166:1,4
**confuse** 155:19
**congratulate** 175:6
**congratulations** 173:9 174:6
**conjunction** 16:7
**connection** 13:3 42:16
**consent** 94:2
**consider** 33:1 37:9 73:18,23 77:5 78:12 96:15 116:9
**consideration** 40:20 59:3 66:23 111:25 116:5
**considerations** 125:15
**considered** 17:11 73:17 127:25
**considering** 72:7 146:22,25
**consisting** 16:11,13
**consists** 120:15
**construct** 70:12
**consult** 174:19
**consultation** 13:25 14:9 16:2 17:12
**contingencies** 46:2 52:19 60:14 64:1 75:10 78:22 80:21 101:17 104:2 130:15 130:17,23 133:15
**contingency** 44:6 48:14 53:18 54:3 78:8 86:16,17 131:2 131:5 132:25 160:4
**contingent** 34:21 46:16 58:21,23 101:12 122:20 143:7
**continue** 14:1 69:13 116:24 131:19 132:8 142:13 150:13 157:4 163:3 167:8,25 168:6 168:12 169:6 169:16,21 175:1
**continuing** 11:12 14:4
**continuity** 45:21 48:20
**contract** 54:7,9 61:9 70:2 71:22 102:14 117:15 159:6,19
**contracts** 48:1 68:1 130:17
**contradict** 155:24
**contradicts** 166:22
**control** 100:10 100:11
**controlling** 62:16
**conversation** 42:3 90:1
**conversations** 113:17
**converting** 67:8 67:9
**conviction** 167:11
**correct** 23:17 23:24 24:16 25:11,21 32:8 39:19 58:13 67:2 74:14 109:18 111:8

112:21 117:23 128:16,17 130:18 131:6,7 134:22 141:14 146:17 150:7 154:23 159:20 161:5
**cost** 101:3,4
**costs** 84:12
**council** 158:3 158:16 160:6 161:21 162:20 163:16 165:16
**counsel** 4:4 6:13,14 7:10 10:16,25 37:3 66:6 77:14 154:24 155:6 178:10,12
**counseling** 5:23
**counter** 57:22 105:12 147:7 159:17
**counteroffer** 102:5
**couple** 65:5 85:18 98:22 100:17 154:19
**course** 63:7
**court** 1:1,14 3:6 3:7,9,12,15,21 8:13 11:3 13:6 13:14,17 15:22 35:10 38:21 42:10 43:6,10 43:11,12 51:22 78:1 110:6 121:21 125:23 125:25 134:23 134:25 135:2 144:20 157:25 177:19 178:4 178:18,18
**covenant** 63:10
**cover** 12:24 149:7 150:1
**covers** 104:5
**cp** 44:13,15 76:18 83:13 86:6 87:2 88:21 88:24 89:23 95:9,11 96:9 98:16,18 99:10 100:24 101:7 101:12 132:19
**cps** 96:10
**crap** 122:16
**crazy** 120:10
**create** 97:9,15 112:11
**creates** 68:25
**credibility** 69:10
**credit** 15:16
**creditor** 82:19
**creditors** 4:10 40:15 70:25 82:20 94:21,22
**cro** 9:17 12:22 41:5
**crosstalk** 5:4 9:4 26:6 31:14 32:4,15 38:17 39:11
**current** 44:5 45:18 46:1 60:5 88:1 90:13,17 110:25 121:15 121:15 134:19 149:1 150:20 154:1 155:23
**currently** 60:18 86:8 158:11 163:24 165:10
**customer** 46:22 46:24 50:21 57:3 66:22 70:1 70:15
**cut** 53:25 117:2 171:17
**cute** 102:23 103:14

**d**

**damages** 51:8
**data** 41:7 59:25 60:1,6 63:12 67:4 93:7 98:6 103:7,13 164:5 166:24 176:24
**date** 51:1,3 61:20,20,23 62:20 68:6,8 160:23 161:17 161:22,23 162:18,18 164:12 165:14 178:7
**dated** 178:18 178:18
**day** 1:15 37:10 51:18 61:3 91:22 97:6,6 116:22,25 157:17
**days** 18:20 164:18
**dbr** 10:11,18 48:14 53:22,25
**dbr's** 10:16
**dd** 158:14
**de** 79:12,14 86:7 92:7,15
**deal** 50:24 53:25 71:8 84:6 92:12,13 94:8 97:6,17 104:14 106:20 110:14 117:3 159:15 159:17 162:10 172:18
**dealing** 20:12
**deals** 101:25 110:8
**dealt** 83:17 104:14

**debatable** 83:24
**debt** 82:16
**debtor** 9:17 12:22 44:8 60:12 73:14 132:3 157:2
**debtor's** 123:25 155:5
**debtors** 1:5 3:19 12:23 13:2 13:5,24 14:9,18 14:22 15:2,22 16:2 17:11,15 19:4 25:17 27:22 30:11,16 47:15 82:21 106:21 156:25 162:2
**december** 68:7 160:21,22 161:14,18 162:7 163:18 165:7,10
**decide** 49:21 62:19 89:24 119:23 121:21 132:18
**decided** 30:11 115:18 123:3,8 124:18
**decides** 150:9
**decision** 33:8 80:7 119:11 123:22 132:2 132:17,18 159:11
**deeply** 69:2
**default** 102:18 126:17 148:21
**deficiencies** 166:20
**define** 54:20 81:1 112:3
**defined** 16:12 16:14 78:11,25 104:5
**defining** 81:10
**definite** 70:5
**definitely** 83:7 84:19 87:23 108:22
**definition** 57:10 108:12
**degree** 114:13 114:19
**delay** 19:2 20:7 20:10,23 30:7 103:20
**delayed** 177:10
**delete** 161:20
**deletion** 157:3
**delta** 80:19 149:7
**demand** 47:18 75:4
**depends** 72:13 72:16
**deposit** 15:14 15:17 177:6,10
**depository** 15:15
**deposits** 18:15 18:16,19 40:3 177:1
**described** 81:20
**description** 106:24
**designate** 14:13
**designated** 15:15
**detail** 108:5
**determination** 165:6
**determine** 14:2 73:15
**determined** 121:14
**develop** 51:9 87:9 88:17 99:24 101:22
**development** 95:19 101:19 104:21
**deviate** 19:13
**dial** 156:20
**dialogue** 18:23
**difference** 151:21
**different** 30:20 30:21 45:10 85:19 99:21 100:1 101:10 103:25 109:24 110:8,11 122:3 122:5
**differently** 99:25 101:2 105:2 107:3 142:14
**difficult** 19:16 55:8 163:20 172:15
**difficulties** 15:9
**digging** 83:13
**digi** 129:22 134:11 135:5,8 139:1
**digipower** 4:3 21:12 129:1,3 129:11,24 133:16 135:20 136:7,9,14,16 136:21,23 137:3,5,9,11,14 138:9,13,15,19 138:21,24 139:7,9,15,22 140:4,10,24 171:23 176:15
**digipower's** 126:22 129:13 135:14,22
**diligence** 41:6 157:20,22 158:20 163:5

**dinks** 165:2
**dinner** 174:7
**direction** 114:5 114:6 116:3
**directly** 114:13
**disadvantage...** 39:7
**disagreeing** 162:14 177:13
**disclosures** 21:3
**disconnect** 86:3
**discount** 81:12 81:14
**discourse** 30:9
**discreet** 26:24 32:17
**discrepancy** 158:14
**discretion** 17:11 76:5 154:13,19
**discuss** 11:15 25:16 27:22 53:5 74:7 84:23 131:24 133:10 141:1 150:13
**discussion** 9:9 49:11 69:18 73:2 77:12,20 85:14 103:17 125:24 127:20 139:13 148:24 155:1 167:5 172:17 173:21
**dispute** 147:22
**disqualified** 123:11 125:3
**disqualifying** 119:25
**district** 1:2 13:7
**documentation** 15:20 17:22 172:16
**documents** 16:5 18:12 84:3
**doing** 26:9 34:22 36:5 37:22 43:18 49:1 62:15 100:19 105:9 116:25 172:20
**dollar** 32:25 33:2,19 43:20 84:14 87:4 120:8 122:16 132:5,8 133:1
**dollars** 17:9 19:23 31:1,2 35:11 36:14 44:16 49:20 58:6 79:25 84:11,16 88:23 93:10 100:4 109:15 151:13
**donkey** 111:18
**doug** 9:25 12:16
**douglas** 2:4
**downside** 95:1
**dozens** 95:16
**drag** 75:5 104:24
**drama** 67:10
**dream** 13:2
**drilling** 84:4
**drive** 90:1
**drives** 86:4
**driving** 60:24
**drop** 174:9
**dropped** 172:19
**due** 41:6 160:12
**dufrayne** 2:2 9:17,19,22 12:9 12:21,22 13:11 41:8,10,12 42:12 43:9,13 44:25 45:2 48:4 48:13,21 49:13 49:24 50:6,17 51:22 52:7,11 52:22,25 54:22 55:11 59:17,22 60:18,25 61:11 68:17,21 69:14 69:16,19 72:22 74:24 75:10,13 75:16 76:24 77:24 78:2,9 79:7 80:13 102:1 103:18 103:20 107:11 110:23 112:2 126:1,6,9,17 127:10,15,18 127:21 128:21 128:24 129:3,7 129:13,18,21 129:24 130:3,7 130:13 131:23 133:2,10,23 134:9,11,12,14 134:19,22,24 135:8,11,14,18 135:22 136:2,7 136:9,13,16,20 136:23 137:2,5 137:8,11,14,18 138:7,12,15,18 138:21,23 139:1,4,6,9,12 139:15,20,22 139:25 140:4,8 140:12,22 142:19 143:5,9 143:13,19,22 144:1,4,8,10,14 144:19,22 145:1,3,5,8,12 145:17,20,23 146:2,9,14,18 146:22 147:3 147:15,21 148:1,12,22 149:1,4 151:23 152:6 153:2,5,7

153:9,11,13,15 153:17,19,21 154:1,5,7 155:3 156:25 157:11 164:11,16 165:1 166:7 167:14 168:2,5 169:10 170:7 170:13,15,19 170:21,25 171:5,9,20 174:22 175:1,9 175:13,15,17 175:19,21 176:2,6,9
**dunlap** 2:19 6:24 119:18
**dussol** 2:12 5:15
**duties** 43:8 162:1
**dvr** 53:19
**dynamic** 165:4 166:5,12,19
**dynamics** 101:18

**e**

**e** 8:24,24 10:1,1 10:4 178:1,1
**eamonn** 1:8 13:8
**earlier** 82:24 105:8 155:6 176:4
**earliest** 160:18 160:24
**earn** 79:12 91:3 91:13
**easier** 101:14
**easiest** 89:25
**eastern** 90:9
**easy** 82:7,11 116:16
**economic** 63:13
**economics** 60:13 89:22 92:21
**efforts** 63:11
**ehrler** 2:7 8:22 8:22 63:20 97:22 99:20 101:3
**eight** 52:24
**either** 5:17 44:18,19 46:20 54:7,18 66:19 71:14 82:4 85:7 104:2,7 106:3 106:13 117:13 117:15,16,18 118:11 121:18 159:17
**ejo** 1:7
**element** 73:16 75:2
**email** 164:5
**emailed** 77:24 155:5
**emoji** 74:19
**emphasis** 82:10 95:2
**employee** 178:10,12
**ended** 57:4 113:4,6 114:22 121:8
**energization** 72:1 161:13
**energy** 6:12 72:3,8 74:16 76:15 80:22 105:9 112:20 128:21 158:3 158:16 160:6 161:21 162:4 162:20 163:16 165:16 176:13
**engineer** 119:19
**english** 40:12
**enter** 29:20 71:22
**entered** 3:20
**entering** 117:14
**entertain** 75:6
**entitled** 127:16
**entitlements** 118:7
**envisioning** 116:18
**epas** 45:14
**equation** 89:16 89:17
**equipment** 58:15
**ercot** 161:2 165:5
**escrow** 18:3,5 66:12,13
**especially** 36:12
**essentially** 26:12 98:21
**est** 1:16
**estate** 28:6 51:6 51:10 62:25 106:20 107:15 107:16 122:4 162:1
**estates** 81:21
**et** 1:4 71:22 92:18 99:6
**evaluate** 17:17
**evans** 56:22 57:15 58:17,25 59:7,11
**evening** 73:16
**event** 14:22 112:12,15 148:16
**everybody** 3:23 21:19 30:19 35:12 51:20 86:7 97:1 105:18 123:16

125:20 148:5 170:11
**everybody's** 3:25 121:21
**everyone's** 18:14
**evident** 26:12
**exactly** 21:13 30:25 56:21 71:10 81:1 92:6 122:13 164:25
**example** 26:14 27:23 28:1 61:2
**exceed** 17:2,6 82:13
**except** 45:13
**excepting** 165:8
**exception** 106:17 109:11
**exceptions** 105:24
**excess** 138:5
**excuse** 8:20 127:17 131:25 159:23,24
**execute** 15:20 87:22,23
**execution** 47:14
**exhibits** 16:4
**exist** 19:19 20:14 96:10
**existing** 17:2,6 48:10 54:1 60:20 83:24
90:2
**exited** 43:6
**expect** 5:6 69:12
**expectation** 158:5
**expedite** 62:19
**explain** 21:17 21:20 63:23 72:5 155:7,12 155:18
**explained** 17:14
**explore** 69:20
**extent** 66:4 177:2
**extract** 76:21
**extremely** 124:23
**extrication** 62:5

**f**

**f** 178:1
**face** 74:18
**facetious** 63:7
**facility** 156:1
**factor** 108:15 131:15
**facts** 20:13
**fair** 27:5,12,13 40:21,25 49:25 51:4 65:13 127:13
**fairly** 106:2 121:18,19
**fall** 88:2
**falls** 96:5
**false** 159:13
**familiar** 95:18 164:14
**far** 18:22 104:25 163:23
**fart** 134:7
**fashion** 19:12 76:21
**fast** 134:6,16
**fault** 79:19
**favor** 76:21
**fears** 92:22
**feature** 115:20
**fee** 55:18 57:9
**feed** 10:9
**feel** 45:20 92:11 96:8 159:8
**feels** 64:3 159:3
**fees** 56:24
**feinstein** 2:5 7:18,19 51:1 77:1,8 82:6 92:24 94:18 95:10,15,24 108:18 115:12 116:7 174:19 176:20
**fiduciary** 161:25
**fight** 41:24
**figure** 45:25 64:15 66:1,14
73:19 84:14 87:20 98:14 100:11 101:23 158:3
**figuring** 91:14
**file** 177:16
**final** 26:17,19 68:5 120:23 142:3 160:16 160:24 162:4 165:8,13 166:13 172:19
**financial** 8:19 46:16 110:8,14
**financially** 178:13
**financing** 93:7
**fine** 9:8 21:6 35:5 42:8 56:8 90:25 93:4 123:17 124:21 147:13 150:17 156:23 164:16 177:18
**finished** 12:1
**first** 4:3 16:10 16:15,17 23:20 29:12 35:14 40:6 50:11,18 54:23 68:23 86:5,18,25 88:19 89:15,16 91:9 92:1 98:12 100:20,21,23

100:24 106:24 107:10 124:5 149:14 160:11
**fit** 49:23 88:18
**fitting** 100:17
**five** 4:11 18:1 18:20 28:21 35:10 48:3 52:25 77:9 130:8 144:16 153:24
**fix** 12:19
**fixed** 121:17
**flesh** 65:9
**fleshed** 79:17
**flexibility** 36:5
**flip** 94:3 106:5 106:9
**flipping** 91:17 106:7
**flocos** 2:18 6:7 6:8
**floor** 55:17 105:15 144:22 145:17
**fluid** 38:16
**fluidstack** 23:4 23:8 38:14 41:5 142:21 143:9 143:12,14,16 143:20,22 144:2,4,10,15 144:22 145:14 145:18,25 146:2,9 148:18 161:17 172:1 176:18
**fluidstack's** 145:8,20
**fluidstock** 29:22 38:11 39:1
**flush** 66:8
**flushed** 55:3
**focus** 100:4
**foley** 6:14 27:2
**folks** 94:5 163:12
**follow** 30:4
**following** 24:4 147:6
**follows** 110:14
**foregoing** 178:4
**form** 73:3 93:17
**forth** 11:9 31:11 64:1 85:24 95:17 178:7
**fortunately** 100:6
**forward** 30:1 97:24 122:9 150:8,12 163:3 166:2 168:24
**found** 86:11
**four** 22:25 61:4
**fractional** 65:2 65:2
**frame** 60:21 67:16
**framework** 112:9
**frankly** 57:20 86:21 87:15 100:14
**free** 58:14 59:10 92:12 98:21 99:11
**frequently** 26:21
**front** 44:15 48:18 51:15 60:13 71:8 79:24,25 80:5 80:20,24 82:10 82:13 86:19 87:5,14 89:22 90:21 91:2 95:2 95:22 109:15 110:11,15,19 111:12,22 115:15,20,22 115:24 116:4
**full** 149:6
**fully** 17:14 20:18 63:14 89:1 90:8,9 162:5 175:8
**functioning** 60:19
**further** 29:1 53:22 66:23 69:20 175:4 178:9
**furtherance** 15:21,25

**g**

**g** 8:12,20,21 10:3,3
**general** 56:20 69:25 72:10
**generally** 58:19 58:20
**generating** 112:10,11
**genesis** 123:6
**genoot** 2:11 4:25 5:1,2 43:25 44:4 45:6 45:17 46:15,22 47:1,9 48:8,15 48:16,23 49:3 49:10,17 59:20 59:24 60:22 61:1,10,13,22 62:23 63:8,15 63:24 64:13,24 65:7,12,16,21 66:1,10,25 67:7 67:18,24 68:11 68:14,22 69:15 85:16,17 89:4 89:10,14 91:24 92:6,11 93:2,19

94:5 95:7,12,16 96:7,17,19,23 97:21 98:2 100:2 101:10 102:7,16 103:11 151:12 151:15 155:14 155:22 157:19 158:1 159:20 160:9,20 161:1 161:5 162:22 163:22 164:4 164:14,25 165:25 166:5,9 166:15 167:2,6 170:11,14,18 170:22,24 171:1,3,6,15 172:3,6,9,12,21 173:1 174:9 175:7,12,14,18 175:22 176:3
**getting** 37:19 42:16 47:13 51:15 83:5 86:20 90:6 96:4 98:21 102:12 107:18,18,20 114:20,25 168:11 174:11
**giga** 6:12 126:5 128:21,22 129:10,19,21 134:9,14 135:16,24 136:11,13,18 136:20,25 137:2,8 138:3 138:12,16,18 138:23 139:2,6 139:12,20,25 140:6,8,11 150:6 151:20 151:24 152:13
**giga's** 128:24 135:11,18 136:2 137:22 140:23 177:6 177:10
**gigaenergy** 149:20,23 171:13,21
**gigawatts** 47:11
**give** 27:23 56:16 60:12 67:13 68:1 73:3 79:1 81:6 85:5 88:7 89:19 91:21 92:19 94:14 99:8 100:15 105:11 106:11 108:10 109:2 110:10 114:21 132:12 132:15 154:9 156:17 163:10 166:3,18
**given** 41:6 95:20 165:14
**gives** 86:21 88:24
**giving** 27:9 87:2 112:24 165:8
**glitch** 12:15
**go** 3:24 11:15 11:24 13:9 18:17 19:6,24 20:4,18 21:15 29:6,7,9 31:11 31:23 37:13 38:24 39:13 41:2 42:5 45:2 50:4 53:7 54:12 55:14,24 67:13 68:9 79:18 85:8 85:12,22 93:7 94:22 97:24 98:22 100:25 101:21 105:15 109:21,22 110:23 112:7 114:21 118:3 122:18 123:16 125:22 127:5 142:8 146:19 147:13 148:20 150:8 151:3,23 152:3 155:21 158:19 168:16 169:18,24 177:20
**goes** 36:3 52:15 62:25 110:21 147:12
**going** 3:22,24 4:11 6:22 8:23 9:14 11:4,7,7,8 11:10,11,13,23 12:9,10,19,24 17:19 18:7 19:1 20:3,8,20,23 21:14,15,17 22:20,21,22 23:20,21,22,22 24:3 26:11 27:6 27:20,21,22 28:9 29:10 30:1 30:12,12,15,17 30:18,21,22,23 31:10,12,16 32:24 33:1,10 33:14,15,16 34:5,7 35:8 36:9 37:8,10,13 37:24 38:8 39:16 40:18 41:20 42:2,3 43:14,22 45:14 45:22 48:6,8,9 49:9 51:23 54:2 54:11,14 56:14 56:22 61:3 63:2 64:3 65:4 66:1 66:8 67:1 74:16

75:17,19 76:8 76:10,24 77:8 78:13 79:15 81:9,11,16 82:4 82:20,22 83:17 83:19,25 84:1,6 84:13 85:4,24 86:8 88:2 90:25 93:6,25 94:3,8 94:10,11 97:12 100:16 101:7 103:12,13 105:11 106:11 110:9,19,22 111:15 114:5,6 114:23 116:13 116:19 118:25 119:14,15 120:3 121:23 122:16 123:9 123:16 124:3 124:19 125:23 128:11,12,13 132:10,15,25 133:19,20 141:12,19,21 141:22 142:4 142:13,19 147:7 150:11 150:12,16,17 151:20 153:23 155:15 157:2 157:21 160:9 163:17 165:23 167:24 168:6 168:14,17,24 169:17,17,20 173:1 174:12 174:17,22 175:1 176:3

**golf** 63:6

**golkow** 13:17

**good** 3:1,1 9:20 10:10,13,14 12:21 13:24 46:11 55:2 68:1 68:16 69:4 71:23 85:17,20 88:19 116:1 117:6 133:12 134:25

**gordon** 2:18 6:13 27:2,2,10 34:10 39:13 126:5 128:15 129:9,20 130:5 136:12 140:10 141:3,11,25 142:17 149:5,9 149:20 150:5 150:13 177:1,6 177:9,15

**government** 164:12

**governor's** 164:17

**grabbing** 77:14

**granted** 160:25

**grappling** 94:19

**gray** 122:2

**great** 65:7 81:11 91:23 134:19 141:23 152:20

**greenfield** 87:9 88:15 101:19

**greg** 2:13,17 5:20,21,22 6:4 56:2 152:17

**greg's** 76:13

**greiner** 3:3 9:24

**grossman** 2:22 29:18 39:18,22 40:5,11,24 41:15,19 42:5,7 119:13 120:1 120:13 121:3 121:10,17 146:4,7

**group** 95:21 110:7

**guarantee** 54:12 107:25

**guaranteed** 45:4 78:20 122:3

**guaranty** 46:8 93:19 104:8 112:23,25,25

**guarantying** 106:11

**guarantys** 108:11

**guess** 37:18 49:24 54:9 60:23 70:4 72:13 76:12 108:2 113:17 113:25 114:23 115:5 119:5 124:14 156:20 160:16

**guesstimating** 111:10

**guidance** 82:12

**guy** 41:1 120:7 169:12

**guys** 8:6 28:25 35:6 37:1 40:7 43:19 44:24 46:4,5,7 49:21 50:13 53:2,23 55:15 59:13 61:22 65:1 66:14 67:18 74:15 76:23 80:15 81:8,11 85:1,2,11 86:2 86:20 89:19 91:6,17 92:1,22 94:14 96:14 97:16 99:10,16 99:19 100:9,12

102:8,24 103:18 109:5 109:20 110:1,3 111:12 114:1 115:21 116:1,5 116:14 120:1 121:10 123:3,5 123:6,8,24 124:6 142:17 147:22 151:12 151:15 152:17 152:18 157:18 167:2 171:16 172:11 173:13 174:15,16,18 176:4

**h**

**h** 8:24 10:4
**hair** 87:20 101:22
**half** 44:16 58:6 95:11 108:20 118:16 150:25 152:24 153:1,4 153:8,12,16,20
**hand** 46:8
**handed** 69:21
**handle** 19:15
**handling** 100:9
**hang** 50:12 139:17
**happen** 26:20 55:4,5 60:10 83:19 88:10 95:14 103:8 160:15 162:7 165:22,23 175:5
**happened** 173:16
**happening** 67:20 112:9 162:17
**happens** 26:22 74:23 81:3 91:17 98:19 100:25
**happy** 25:17 43:2 81:4,7 88:10,23 92:22 93:14 94:16 95:22 116:4 155:14
**hard** 30:4 81:6 101:15,16
**head** 35:18 38:2
**hear** 8:14 30:1 31:13 43:10,12 50:16 53:23 56:18 68:3 74:8 105:21 123:16 123:19,19,20 157:13,14,14 174:16
**heard** 105:2
**hearing** 15:25 55:23
**hearings** 41:16
**held** 9:9 30:6 39:15 42:9 59:16 69:18 73:10 77:12,20 77:25 85:14,15 103:17 110:5 117:8 125:24 127:20 130:9 133:13 134:21 136:6 137:17 139:13,18 140:2 144:17 145:16 146:21 147:20 148:14 148:24,25 152:5 153:25 154:6 155:1 156:24 157:10 167:5 168:1 169:23 170:10 173:21 174:25
**help** 55:21
**helpful** 22:24 30:9 57:20 79:21,24 102:10 116:8 156:16
**helps** 68:21
**hereinfore** 178:7
**hesitation** 113:12
**hey** 10:10 51:20 90:23 161:11 162:3 163:9 170:11
**hi** 105:18
**high** 60:4 75:4 99:9 114:13,19
**higher** 22:5,13 25:16,25 31:25 35:7,11,21 37:11 42:14 43:23 44:23 49:5 90:17 120:22 124:16 128:6 141:12 141:22 150:9
**highest** 14:5,6,7 16:8 19:25 21:25 25:3,6 27:18,19 28:8 33:6,9 36:23 49:7,19 97:19 103:23 105:12 119:24 148:20
**hint** 100:15
**history** 121:11
**hit** 61:14 69:2,9
**hold** 53:2 75:23 97:25 127:10 127:19 170:22 171:15 173:11 173:13 174:10 174:11

**holder** 94:3
**holding** 45:18
**holistic** 168:15
**home** 85:22 94:22
**honest** 24:18 51:11 86:24
**honestly** 95:3
**hongxing** 2:10 4:19,20
**hopefully** 3:25 85:6
**hopes** 162:19
**hoping** 114:8
**horse** 6:4 19:14 19:21 23:2 28:18 158:16
**hosting** 54:8
**hour** 20:4,9
**hsuan** 2:23
**hua** 4:13,13
**huber** 2:9 10:4 10:5
**huddle** 84:25
**huge** 48:1
**huh** 157:17
**hump** 98:9
**hundred** 33:6 36:14 52:25 149:12
**hung** 102:12
**hurdles** 64:1
**hurt** 94:8,15
**hut** 26:17 27:8 36:17,21 152:23,24 153:1,13
**hut8** 4:24 5:25 18:9,11 23:3,5 28:3 30:14 42:13 52:3 70:1 77:3 103:23 105:22 113:24 115:13 118:4 120:21 121:25 122:8 123:20 125:2 146:24 150:9,10,18 153:9,21 154:2 155:3 157:24 160:3 168:2 170:15,19 171:5,12 172:9 175:17,21,21 176:2,11
**hut8's** 31:10 52:7
**hypothetical** 70:13,17
**hypothetically** 33:5 70:11

**i**

**ideally** 48:11
**ideas** 82:5
**identify** 13:21 15:6 142:25 149:17
**ilana** 21:11
**illana** 2:21 133:23
**immediately** 15:10
**impediments** 59:5
**important** 72:9 75:3 86:1
**impossible** 47:24
**improved** 161:12
**improvement** 95:5,5
**inaudible** 68:24 113:14 130:12 143:2,17 148:16 164:4
**include** 57:8 130:23
**includes** 25:10
**including** 15:18 31:1 43:17
**incomplete** 55:7
**incorporated** 76:9
**increase** 58:22 58:24 90:3,15 91:1 126:20 128:2,3 149:6
**increased** 78:9
**increases** 54:17 159:18
**increasing** 149:25 159:14
**incremental** 131:18 147:17
**incrementally** 132:22
**increments** 147:23
**indemnity** 16:18
**independently** 117:24
**individual** 21:15 22:15 28:6 32:10 49:4 65:2 116:14 120:6 125:20
**individually** 36:3 125:12
**individuals** 64:11 65:10 176:21
**industry** 106:4
**infinite** 61:24
**inflate** 36:10
**inflates** 36:23
**inflation** 37:5
**information** 55:25 163:5,8 163:12 164:10 165:4,11

**infrastructure** 67:17
**initial** 24:13 44:14,14 50:6 51:23 52:12 53:9 147:15
**initially** 44:13 56:5
**input** 30:8 131:11
**inquire** 55:11
**insisting** 162:17
**inspection** 47:13
**instances** 9:14
**intelligently** 52:6
**intend** 18:15 20:18 123:23
**intent** 88:3 91:25 102:25
**interdependent** 32:17
**interest** 10:17 18:16,17 61:5 65:11 71:3
**interested** 178:13
**interesting** 77:4 88:3 176:24
**interests** 63:14 63:16 65:3
**interfere** 83:22 83:23
**interfering** 84:4
**interim** 165:18
**intermediate** 51:14
**internal** 87:12 88:13 101:18 132:2
**internally** 87:8 101:14 166:2,4 167:7
**interrupt** 102:2
**intimately** 95:18
**intrigued** 76:13
**introduce** 8:6 12:9
**invest** 47:17
**investment** 87:11
**irrelevant** 176:22
**irrevocable** 14:11
**irwin** 2:13 5:16 5:20,21,21,22 5:25 6:2 77:17 77:21 79:21 83:4,10 84:17 84:25 103:15
**isolation** 39:5
**issue** 15:11 23:9 31:20 35:15 37:11 62:8,10 65:22 76:12 95:20 97:9 114:9,17 119:18 124:10 124:11 138:2 155:6
**issued** 164:12
**issues** 53:13 54:16 62:13 69:20 80:16 86:10 97:15 98:7 101:23 106:13,19 118:8,22 124:8 172:17
**item** 71:19
**items** 62:14

**j**

**j** 1:8 8:12,21 13:8
**jack** 2:7,14 6:8 8:8 51:25 53:3 53:6 56:2,10 105:21 109:21 110:2 143:2,11 143:13 146:4
**jack's** 53:4
**jake** 2:18 6:13 27:2,4 28:21 34:8 37:12
**jason** 2:6 7:20
**jersey** 1:2 3:15 13:7
**jiang** 2:3 8:9,9 8:12,21
**jimmy** 2:11 5:9
**john** 2:3,21 8:19 10:10,11 10:14
**join** 5:17 6:23 77:19
**joined** 51:25
**joining** 6:21 7:3 7:4 13:20
**joins** 5:8
**joint** 32:3 34:16 35:22 36:7 39:2 149:9,11,21 150:3
**jointly** 54:10
**jones** 2:19 6:14 6:16 7:3
**judge** 1:8 3:5 13:8 40:1 41:17 123:13,17
**judging** 112:8
**judgment** 124:1
**julia** 2:3 8:9,20
**jump** 158:25
**juncture** 74:22
**june** 158:8,11 158:12 163:19 164:9

**k**

**k** 9:25
**kathy** 2:13
**kb** 158:10
**keep** 33:23 34:2 34:4,7 40:11 51:5,11 86:16 86:17 94:24 95:8,9,22 116:2 128:12 133:17 134:6 153:23 160:9 163:11 173:1 174:17 176:3
**keeping** 58:18 59:8 90:2 110:25 111:4
**ken** 8:22 9:1
**ken's** 9:5
**kenneth** 2:7
**kept** 78:10 81:20 172:21
**kevin** 2:14
**kicked** 117:25
**kicker** 58:7,13 78:4,11
**kidding** 74:17 74:17
**killing** 68:14
**kind** 57:4 63:8 67:21 86:24 87:8,10,21 88:4 88:11,12 89:15 89:25 90:10 93:21,24 94:19 105:20 121:22 158:2 163:4
**knew** 154:22
**know** 4:2 5:7 5:17 11:15 15:10 19:12 21:8 26:15,20 26:22,25 27:5 28:15 29:13 30:24,25 36:11 36:12,13,16 41:23 50:1 52:4 54:8 56:9 58:3 61:4 65:10 66:22 72:20 77:6,23 80:3 81:3,15,17,19 82:3,21,23 83:19 84:5,13 84:14 85:10 89:9 91:20 94:4 104:19,25 105:9,10,15 108:11,13 113:7,18,19,23 113:25 114:9 115:25 121:19 121:24,25 122:14 124:12 124:13,17 132:9,14,21 141:17 157:1 159:16 162:9 163:8,13,13,18 163:19 164:18 165:19 172:17 173:9,10
**knowing** 12:2 19:18 57:21

**l**

**l** 8:20,24 10:1
**lags** 100:23
**lake** 158:10
**land** 10:11 48:9 48:10 76:3 95:18 115:4
**landing** 10:19 10:20 103:21
**landowners** 97:3
**language** 40:12 59:8 63:9,15 71:21 79:22 82:15 88:7 103:16 154:12 155:16,18 156:4,10 157:3 158:14,15,24 162:24 167:12
**lardner** 27:3
**larger** 66:17
**largest** 92:13
**late** 18:23
**latest** 158:7
**laughing** 161:9 161:9
**lay** 71:10
**laying** 86:24
**layman** 161:6
**lease** 26:23 46:22 47:13 59:25 63:3 69:20 70:2 71:17 75:3 81:23 88:10 91:14 92:17 93:7 100:10 102:22 103:1,3 103:8 112:12
**leases** 28:19 47:2 49:22 59:6
**leave** 19:14 113:3
**left** 152:12,13
**legal** 84:12
**legally** 83:23
**leney** 2:4 10:1 11:19,23 12:17 56:12,16 75:23 105:16 107:2 110:22 125:14 126:11,22 127:2 141:9 157:16 168:25 172:2
**letter** 164:20
**level** 50:7
**liability** 61:25 63:20 70:8,19 70:23,25

**license** 55:18
**likelihood** 99:9
**limitation** 84:2
**limited** 13:5
**lindsey** 48:5 53:21 54:16 59:1,4 65:20,23 71:19 74:21 83:15 84:21 89:11,13 105:24 113:13 113:19 115:5 118:9
**line** 7:1,5 21:19 40:6 45:22 111:11 121:23 143:10 164:8 174:8
**liquidated** 51:8
**list** 3:24
**listen** 36:12
**little** 13:9 24:17 26:7 31:12 35:7 77:15 79:3 84:7 92:9 101:1,10 101:14,18 102:17 108:14 108:15 114:7 114:12,15 159:8 160:21
**live** 9:25 52:15 83:20 97:16
**llc** 10:11
**load** 158:7
**lobby** 105:17
**located** 47:21
**locked** 81:4 99:6
**lodge** 159:11
**lonestar** 3:19 13:2,3
**long** 20:22 37:13 41:11 47:1 66:8 73:5 85:2 94:15 102:21 103:20 116:20 157:17 157:21 158:19 162:20
**longer** 64:9 94:25 148:19 161:11,14
**look** 21:3 38:3 78:19 80:4 82:6 82:15 83:7 96:25 100:16 107:17 123:12 138:3 154:15 161:11 164:2
**looking** 20:11 103:15 105:3,4 105:5 109:1,5 158:21
**loopholes** 88:5
**looping** 62:14
**loose** 81:22
**lose** 40:8 42:2 98:19 125:16
**lost** 69:3 77:13
**lot** 4:3 30:4,24 30:24 31:3,21 31:24 32:12 33:16,18,24 34:9,24 35:20 44:25 49:21 60:17 69:3,4 79:1 83:2,9 87:9 91:6 92:14 92:15 94:12 96:20 97:12,12 100:6 123:25 130:22 140:17 142:20 146:16 155:6 176:21 177:2
**lots** 31:4 34:19 34:23 35:2,3,8 35:14,20,23 36:3 37:20,21 39:5 49:15 113:16 116:14 125:21 141:8 142:1
**lotwise** 32:24
**love** 71:7 111:15
**lower** 32:25 33:2 34:11 49:5 93:17
**lunch** 77:14

**m**

**m** 8:20 9:25
**m3** 8:18,22
**made** 9:22 22:17 40:16,17 114:7,10 155:9 159:13 165:3
**magliano** 2:3 8:19 51:13 67:3
**majority** 82:19
**make** 3:23 8:23 12:25 14:14 19:16 20:13,15 21:1,2 22:5 26:8 27:14 29:1 33:8 39:5 40:24 41:2 53:14 55:24 60:10,15 63:24 64:2 68:4 80:7 93:13 95:8 99:1 103:5 107:6 114:18 119:11 123:22 124:16 125:9 125:18 131:13 132:2,17,17 149:14,16 150:14 151:17 151:19 152:18 154:25 159:11 162:2 163:3,6,7 165:5 166:16 167:21

**makes** 37:23 62:21
**making** 10:22 15:8 20:11 73:23
**management** 93:18
**mark** 174:16
**market** 47:18 75:4
**marking** 46:5 93:24
**markup** 76:8
**markups** 16:4 19:6
**martin** 6:19
**martini** 2:11 5:9,10 166:18 166:25
**massive** 86:6
**matches** 121:2
**material** 114:9
**materialize** 79:20
**matter** 62:1 66:7 84:9 92:16 95:25 97:7 132:16
**maximizing** 27:15
**mccamey** 158:9
**mean** 19:17,23 20:3 23:12 24:17 25:11 27:9 32:25 33:4 37:23 46:21 50:21 51:7 55:19 61:1 70:22 79:1,19 81:4 82:18 84:15,18 93:9 109:3 114:4 119:21 130:21 138:1 161:8 169:18 172:20 174:15,18 176:22
**meaning** 43:15 113:14 117:14 161:12 162:5
**means** 52:14 54:4 55:17 70:19 72:7 81:2 92:14 94:24 148:18 155:13 155:18
**mechanisms** 81:22
**mediation** 123:13
**meet** 28:8 57:10 59:11 78:21 82:12 105:19
**meeting** 85:5
**megan** 2:21 10:11
**megawat** 88:15
**megawatt** 46:13 47:12
**megawatts** 67:15 155:25 156:3 158:9,12 161:3,3,13 164:17,21,22 165:9
**member** 9:11
**members** 3:2 4:10,22
**memorialize** 15:12
**memorialized** 13:16
**mentioned** 105:8 148:3
**merit** 127:25
**mess** 114:18
**message** 80:9
**messier** 89:9
**michael** 2:2,12 5:10 12:9
**middle** 30:10
**midnight** 116:19
**mike** 9:17,18 12:20,21 19:5 42:10
**mike's** 11:8
**million** 16:24 16:25 26:15,16 26:18,18 28:3,3 33:23 35:10 36:14,19,21 44:2,16,21,22 44:23 45:4 50:2 50:16,17,19 51:10,19 52:12 52:13,23 53:10 53:11 54:13,18 58:6,7,11 62:22 64:20,23 66:11 71:1 73:13,22 74:2,5,12,25 77:10 78:3,17 78:20 80:6,12 80:13,14 82:17 83:11 90:14,15 90:16,16,21,22 91:2,3,19,21 95:12,13 98:15 99:4 103:24 104:1,3,12,15 105:22 107:9 107:18,20 108:2,7,14,20 108:23 111:10 111:11,24 115:14 117:10 117:12,17,21 117:22,23 118:4,5,9 119:6 121:1 124:11 124:11 126:8 128:8,19,20 129:7,18 130:2

130:4,14,22 131:21,22 133:14,24 134:3,17,20 135:21,23 136:15,17 137:4,6 138:8 138:10,20,21 139:8,10,21,23 142:23 144:1,5 144:8,11,14 145:1,6,13,22 145:24 146:13 146:16 149:2,3 149:7 150:3,21 150:22,25 151:13,20 152:16 155:2 170:7,16,19,21 171:11,12,25 173:23 174:4 175:13 176:1 176:10,12,18

**millions** 84:15 84:16

**mind** 61:23 94:18 95:20 142:17 155:17

**mindset** 88:12

**mineral** 44:6,7 44:12,15,17 45:13 46:2 50:24 52:17 53:12,15 54:16 62:8,10 65:20 71:9,12,16,17 71:20 72:4,9 74:21 76:21 78:5,22 79:8 80:15 83:5,12 83:21 86:6,20 87:3 88:20 89:23 90:19 91:5,10,12,14 95:9,19 96:21 97:4,23 98:7,16 98:24 99:21,23 100:9 101:12 104:1,13 105:5 105:23 106:13 106:16,17,18 109:11,17 110:9 111:3 115:3,16 118:6 118:7,8,17 130:11,16 131:5,22 132:4 133:6 143:3

**minerals** 80:21

**minimize** 109:6 109:8,12

**minimum** 24:3 56:25 57:4,9 61:11

**minimus** 79:12 79:14

**mining** 45:19 45:20

**minus** 149:13

**minute** 125:1 127:7,8,9,17,18 130:5 170:9

**minutes** 42:2 73:4,7,9 85:6 110:4 130:8 144:16 153:24 156:17 157:9

**miscommuni...** 174:2

**mispronounce** 4:12

**missed** 77:1

**missing** 111:20 120:1 151:12

**mitigate** 92:22

**mixup** 176:5

**model** 166:5,12 166:21

**modeling** 165:4

**models** 166:19

**modest** 51:10

**modification** 155:11

**modifications** 155:5,8 165:3

**mold** 88:18

**moment** 17:20 49:16 50:4 78:6 152:7 166:14

**momentarily** 167:4

**monetize** 98:6 98:13 112:13

**monetizing** 98:10

**money** 40:14 41:2 60:3,17 66:13 69:3 93:10 101:20 110:11,12 111:13

**monitor** 94:25

**montejo** 2:15

**month** 63:23

**months** 47:10 48:3 50:22 51:18 55:13,14 61:16,18,19 62:3,21 63:13 65:6 70:7 75:5 98:22 104:23

**morning** 3:1,2 7:16,17 10:10 10:13,14 12:21 20:5 44:24

**morris** 2:15 29:19 155:7,12 155:17 156:10 156:15,20 157:11,12,14 157:17 158:25 159:22 167:15 167:16,19,23 169:8 171:17 171:17 172:11

172:25 174:23
**morris's** 162:12
**mortgage** 94:2
**mortgages** 93:1 93:5
**motion** 177:16
**move** 61:6 102:2 142:15 166:2
**moved** 95:7
**moving** 95:3 116:2
**multiple** 18:2

**n**

**n** 7:7 8:12,20,21 9:25 10:1,3,3
**nail** 79:2 114:16
**name** 3:2 8:11 15:7 27:1 56:13
**names** 4:11 8:14
**natasha** 2:16 10:2
**nature** 54:8
**necessarily** 57:13 71:4
**need** 17:20 19:12 20:15,22 29:11 46:3 47:2 52:9 55:16 56:24 64:8 65:14 73:6 79:2 80:5,25,25 85:2 92:17 97:8 100:11 102:2 110:1,3 113:17 113:25 115:24 117:2 124:13 125:13 132:7 132:21 133:17 136:4 140:1 141:11 147:18 152:8 154:15 156:10 157:5 158:22 159:22 159:23 162:9 167:6
**needed** 15:1 165:3
**needs** 49:13 108:19 114:6 127:8,9 144:15
**negotiate** 48:9 53:21 70:4
**negotiations** 48:25
**neither** 178:9 178:11
**net** 155:6
**never** 24:25 70:20 82:9 91:10 95:13 141:19,21 159:5
**new** 1:2 3:15 13:7 43:3 163:8 164:10 174:7 174:17
**newer** 148:4
**nice** 84:19 105:19
**nicely** 100:18
**night** 18:24 161:16
**non** 31:2 86:14
**noncash** 17:9 17:13
**nonsensical** 119:13
**normal** 69:4
**north** 158:9
**note** 164:20
**noted** 160:1 175:3
**notes** 53:5 54:12
**notice** 3:25
**notion** 59:18
**november** 60:19 61:15 68:7 87:24
**nuances** 64:2
**number** 3:16 11:20,24 12:3,6 12:17 13:7 46:8 46:9 80:5 89:21 99:18 101:16 104:23 119:15 124:12 132:22 149:10
**numbers** 67:10 151:16 171:10 176:8

**o**

**o** 8:20 10:3,3
**o'hagan** 1:8 3:5 13:8
**object** 76:7 142:12
**objection** 19:3 19:10 35:9 40:6 71:14 122:8 123:6 124:22 159:1,12 160:1 175:2 177:17
**objections** 19:8 71:13
**objects** 21:7 174:24
**obligation** 93:12,12 94:23
**obligations** 92:25
**observer** 10:16
**observing** 10:12
**obtain** 15:23
**obtuse** 72:15
**obviously** 12:2 38:7 66:25 91:5 105:3 111:1 131:16
**offer** 16:8 33:9 54:3 58:8 78:3

82:7 103:23,24 108:1,9,17,20 110:15 111:2 112:16 114:24 115:14 116:1,4 116:6 117:19
**offered** 16:10 16:13,21 50:17 77:3 104:10 109:10,12 110:7 117:10
**offering** 14:8 15:7 24:15 54:17 56:21 58:11 95:17 126:12
**offers** 54:15 77:10 110:21
**officially** 160:18
**offline** 90:8,9 167:19
**offset** 35:5
**oftentimes** 26:22
**oh** 3:7 4:7 6:1 8:2 10:24 11:21 22:2 134:15 177:8
**oichen** 2:8
**okay** 3:10 4:9 4:21 5:19 6:3,6 6:12,24 9:16 10:13 12:6,15 12:17 18:9,14 21:6 22:19,24 23:5 24:7 27:7 27:25 28:10,11 29:3,6,9 33:5 34:6,14 36:15 36:18 37:8 38:10 41:13,14 42:19 43:4 44:3 45:16 52:2,11 52:22 54:3 58:10 62:24 65:6 69:14 72:18 75:11 84:17 89:14 92:3 102:3,7 103:9 106:22 109:19 110:17 110:20 115:11 116:11 119:1 122:14,21 123:15 124:13 127:18 128:5,8 128:13 138:4 146:3 148:23 150:16 151:22 152:20 156:18 156:22 161:14 162:8 170:14
**old** 134:7
**once** 14:10 67:16 100:25 174:2
**ones** 84:8
**online** 4:4 6:16 10:2 12:14 15:3 15:4 30:4 47:15
**onsite** 46:23
**open** 9:14 14:4 21:18 30:18 57:4 92:25 94:25 99:14 113:4,6 173:22
**opening** 49:14 126:2 142:23 143:14
**opinion** 72:2,11 83:18,20
**opportunities** 67:9 87:17
**opportunity** 17:16 25:15 41:6,14 69:19 141:4 147:6
**opposed** 22:22 96:5
**option** 86:22 87:19 95:23 98:21 99:11 100:12 106:25 109:2,2 110:16 110:18 111:21 115:14 121:17
**optionality** 88:25
**options** 110:11 116:10 121:23
**oranges** 122:24
**order** 3:20 11:10 13:13 15:22 19:11 76:8,10 141:14 169:9,14
**organization** 88:16
**outbid** 169:21
**outcome** 69:5
**outside** 103:12 161:22 162:18 164:10
**outstanding** 71:16
**overall** 62:15 89:21 90:4,15 92:20 147:2
**overbid** 50:7 173:2
**overbids** 17:2,5
**overdeliver** 62:4
**overlapping** 150:2
**owe** 51:4
**own** 15:3 57:18 97:3 127:25 152:11
**ownership** 65:3
**owns** 65:23

**p**

**p** 1:13 7:7 9:25 178:3,17
**p.m.** 85:22 90:9 177:22
**pachulski** 7:10 47:6
**package** 36:13 40:23 64:18 125:15
**packages** 26:23 40:2
**packman** 2:2 3:1,3,10,13 4:7 4:9,15,17,19,21 4:24 5:2,7,12 5:19,24 6:3,6,8 6:12,18,21,24 7:2,6,9,15,17 7:20,22 8:10,18 8:25 9:5,12,16 9:20,23,25 10:6 10:13,15,24 11:3,21 12:8 17:20,24 18:9 18:11,14 19:17 19:22 20:7,17 21:5,7,18 22:2 22:9,12,18 23:3 23:8,17,24 24:6 25:11 28:9,23 29:4,11,15 30:7 31:9 32:22 33:5 33:12,21,25 34:4,7,11,22 35:12 36:2,25 37:8,16,24 38:3 38:8 39:16,20 40:1,9,21 41:4 41:9,11,13,17 41:25 42:6,8,10 42:15,21 43:18 44:3 45:1,3,9 45:16 46:11,18 46:24 48:24 49:8 50:10 52:2 52:9,17 53:14 53:20 55:2,20 55:24 56:4,7,10 56:14,18 57:11 58:1,3,9,14,19 58:21,23 59:2,9 59:14 62:18,24 63:2,5 64:9,19 64:25 65:9,14 65:19,23 66:5 66:15 67:12,22 68:3,13,16 69:23 70:16,21 70:24 71:7,13 71:23 72:5,13 72:19 73:5,8 74:10,20 75:19 76:1,6,20 77:13 78:7,11,17,19 78:24 79:9,14 79:23 80:10,14 80:18 81:13 82:3,18 83:15 84:18 85:9 89:2 89:8,11 96:14 96:18,20 97:19 104:25 105:20 106:9,16 107:1 107:4,12,17,22 108:24 109:5 109:10,18 110:17 111:19 111:24 112:17 113:1,11,16 114:23 116:13 116:20,24 117:1,6,9 118:2 118:4,13,20 119:6,10,22 120:11,20 122:8,18 123:5 123:12,15 124:3,9,19 125:5,8 127:24 128:3,11,19 130:19,25 131:14 132:14 133:19 140:11 140:14,17 141:16 142:4 142:10,15,25 147:10,18 149:8,14 150:8 150:16 151:5,7 152:8,13,25 154:9,16,23 155:15,21 156:9,22 160:1 160:11,15,22 161:2,6 163:15 163:25 165:8 166:8,11,24 167:13,21 170:1 172:14 173:8,15 174:5 175:4 176:1 177:4,12,18,19
**page** 48:17 107:7 155:19
**paid** 64:17 66:14 91:11,15 91:24 102:24 102:25
**paired** 141:13
**pam** 2:14
**paper** 47:14 54:9 82:1
**paralegal** 10:6
**parent** 104:8 106:10 112:23
**part** 37:14 50:15 57:12,14 62:14 63:15,23 68:24 69:1 70:8 72:1 81:19 107:10 116:5 174:5
**partial** 44:18
**participate** 39:9 147:1,8

169:16
**particularly** 74:21 105:6
**parties** 15:2 27:16,17 39:21 159:7,10 178:11
**partner** 94:16 152:11
**parts** 80:23
**party** 11:25 14:12,12,15 22:21 112:10 115:10 159:4 159:17,18
**party's** 159:13
**path** 98:10
**patience** 42:2
**patrick** 2:12 5:13,15
**pause** 14:23,25 170:23
**pay** 41:20 51:5 51:9 62:1 86:23 91:25 93:3,12 93:24 95:22 97:2
**payable** 57:9
**paying** 58:5 70:14 106:5
**payment** 44:14 44:14,20 50:19 50:20 52:12,13 53:9,10 55:18 62:21 81:24 106:10 118:10 122:4
**payments** 50:18 60:25 131:9
**payout** 88:10
**peacock** 1:14 43:7 178:3,17
**pei** 2:23
**pending** 13:6 158:12 166:6 166:10,20,22
**people** 9:24 28:25 30:4 47:24 52:4 61:4 69:4 120:5
**percent** 15:15 78:10 81:12 122:12
**perez** 2:12 5:11
**period** 47:8 54:5,19 66:20 70:6 107:24 177:14
**permit** 10:15
**permitted** 14:14 40:5 83:23
**permitting** 16:6
**perpetual** 70:19,23
**person** 8:23 14:13,14 26:2 96:24,25 97:1 167:6 174:12 174:13
**personally** 87:16 90:7 117:1
**perspective** 27:15 57:6 72:10 75:9 82:25
**phase** 148:3
**philosophical** 87:10
**phone** 12:6 152:17 173:12
**pick** 165:14
**picked** 173:12
**piece** 62:9 86:18 89:15,16 113:15
**pieces** 92:11
**pin** 111:17
**ping** 4:13,13 90:10
**place** 7:4 42:7 44:11 49:14 63:22 85:23 104:13 178:6
**plainly** 173:11
**plan** 85:3
**plane** 177:9
**planning** 102:21 109:25 110:3
**play** 67:5 165:19
**please** 5:8 7:6 8:7 12:2 15:10 21:8 38:24 72:6 107:5 117:4 128:5,7 142:25 145:15 173:3 174:21 176:8
**pledged** 104:8
**plus** 58:15 108:21
**pocket** 90:10
**point** 11:24 34:8,10,12 37:16,17 52:25 55:2 56:24 68:11 71:1 96:7 101:6 103:12 105:10 124:6 137:23 147:19 162:12,13,14 173:8
**pointing** 115:13
**points** 29:2 158:21
**poolin** 1:4 3:4 3:13 13:4
**pop** 90:12
**portfolio** 100:18
**portion** 66:16 66:17 97:5 117:20 149:7

**position** 48:4 123:21 172:15
**positioned** 47:20 48:2
**positive** 83:8
**possible** 47:18 70:17 92:10 106:6 121:13
**possibly** 82:9 105:8
**post** 110:16 111:23
**posted** 138:4 154:22
**posting** 46:24
**postpone** 40:18
**potential** 10:19 19:9 58:12 114:17
**potentially** 11:17 21:12 36:10 41:19 64:14 75:6 76:14
**power** 45:7 46:5,12 48:18 48:20 58:17,18 58:22,24 67:14 68:5 115:4 129:22 156:1,6 156:6,7 162:25 163:6
**powers** 158:21
**practically** 98:3 98:5
**pre** 157:23
**precedent** 90:20 164:8
**preclude** 37:10
**precluded** 39:18,22 41:1
**predicament** 154:11
**prefer** 21:9
**preferable** 72:11
**preference** 31:17
**prepared** 71:11 159:15,16
**present** 7:21 128:15
**presented** 14:15
**presenting** 53:22
**presently** 111:7
**presiding** 13:8
**pretenses** 159:13
**pretty** 18:23 46:8 59:24 66:5 69:2 74:11 107:25 125:18 154:14
**prevailed** 171:13
**prevailing** 15:19 146:15 152:6 176:13
**prevent** 84:3
**price** 26:2,5 36:10 70:9 96:6 97:25 101:8 146:12 149:25
**priced** 96:1
**prices** 96:6
**pricing** 91:7
**pride** 68:22
**primarily** 162:15
**prior** 13:19 15:8,17 16:5,6 16:12 49:14 68:9 70:4 160:6
**private** 14:17 15:3
**privately** 114:24
**probably** 6:11 46:7 66:17 67:20 69:3,10 84:8 89:13 108:14 150:18 161:22 173:24
**problem** 114:14 115:2 124:7,17,23 173:5
**problematic** 24:18
**procedure** 21:8 166:13
**procedures** 1:12 3:20 11:9 11:10 12:12 13:13,13 14:3 15:18
**proceed** 13:23 142:19 148:16
**proceedings** 3:14 13:4 177:22
**process** 40:7,14 40:18 49:19,23 57:7 62:12 67:7 67:9 86:8 98:3 101:13 107:16 116:2 123:2 152:12 163:5
**processes** 49:18 123:2
**proclamation** 164:12,18
**professional** 70:8
**progress** 114:7 114:10
**project** 114:22 158:10 164:22
**projects** 88:1 97:13
**promise** 29:5
**proof** 137:23

**proper** 47:3 169:5
**properties** 53:17 93:1 105:7 106:18 113:19 120:15 126:2
**property** 39:8 50:7 51:5,9 53:21 54:1,7 55:13 63:6 65:23 71:14,24 75:22 76:3 93:18,25 104:2 104:7 105:25 106:4,13 112:14 117:16 118:11 148:20 149:24
**proposal** 42:21 42:22 72:23 73:3
**propose** 103:16
**proposed** 19:13 79:22 160:8
**protection** 163:2,10
**protections** 64:8
**protest** 175:2
**provide** 45:24
**provided** 107:20,22 118:14
**provides** 169:9
**provision** 84:20 161:18
**provisory** 156:2
**pte** 1:4 13:5
**public** 93:3 103:2 108:4,10
**published** 42:14
**pull** 43:16 88:25 99:11
**pulled** 141:7
**pumping** 98:15
**purchase** 16:14 26:2,5 28:13,17 59:1 70:9
**purchased** 16:11
**purchasing** 24:21
**purpose** 90:5,7 92:19 103:9
**purposes** 110:1 110:3 123:25
**pursuant** 3:19
**push** 60:22 165:21
**pushback** 158:23
**pushed** 76:22
**put** 11:19,23 32:22 33:11,15 33:15 41:2 42:16,22,22 43:22 56:11 61:23 63:8,10 69:9 78:15 81:25 84:14 86:19 87:4 90:14 97:13 99:3 116:4 122:17,21 132:4 140:20 148:9 152:9 157:1 168:17 174:3
**putting** 33:17 39:23 66:11 77:5 120:19 124:22 125:1 131:18 172:14
**pyote** 3:18 11:11 16:10,20 16:23 17:1 21:14 22:3,16 23:1,9,10,21 24:4,9,13,14 25:3,10,25 26:15 27:5,6,19 28:8 30:25 33:6 36:20 37:6 48:22 54:17 59:4 64:22 65:3 65:17 66:16 76:15 83:21 84:19 89:2,4,7 89:12 96:21 105:25 113:13 113:21 115:2 117:21 118:9 119:7,16 120:22 122:15 126:2,7 127:3 128:5,6 130:22 140:11,14 141:20 143:7 149:22,23 171:13,20 176:13

**q**

**q&a** 164:6
**qi** 2:9 4:15
**qichen** 4:11
**qualification** 16:19
**qualified** 16:22 22:25 23:6 24:1 25:20 40:2,9,10 42:17 146:23 147:4 149:10
**qualify** 43:19
**question** 19:10 22:14 23:19 46:19 47:5 54:23 56:19 60:24 66:18 69:24 75:24 85:25 112:6 115:5 124:4 131:8 137:25 147:7 148:15

158:6 163:21 165:12 167:16 167:20
**questions** 21:13 56:7 68:17,19 75:12,14 84:24 85:18 109:19 126:9 128:12 156:9 157:20 166:16 168:9
**quick** 74:11 77:18 102:17 167:22,23
**quickly** 40:14 47:17 60:22 61:7 62:2
**quite** 50:16 84:21 85:9 115:9,11 162:11
**quo** 126:14

**r**

**r** 7:7 8:24,24 10:4 178:1
**r.e.** 2:22 29:18
**raise** 73:12
**raised** 46:9 123:5
**raj** 2:17 6:5 113:2 152:17
**ram** 156:5
**ramp** 160:12 161:11 162:17 163:1,17 165:6
**ramped** 162:5
**ran** 8:7
**rate** 158:7
**rather** 28:4 46:1 85:23
**ratification** 46:9
**read** 11:8 12:11 43:17 73:2 155:15 164:2 173:14,15,19
**ready** 9:20 12:4 143:13 144:18 168:16
**real** 77:18 81:9 95:13 96:9 98:17 99:15 102:17
**realistic** 67:11 116:17
**reality** 96:25
**realize** 125:16
**really** 26:24 27:9 49:22 67:14 80:4 82:21 83:22 85:21 101:5 102:14 109:4 109:12 120:10 123:2,4 163:19 167:21,23
**reason** 8:7 30:19 40:15 43:18 66:18 67:4 94:19 157:21 162:3 162:10
**reasonable** 63:11
**reasoning** 45:17
**reasons** 160:7
**rebid** 42:17
**receive** 44:9
**received** 15:16 18:25 163:5 164:19,20,20
**recess** 30:6 39:15 42:9 59:15 73:10 77:25 85:15 110:5 117:8 130:9 133:13 134:21 136:6 137:17 139:18 140:2 144:17 145:16 146:21 147:20 148:14 148:25 152:5 153:25 154:6 156:24 157:10 168:1 169:23 170:10 174:25
**reconcile** 158:23
**record** 9:9 38:19 39:13,25 43:13,15 69:18 77:12,20 78:1 85:14 103:17 107:9 110:6 124:22 125:22 125:24,25 127:6,20 134:22,23 139:13 140:21 140:22 142:7 144:21 148:24 149:15,18 150:19,23 151:25 152:1,9 152:22 154:7 155:1 157:1 159:12 167:5 173:21 174:23 176:21 177:15
**recording** 3:7 11:5
**redline** 167:9
**reduce** 44:12
**reference** 154:16
**referring** 3:17
**reflected** 91:7
**refusal** 125:2
**refuses** 120:3
**refusing** 123:10
**regard** 48:5
**regarding** 71:19 155:6
**regardless** 44:17 99:7

124:4
**regroup** 72:25
**rejecting** 160:7
**rejoin** 56:15
**related** 16:5 106:4
**relationship** 46:17
**relative** 117:15 178:10,12
**release** 54:1
**releases** 106:17
**reload** 48:17
**relocate** 48:6
**remain** 132:23 133:4,5 146:7 169:11
**remainder** 46:16 117:11
**remember** 142:14
**remind** 144:24
**remove** 44:13 45:15 75:21 86:15,17 158:17 167:9 167:11
**removed** 19:20
**removing** 86:5 87:2 88:20 156:3
**renegotiate** 98:20
**renewal** 59:6
**rent** 55:18 57:9
**reopening** 174:24
**repeat** 8:16 52:21 139:3 175:25
**repeating** 133:17 165:23
**reporter** 3:7,9 3:12 8:13 11:4 38:22 42:11 43:6,10,11,12 51:22 78:1 110:6 125:23 125:25 134:23 134:25 135:2 144:20 157:25 173:18,19 177:20 178:18 178:18
**reporters** 1:14 13:18 178:4
**reporting** 43:8
**represent** 36:16 94:21
**representative** 15:5
**reputation** 92:14 94:7,8
**request** 14:24 130:5 134:18 153:22 157:5
**requested** 11:25 155:8 157:3 173:19
**requests** 14:23
**required** 15:20 15:22 17:21 61:9
**requirements** 165:18
**requiring** 131:12
**reservation** 71:16 83:17 113:20 115:7
**reservations** 59:6 106:16
**reserve** 13:25 16:3 19:5 142:6
**reserving** 177:16
**resolved** 97:23
**respect** 52:16 71:11
**respectful** 42:1 116:1
**respective** 119:1
**respond** 55:22 56:1,22
**responded** 78:2
**responding** 37:2,3
**response** 4:23 11:2 21:10
158:6
**responses** 158:2
**rest** 78:24 109:13
**restructure** 42:20
**result** 98:20
**resumed** 43:7
**rethought** 157:7
**return** 130:7
**returned** 18:20 177:2,7,11
**revenue** 112:9 112:11
**reverse** 31:20 119:19,21
**review** 16:3 156:10
**revised** 18:24 19:13 43:5,21 52:3,5,7
**revisions** 20:19
**rewriting** 121:10
**rich** 96:16 97:1
**rid** 65:11 66:9 76:5
**right** 5:7 7:9 9:23 14:1,19 16:3 19:5 23:18 25:5 28:20 34:10 36:19

38:12 39:9,21 43:21 45:7 46:18 49:3,7,17 50:9,11 55:15 55:21 57:19 59:11 61:24 62:12,20,22 67:19,24 68:11 71:24 72:4,15 72:15 74:18 78:22 79:9,11 81:6,13,23 83:2 83:9,12,18 89:5 91:18,21 92:8 94:21 98:7 100:6 102:10 102:19 103:6 104:2 107:3,4 108:25 114:5,5 114:11 118:8 122:9 124:1 125:18 130:16 131:1,21 132:7 136:5 141:9 147:10 148:17 152:13 160:17 160:17 161:1,8 161:13,15 163:1 166:6,6 167:7 170:24 171:6 172:4,6 172:13 175:8 175:24 176:22 177:3

**rights** 44:7,7,13 44:15,17 45:13 46:2 50:24 52:17 53:12,12 53:15 62:8,10 64:15 65:20 71:9,12,16,20 72:9 74:21 76:21 78:5,22 79:8 80:16 83:5 83:17,22 86:6 86:20 87:3 88:21 89:23 90:19 91:6,10 91:13,15 95:19 97:4,23 98:16 98:24 99:21,23 100:9 101:13 104:13 105:6 105:23 106:18 109:11,17 110:9 111:3 113:20 115:3,8 130:11 131:5 131:22 132:4 133:6 142:7 143:3 177:16

**risk** 44:8,12 86:13,14 87:8 91:1 92:7,9,15 95:25 96:5 97:23 99:3 108:3,16 109:6 109:8,13,14 165:21

**riskier** 91:6

**risking** 86:7

**road** 82:9 114:19

**rob** 82:6 92:24

**robert** 2:5,15 7:18 82:4

**roger** 56:22

**roll** 9:21 176:7

**room** 5:11 6:5 8:3,7 9:1,3,6,11 38:22 41:7 56:11 67:8 69:10 74:20 77:16 79:18 109:24 164:5 166:24 167:3 174:20

**rooms** 15:3 29:8,10 59:15

**rosell** 2:6 7:20 7:21

**roughly** 115:15

**round** 22:22,23 48:25

**rudely** 42:4,6

**rules** 11:9 12:12 13:15

**rumors** 62:5

**run** 34:24 67:10 124:25

**ruo** 4:13,13

**s**

**s** 7:7 10:3

**safe** 63:12

**sake** 126:12 176:20

**sale** 15:24 16:11,13 35:8 39:24 76:8,9 112:12

**sam** 2:20 7:3,9

**sand** 158:9

**sandler** 2:5 7:11 9:7 47:4,5 51:17 61:16 68:19 73:20,21 73:25 74:4 75:15 77:4,11 82:25 83:7 85:2 91:16 92:3,7 93:16,21 102:9 103:4 108:8 109:25 112:22 113:5 131:15 132:16 135:17 135:25

**sans** 78:22

**sapnar** 2:20 7:4 7:9

**sat** 176:19

**saved** 51:18

**saving** 66:13

**sawing** 62:13

**saying** 22:3 24:12 25:3

27:11 28:23,24 34:1 37:1,4,12 37:18 40:11 47:24 50:22 54:11 57:2 62:16 63:22 67:25 80:4 85:12 92:16 96:22 102:13 104:22 113:24 119:8,22 120:10,12,13 121:6 123:16 132:21 157:7 166:23 169:15 172:21 174:16
**says** 36:21 91:20 164:3 169:14,14
**scar** 97:11
**scenario** 35:18 66:20 67:2 91:9 99:7,11 100:20 100:21,23,24 102:18,19,20 103:1
**scenarios** 103:25
**schedule** 156:5
**sealed** 14:16
**search** 64:12
**second** 27:8 39:14 50:20 53:10 56:17 87:6 100:21,23 111:2 123:15 148:20 149:15 166:3 169:12 170:22 171:8 171:16 172:22 172:22,24 173:12 174:14 175:22
**secondly** 22:25
**seconds** 166:18
**secure** 106:6
**secured** 92:25
**security** 93:16 104:7 107:24 108:11 112:22
**see** 7:12 10:3 12:3 19:25 22:2 35:18 48:10 49:18 53:6 56:12 60:15,20 61:24 62:18 74:23 85:17 97:22 98:10 101:11 104:11 116:8 130:7 131:23 134:15 147:11 164:2 166:25
**seem** 77:13
**seems** 26:10 81:15 115:10 131:11 158:20 159:1
**seen** 162:24
**self** 26:12
**sell** 102:23
**send** 102:8,9 156:14,15
**sense** 20:16,17 26:8 27:14 37:23 56:20 125:10 159:9
**sent** 18:3,4 156:13 164:4
**separate** 25:13 28:13 34:23,24 35:20 49:8,18 89:20 120:19 121:22 122:25 124:8 160:18
**separately** 28:16 30:16 34:23
**september** 1:15
**seriously** 94:7
**serve** 168:14
**service** 46:11
**session** 150:15
**set** 11:9,12 20:1 20:12 94:18 110:10,21 117:16 178:7
**sets** 16:22 24:21 27:17 41:7,9 45:10 118:5 130:25
**setting** 51:13
**seven** 63:21
**shannon** 1:13 43:6 178:3,17
**shared** 168:10
**sheet** 13:18,22 93:9,11 102:10 104:11 106:12 107:14 118:14 168:8
**shirley** 2:6 7:15 107:8
**short** 80:6 87:24 146:19 153:22 154:4
**shortly** 102:6
**shot** 77:22 100:8
**show** 164:1
**shown** 60:9
**side** 36:7 104:16 105:10 108:16,18 109:14
**sideways** 84:4
**sign** 18:11 46:22 59:25 88:9 92:17 93:6 102:21
**signatures** 18:7
**signed** 18:3,4 81:23
**significant** 68:25 79:16

81:14 107:25
**signified** 54:6
**signing** 46:5 100:10 103:1
**silent** 14:17
**similar** 50:11
**simple** 59:24 63:25
**simplify** 92:15
**simply** 115:21
**sir** 135:3 159:25
**sit** 157:9
**site** 44:18,18 45:18,23 46:20 47:16,21,22,23 47:23 60:3 64:5 64:8 66:19 69:7 81:23 87:7 88:9 97:24 98:10,23 99:24 101:8 102:21,22,23
**sites** 44:1 46:12 47:7 54:18 60:4 60:10 62:11 86:9 95:16 96:23 98:8 100:6 101:22
**sits** 66:24,25 67:2 70:24
**sitt** 56:10 105:14,18 106:7,15,22 107:21 109:8 109:15,19,22 110:4,7,18 111:6,9,22 112:1,5,16,24 113:2 114:12 115:23 116:11 116:16,22 117:5,23 118:3 119:14,21 120:25 121:5 121:12,22 122:7,23 123:8 123:14 124:8 125:22 126:7 126:15,19 127:9,13,16,19 127:23 128:1,8 128:10,18,20 129:6,8,17 130:2,10 132:7 132:12,20 133:4,14,22,25 134:2,4,10,13 134:18 135:4,7 135:10 136:1 136:19 137:1,7 137:13 138:11 138:17,22 139:3,5,11,17 139:19,24 140:7 141:1,6 142:24 143:2,2 143:6,16,21,25 144:3,7,13,18 145:2,4,7,11,15 145:18,22 146:6,11,13 147:2 148:9,13 148:15,23 149:3,13 150:3 150:7 151:3,9 151:19 152:10 152:15,21 153:3,6,10,14 153:18,22 154:3,8 155:2 167:17 168:4 169:4 170:5,8 170:17,20 171:2,4,8 175:16,20
**sitting** 23:10
**sitts** 2:7 6:9
**situation** 28:14 37:7 46:1 60:5 94:25 113:18
**six** 28:22 47:10 48:3 50:22 51:17 55:13,13 61:16,18,19 62:3 63:13,23 70:7 75:5
**size** 61:9 88:16
**slower** 13:10
**smaller** 47:22
**smiley** 74:18
**sold** 120:16
**sole** 154:13,18
**solivers** 157:2
**solve** 62:10 65:8 66:2 97:16 98:11 99:10
**solved** 98:18 114:10,14,15 114:20
**solving** 98:5
**somebody** 4:1 91:18,19 103:6 114:18 117:2 154:23 156:15 174:10 175:6
**somewhat** 55:22
**song** 2:10 4:17 4:17,18
**songonuga** 2:16 10:2
**soon** 66:12,13 88:8
**sorry** 3:8 4:7,12 5:14 8:13 10:25 24:11 30:7 32:14 33:3 36:15 40:4 52:20 53:23 55:7 61:6 72:14 72:16 75:25 89:6 102:1 103:19,20 111:10 113:5 118:13,20

119:17,25 127:5 128:9 134:5,15 139:3 146:13 148:15 150:24 164:19 167:2,16 171:15 174:14 176:4
**sort** 31:20 63:12 78:24 125:9 126:13
**sounds** 55:6,7 57:3 91:23 115:21
**speak** 17:20 97:11 110:20 113:2 124:15 149:17
**speaker** 4:6 5:1 5:3,5,22 6:1,20 6:22,25 7:8,12 7:14,23,25 8:2 8:4,8,16 9:2,10 9:13 13:9 18:6 18:10,13 21:20 22:20 23:12 24:11,19,23,25 25:2,5,8,19,21 25:22,24 26:1,4 27:13,20,25 28:2,7 29:7,17 29:21,23 31:7 31:15,19 32:2,5 32:7,9,11,13,16 32:19 33:3,10 33:14,22 34:2,6 34:13,14,18 35:6,17,25 36:4 36:6,17 37:14 38:1,11,14,18 38:20,21,23 39:3,12 42:18 42:19,24 43:2,4
**speaker1** 50:13
**speaking** 30:2,3 30:5 82:19 95:24 98:5 116:7 157:24
**specific** 56:19 61:8 87:7
**specifically** 35:15 109:9
**speed** 62:16 75:20
**spell** 7:6 8:10
**spend** 20:22 81:9 88:15 100:4,5
**spending** 87:17 101:20
**spent** 85:20 87:14
**split** 89:21 90:18 96:15 111:19 117:24
**spot** 10:19,20
**squad** 103:21
**stacked** 33:17
**stage** 72:22
**stalking** 6:4 19:14,21 23:1 28:18 158:15
**standing** 169:12
**stands** 167:11
**start** 3:11 11:11 12:16 17:1,5 20:23 30:13 35:13 38:8 39:16,17 43:1,9 44:10 45:1,10 52:2 59:21 62:5 85:18,25 88:19 114:25 116:13 126:1,3 147:10 161:4
**started** 19:3 21:9 44:24 121:9
**starting** 21:21 24:2 41:17 43:21 47:12 85:10 101:6
**starts** 13:20
**state** 14:25 47:14
**stated** 17:9
**statement** 159:2 173:9
**states** 1:1 3:5 3:15 13:6 60:3
**status** 126:14
**stay** 22:9,11 29:10 31:8 142:17
**staying** 104:13
**stenographic...** 1:13 178:6
**step** 39:19 77:1 109:22 114:25
**stephen** 2:2
**steps** 51:14
**steve** 3:2 9:24 10:21 20:25 28:12 29:25 31:19 36:8 69:22 75:21 76:2 112:7 113:6,11 148:3 154:8 159:9 167:20 173:3
**steve's** 56:24
**steven** 2:19,22 6:13 10:21,24 19:10,22 29:25 38:25
**stick** 37:15
**stone** 68:15
**stop** 104:21 121:20 133:20
**straight** 110:18
**strong** 108:9,17
**structural** 47:10 57:6

**structurally** 65:12
**structure** 57:17 64:13 75:4,7 87:13,21 88:4,7 88:18 90:3,4,13 91:8 96:3 99:22 100:1
**structured** 44:4
**structures** 75:8 89:20
**stuck** 125:7
**stuff** 173:14
**su** 2:9 4:14,15 4:16
**sub** 47:9
**subject** 35:23 45:5 105:25 130:15 131:10 155:4 172:16
**submissions** 16:4
**submit** 39:2 42:25,25 43:3,5 43:20 149:9,11 149:21
**submitted** 14:10 40:2,22 50:10 126:18 126:20 166:21 168:20
**submitting** 13:11 168:22
**subscribing** 81:14
**subsequent** 17:2,5 22:17 164:11
**subset** 73:17
**subsidiary** 93:20
**substantial** 79:4 108:4,6
**substantially** 137:22 138:5
**substation** 48:7 48:18 58:16
**successful** 18:18 36:13 44:10 69:6
**successive** 15:6
**successively** 30:18
**successor** 15:13
**sufficiently** 55:4 78:25
**suggest** 77:8 126:11
**suggesting** 79:25
**suggestion** 50:3
**summarize** 69:22
**summary** 65:5
**superior** 119:9 121:25
**support** 66:3,4
**supporting** 16:4
**suppose** 160:16
**sure** 3:23 8:18 10:22 12:25 20:12 21:1 22:9 22:12 53:14 55:24 60:18 68:4,8 69:8,16 73:8 76:11,16 83:15 93:2,3 103:5 107:6 120:17 147:8 149:15,16 151:17 152:18 154:5,14,25 163:3,7 167:21 177:4
**surface** 53:12 53:13,16 58:15 59:9 64:15,21 64:24 68:13 97:4

**t**

**t** 178:1,1
**table** 21:16 50:4 74:10 77:6 78:15 86:25 93:22 98:4 122:17,21 172:13 173:23
**tail** 111:17
**take** 11:13 17:19 20:3,9,21 25:12,13 27:21 28:9 31:12 40:20 42:7 43:21 49:4,14 53:4 61:18 63:22 64:5,21 65:5 66:8 70:6 70:7 76:18 94:6 99:2,18 116:4 119:23 121:6 127:18 146:19 147:19 148:12 154:4 156:11 162:16,19 165:21 177:21
**taken** 1:12 13:17,17,18 14:21 159:8 178:5
**takes** 64:9 84:7 107:24 116:20 116:21 161:11 161:13
**talk** 28:10,25 29:11 52:5 75:17 98:3,22 102:16 105:2 141:16 148:11 169:18
**talking** 10:18 47:8 56:3 103:23 108:7

115:9 161:25 163:23 174:13 176:23
**taproot** 13:3
**tarbush** 3:18 16:12,14,16,18 16:20,25 17:4 23:2,3,21 24:4 25:20 26:16 30:25 36:1,7 48:22 66:17 74:16 76:17 89:3 122:15 141:2,13,20 142:6,16,18,20 143:4,6,8 146:16 147:5 148:4,19 149:22 171:24 176:17
**target** 61:15 149:25
**tasha's** 10:3
**team** 35:25 90:11 110:20 112:5
**team's** 4:1
**teamed** 149:20
**technical** 15:9
**technically** 70:17
**technology** 1:4 13:5
**tell** 33:16 76:25 85:3 111:14 115:18 116:3 117:3 119:16 163:15
**telling** 169:15
**ten** 28:19 73:7 111:24
**tenant** 52:15 57:3 59:25 102:22 103:7
**tentative** 160:23
**term** 47:1 92:4 102:11,15,21 104:11 106:12 107:14 118:14
**terms** 47:7 67:5 79:3 84:11 87:13 89:18 102:9 106:2 110:11 113:8 117:11 118:15 126:15,19 147:9
**territory** 93:25
**testimony** 173:20 178:5
**texas** 62:11 66:6 95:19 97:3
**text** 12:2,4 77:22
**texting** 12:16
**thank** 5:14 6:16 8:24 12:7 29:3 29:16,23,23 50:9 68:21 69:15 75:16 102:7 113:11 117:6 133:12 143:5 146:3 148:13 156:22 166:25 171:8 176:4
**thanks** 30:8 59:14 67:3 84:25 148:23
**theirs** 33:7 113:10
**theory** 120:9
**thing** 12:16 28:12 46:3 50:8 64:6 68:22,23 87:25 99:2,18 115:10 116:22 121:9 175:23
**things** 60:7 75:4 86:1 87:9 88:13 92:15,21 93:13 94:12 100:3,6,17,18 148:8 162:6
**think** 5:3 8:5 12:13 18:6,20 19:24 22:21 23:19 26:25 30:1 31:15,16 32:23 36:8 37:12 39:6 43:23 45:24 47:9,20 48:1,2 52:9 53:3 55:3 57:18,21 60:9 60:12 61:2 62:9 65:13,21,24 66:15 67:18 68:25 69:5,9,23 72:24 73:5 75:7 76:20 79:2 80:10,18,19,23 81:5 83:4,16,25 84:16,18,22 85:10 86:5,13 86:21 87:3,18 87:19 88:2,22 88:24 89:15 90:6,24,25 91:5 91:8 93:5 94:13 95:25 97:14,15 98:2,13,17,18 99:4,15 100:7 100:14 101:15 102:10,12,13 103:6 107:9 110:2 115:13 116:7,8 121:24 124:23 125:6,8 127:13 133:17 147:18 154:12 154:20 155:23 160:2 162:23

163:16 166:1 166:16 168:7 169:10,12,19 174:1 175:9
**thinking** 70:12 85:21 89:17 99:13
**thinks** 97:1 107:5 165:23
**third** 112:10
**thor** 6:4 10:23 10:25 19:11 20:18 21:1 23:1 23:4,6,23 26:15 27:7 28:4 30:14 31:9 36:16 38:25 42:17,23 43:1 50:14 51:16,19,23 52:4,6 67:13 73:11,12,18 75:23,24 78:2 85:3 117:10 124:15 126:16 127:2,4,8,9 128:19 129:5,7 129:15,18 130:3,14 132:1 141:3,4 142:22 142:23 143:19 143:24 144:1,6 144:8,12,14 145:3,10 146:24 147:15 148:7 149:21 150:6,15 151:7 151:24 152:8,9 152:10,11,15 152:21,25 153:2,5,7,11,15 153:19 158:15 159:3 161:24 161:24 163:10 168:5 170:7,8 170:21 171:2,6 171:10,25 172:2,17 174:23 175:10 175:15,19 176:10,17
**thor's** 145:5,12 145:23
**thought** 74:15 77:15 81:21 87:18 121:8 141:18 172:7
**thoughts** 86:25 114:3
**thousand** 53:1
**three** 18:1 120:16
**threshold** 92:18
**thresholds** 87:8
**tight** 50:12 157:9
**tim** 2:16 7:23
**time** 5:5 14:19 21:1,5 25:12,14 26:20 31:12 36:11 47:8 48:6 54:5,19 57:5 60:21 64:21 66:20 67:15 69:8 70:5 74:7 81:10 84:7,12 85:20 87:17,24 100:5 107:24 110:1,2 115:9 115:25 116:2 116:17 118:19 119:23 121:21 126:12 134:25 161:12 162:11 165:13 178:6
**timetable** 105:1
**timing** 60:25 75:2,8
**tissue** 97:11
**title** 45:8 46:7 46:11 52:16 53:16 58:14 59:5,10 64:11 64:22,24 65:22 66:6 68:12,13 71:13,14,23 89:8,9 105:24 106:13,17,19 109:11 112:19 115:2 118:7,21
**tnmp** 45:6 48:17 162:23 162:25 164:21
**tnmp's** 46:4
**today** 3:4 9:18 10:16 11:4 12:10,12,13 13:23 15:21,23 15:24 16:6 17:25 46:7 47:19 61:2 62:13 67:19,25 81:5 82:17 89:1 93:11 94:13 100:13 163:15 163:17
**today's** 12:23 13:19
**together** 24:22 28:16 93:14 94:17 116:16
**told** 24:20,23 54:4 70:1 103:22 122:25 123:8 134:16
**tomorrow** 100:14 160:16
**took** 103:21 138:3
**top** 21:23 31:23 32:1 33:17 73:20,21,23 74:1 108:20 141:23 172:4
**topping** 21:22 173:7

**total** 15:16 44:1 44:22 50:2 54:18 56:6 103:24 118:5 151:24 164:22
**totally** 9:8 122:4
**touch** 65:1
**towards** 48:14 60:24
**towers** 39:7
**town** 97:2
**track** 15:12 59:4 134:6
**tract** 48:5 59:1 71:19 83:16 105:24 115:5 118:9
**trait** 101:20
**transaction** 16:1 92:8
**transactional** 64:10
**transcribe** 11:5
**transcript** 11:6 13:16 43:16 142:9 178:5
**transfer** 45:6 52:18
**transferred** 46:12
**transmission** 158:10
**treat** 64:17
**trending** 114:4
**trickery** 88:5
**trigger** 81:18 81:24 106:8,10
**triggering** 81:22
**trivial** 86:14
**trouble** 37:19
**true** 47:23 70:21 86:15
**trust** 70:25 94:25
**truth** 86:24
**try** 12:18,18 56:14 66:2,3 75:19 82:12 84:1 85:4 86:11 98:23 105:11 153:23
**trying** 29:19 41:25 60:15,23 63:24 80:2,8 81:25 88:18 92:7,14 102:22 103:14 111:17 115:25 123:7 155:19 158:2 158:13,17,19 158:23 159:20 163:14 167:3 174:10
**turn** 20:2 46:19 138:6
**turns** 24:8
**two** 9:14 21:13 23:15 26:8,24 28:13 30:14 32:13,14 35:20 38:9,10 39:21 40:1 42:1 45:9 49:8,17 50:18 60:3 62:20,20 63:21 68:14 70:6 77:9 80:23 86:1 89:19 100:3,5 102:20 103:25 106:18 110:7,10 120:16 121:15 121:15 123:2 124:8 142:21 146:23 151:18 155:23 160:11 164:6 166:18
**type** 104:6 106:2 112:12 117:14
**typically** 65:7
**typos** 20:19

**u**

**u** 10:3,4
**u.s.** 17:8 126:8
**ultimately** 24:13 83:22 85:11 98:19
**unable** 44:9
**unacceptable** 111:15
**uncertain** 54:24
**uncertainty** 55:10 83:1,2,5 83:9 84:12
**unchanged** 117:12
**unconditional** 115:19
**unconditionally** 115:15
**under** 45:14 60:20 66:19
**understand** 17:17 19:22 26:19 27:10 28:24 30:20 36:25 37:18 40:12 49:25 55:8,16 56:24 57:1,7,11,15,16 57:17,21,23 60:23 68:4 72:25 80:2,8 81:8,25 85:13 94:18 95:3,5,15 113:18,25 114:2 115:6,11 119:4 120:11 124:5 149:16 158:18 160:23 162:12 163:2

163:14
**understanding** 102:15 148:18
**understood** 39:4 72:21 73:25 83:10 103:4 165:25 175:7
**unfair** 26:25 124:24
**unfortunately** 161:7
**unidentified** 4:6 5:1,3,5,22 6:1,20,22,25 7:8,12,14,23,25 8:2,4,8,16 9:2 9:10,13 13:9 18:6,10,13 21:20 22:20 23:12 24:11,19 24:23,25 25:2,5 25:8,19,21,22 25:24 26:1,4 27:13,20,25 28:2,7 29:7,17 29:21,23 31:7 31:15,19 32:2,5 32:7,9,11,13,16 32:19 33:3,10 33:14,22 34:2,6 34:13,14,18 35:6,17,25 36:4 36:6,17 37:14 38:1,11,14,18 38:20,21,23 39:3,12 42:18 42:19,24 43:2,4 50:23 51:16,25 53:6 56:23 61:8 74:15 118:12 118:18 119:4,8 126:4 127:1,5,7 128:14,17,22 129:16 130:1 130:18,21 131:2,7,17,20 132:24 137:21 138:2 143:18 147:13 148:7 151:1,6,14,22 152:3,19,20 154:18,21 155:10 156:13 156:19 157:8 167:24 169:20 172:4,7,23 173:3,6,17 175:11 176:7 177:8
**unintelligible** 7:24
**unique** 45:24 62:9 86:11
**uniquely** 47:20 48:1
**unit** 48:18
**united** 1:1 3:5 3:14 13:6
**unlimited** 56:25
**unpack** 160:20
**unrealistic** 64:3
**unreportable** 5:4 9:4 26:6 31:14 32:4,15 38:17 39:11
**unsecured** 4:10
**update** 86:4 141:3
**updated** 166:24
**updating** 166:21
**upgrade** 68:5 164:8
**use** 63:6,11 83:24 92:3
**using** 45:19
**usually** 28:16 28:17
**utilities** 156:5

**v**

**valuable** 72:19 90:24
**value** 17:13 27:15 28:5 33:16 47:16 60:4 63:18 65:24 68:25 78:14,18 79:1,2 79:4,10,12,12 79:15 81:6,9 82:2,16,21 86:3 87:2 88:20 89:2 89:4,6,24 96:21 98:1 99:16,19 107:15 108:6 111:12 113:24 115:4 123:24 131:9,18 132:3 132:6,8 133:3
**valued** 95:21 107:2
**values** 107:16
**valuing** 78:15
**vast** 82:19
**verbally** 14:16
**verbatim** 178:5
**version** 154:10
**versus** 72:3 78:15 83:6 87:14 89:1,22 97:16 158:14 163:11
**video** 11:6
**view** 78:5 108:9 108:13,16,22
**views** 108:8
**virtual** 21:16
**voice** 50:23 51:16,25 53:6 56:23 61:8 74:15 118:12 118:18 119:4,8 126:4 127:1,5,7

127:11 128:14 128:17,22 129:16 130:1 130:18,21 131:2,7,17,20 132:24 137:21 138:2 143:18 147:13 148:7 151:1,6,14,22 152:3,19,20 154:18,21 155:10 156:13 156:19 157:8 167:24 169:20 172:4,7,23 173:3,6,17 175:11 176:7 177:8
**voicemail** 77:22
**voices** 21:22
**volkov** 2:21 21:11,11,24 22:7,10,14,19 22:24 23:5,11 23:14,18 24:2,7 24:17 26:7 27:4 27:12 28:11 29:3,6,9,13 32:8 34:20 36:8 36:18 37:2,22 38:6,13,15 117:22 121:7 122:12,20 124:10,21 125:7,11,19 126:25 127:14 128:9 129:2,12 129:23 131:12 133:9,16,21,24 134:1,3,5,15 135:6,9,13,21 136:4,8,15,22 137:4,10,16,20 137:25 138:6,8 138:9,14,20,25 139:8,14,21 140:1,3,9,15,19 141:18 142:2,8 146:12

**w**

**wait** 24:11 51:17 59:12 94:23 118:2 122:18 123:15 127:7
**waiting** 9:11 20:3 77:23 100:24 157:16
**waive** 59:4 65:19 71:11 74:16 76:17 96:24 98:12 106:12,15 126:16 132:19 133:6
**waived** 52:17 71:25 96:2,4 118:8
**waiver** 53:12 53:15 72:3,4,14 90:18 96:15,17 96:21 105:23 107:19 109:11 112:16 113:12 118:17,21 126:13 131:13 131:19,22 132:4,6,12,15 133:18 140:13 142:24 148:3,4 148:8
**waivers** 76:18 84:2 111:25 112:1 117:18 117:19
**waiving** 50:23 54:15 71:20,21 71:25 72:8 76:14 97:14 118:7 130:16 131:6 132:25 143:3
**walk** 46:7 48:12
**want** 11:19 17:24 19:15 20:7,10,21 24:9 24:10,16 25:15 27:16 28:20 34:15,25 35:4 35:12,15,17,21 35:22,24 36:2,4 38:3,4 39:24 40:16,19 41:21 41:23 42:24,25 43:1,20 45:1 47:17 53:21 55:24,25 56:4 56:20 57:2,15 57:16,17,23 59:9,20 61:22 62:5 65:25 68:4 69:22 79:15 81:8,25 82:11 82:14 83:1 86:23 88:6,25 92:9 94:22 97:4 102:8 103:4 107:6 108:3 112:7 113:3 114:1,2,21 115:21 116:3 116:11,15 119:22 120:5 120:24,25 121:18,19 123:18,19,19 123:20,22,24 124:7 125:17 128:6 132:19 133:5,8 140:20 142:11,12 146:4 147:8 148:11 151:17 152:18 154:25 156:14 157:1 157:19 159:2

159:11 163:3,7 167:20 175:22
**wanted** 20:25 23:14 32:5,6 77:6 141:18
**wants** 11:15 25:6 28:21 43:16 85:22 114:18 124:15 133:10 150:18 165:22
**wasting** 121:20
**way** 3:22 8:5 12:2 26:14 32:23 43:19 51:14 53:23 62:9 65:7,13 80:6 83:11 85:7 87:13 89:25 97:9 108:9 111:1,14 156:11 157:25
**wayne** 2:15 29:19
**ways** 86:11 92:4 98:6
**we've** 24:19,20 35:13 41:15,21 104:10 113:16 115:8 159:16 163:4
**week** 61:6 100:15 164:19
**weeks** 62:20 70:6 164:6
**went** 18:23 69:2 77:21 173:13,13
**whacked** 107:3
**whatever's** 12:19
**whatnot** 20:20
**whatsoever** 97:18 102:25 104:6 107:23
**whitehead** 2:20 7:2 9:12
**wiggle** 74:20 79:18
**willing** 28:8 32:1 33:18 41:19 73:18 75:6 98:12 108:10 115:23 125:17 158:17 162:15 163:10 165:20 169:6 172:9
**win** 24:12 32:10 40:7 61:2 171:6 171:18 174:6
**winner** 24:14 121:14 176:17
**winners** 177:2
**winning** 15:14 34:16 35:3,23 140:23 171:11
171:20,24 175:6 176:10 176:25
**wise** 78:8 115:4
**withdrawn** 146:2
**witness** 157:18
**wonderful** 156:18
**wondering** 51:7
**word** 72:15,15 124:6
**words** 22:3 31:9 57:12
**work** 12:13 21:14,17 31:16 36:6 37:5 62:7 82:23 86:12 88:11,14 93:5 93:14 100:13 116:15,15 123:7 150:11
**worked** 94:6 108:5
**working** 10:7 88:1 100:17 113:20,21 123:4
**works** 36:9 89:5 147:6
**world** 99:22 100:22
**worlds** 60:13
**worry** 68:2 95:1
**worse** 101:5 113:9
**worth** 82:16 84:11 99:25 108:2,19 115:3 115:12
**wow** 91:22
**wrap** 38:1
**write** 134:5,16
**writing** 76:11
**written** 14:17 164:24
**wrong** 175:23

**x**

**x** 104:23 171:23 176:15

**y**

**y** 10:1
**yeah** 4:16,18 5:21 6:16 7:8 9:16 10:15 11:21 17:24 22:10 34:4 43:22 47:1 57:1 58:2 59:9,24 63:4 65:19 68:13 69:23 71:25 72:16 75:19 76:2 77:1 77:4,11,17 78:23 79:23

80:11,17 82:12 84:2,6,10 89:14 95:10 97:21 99:8 102:16 105:16 107:12 113:16 118:20 122:12 125:5,7 140:19 146:6 148:2,22 151:11 158:1 161:21 162:18 164:14,25 165:20,25 170:3 177:9
**year** 60:11 63:21,21 75:5 101:25 163:1 164:9
**yep** 5:21 6:2
**york** 174:7
**yost** 1:13 43:6 178:3,17
**young** 2:21 10:10,11,14
**yuan** 4:17
**yuang** 2:10

**z**

**zang** 2:13
**zero** 52:24 61:10 114:10
**zhang** 2:10 4:19
**zoom** 1:14 8:24 10:9 52:1 53:7 109:22