# EXHIBIT C

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** ("Agreement"), dated as of September 21, 2026 (the "Effective Date"), is made by and between LONESTAR DREAM INC., a Delaware corporation (the "Seller 1") and LONESTAR TAPROOT LLC, A Delaware Limited Liability Company (the "Seller 2" together with Seller 1, each a "Seller" and collectively, the "Sellers"), and MESQUITE FALCON LLC, a Delaware limited liability company (the "Buyer" and, together with Seller, collectively, the "Parties" and, individually, a "Party"). Capitalized terms used in this Agreement are as defined herein.

## RECITALS

**WHEREAS**, Seller was engaged in the business of, *inter alia*, crypto mining and hosting operations (the "Business") at the Pyote Property set forth below through July 10, 2026.

**WHEREAS**, Seller is the owner of that certain real property located at 3072 FM 1927, Pyote, TX 79777 in Ward County, Texas, (known as the "Pyote Property").

**WHEREAS**, Seller is the owner of certain personal property, equipment and other assets located at the Pyote Property and set forth on the **Exhibit "A"** attached hereto (together with the Pyote Property, the "Purchased Assets").

**WHEREAS**, on July 22, 2026 (the "Petition Date"), Seller commenced a voluntary case under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") (the "Bankruptcy Case").

**WHEREAS**, subject to Seller's receipt of any higher and better offer for the Purchased Assets (as defined herein) in accordance with the Bidding Procedures and Bidding Procedures Order, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Purchased Assets in accordance with this Agreement and sections 105, 363, and 365 of the Bankruptcy Code.

**WHEREAS,** the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement, are subject to entry of the Sale Approval Order.

**NOW THEREFORE,** in consideration of the mutual covenants, representations, warranties, and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the Parties hereto agree as follows:

## ARTICLE I
## SALE OF ASSETS AND REAL PROPERTY

I.1 Sale of Purchased Assets.

(a) On the Closing Date and subject to the terms and conditions and exclusions contained in this Agreement (including but not limited to Section 1.3) and subject to Permitted Liens as defined herein, each Seller will sell, transfer, convey, assign, and deliver all of Seller's right, title, and interest in and to the Purchased Assets, free and clear of any and all interests, Claims, obligations, rights, encumbrances, pledges, and liens in, against or with respect to any of the Purchased Assets or each Seller having arisen, existed or accrued prior to and through the Closing Date, whether direct or indirect, absolute or contingent, choate or inchoate, known or unknown, matured or unmatured, liquidated or unliquidated, arising or imposed by agreement, understanding, law, equity, statute or otherwise and whether arising prior to, on or after the petition sate, including claims or liabilities otherwise arising under doctrines of successor liability, *de facto* merger or substantial continuity or liabilities or obligations arising under any law or orders (collectively, "Liens").

(b) The Purchased Assets include the following assets of Seller:

(i) The Pyote Property and additional assets set forth on **Exhibit "A"** hereto;

(ii) the Power Rights associated with the Pyote Property;

(iii) all rights under those executory contracts (the "Contracts") and personal property and commercial real property leases (the "Leases") set forth on **Exhibit "B"** attached hereto. The Contracts and Leases are herein, at times, collectively referred to as the "Assumed Contracts" and, individually, as an "Assumed Contract"; provided however, that Buyer may at any time prior to Closing remove any Assumed Contracts from **Exhibit "B"**. Upon removal, such Contracts or Leases shall no longer be an Assumed Contract;

(iv) all claims under existing insurance policies to the extent such policies may provide coverage or a defense with respect to the Purchased Assets;

(v) any and all transferable federal, state, local and foreign governmental Permits, authorizations, and approvals of Seller related to the Purchased Assets;

(vi) copies of documents relating to the Purchased Assets.

I.2 Instruments of Conveyance and Transfer.

(a) Upon the Closing, Seller shall deliver to Buyer possession of the Purchased Assets and convey to Buyer clear title to all of the Purchased Assets.

(b) At the Closing, Seller shall execute and deliver to Buyer a bill of sale and such endorsements, assignments, and other good and sufficient instruments of conveyance and transfer as are reasonably necessary to transfer, convey, and assign good and marketable title to Buyer of the Purchased Assets, free and clear of any and all Liens except for Permitted Liens.

(c) At the Closing, Seller shall convey the Pyote Property to Buyer pursuant to a Special Warranty Deed ("Warranty Deed") in the form customarily used in similar transactions in Texas and approved and prepared by Buyer and such endorsements, assignments, and other good and sufficient instruments of conveyance and transfer as Buyer reasonably deems desirable to for Seller to transfer, convey, and assign its good and marketable title to the Pyote Property to Buyer, free and clear of any and all Liens except Permitted Liens.

I.3 Excluded Assets. The Purchased Assets shall exclude all assets and interests of the Seller set forth on **Exhibit "C"** hereto (collectively, the "Excluded Assets").

I.4 Assumed Liabilities. As of the Closing, Buyer shall assume, and pay when due, all Cure Costs due on the Assumed Contracts and any other liabilities of Seller which Buyer has expressly agreed in writing to assume as set forth on **Exhibit "D"** (collectively, the "Assumed Liabilities"); provided however, that Buyer may at any time prior to Closing remove any Assumed Liabilities from **Exhibit "D"**. Upon removal, such liabilities shall no longer be an Assumed Liability.

I.5 Excluded Liabilities Notwithstanding anything to the contrary in this Agreement, except for the Assumed Liabilities set forth herein, Buyer shall not assume, or become obligated in any way to pay, any of Seller's liabilities, obligations, or debts of any kind whatsoever, whether accrued, absolute, contingent, or otherwise, whether known or unknown, whether due or to become due, and regardless of when or by whom asserted, including, without limitation, to the following (collectively, the "Excluded Liabilities"):

(a) any of Seller's liabilities under this Agreement, and any other agreements (written or oral) entered into by Seller other than the Assumed Contracts.

(b) any liabilities from the Seller's business ("Business") that took place prior to the Closing;

(c) any note payable in favor of, or any other amount owed to, any of Seller's lenders or creditors;

(d) any liability of Seller with respect to any Taxes;

(e) any of Seller's liabilities (i) arising by reason of any violation or alleged violation of any federal, state, or foreign law, or any requirement of any Governmental Entity, (ii) arising by reason of any breach or alleged breach by Seller of any contract, agreement, license,

commitment, instrument, judgment, order, or decree, (iii) arising under any environmental, health, and safety laws, regulations, and/or requirements;

(f) any liability of Seller arising out of the injury to or death of any individual, or damage to or destruction of any property, whether based on negligence, breach of warranty, strict liability, enterprise liability, or any other legal or equitable theory, and arising from or related to products (or parts or components thereof) distributed or otherwise disposed of or for services performed by Seller, to the extent any of such Liabilities result from or arise out of events, facts, or circumstances occurring or existing on or prior to the Closing, notwithstanding that the date on which any Proceeding or Claim therefor is commenced or made after the Closing;

(g) any of Seller's liabilities, including legal fees and expenses, for vacation pay, sick pay, holiday pay, salary, bonuses, severance pay, workers' compensation, benefits, fringe benefits or other payments or liabilities of any kind to any current or former employee of, or any party who was hired or engaged by, Seller, or under any employee benefit or employee benefit plan, resulting from Seller's conduct before the Closing Date;

(h) any of Seller's liability for any expenses or fees related to the negotiation, preparation, approval, or execution of this Agreement or its transactions (including attorneys', accountants', and brokerage fees incurred by or charged to Seller);

(i) any of Seller's liabilities arising from conduct before the Closing, or the actions of its officers, directors, shareholders, employees, consultants, contractors, agents, or advisors; and

(j) any of Seller's other liabilities other than the Assumed Liabilities.

Seller acknowledges that it retains the Excluded Liabilities.

I.6 Purchase Price. The purchase price to be paid by Buyer to Seller for the Purchased Assets shall be Thirty-Seven Million U.S. Dollars ($37,000,000.00) (the "Purchase Price"). The Purchase Price shall be paid as follows:

(a) A deposit of 7.5% of the Purchase Price in the amount of Two Million, Seven-Hundred and Seventy-Five Thousand U.S. Dollars ($2,775,000.00) (with crediting for the funds previously deposited with Seller's escrow agent, Archer & Greiner, from Buyer in the amount of $792,500.00) shall be paid by Buyer to Seller within five (5) days of signing this Agreement ("Good Faith Deposit"), to be held in an interest-bearing escrow account by Seller's counsel (the "Escrow Agent") and pursuant to an escrow agreement in form and substance reasonably acceptable to Buyer and Seller, attached hereto as **Exhibit "I"** (the "Escrow Agreement") until Closing, with the funds (including any interest earned thereon) to be applied to the Purchase Price on a dollar-for-dollar basis at Closing. The Escrow Agent shall not release, transfer, apply or otherwise dispose of the Good Faith Deposit except (i) at Closing, in accordance with joint written instructions from Buyer and Seller, (ii) pursuant to a written agreement executed by Buyer and



32473248 v1

Seller, or (iii) pursuant to a final, non-appealable order of a court of competent jurisdiction. The Escrow Agent shall have no discretion or authority to determine entitlement to the Good Faith Deposit. All escrow fees and costs shall be borne by Seller unless otherwise agreed by the parties;

(b) The balance of the Purchase Price shall be paid by Buyer to Seller at Closing (the "Closing Payment"); and

(c) The Good Faith Deposit shall be fully refundable (with interest) as set forth herein. The Parties acknowledge and agree that the Good Faith Deposit shall not be deemed to constitute property of the Estate under the Bankruptcy Code, that Seller's Estate shall have no interest of any kind under Chapter 5 of the Bankruptcy Code or applicable law (equitable or otherwise) in and to the Good Faith Deposit and the Escrow Agent shall hold the Good Faith Deposit in trust in accordance with this Agreement. In the event that Buyer purchases the Purchased Assets and the sale closes, then all Good Faith Deposit payments made by Buyer pursuant to the terms of this Agreement (together with any interest earned thereon) shall be credited to and offset against the Purchase Price and paid to the credit of Seller at the Closing.

I.7 Allocation of Purchase Price. The Allocation of the Purchase Price shall be determined by the Buyer as soon as commercially practicable, but no later than one hundred and eighty (180) days after the Closing. The Parties hereby agree that they shall file all federal, state, and local Tax Returns and reports in a manner consistent with such allocation, and that neither Party will assert or maintain a position inconsistent with such allocation in any administrative or judicial proceeding, including any tax audit or tax proceeding.

I.8 Transfer Taxes. The Party that is required by applicable Law to pay any and all bulk sale, stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or other non-income Tax, fee, or governmental charge imposed under applicable Law in connection with the transactions contemplated hereby (the "Transfer Taxes") shall be responsible for paying that Party's Transfer Taxes. The Party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall prepare and timely file such Tax Returns. Seller shall timely provide Buyer with all information and documentation reasonably requested by Buyer in connection with such Tax Returns and shall execute any documents reasonably requested by Buyer in connection therewith. Buyer shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by the Seller, but not less than ten (10) Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to Buyer's approval, which shall not be unreasonably withheld, delayed, or conditioned. Buyer and Seller shall cooperate in making, in a timely manner, all Tax Returns, filings, reports, forms and other documentation as are necessary or appropriate to comply with all applicable Laws in connection with the payment of Transfer Taxes and shall cooperate in good faith to minimize, to the fullest extent possible under such Laws, the amount of any such Transfer Taxes. Seller shall take all actions reasonably requested by Buyer to obtain any available exemption, reduction or refund of any Transfer Taxes.

I.9 Proration. All monthly payments (the "Prorated Charges") for the month in which the Closing occurs (including utility charges) shall be apportioned and prorated between Seller and Buyer as of the Closing Date with (i) Buyer bearing the expense of Buyer's proportionate share of such Prorated Charges that shall be equal to the product obtained by multiplying (A) a fraction, the numerator being the amount of the Prorated Charges and the denominator being the total number of days in the month in which the Closing occurs, times (B) the number of days following the day that immediately precedes the Closing Date and paying such amount to Seller to the extent payment for such Prorated Charges has been made by Seller prior to the Closing, and (ii) Seller bearing the remaining portion of such Prorated Charges (and paying the amounts thereof to Buyer to the extent payment for such Prorated Charges has not been previously made by Seller). Seller shall be responsible for any and all taxes and assessments, including any interest, penalties or fees, incurred prior to the Closing and any transfer taxes associated with the transfer of the Real Property to Buyer. Buyer shall be responsible for all taxes and assessments accruing after the Closing. The Closing statement to be prepared by Buyer's title company (the "Title Company") shall reflect such proration based on the most recent and available tax rate and valuation. Any other costs or expenses, if any, shall be allocated between and charged to Buyer and Seller in accordance with the Title Company's usual practices. Seller shall be responsible for the cost of the preparation and delivery of all documents to be furnished by Seller. Buyer shall be responsible for the cost of recording the deed and the cost of purchasing a title insurance policy. The Closing fee of the Title Company will be paid by Buyer. Except as set forth herein, no amounts paid or payable under or in respect of any Purchased Asset or group of Purchased Assets shall be apportioned and prorated between Seller and Buyer.

I.10 Sales Tax. Buyer shall be responsible for and pay any and all sales tax due and payable arising from the transactions contemplated by this Agreement.

I.11 Title Commitment/Survey.

(a) Within five (5) days after the Effective Date, Seller shall deliver to Buyer: (i) copies of all existing owner's and lender's title policies relating to the Pyote Property; (ii) all existing surveys of the Pyote Property; and (iii) all engineering, environmental, geotechnical, wetlands, seismic, structural, zoning and other third-party reports concerning the Pyote Property in Seller's possession or control.

(b) Buyer shall obtain a title commitment for the Pyote Property (the "Title Commitment"). Buyer may object ("Title Objection") in writing to any title matter disclosed in the Title Commitment or any amendment, update or continuation thereof through October 15, 2026. Seller shall, on or before Closing, with respect to a Title Objection, use its reasonable best efforts to remove all liens, claims, encumbrances, title defects and other title exceptions affecting the Pyote Property, excluding Permitted Liens such as mineral rights, rights of way and easements granted to public utilities and for gas or electric, including any disclosed in any update to the Title Commitment, except Permitted Liens and those Title Objections expressly approved in writing by Buyer. Notwithstanding the foregoing, Seller shall be required to cause to be released, satisfied,

and removed of record as of the Closing: (i) any title defects which have been voluntarily recorded or otherwise placed, or permitted to be placed, by Seller against the Pyote Property on or following the Effective Date (other than with the prior written approval of Buyer); and (ii) any mortgages, deeds of trust, security instruments, financing statements, or other instruments which evidence or secure indebtedness, judgments, and liens against the Pyote Property of a definite and ascertainable amount, including, without limitation, mechanics' liens, tax liens and real estate taxes, water rates, and sewer rents and taxes, in each case, which are due and payable but which remain unpaid and/or of record as of the Closing (collectively, the "Mandatory Title Removal Items"). Buyer shall have no obligation to accept any title exception subject to a timely raised Title Objection not expressly approved by Buyer in writing.

(c) If Seller is unable or unwilling to convey title to the Pyote Property in accordance with this Agreement on or before Closing, Buyer may, at its sole option: (i) terminate this Agreement and receive the immediate return of the Good Faith Deposit, whereupon neither party shall have any further obligations hereunder except those that expressly survive termination; or (ii) waive such objection and proceed to Closing without waiving any other rights or remedies available under this Agreement or applicable law.

(d) Seller may satisfy and discharge Mandatory Title Removal Items from the proceeds of Closing, provided that the Title Company issues the Title Policy without exception for such Mandatory Title Removal Items or other title defects subject to a Title Objection.

(e) Seller shall execute and deliver all affidavits, releases, payoff letters, curative documents and other instruments reasonably required by Buyer or the Title Company to permit issuance of an owner's title insurance policy (the "Title Policy") insuring fee simple title to the Pyote Property, effective as of Closing, free and clear of all liens, claims, encumbrances and title exceptions raised by Buyer as Title Objections, other than Permitted Liens and those expressly approved herein and otherwise in writing by Buyer.

(f) If requested by Buyer, and pursuant to a Title Objection, Seller shall use commercially reasonable efforts to obtain and deliver any estoppel certificates, lien waivers, subordinations, non-disturbance agreements or other documentation relating to the Pyote Property reasonably required by Buyer or the Title Company.

(g) Notwithstanding anything herein to the contrary, Seller shall convey the Pyote Property pursuant to the Sale Approval Order free and clear of all liens, claims, interests, encumbrances and title exceptions to the fullest extent authorized under the Bankruptcy Code, except only those matters raised as Title Objections unless Permitted Liens or otherwise expressly approved herein and otherwise in writing by Buyer, with all such liens, claims and interests attaching solely to the proceeds of sale to the extent provided in the Sale Approval Order.

# ARTICLE II
# CLOSING

II.1 Closing. The consummation of the transactions contemplated hereby (the "Closing") shall take place on December 15, 2026, pursuant to the Sale Approval Order (or on such other date as may be agreed by the Parties and/or ordered by the Bankruptcy Court (conditioned, if applicable, upon the Bankruptcy Court making a finding under Fed. R. Bankr. P. 6004(h)) (the "Closing Date")). Upon written notice to Buyer prior to the Closing Date, the Sellers may extend the Closing Date to January 14, 2027 (the "January Closing Date"), provided that the Purchase Price shall be reduced by $75,000. Upon written notice to Buyer prior to the January Closing Date, the Sellers may extend the Closing Date to February 13, 2027 (the "February Closing Date"), provided that the Purchase Price shall be reduced by an additional $150,000. Upon written notice to Buyer prior to the February Closing Date, the Sellers may extend the Closing Date to March 15, 2027 (the "March Closing Date"), provided that the Purchase Price shall be reduced by an additional $250,000. Unless otherwise agreed to in writing by the Parties, the Closing Date shall not extend subsequent to the March Closing Date.

II.2 Deliveries to be Made by Seller at Closing. At the Closing, Seller shall deliver the following to Buyer free and clear of Liens, except Permitted Liens, all of which shall be properly authorized and executed by Seller and acceptable to Buyer in its reasonable discretion:

(a) possession of the Purchased Assets;

(b) a bill of sale and/or such endorsements, assignments, and other good and sufficient instruments of conveyance and transfer as Buyer may deem desirable in a form reasonably satisfactory to Buyer, conveying title from Seller to Buyer to the Purchased Assets, free and clear of any and all Liens, except Permitted Liens;

(c) the Assignment and Assumption Agreement;

(d) such affidavits, certifications and other documentation evidencing the authority of the person executing the subject documents on behalf of Seller in a form acceptable to Buyer;

(e) An Owner's title affidavit (the "Title Affidavit"), affidavit of Seller's Residence ("Seller's Residence Affidavit"), Broker's affidavit ("Broker's Affidavit"), Broker's lien waiver ("Broker's Lien Waiver"), 1099-S certification ("1099-S Certification") and, if applicable, an Affidavit of Exemption from Withholding ("Exemption Affidavit") in the forms annexed hereto as **Exhibit "G-1"** and, if Seller has retained a person or entity (other than an employee of Seller) to manage the Pyote Property or any portion thereof and does not include in the Title Affidavit such certifications as the Title Company shall reasonably require to omit from the Purchaser's title policy exceptions for possible liens of the property manager, and, if applicable, a Property Manager Lien Waiver (the "Property Manager Lien Waiver") duly executed by Seller and the property manager in the form annexed hereto as **Exhibit "G-2"**.

(f) Such other documents, instruments or agreements as may be reasonably requested by Buyer or the Title Company to consummate the Closing of the Pyote Property in accordance with the terms of this Agreement;

(g) if the Sale Approval Order does not authorize a sale free and clear of all Liens (other than any liens for *ad valorem* taxes falling due after Closing or any additional exceptions approved by Buyer in writing herein or otherwise, or as otherwise required by law (collectively, "Permitted Liens")) affecting the Purchased Assets to the maximum extent permitted by Section 363 of the Bankruptcy Code, such releases and termination statements with respect to all Liens (other than Permitted Liens) on the Purchased Assets as may be necessary and required by Buyer; provided, however, nothing herein shall obligate Buyer to proceed to Closing if the Sale Approval Order does not authorize a sale free and clear of all Liens (other than Permitted Liens) to the maximum extent permitted by Section 363 of the Bankruptcy Code;

(h) such other documents of assignment and transfer as may be reasonably required to vest all right, title, and interest of Seller in and to the Purchased Assets in Buyer;

(i) an assignment and assumption agreement relating to the Assumed Contracts in a form reasonably satisfactory to Buyer (the "Assignment and Assumption Agreement") duly executed by Seller;

(j) resolution of the board of directors of Seller authorizing the execution and delivery of this Agreement and all documents contemplated hereby and consummation of the transaction contemplated herein;

(k) A certificate (the "Seller's Representation Update Certificate") stating that all of Seller's representations and warranties set forth in this Agreement remain true and correct in all respects at and as of Closing, except as otherwise set forth in such certificate and in the form annexed hereto as **Exhibit "H"**, subject to modifications to reflect facts and circumstances existing as of the Closing Date for reasons other than Seller's breach of this Agreement

(l) an executed certificate of Seller to the effect that, as of the Closing Date, all representations and warranties of Seller contained in this Agreement are true and correct in all respects and that all of the covenants and agreements of Seller contained in this Agreement to be performed or satisfied before the Closing Date have been performed or satisfied before the Closing Date;

(m) an information reporting form for purposes of preparing an IRS Form 1099-S;

(n) such other documents as shall be reasonably requested by Buyer, its counsel or its title company in connection with the transactions contemplated by this Agreement.

II.3 Deliveries to be Made by Buyer at the Closing. At the Closing, Buyer shall deliver the following to Seller:

(a) the Closing Payment;

(b) the Assignment and Assumption Agreement;

(c) resolutions of the Buyer authorizing the execution and delivery of this Agreement and of all documents contemplated hereby and consummation of the transaction contemplated herein;

(d) an executed certificate of Buyer to the effect that, as of the Closing Date, all representations and warranties of Buyer contained in this Agreement are true and correct in all respects and that all of the covenants and agreements of Buyer contained in this Agreement to be performed or satisfied before the Closing Date have been performed or satisfied before the Closing Date; and

(e) such other documents as shall be reasonably requested by Seller or its counsel in connection with the transactions contemplated by this Agreement. and closing of the sale transactions herein.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

As an inducement to Buyer to enter into this Agreement, each Seller jointly and severally hereby represents and warrants to the Buyer as of the Effective Date and as of the Closing Date, as if such representations and warranties had been made at the Closing Date, as follows:

III.1 Organization and Authority. Seller 1 is a corporation and Seller 2 is a limited liability company, and each Seller is duly organized, validly existing, and in good standing under the laws of the State of Delaware. This Agreement and Seller's execution thereof has been duly authorized by all necessary corporate action. Seller has obtained and currently maintains all qualifications to do business as a foreign entity in all other jurisdictions in which the character of Seller's properties or the nature of Seller's activities require it to be so qualified. Subject to entry of the Sale Approval Order by the Bankruptcy Court, Seller has the full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated herein. Subject to entry of the Sale Approval Order by the Bankruptcy Court, this Agreement constitutes a legal, valid, and binding agreement of Seller that is enforceable in accordance with its terms.

III.2 Governmental Authorization. The execution, delivery, and performance by Seller of this Agreement requires no action by, or filing with, any governmental body, agency, or official, other than approvals of authorization by the Bankruptcy Court and

Approvals as set forth in Section 7.2(c), and all such approvals, authorizations, consents, notices and filings necessary for Seller to consummate the transactions contemplated hereby shall have been duly obtained, made or given prior to the Closing and shall be in full force and effect. No other consent, approval, authorization, order, permit or filing is required that would prevent, delay or impair Seller's ability to consummate the transactions contemplated hereby or Buyer's ownership or use of the Purchased Assets following the Closing.

III.3 No Conflict. Subject to entry of the Sale Approval Order, the execution, delivery and performance of this Agreement by Sellers do not and will not (a) violate each Seller's Organizational Documents, (b) violate any applicable Law or Order applicable to each Seller or the Purchased Assets, (c) result in any breach or default under any material Contract relating to the Purchased Assets, or (d) result in the creation of any Lien on the Purchased Assets other than Permitted Liens.

III.4 Litigation. Except as disclosed in the Bankruptcy Case or on **Exhibit "E"** there is no action, suit, proceeding, arbitration, investigation or governmental inquiry pending or, to Seller's knowledge, threatened against Seller or affecting the Purchased Assets that would reasonably be expected to materially impair the Purchased Assets or prevent or delay the consummation of the transactions contemplated hereby.

III.5 Sufficiency of and Title to the Purchased Assets. Each Seller has and, pursuant to the Sale Approval Order and upon Closing, Buyer shall acquire good, valid and marketable title in and to the Purchased Assets, free and clear of all Liens, other than Permitted Liens expressly assumed by Buyer pursuant to this Agreement. Seller has good and valid title to, or a valid and enforceable right to transfer, each of the Purchased Assets. None of the Purchased Assets is subject to any restriction on transfer or other agreement that would impair Buyer's ownership, use or enjoyment thereof following the Closing. For the avoidance of doubt, to the extent anyone asserts a fractional ownership interest in the Pyote Property, Seller shall deliver the Pyote Property to Buyer free and clear of all such Fractional Ownership Interests at Closing, unless otherwise agreed to by Buyer in writing.

III.6 Required Consents. Except for consents, approvals or authorizations of, or declarations or filings with the Bankruptcy Court and Approvals, there is no agreement or other instrument binding upon Sellers requiring any consent, approval, notification, filing, registration, authorization, permission, license, requirement, or action by any third-party resulting from the execution, delivery, and performance of this Agreement.

III.7 Utilities. Seller has not received any written notice that any electrical service, power allocation, interconnection rights, utility service, water, sewer, telecommunications or other utility serving the Purchased Assets will be reduced, terminated or materially modified. To Seller's knowledge, there exists no condition that would materially impair the transfer or continued availability of such utility rights following Closing.

III.8 Assumed Contracts. Each Seller has made available to Buyer a copy of all Assumed Contracts, together with all amendments, exhibits, attachments, waivers, or other changes thereto and, to Seller's knowledge, such copies are true, correct and complete in all material respects and constitute all documents comprising the Assumed Contracts. Sellers have not received any written notice of any material default by any party under any Assumed Contract that remains uncured, except as disclosed to Buyer in writing. Each Seller represents that it has not taken or failed to take any action that would impair its ability to assume and assign any Assumed Contract designated for assumption and assignment pursuant to this Agreement. Sellers shall use commercially reasonable efforts to obtain entry of all orders and take all actions reasonably necessary to facilitate the assumption and assignment of the Assumed Contracts designated by Buyer. Buyer acknowledges that the Bankruptcy Court may not approve assumption and assignment of all contracts designated by the Buyer hereunder provided, however, that Buyer shall not be obligated to close if the failure to assume and assign any Assumed Contract designated by Buyer would reasonably be expected to have a Material Adverse Effect on the Purchased Assets.

III.9 Certain Fees. Other than DuFrayne LLC, Seller has not employed any broker, finder, investment banker, or other intermediary or has not incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or any transactions contemplated by this Agreement or the transactions this Agreement contemplates.

III.10 Notices of Certain Events. Sellers shall promptly notify Buyer of:

(a) Any notice or other written communication from any third-party alleging that the consent of such third-party is or may be required in connection with the consummation of the transactions contemplated by this Agreement; and

(b) Any material written communication from any governmental or regulatory agency or authority in connection with or relating to the transactions contemplated by this Agreement.

III.11 Equipment. All of Seller's equipment ("Equipment") is owned by the Sellers and, when conveyed by Sellers to Buyer, will be owned by Buyer free and clear of all Liens except Permitted Liens. The Equipment constitutes all material equipment owned by Seller and used in connection with the Purchased Assets and is in substantially the same condition as of the Effective Date, ordinary wear and tear excepted. Seller has not leased, licensed or otherwise granted any third party any right to possess or use any Equipment, except as disclosed in this Agreement or the Disclosure Schedules. Upon the Closing, Buyer shall acquire good and marketable title to the Equipment, free and clear of all Liens other than Permitted Liens, together with all warranties, guarantees and similar rights, to the extent transferable.

III.12 Permits. Sellers possess all material permits, licenses, approvals and governmental authorizations necessary for the ownership and operation of the Purchased Assets as presently conducted, and such permits are in full force and effect.

III.13 Taxes. Each Seller has timely filed (or caused to be timely filed) all material Tax Returns required to be filed with respect to the Purchased Assets and has timely paid, or will timely pay, all Taxes required to be paid by each Seller with respect to the Purchased Assets for all taxable periods ending on or before the Closing Date, other than Taxes being contested in good faith by appropriate proceedings. There are no Liens for Taxes upon any of the Purchased Assets, other than Permitted Liens arising by operation of applicable Law for Taxes not yet due and payable. Sellers have not received any written notice of any pending audit, examination or proceeding by any taxing authority relating to Taxes that would result in a Lien on, or otherwise materially adversely affect, the Purchased Assets.

III.14 Financial Information.

(a) Seller has made available to Buyer all financial statements, operating statements, utility billing records, capital expenditure information, and other financial or operating information relating to the Purchased Assets, that are in Seller's possession or control and have been requested by Buyer (collectively, the "Financial Information").

(b) To Seller's knowledge, the Financial Information delivered or made available to Buyer has been prepared in good faith from the books and records of Seller, is true, correct and complete in all material respects, and fairly presents, in all material respects, the information purported to be reflected therein for the applicable periods. Seller has not knowingly omitted any material information necessary to make the Financial Information, taken as a whole, not misleading.

(c) Since the date of the most recent Financial Information made available to Buyer, Seller has not become aware of any material adverse change in the financial condition or operation of the Purchased Assets that has not been disclosed to Buyer in writing. Seller has made available to Buyer true, correct and complete copies, in all material respects, of all books, records, utility information, correspondence, reports, contracts and other documents in Seller's possession or control relating to the Purchased Assets that have been requested by Buyer. To Seller's knowledge, such books and records accurately reflect the information they purport to contain in all material respects, and Seller has not knowingly withheld any material information relating to the Purchased Assets requested by Buyer.

III.15 Environmental Matters. Except as set forth on **Exhibit "F"** to Seller's knowledge: (a) Each Seller is, and during Seller's ownership of the Purchased Assets has been, in material compliance with all applicable Environmental Laws with respect to the Purchased Assets; (b) Seller has not received any written notice, demand, claim, request for information or other written communication from any governmental authority or third party alleging any material violation of, or material liability under, any Environmental Law with respect to the Purchased Assets that remains unresolved; (c) there has been no release, discharge, disposal or threatened release of any Hazardous Substance at, on, under or from the Purchased Assets in violation of applicable Environmental Laws that would reasonably be expected to result in material liability relating to the Purchased Assets; (d) Seller has not received any written notice of the presence of

any underground storage tanks, asbestos-containing materials, polychlorinated biphenyls or other regulated Hazardous Substances at the Purchased Assets, except as disclosed on **Exhibit "F"**; (e) Seller has obtained and is in material compliance with all material permits, licenses and other governmental authorizations required under applicable Environmental Laws with respect to the ownership and operation of the Purchased Assets; and (f) there is no pending or, to Seller's knowledge, threatened investigation, action or proceeding under any Environmental Law relating to the Purchased Assets that would reasonably be expected to result in material liability or materially impair Buyer's ownership, development or use of the Purchased Assets following the Closing. For purposes of this Agreement, "Environmental Laws" means all applicable federal, state and local Laws relating to pollution, the protection of human health or the environment, or the manufacture, generation, use, handling, storage, treatment, transportation, release or disposal of Hazardous Substances, each as amended from time to time. "Hazardous Substances" means any substance, material or waste that is regulated under any Environmental Law, excluding quantities of substances customarily used, stored or maintained in compliance with applicable Environmental Laws.

III.16 General Warranty. None of the representations or warranties contained herein by Seller, nor any exhibit, schedule, statement, or certificate furnished to or to be furnished by Seller to Buyer pursuant to the terms hereof or in connection with the transactions contemplated herein, contains or will contain any knowingly untrue statement of a material fact or knowingly omits or will omit to state a material fact necessary to make the statements contained or incorporated herein or therein not misleading.

III.17 Real Property.

(a) Except for certain fractional ownership rights which may be asserted, Seller is the sole owner of the Pyote Property and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this Agreement; for the avoidance of doubt, Seller agrees to deliver the Pyote Property to Buyer free and clear of all fractional ownership rights at Closing unless otherwise agreed to by Buyer in writing;

(b) Seller is not a "foreign person", as that term is defined for purposes of the FIRPTA;

(c) Seller has been known by no other name for the past ten years, except Lonestar Dream Inc. and Lonestar Taproot LLC;

(d) The Pyote Property is not serviced by municipal sewer and water systems. The water and electrical and other mechanical and utility systems serving the Pyote Property is, to the best of Seller's reasonable knowledge, in sound operating condition;

(e) There are no assessments, charges, paybacks, or obligations for improvements or services affecting the Pyote Property;

(f) There are no persons employed at the Pyote Property in connection with the ownership, use, operation, maintenance, repair and/or replacement of the Pyote Property who will be binding upon Buyer after the Closing;

(g) There are no collective bargaining agreements, management agreements or other employee agreements affecting the Pyote Property or which would bind Buyer after the Closing;

(h) Seller has not received any written notice of any lawsuits, tax appeals, condemnation proceedings, or environmental investigations pending or, to Seller's best knowledge, affecting the Pyote Property.

(i) Other than for the leases identified as potential Assumed Contracts, there are no leases, licenses or other occupancy and/or use agreements, written or oral, affecting the Pyote Property or any portion thereof to which Seller is a party or by which Seller or any future owner of the Pyote Property through Seller is or will be bound, and Seller has delivered a true, correct and complete copy of the Leases to Buyer prior to Buyer's execution and delivery of this Agreement.

(j) There are no contracts or agreements affecting the Pyote Property which will survive Closing and be binding upon Buyer except the Assumed Contracts and in the Title Commitment;

(k) Excluding the right of bidders to bid at bankruptcy auction on the Pyote Property and Purchased Assets, no person, firm or entity, except for the Buyer, has any rights in, or rights to purchase or acquire all, or any part of the Pyote Property, including, without limitation, a right of first refusal or option to purchase with respect thereto.

(l) Seller has not received any written notice from any governmental authority or other person claiming or alleging that the Pyote Property or any portion thereof, or any properties in the vicinity of the Pyote Property, is contaminated by hazardous materials or substances in violation of any federal, state and local laws, statutes, ordinances and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S. §§ 6901 et seq.), the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), as amended, and any

state or local counterpart or equivalent of any of the foregoing, and any federal, state or local transfer of ownership notification or approval statutes.

(m) There are no current or pending litigation(s), lawsuits, actions, investigations, grievances, complaints, charges, or proceedings against Seller, or with respect to the Pyote Property, either filed individually, jointly or by class, in a federal, state or municipal court, of any jurisdiction whatsoever, or before any administrative agency or arbitral tribunal, involving any federal, state or municipal labor, employment or benefits law (as those terms are most broadly defined); including, but not limited to, the National Labor Relations Act, 29 U.S.C. §§151, et seq., the Fair Labor Standards Act, 29 U.S.C. §§201, et seq., ERISA, Section 1981 through 1988 of Title 42 of the United States Code, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000(e), et seq., the Americans With Disabilities Act of 1990, 42 U.S.C. §§12101, et seq., the Family and Medical Leave Act of 1993, 29 U.S.C. §§2601, et seq., the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621, et seq., the Genetic Information Nondiscrimination Act of 2008, Uniformed Services Employment and Reemployment Rights Act, the Fair Credit Reporting Act, the Rehabilitation Act of 1973, 29 U.S.C. §§701, et seq., the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. §§1161, et seq., the Occupational Safety and Health Act, 29 U.S.C. §§651, et seq., the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621, et seq., the federal and state Worker Adjustment and Retraining Notification Acts (collectively, the "WARN Acts") any State of Texas labor, employment, discrimination law, sexual harassment, or wage and hour law, or any other federal, state or local human rights, civil rights, wage-hour, wage-payment, pension, labor or employment-related laws, or their respective implementing laws, rules and/or regulation(s), or with respect to an alleged breach or violation of any collective bargaining agreement, union agreement, labor agreement, benefits agreement, or employment contract of any kind (as those terms are most broadly defined), or which arise under the common law or in equity (including claims for wrongful discharge or otherwise) (collectively, "Labor and Employment Laws").

III.18 Seller represents and warrants that: (i) it is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986 (the "Code"), which is subject to Section 4975 of the Code; and (ii) the assets of Seller do not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA or Section 4975 of the Code; and (iii)(a) Seller is not a "governmental plan" within the meaning of Section 3(32) of ERISA, and the assets of Seller do not constitute plan assets of one or more such plans; or (b) transactions by or with Seller are not in violation of state statutes applicable to Seller regulating investments of and fiduciary obligations with respect to governmental plans.

III.19 Neither Seller, nor any ERISA Affiliates (as hereinafter defined) has, within the last six (6) years, made a "partial withdrawal" or a "complete withdrawal" (within the meaning of Sections 4205 and 4203 of ERISA) from any "multiemployer plan," nor incurred any liability on account of a "partial withdrawal" or a "complete withdrawal" from any "multiemployer plan", no such liability has been asserted through a "Notice of Assessment" or any similar

correspondence, and there are no events or circumstances which could result in any such partial or complete withdrawal, neither Seller, the Property Manager nor any ERISA Affiliate has incurred or could be subjected to any liability under Title IV or Section 302 of ERISA that could reasonably be expected to result in liability to the Buyer ("ERISA Affiliate" means, at any time, each trade or business (whether or not incorporated) that would, at the time, be treated together with either Seller or the Property Manager as a single employer under Title IV or Section 302 of ERISA or Sections 414(b) or 414(c) of the Code.

III.20 Seller covenants and warrants that all of the representations and warranties set forth in this Agreement shall be true and correct at, and as of, the Closing Date, but not thereafter. The covenants and agreements of the Parties that by their terms contemplate performance after the Closing (including Section 5.4 and Section 10.6) shall survive the Closing in accordance with their terms.

III.21 No Other Representations or Warranties. Other than as set forth herein, the Purchased Assets are being sold "as is," "where is," and "with all faults," and Buyer, or any ultimate highest bidder pursuant to any Auction or order of the Bankruptcy Court, hereby acknowledges and agrees that Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets. Buyer will accept the Purchased Assets "as is" and "where is" at closing.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

IV.1 Organization and Authority. Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware. Buyer has the full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated herein and have been duly authorized by all necessary action on the part of Buyer. Subject to entry of the Sale Approval Order by the Bankruptcy Court, this Agreement constitutes a legal, valid, and binding agreement of Buyer that is enforceable in accordance with its terms.

IV.2 No Conflicts. The execution, delivery, and performance of this Agreement by Buyer will not (i) violate any provision of any existing law, statute, rule, regulation, or ordinance, or (ii) conflict with, result in a breach of, or constitute a default under (a) any certificate or articles of incorporation or by-laws of Buyer, (b) any order, judgment, award or decree of any court, governmental authority, bureau or agency, or (v) any mortgage, indenture, lease, contract or other agreement, or undertaking to which Buyer is a party or by which Buyer or its properties or assets may be bound.

IV.3 Investigation by Buyer. Buyer is conducting its own independent review and analysis of the Purchased Assets, the Assumed Liabilities, and the Assumed Contracts. Buyer acknowledges that it has until 10:00 a.m. September 10, 2026 ("<u>Due Diligence</u>

Expiration Date") to conduct such diligence as it deems necessary or appropriate in connection with the transactions contemplated hereby. Notwithstanding the foregoing, Buyer's investigation shall not limit, diminish or otherwise affect Seller's representations, warranties, covenants or obligations under this Agreement, any Seller Disclosure Schedule or any other document delivered in connection herewith. Buyer shall be entitled to rely upon the accuracy and completeness of the Seller's representations and warranties expressly set forth herein, and Seller shall remain liable for any breach thereof. Buyer shall complete its due diligence by the Due Diligence Expiration Date.

IV.4 Nothing herein shall waive or limit any rights or remedies of Buyer arising from Seller's fraud, willful misconduct, intentional misrepresentation or breach of this Agreement. Buyer is capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts and Assumed Liabilities.

IV.5 Litigation. As of the date hereof, there is no action, suit, investigation or proceeding pending, against or, to the knowledge of Buyer, threatened against or affecting Buyer before any court or arbitrator or any governmental body, agency, or official, which in any manner challenges or seeks to prevent, enjoin, alter, or materially delay any transactions contemplated by this Agreement.

IV.6 Certain Fees. Buyer has not employed any broker, finder, investment banker, or other intermediary or has not incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or any transactions contemplated by this Agreement.

IV.7 Required Consents. Except for consents, approvals or authorizations of, or declarations or filings with the Bankruptcy Court, there is no agreement or other instrument binding upon Buyer requiring any consent, approval, notification, filing, registration, authorization, permission, license, requirement, or action by any third-party resulting from the execution, delivery, and performance of this Agreement.

IV.8 General Warranty. None of the representations or warranties contained herein by Buyer, nor any exhibit, schedule, statement, or certificate furnished or to be furnished by Buyer to Seller pursuant to the terms hereof or in connection with the transactions contemplated herein, contains or will contain any knowingly untrue statement of a material fact or knowingly omits or will omit to state a material fact necessary to make the statements contained or incorporated herein or therein not misleading.

## ARTICLE V
## COVENANTS OF SELLER AND BUYER

V.1 Efforts; Further Assurances. Seller and Buyer will use commercially reasonable efforts to take any and all actions and to do all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated in this Agreement. Seller and Buyer agree to execute and deliver such other documents, certificates, agreements, and other writings and to take such other actions as may be necessary or desirable in order to vest marketable title to the Purchased Assets in Buyer.

V.2 Notices. If (i) Buyer becomes aware of any material breach by Seller of any representation, warranty, covenant, or agreement contained herein and such breach is capable of being cured by Seller, or (ii) Seller becomes aware of any material breach by Buyer of any representation, warranty, covenant, or agreement contained herein and such breach is capable of being cured by Buyer, the Party becoming aware of such breach shall promptly notify the other Party in writing, in accordance with the notice provisions of this Agreement. Upon such notice of breach, the breaching Party shall have five (5) days to cure such breach before the exercise of any remedies in connection therewith.

V.3 Pre-Closing Covenants. As material terms of this Agreement:

(a) From the Effective Date until the Closing Date, Seller will maintain the Purchased Assets in the manner consistent with its standards of maintenance prevailing immediately prior to the Effective Date and it will not commit or permit to be committed any waste or change in the condition or appearance of the Purchased Assets, or convey any other right with respect to the Purchased Assets except with the written consent and joinder of Buyer. Seller shall operate, manage and maintain the Purchased Assets in the ordinary course consistent with past practice and shall promptly notify Buyer of any material damage, casualty, condemnation, governmental action or other event affecting the Purchased Assets. Seller will keep all current insurance policies concerning the Purchased Assets in full force and effect until Closing and shall not modify, cancel, terminate or permit any lapse in coverage without Buyer's prior written consent. Buyer and Seller, or its representative, shall have the right to walk the Pyote Property the day before the Closing Date, unless otherwise waived by Buyer in writing, to confirm the condition of the Purchased Assets .

(b) Seller must not transfer any of the Purchased Assets, create any Lien on the Purchased Assets, grant any easements or rights-of-way, or enter into any contract, lease, license, agreement, commitment or other arrangement affecting the Purchased Assets or Buyer's intended use thereof, which is not cancelable on and as of the Closing Date without Buyer's prior written consent. Seller shall not take any action, or fail to take any action, that would reasonably be expected to adversely affect Buyer's rights in or to the Purchased Assets, the value thereof, or the ability to consummate the transactions contemplated hereby.

(c) Seller shall operate, manage and maintain the Purchased Assets in the ordinary course of business consistent with past practice and shall use commercially reasonable efforts to preserve intact the Purchased Assets and the goodwill associated therewith. Seller shall not take, or omit to take,

any action that would reasonably be expected to materially impair the value of the Purchased Assets or Buyer's ability to consummate the transactions contemplated by this Agreement.

(d) Seller shall not amend, modify, terminate, renew, extend, waive any material rights under, or enter into any new Assumed Contract, or consent to any amendment, modification or termination of any Assumed Contract, without the prior written consent of Buyer.

(e) Seller shall use commercially reasonable efforts to preserve and maintain in full force and effect all permits, approvals, authorizations, licenses, utility allocations, interconnection rights, governmental approvals and other rights relating to the Purchased Assets, and shall not take any action, or fail to take any action, that would reasonably be expected to adversely affect the transferability, availability or use thereof by Buyer following the Closing.

(f) Seller shall promptly notify Buyer in writing of (i) any material damage to or destruction of the Purchased Assets, (ii) any condemnation or threatened condemnation affecting the Purchased Assets, (iii) any written notice of violation, default, investigation or enforcement action relating to the Purchased Assets, (iv) any material claim, action or proceeding affecting the Purchased Assets, or (v) any event or circumstance that would reasonably be expected to result in a Material Adverse Effect or prevent or materially delay the consummation of the transactions contemplated hereby.

(g) Seller shall provide Buyer and its representatives with reasonable access, upon reasonable prior notice and during normal business hours, to the Purchased Assets, the Assumed Contracts, books and records, and such other information relating to the Purchased Assets as Buyer may reasonably request in connection with the transactions contemplated hereby.

(h) Seller shall use commercially reasonable efforts to obtain entry of the Bid Procedures Order and the Sale Approval Order and to satisfy all conditions to Closing within Seller's control and shall not take any action that would reasonably be expected to delay, impair or prevent the consummation of the transactions contemplated hereby.

(i) Seller shall preserve all books, records, files and other documents relating to the Purchased Assets and shall not destroy, discard or materially alter any such books, records or documents prior to the Closing, except in the ordinary course of business and in accordance with applicable Law.

(j) Seller shall not settle, compromise or release any material insurance claim, condemnation award or other claim relating to the Purchased Assets without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed.

(k) From the Effective Date through the Closing or earlier termination of this Agreement, Seller shall preserve the Pyote Property in substantially the same condition as exists on the Effective Date, ordinary wear and tear and casualty excepted, and shall not, without the prior written consent of Buyer, which may be granted or withheld in Buyer's sole discretion:

(i) create, incur, assume or permit any lien, claim, encumbrance, easement, covenant, restriction, license or other interest affecting the Pyote Property, transfer any development or similar rights relating to the Pyote Property, or otherwise take or omit to take any action that has a material adverse effect on the Pyote Property, including title thereto;

(ii) demolish, remove, alter or materially modify any improvements located on the Pyote Property, or remove, sell, transfer or dispose of any fixtures, equipment or personal property used in connection with the Pyote Property, except for replacements of equal or greater quality made in the ordinary course of business;

(iii) enter into, amend, extend, renew, terminate or modify any lease, license, occupancy agreement or other agreement granting any possessory rights in or to the Pyote Property;

(iv) enter into, amend, terminate or modify any contract, service agreement, management agreement or other agreement affecting the ownership, operation, maintenance or use of the Pyote Property that is to be assumed by Buyer and will survive Closing;

(v) seek, permit or consent to any change in the zoning, land use designation, subdivision status, permits, entitlements or other governmental approvals affecting the Pyote Property, or voluntarily initiate or consent to any governmental action affecting the Pyote Property;

(vi) take any action, or fail to take any action, that would cause any representation or warranty of Seller contained in this Agreement to be inaccurate as of Closing or result in a breach of any covenant of Seller under this Agreement; or

(vii) settle, compromise, waive or release any claim, litigation, insurance claim, condemnation claim or other material right relating to the Pyote Property without Buyer's prior written consent, unless to clear title to the Pyote Property.

(viii) provide Buyer with copies of any material notices that Seller receives from any governmental authority or third party with respect to the Pyote Property;

(ix) advise Buyer promptly of any litigation or arbitration proceeding relating to the Pyote Property or that might affect Seller’s ability to perform its obligations under this Agreement, or notices that allege a claim that could result in such litigation.

V.4 Post-Closing Covenants. As material terms of this Agreement:

(a) Immediately upon the consummation of the Closing, the Parties agree to cooperate with one another and use all good faith efforts to take (or cause to be taken) all actions, and to do (or cause to be done) all things reasonably necessary or proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement, including, without limitation, (i) providing access and title to the Purchased Assets to Buyer; and (ii) assisting Buyer with obtaining access and control over the Purchased Assets.

V.5 Fire or Casualty.

(a) Seller shall promptly notify Buyer in writing of any fire, flood, storm, casualty or other damage affecting the Pyote Property occurring prior to Closing.

(b) If, prior to Closing, all or any portion of the Pyote Property is damaged or destroyed by fire, flood or other casualty, Buyer may, in its sole discretion, by written notice delivered to Seller at any time prior to Closing:

(i) terminate this Agreement, in which event the Good Faith Deposit shall be immediately returned to Buyer and neither party shall have any further obligations hereunder except those expressly stated to survive termination; or

(ii) proceed to Closing, in which event Seller shall assign to Buyer, at Closing, all insurance proceeds and claims relating to such casualty, transfer any insurance proceeds previously received by Seller, credit Buyer at Closing for all applicable deductibles and uninsured losses, and assign all rights, claims and causes of action arising from such casualty.

(c) Seller shall not settle, compromise or release any insurance claim relating to the Pyote Property after the Effective Date without Buyer's prior written consent.

(d) Seller shall maintain all property and casualty insurance covering the Pyote Property in full force and effect through Closing.

V.6 Condemnation.

(a) Seller shall promptly notify Buyer in writing upon learning of any pending, threatened or completed condemnation, eminent domain proceeding or conveyance in lieu of condemnation affecting all or any portion of the Pyote Property.

(b) If, prior to Closing, all or any portion of the Pyote Property becomes subject to any condemnation, eminent domain proceeding or conveyance in lieu thereof, Buyer may, in its sole discretion, by written notice delivered to Seller prior to Closing: (i) terminate this Agreement, in which event the Good Faith Deposit shall be immediately returned to Buyer and neither party shall have any further obligations hereunder except those expressly stated to survive termination; or (ii) proceed to Closing, in which event Seller shall assign to Buyer all condemnation awards,

settlement proceeds, claims, rights and causes of action relating to such condemnation or taking, whether received before or after Closing.

(c) Seller shall not settle, compromise or consent to any condemnation proceeding or conveyance in lieu thereof without Buyer's prior written consent.

(d) The provisions of this Section shall survive the Closing.

## ARTICLE VI
## BANKRUPTCY MATTERS; BIDDING PROCEDURES

VI.1 Bankruptcy Filings. Seller shall deliver or cause to be delivered to Buyer for review and comment, as soon as commercially reasonable and in any event not less than two (2) business days prior to the filing thereof, all documents to be filed on behalf of Seller with the Bankruptcy Court, including all motions, applications, petitions, schedules, and supporting papers prepared by Seller (including forms of orders and notices to interested parties) that relate to, or that may affect, the Purchased Assets or the transactions contemplated hereby. All motions, applications, petitions, schedules, and supporting papers prepared by Seller and relating to the transactions contemplated hereby or the Purchased Assets to be filed with the Bankruptcy Court on behalf of Seller must be reasonably satisfactory in form and substance to Buyer and Seller.

VI.2 Sale Approval Order. Seller and Buyer shall use commercially reasonable efforts to cooperate, assist and consult with each other to secure the entry of the Sale Approval Order following the date hereof, and to consummate the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes of, among others, providing necessary assurances of performance by Buyer under this Agreement and furnishing any testimony regarding the transactions contemplated hereby, including to support the good-faith nature of the negotiations leading to this Agreement.

## ARTICLE VII
## CLOSING CONDITIONS

VII.1 Conditions to Obligations of Buyer and Seller. The obligations of Buyer and Seller to consummate the transactions contemplated in this Agreement are subject to the satisfaction of the following conditions:

(a) The Bankruptcy Court shall have entered the Sale Approval Order and, as of the Closing Date, the Sale Approval Order shall be in full force and effect and shall not have been stayed, vacated, or reversed. The Sale Approval Order shall be in form and substance reasonably acceptable to Buyer and shall, *inter alia*:

(i) Authorize the Seller's execution and delivery of this Agreement and approve the transactions contemplated herein;

(ii) Find that the transfer of the Purchased Assets is legal, valid, and enforceable and vests Buyer with valid title to the Purchased Assets, free and clear of all Liens (except for any Permitted Liens);

(iii) Find that the Purchase Price and other consideration provided by Buyer hereunder constitute fair and reasonable consideration for the Purchased Assets;

(iv) Provide that Buyer is a good faith purchaser of the Purchased Assets pursuant to Section 363(m) of the Bankruptcy Code and none of the grounds set forth in Section 363(n) exists with respect to the sale;

(v) Authorize Buyer to file, if desired in its discretion, terminations or cancellations of any recorded Liens (except for Permitted Liens or to the extent required by law) against the Purchased Assets and require secured parties or lienholders, where required by applicable non-bankruptcy law or requested by Buyer, to execute documents of release, cancellation or satisfaction prepared by Buyer, to be filed by Buyer to clear any Liens of record (other than Permitted Liens) from the Purchased Assets;

(vi) Approve the assumption and assignment of any Assumed Contracts and provide that upon payment of the applicable Cure Costs (or other such agreed amount) by the Buyer or Seller, as applicable, such counterparty shall not have any remaining claim against Seller, its Estate or creditors, or Buyer related to any pre-Closing default under any such Assumed Contract;

(vii) Find that Buyer has not assumed, and has no responsibility or liability for any of Seller's liabilities of any description whatsoever, including any liability of Seller with respect to any Taxes or any pre-Closing liabilities (other than Cure Costs for the Assumed Contracts or other Assumed Liability), whether known or unknown as of the Closing, whether fixed or contingent, or whether existing at the time of or arising after the Closing, including successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, alter ego, successor or transferee liability, de facto merger, mere or substantial continuation; and

(viii) Waive any stay that would otherwise be applicable pursuant to Rules 6004(h) or 6006(d) of the Federal Rules of Bankruptcy Procedure.[8]

(b) No injunction, stay, or similar order or decree issued by any court, tribunal or governmental entity, shall be in effect that restrains, enjoins, stays, or prohibits the consummation of the transactions contemplated by this Agreement.

VII.2 Conditions to Obligations of Buyer. The obligation of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Buyer) of the following conditions:

(a) Seller shall have performed in all material respects all of its obligations hereunder required to be performed by it at, or before, the Closing Date; and

(b) The representations and warranties of Seller contained in this Agreement shall be true and correct at, and as of the Closing Date, as if made at, and as of, the Closing Date.

(c) Buyer shall have received written confirmation, in form and substance satisfactory to Buyer, in its reasonable discretion, of the electrical power supply available to the Pyote Property (i) in the firm allocated and available amount of not less than 54MW of electrical capacity (ii) with the applicable voltage and at the approved point of interconnection for use of such power, (iii) and is available without any known condition, restriction or third-party approval (including that of the retail electricity provider and QSE) which would materially impair the availability, allocation, or delivery of electrical service to the Pyote Property (collectively, the "<u>Power Rights</u>").

(d) Buyer shall have received, in form and substance reasonably satisfactory to Buyer, all governmental and third-party permits, approvals, consents, authorizations and agreements necessary ("<u>Approvals</u>") to transfer to Buyer the electrical power allocation and related Power Rights associated with the Pyote Property, without material reduction or restriction. All such permits, approvals, consents, authorizations, and agreements shall be in full force and effect and shall not contain any condition or limitation that would materially impair Buyer's intended use of the Approvals and associated Power Rights.

(e) Buyer waives any Title Objection pertaining to the Pyote Property based upon mineral rights (reservations, leases or other mineral rights rights), whether of record or not.

(f) Since the Effective Date, no event, change, circumstance or condition shall have occurred that has had, or would reasonably be expected to have, a Material Adverse Effect on the Purchased Assets, the utility rights associated therewith, or Buyer's intended use of the Pyote Property as an AI data center, including any material casualty, condemnation, loss of utility capacity, material governmental action or material termination of any Assumed Contract.

(g) All necessary governmental approvals, permits, authorizations, consents and filings required for the consummation of the transactions contemplated by this Agreement shall have been obtained or made and shall be in full force and effect.

(h) Other than for payment of the title premium, endorsement fees and other charges of the Title Company to be paid by Buyer, and Buyer's satisfaction of any other conditions of the Title Company to issuance of the Title Policy that can only be satisfied by Buyer, the Title Company is unconditionally committed to issuing an owner's policy of title insurance for the Pyote Property (the "Title Insurance") on such form and with such endorsements as shall be available in the State of Texas and acceptable to Buyer, insuring Buyer's title to the Pyote Property for the full amount of the Purchase Price and free of any liens or other encumbrances other than Permitted Liens and those accepted by Buyer in accordance with the terms of the Agreement.

(i) All material third-party consents required for the consummation of the transactions contemplated by this Agreement (other than those to be obtained through the Bankruptcy Court process) shall have been obtained and shall be in full force and effect.

(j) The Closing (as defined in the Tarbush Agreement) of the Tarbush Agreement shall have occurred substantially contemporaneous with the Closing hereunder.

VII.3 Conditions to Obligations of Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Seller) of the following further conditions:

(a) Buyer shall have performed in all material respects all of its obligations hereunder required to be performed by it at, or before, the Closing Date; and

(b) The representations and warranties of Buyer contained in this Agreement shall be true and correct at, and as of the Closing Date, as if made at, and as of, the Closing Date.

## ARTICLE VIII
## TERMINATION

VIII.1 Grounds for Termination. This Agreement may be terminated at any time before Closing by:

(a) mutual written agreement of Seller and Buyer;

(b) either Buyer or Seller, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; provided that no Party may terminate this Agreement under this Section if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c) either Buyer or Seller, if the Closing shall not have occurred on or before December 15, 2026, or such later date that is provided for herein or otherwise agreed to by the parties (the "Outside Date"); provided that a Party shall not be permitted to terminate this

Agreement pursuant to this Section if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d) Buyer, if any material condition set forth in this Agreement has not been satisfied by Seller or if the conditions of Section VII.2 have not been satisfied, and such condition is incapable of being satisfied, unless Buyer elects to waive such satisfaction;

(e) Seller, if Buyer fails to consummate the Closing in accordance with this Agreement due to Buyer's default, unless Seller elects to waive such default; provided, however, that Seller shall not be entitled to terminate this Agreement or retain the Deposit unless Buyer has failed to consummate the Closing as a result of Buyer's default under this Agreement. For the avoidance of doubt, Buyer shall be entitled to the return of the Deposit if Buyer's failure to consummate the Closing is due to Seller's breach, failure to perform, failure to satisfy a condition to Closing, or any other circumstance not caused by Buyer's default under this Agreement;

(f) Buyer, if Buyer is not the successful bidder or the backup bidder at the Auction and Seller enters into a Competing Transaction with the successful bidder or the backup bidder;

(g) Buyer, if the Bankruptcy Case is dismissed or converted to a case or cases under chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Seller is appointed in the Bankruptcy Case;

(h) Buyer if Seller withdraws or seeks authority to withdraw the Bidding Procedures/Sale Motion.

(i) Buyer, upon the occurrence of a material casualty or condemnation affecting the Purchased Assets.

The Party desiring to terminate this Agreement under this section shall give notice of such termination to the other Party in accordance with the notice provisions herein. Notwithstanding the foregoing, except in connection with a termination of this Agreement by Seller pursuant to Section VIII.1(e), Buyer shall be entitled to receive the Good Faith Deposit in full, and Seller shall have no right to retain, apply or otherwise claim any portion of the Good Faith Deposit.

VIII.2 Effect of Termination.

(a) If this Agreement is terminated by Buyer in accordance with Section VIII.1(d), Buyer shall be entitled to the return of the Good Faith Deposit (with interest) within three (3) business days of such termination.

(b) If this Agreement is terminated by Seller in accordance with Section VIII.1(e), Buyer shall forfeit the Good Faith Deposit and the Good Faith Deposit shall become property of Seller's Estate as liquidated damages.

(c) If this Agreement is terminated in accordance with any other subsection of Section VIII.1, such termination shall be without liability of any Party to the other Party to this Agreement, and the Good Faith Deposit (with interest) shall be returned to Buyer within three (3) business days of such termination.

## ARTICLE IX
## ASSUMPTION OF EXECUTORY CONTRACTS OF THE SELLER

IX.1 Assumed Contracts. Buyer shall be solely responsible for and shall pay or cause to be paid at or prior to Closing, all Cure Costs related to the Assumed Contracts. Buyer shall have no obligation to pay any Cure Costs except to the extent expressly set forth on Exhibit B. Seller represents and warrants that Exhibit B sets forth a complete and accurate list of all known Cure Costs for each Assumed Contract.

## ARTICLE X
## MISCELLANEOUS

X.1 Further Assurances. After the Closing Date, each Party shall execute and deliver such further documents, and perform such acts, as may be reasonably necessary to transfer and convey the Purchased Assets to Buyer on the terms contained herein, and to otherwise comply with the terms of this Agreement and to carry out the transactions provided for herein.

X.2 Notices. All notices, requests, and other communications to any Party hereunder shall be in writing, via e-mail transmission, and shall be given:

| | |
|---|---|
| If to Seller, to: | Lonestar Dream Inc. and Lonestar Taproot LLC<br>Attn: Michael DuFrayne, CRO;<br>(mdufrayne@dufraynellc.com) |
| With a copy to: | Stephen M. Packman, Esq. (spackman@archerlaw.com) |
| If to Buyer, to | Attn: Jimmy Martini<br>Hut 8 Corp.<br>777 Brickell Ave, Floor 2<br>Miami, FL 33131<br>(jimmy.martini@hut8.com) |
| With a copy to | Andrew M. Carty<br>Brown Rudnick LLP<br>Seven Times Square |

New York, NY 10036
(acarty@brownrudnick.com)

All such notices, requests, and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request, or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

X.3 Bulk Sales Laws. The Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer, or similar laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

X.4 Expenses. Except as otherwise provided herein, each of the Parties shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including, without limitation, any legal, accounting and other professional fees, whether or not the transactions contemplated hereby are consummated.

X.5 Waivers. No failure or delay by any Party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

X.6 Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. Notwithstanding anything to the contrary herein, Buyer shall have the right, in its sole and absolute discretion and without the prior consent of Seller, to assign this Agreement, and its rights and obligations hereunder, in whole or in part, to one or more affiliates of Buyer or to one or more designees (including, without limitation, any entity formed for the purpose of consummating the transactions contemplated hereby); provided, however, that such assignment shall not release Buyer from its obligations hereunder. Seller may not assign, in whole or in part, this Agreement or its rights hereunder without the prior written consent of Buyer.

X.7 Assumption of Risk. Seller agrees to assume the risk of loss or damage to the Purchased Assets occurring on or before the date on which title thereof is conveyed to Buyer. If, prior to its conveyance, all or any material portion of the Pyote Property is the subject of a pending or contemplated taking by eminent domain which has not been consummated or if the Pyote Property has been substantially damaged or destroyed, Seller shall notify Buyer of such fact and Buyer shall have the option to terminate this Agreement and, in the event Buyer shall elect to terminate this Agreement, the Good Faith Deposit together with all interest earned thereon shall promptly be returned to Buyer. If this Agreement is terminated and the Good Faith Deposit together with accrued interest is returned, as aforesaid, neither Party shall have any further rights or obligations hereunder. If, after receipt of Seller's notice, as aforesaid, Buyer does not exercise its option to terminate this Agreement, the Parties hereto shall remain bound hereunder and Seller

shall assign and turn over, and Buyer shall be entitled to receive and keep, all awards for the taking by eminent domain described in said notice or all insurance proceeds payable as a result of such destruction or damage and any deductible due from Seller If, prior to its conveyance, any part of the Purchased Assets which constitutes Equipment has been substantially damaged, lost or destroyed, or if there has been a material condemnation affecting the Purchased Assets, Seller shall notify Buyer of such fact and Buyer may elect to either (i) accept all insurance or condemnation proceeds payable as a result of such destruction, damage or, loss or condemnation and any deductible due from Seller or, (ii) agree to a reduction of the Purchase Price by the current mutually agreed value of the lost, damaged or destroyed Purchased Asset, or (iii) terminate this Agreement and receive the prompt return of the Good Faith Deposit (with interest).

X.8 Governing Law. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of State of New York, without giving effect to the principles of conflicts of laws thereof) (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York, except to the extent that such laws are superseded by the Bankruptcy Code. The parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court and waive any right to a jury trial regarding the same.

EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ITS RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY OR ANY ASSIGNEE THEREOF, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.

X.9 Entire Agreement; Amendments; Counterparts. This Agreement sets forth the entire agreement between the Parties with respect to the subject matter hereof and may be amended only by in writing, executed by Seller and Buyer. This Agreement may be executed in counterparts, each of which shall constitute an original, and all of which together shall constitute one and the same instrument. This Agreement shall become effective when the Parties hereto shall have received a counterpart hereof signed by the other Party hereto.

X.10 Captions; Headings; Interpretation. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. The headings contained in this Agreement are for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement. Whenever the words “include,” “includes,” or “including” are used in this Agreement, they shall be deemed to be followed by the words “without limitation.” In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no

presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

X.11 Parties Bound. The terms and conditions of this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, executors, successors, and permitted assigns.

X.12 Severability. Except as otherwise provided herein, if any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable, such provision shall be automatically reformed and construed so as to be valid, operative, and enforceable to the maximum extent permitted by law or equity while preserving its original intent. The invalidity of any part or provision of this Agreement shall not render the remainder of this Agreement invalid.

X.13 Retention of Jurisdiction. ANY AND ALL DISPUTES, DISAGREEMENTS, INTERPRETATIONS, OR OTHER MATTERS CONCERNING THE FINAL CONSUMMATION AND ENFORCEMENT OF THIS AGREEMENT SHALL BE AND REMAIN IN THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, AS A RESULT THEREOF, ANY PLEADINGS, CAUSES OF ACTION OR OTHER REQUESTS FOR RELIEF MUST BE BROUGHT BEFORE SAID COURT BY THE PARTY SEEKING SUCH RELIEF.

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the date first written above.

**SELLER:**

**Lonestar Dream Inc.**

By: ___________________________________

Name: Kevin Pan
Title: CEO

**SELLER:**

**Lonestar Taproot LLC**

By: ___________________________________

Name: Kevin Pan
Title: CEO of Lonestar Dream Inc., sole member of Lonestar Taproot LLC

**BUYER: MESQUITE FALCON LLC**

By: ________________________________

Name:
Title:

**ANNEX I**
**CERTAIN DEFINITIONS**

"Auction" means an auction to be held by the Seller in the event higher and better bids are submitted in accordance with the Bidding Procedures.

"Bidding Procedures" means the procedures governing the proposed marketing of, auction of, and bidding for the Purchased Assets pursuant, and attached, to the Bidding Procedures Order.

"Bidding Procedures/Sale Motion" means the motion seeking entry of (i) the Bidding Procedures Order and (ii) Sale Approval Order, which shall be in form and substance reasonably satisfactory to Buyer.

"Bidding Procedures Order" means an Order of the Bankruptcy Court approving the Bidding Procedures, which shall include approval of the Breakup Fee and Expense Reimbursement., and which shall be in form and substance acceptable to Buyer in its reasonable discretion and shall include, at a minimum, customary bid protections, including: (i) a minimum initial overbid in an amount equal to the sum of the Breakup Fee, Expense Reimbursement and an initial overbid increment to be agreed by the parties; (ii) minimum subsequent overbid increments to be agreed by the parties; (iii) requirements that any competing bidder qualify as a "Qualified Bidder" (including delivery of a binding mark-up of the APA with no fewer terms or conditions, proof of financial wherewithal to close, and a non-refundable deposit at least equal to the Good Faith Deposit); (iv) restrictions on credit bidding by any party with disputed liens; (v) payment of the Breakup Fee and Expense Reimbursement on the closing of any alternative transaction with a competing bidder; and (vi) such other customary stalking horse protections as Buyer may reasonably require.

"Business Day" means any day that is not a Saturday, Sunday, or a day on which banking institutions in New York, New York are not required to be open.

"Claim" means any claim, demand, assessment, judgment, order, decree, action, cause of action, litigation, suit, investigation, or other Proceeding.

"Competing Transaction" shall mean a transaction with a bidder who has offered Seller a higher and better purchase price for the Purchased Assets to that offered by Seller, which higher and better bid is approved by order of the Bankruptcy Court.

"Cure Costs" means all amounts payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by Debtor and assignment to Buyer of the Assumed Contracts.

"Debtor" means Lonestar Dream, Inc. and Lonestar Taproot LLC.

"Estate" shall mean the Seller's bankruptcy estate consisting of all assets, rights and interests of the Debtor on the Petition Date in the Bankruptcy Case.

"Final Order" means an order or judgment, the operation or effect of which is not stayed, and as to which order or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired, and as to which no appeal or petition for review or motion for re-argument has been taken or been made and is pending for argument.

"Governmental Entity" means any federal, state, local or foreign political subdivision, court, administrative agency, board, bureau, commission, or department or other governmental authority or instrumentality.

"Law" means any law, statute, treaty, rule, directive, or regulation or Order of any Governmental Entity.

"Liability" means any liability or obligation, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due, regardless of when asserted.

"Material Adverse Effect" means any event, change, circumstance, occurrence, effect, development or state of facts that, individually or in the aggregate, (a) has had, or would reasonably be expected to have, a material adverse effect on the Purchased Assets or (b) would reasonably be expected to prevent, materially delay or materially impair the ability of Seller to consummate the transactions contemplated by this Agreement; *provided*, *however*, that none of the following, alone or in combination, shall be deemed to constitute, or be taken into account in determining whether there has been, a Material Adverse Effect: (i) changes in general economic, regulatory or political conditions or the financial, credit or securities markets in general (including changes in interest rates or exchange rates); (ii) changes generally affecting the industry in which the Business operates; (iii) changes in Law or GAAP (or authoritative interpretations thereof); (iv) any natural disaster, act of God, epidemic, pandemic or disease outbreak; (v) any act of terrorism, sabotage, cyberattack, military action or war; or (vi) the announcement or pendency of the transactions contemplated by this Agreement or the Bankruptcy Case; *provided*, *further*, that any event, change, circumstance, occurrence, effect, development or state of facts referred to in clauses (i) through (v) may be taken into account in determining whether a Material Adverse Effect has occurred to the extent such event, change, circumstance, occurrence, effect, development or state of facts has a disproportionate adverse effect on the Purchased Assets.

"Orders" means judgments, writs, decrees, compliance agreements, injunctions, rules, awards, settlement agreements, or orders of any Governmental Entity or arbitrator.

"Permits" means all permits, licenses, authorizations, registrations, franchises, approvals, certificates, variances, and similar rights obtained, or required to be obtained, from Governmental Entities.

"Proceeding" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, audit, examination, or investigation commenced, brought, conducted, or heard by or before, or otherwise involving, any court or other Governmental Entity or any arbitrator or arbitration panel.

"Person" shall be construed broadly and shall include an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or another entity including a Governmental Entity (or any department, agency, or political subdivision thereof).

"Tarbush Agreement" means that certain Aset Purchase Agreement, dated as of September 21, 2026, by and between LONESTAR DREAM INC., a Delaware corporation, as seller, and LONESTAR TAPROOT LLC, a Delaware limited liability company, as seller, and RAPTOR BASIN LLC, a Delaware limited liability company, as buyer, executed substantially contemporaneous herewith.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Sale Approval Order" means an order of the Bankruptcy Court in form and substance acceptable to Buyer, *inter alia*, (a) approving (i) this Agreement and the execution, delivery, and performance by Debtor of this Agreement and the other instruments and agreements contemplated hereby; (ii) the sale of the Purchased Assets to Buyer free and clear of all Liens; (iii) the assumption and assignment to Buyer of the Assumed Contracts on the terms set forth herein; and (b) determining that Buyer is a good faith purchaser.

**EXHIBIT A**
**Purchased Assets**

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| L001 | Lonestar Taproot | Land | 02/25/2022 | 02/25/2022 | | Priority Power Management LLC | 22.97 Acres in Sec 75, Block 34 Ward County |
| F002 | Lonestar Taproot | Furniture & Fixtures | 08/21/2024 | 08/21/2024 | | Fucheng Huaying Integrated Housing CO. | Steel Mobile Home |
| F003 | Lonestar Taproot | Furniture & Fixtures | 08/21/2024 | 08/21/2024 | | Fucheng Huaying Integrated Housing CO. | Steel Mobile Home |
| V001 | Lonestar Dream | Vehicles Dream | 01/18/2022 | 01/01/2022 | | | 2018 Toyota Tacoma |
| LI001 | Lonestar Taproot | Land Improvements | 03/31/2022 | 04/01/2022 | 24880 | All State Fence Company | All State Fence 6' 11 Chain Link Fence |
| LI003 | Lonestar Taproot | Land Improvements | 07/28/2022 | 08/01/2022 | 25347 | All State Fence Company | Heavy Welded Frames & Terminal & Gate Posts with Concrete |
| LI007 | Lonestar Taproot | Land Improvements | 12/31/2021 | 04/01/2022 | 2130-001 | Charis Engineering, LLC | Charis Engineering Civil, Mechanical, and Electrical Design |
| LI010 | Lonestar Taproot | Land Improvements | 12/31/2021 | 04/01/2022 | 1133 & 1159 & Change Order | Westwood Transport, LLC. | Access Road Pads |
| LI010 | Lonestar Taproot | Land Improvements | 01/31/2022 | 04/01/2022 | 1133 & 1159 & Change Order | Westwood Transport, LLC. | Access Road Pads Change Order 1 - Pyote HWY Changes and Caliche Pit Equip |
| LI011 | Lonestar Taproot | Land Improvements | 04/06/2022 | 05/01/2022 | 1201 | Westwood Transport, LLC. | Grading, Pad & Main Entrance Final Payment 30% + Change Orders |
| LI013 | Lonestar Taproot | Land Improvements | 05/23/2022 | 06/01/2022 | Change Order 10 | Westwood Transport, LLC. | Main Entrance & Electrician Road Pad |
| LI014 | Lonestar Taproot | Land Improvements | 06/02/2022 | 07/01/2022 | 1230 | Westwood Transport, LLC. | Loads of Pea Gravel Delivery & Labor |
| BD001 | Lonestar Taproot | Land Improvements | 01/31/2022 | 04/01/2022 | 20688408 | Elite Supply Partners Inc | 5" 134W 304SS Pipes Pyote |
| BD002 | Lonestar Taproot | Buildings | 03/31/2022 | 04/01/2022 | ICJE4 | Lonestar Dream Inc. | Chao Suan Pyote Site 3D Model |
| BD004 | Lonestar Taproot | Buildings | 12/31/2021 | 01/01/2022 | TG00147 | Terracon Consultants, Inc. | Terracon Consultants, Inc. Geotechnical Pyote |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| BD005 | Lonestar Taproot | Buildings | Various | 01/01/2023 | Pyote Building 1 | JNL Steel Components, Inc/Delta Overhead Doors/West Tex Field Services, LLC | Immersion Building 1 |
| BD006 | Lonestar Taproot | Buildings | Various | 01/01/2023 | Pyote Building 2 | West Tex Field Services, LLC/JNL Steel Components, Inc/Westwood Transport, LLC. | Immersion Building 2 |
| BD007 | Lonestar Taproot | Buildings | 04/06/2022 | 05/01/2022 | Change Order 1 & 2 | West Tex Field Services, LLC | Pyote Pump House & Poly Pipes (Change Order #2) |
| TF003 | Lonestar Taproot | Transformers | 02/28/2022 | 04/01/2022 | 420382 | Alamo Transformer Supply Company Inc. | 500KVA 12470Y 208Y/120 3 Phase Padmount Serial #72112393552 Installed |
| TF004 | Lonestar Taproot | Transformers | 01/25/2022 | 04/01/2022 | INV-85345 | Maddox Industrial Transformer | MT13798-S 500 kVA Padmount Transformer HV: 24940 GY 14400 LV: 480 Y 277 Installed |
| TF031 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100095 Installed in Pyote |
| TF032 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100109 Installed in Pyote |
| TF033 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100101 Installed in Pyote |
| TF034 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100102 Installed in Pyote |
| TF035 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100100 Installed in Pyote |
| TF036 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100110 Installed in Pyote |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| TF037 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100099 Installed in Pyote |
| TF038 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100096 Installed in Pyote |
| TF039 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100104 Installed in Pyote |
| TF040 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100105 Installed in Pyote |
| TF041 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100103 Installed in Pyote |
| TF042 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100112 Installed in Pyote |
| TF043 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100098 Installed in Pyote |
| TF044 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100114 Installed in Pyote |
| TF045 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100120 Installed in Pyote |
| TF046 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100134 Installed in Pyote |
| TF047 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100107 Installed in Pyote |
| TF048 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100141 Installed in Pyote |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| TF050 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100097 Installed in Pyote |
| TF051 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100123 Installed in Pyote |
| TF052 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100137 Installed in Pyote |
| TF053 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100125 Installed in Pyote |
| TF054 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100113 Installed in Pyote |
| TF055 | Lonestar Taproot | Transformers | 09/20/2021 | 04/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100106 Installed in Pyote |
| CN017 | Lonestar Taproot | Computer & Network Equipment | 03/31/2022 | 04/01/2022 | ICJE4 | Lonestar Dream Inc. | Chao Suan Cisco Network Equipment |
| CN018 | Lonestar Taproot | Computer & Network Equipment | 03/31/2022 | 04/01/2022 | ICJE4 | Lonestar Dream Inc. | Chao Suan H3C Network Equipment |
| CN020 | Lonestar Taproot | Computer & Network Equipment | 02/28/2022 | 04/01/2022 | INET0013435 | Infrastructure Networks Inc. | Infrastructure Networks Internet Installation Pyote |
| CN021 | Lonestar Taproot | Computer & Network Equipment | 08/01/2022 | 09/01/2022 | INET0015587 | Infrastructure Networks Inc. | Installation, Hardware, Fasteners, Connectors |
| CN022 | Lonestar Taproot | Computer & Network Equipment | 10/24/2022 | 11/01/2022 | IN-00062689 | FiberLight, LLC | Fiber Installation |
| TM001 | Lonestar Taproot | Tools, Machinery & Equipment | 02/16/2022 | 04/01/2022 | 22-0013 | Crane Monsters Corp | Used 2009 Grove RT700E Rough Terrain Crane |
| TM002 | Lonestar Taproot | Tools, Machinery & Equipment | 06/04/2022 | 09/01/2022 | 22-0035Tarbush | Crane Monsters Corp | Used 2009 Tadano GR600SL Crane Tarbush |
| TM003 | Lonestar Taproot | Tools, Machinery & Equipment | 03/31/2022 | 04/01/2022 | 203629654-001 | United Rentals Power & HVAC | Skytrak 10054 Power & HVAC Forklift Serial #: 0160062628 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| TM006 | Lonestar Taproot | Tools, Machinery & Equipment | 03/01/2022 | 04/01/2022 | 1209622-0001 | Texas First Rental | 100 KW (125 KWA) Tow Generator Model XQ100N Serial #: 0D4D02621 VIN:16MPF1120CD065102 |
| TM009 | Lonestar Taproot | Tools, Machinery & Equipment | 06/06/2022 | 07/01/2024 | INV0152 | CNO Technologies, LLC | Camera Installation Labor, Travel and Materials |
| TM010 | Lonestar Taproot | Tools, Machinery & Equipment | 12/01/2025 | 12/01/2025 | | Mars Dream | Forklift Huayee Model HYD20 2024 SN#HY24082231 |
| V004 | Lonestar Taproot | Vehicles Taproot | 05/31/2022 | 06/01/2022 | 03-492978 | National Storage Tank, Inc. | Nationwide Trailers 25' Low- Pro Flatdeck with Duals $15,700.22 + $1,744.47 S/N: 4P53F3425N1382655 |
| V005 | Lonestar Taproot | Vehicles Taproot | 05/31/2022 | 06/01/2022 | 09-494694 | National Storage Tank, Inc. | Nationwide Trailers Look CP,CR,7X16 Yr: 2023 S/N: 53BMTEA23PR010745 |
| V010 | Lonestar Taproot | Vehicles Taproot | 04/22/2022 | 09/01/2022 | 1K00815 | Ewald Kubota Inc. | Kubota RTV-XG850SLAS22 |
| HD041 | Lonestar Taproot | Cooling System - Hydro | 12/31/2021 | 04/01/2022 | 5964 | Elite Drillers Corporation | Pyote Water Well - Drilling of Water Well and Pump Installation |
| HD042 | Lonestar Taproot | Cooling System - Hydro | 05/27/2022 | 06/01/2022 | 6035 | Elite Drillers Corporation | Pyote Water Well - Drilling of Water Well and Pump Installation North Well |
| HD043 | Lonestar Taproot | Cooling System - Hydro | 01/13/2022 | 04/01/2022 | ECT104-18 | East Coast Tank | East Coast Tank Water Storage Tanks 39’6"D x 10’7"H |
| HD044 | Lonestar Taproot | Cooling System - Hydro | 01/13/2022 | 04/01/2022 | ECT104-18 | East Coast Tank | East Coast Tank Water Storage Tanks 39’6"D x 10’7"H |
| HD045 | Lonestar Taproot | Cooling System - Hydro | 02/28/2022 | 04/01/2022 | 21-152-F | National Storage Tank, Inc. | National Storage Tank 102" Dia 80" Heigh 2,500 Gallon Water Tank |
| HD046 | Lonestar Taproot | Cooling System - Hydro | 02/28/2022 | 04/01/2022 | 21-152-F | National Storage Tank, Inc. | National Storage Tank 102" Dia 80" Heigh 2,500 Gallon Water Tank |
| HD047 | Lonestar Taproot | Cooling System - Hydro | 02/28/2022 | 04/01/2022 | 21-152-F | National Storage Tank, Inc. | National Storage Tank 102" Dia 80" Heigh 2,500 Gallon Water Tank |
| HD048 | Lonestar Taproot | Cooling System - Hydro | 02/28/2022 | 04/01/2022 | 21-152-F | National Storage Tank, Inc. | National Storage Tank 102" Dia 80" Heigh 2,500 Gallon Water Tank |
| HD049 | Lonestar Taproot | Cooling System - Hydro | 02/28/2022 | 04/01/2022 | 21-152-F | National Storage Tank, Inc. | National Storage Tank 102" Dia 80" Heigh 2,500 Gallon Water Tank |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| HD050 | Lonestar Taproot | Cooling System - Hydro | 02/28/2022 | 04/01/2022 | 21-152-F | National Storage Tank, Inc. | National Storage Tank 102" Dia 80" Heigh 2,500 Gallon Water Tank |
| HD051 | Lonestar Taproot | Cooling System - Hydro | 02/28/2022 | 04/01/2022 | 21-152-F | National Storage Tank, Inc. | National Storage Tank 102" Dia 80" Heigh 2,500 Gallon Water Tank |
| HD055 | Lonestar Taproot | Cooling System - Hydro | 03/14/2022 | 04/01/2022 | 8100709193 | Tigerflow Systems, LLC | Tigerflow Systems Tigerflow VMS Pump in Pyote Pump House |
| HD056 | Lonestar Taproot | Cooling System - Hydro | 03/14/2022 | 04/01/2022 | 8100709193 | Tigerflow Systems, LLC | Tigerflow Systems Tigerflow VMS Pump in Pyote Pump House |
| HD057 | Lonestar Taproot | Cooling System - Hydro | 03/14/2022 | 04/01/2022 | 8100709193 | Tigerflow Systems, LLC | Tigerflow Systems Tigerflow VMS Pump in Pyote Pump House |
| HD058 | Lonestar Taproot | Cooling System - Hydro | 03/14/2022 | 04/01/2022 | 8100709193 | Tigerflow Systems, LLC | Tigerflow Systems Tigerflow VMS Pump in Pyote Pump House |
| HD059 | Lonestar Taproot | Cooling System - Hydro | 03/14/2022 | 04/01/2022 | 8100709193 | Tigerflow Systems, LLC | Tigerflow Systems Tigerflow VMS Pump in Pyote Pump House |
| HD060 | Lonestar Taproot | Cooling System - Hydro | 03/14/2022 | 04/01/2022 | 8100709193 | Tigerflow Systems, LLC | Tigerflow Systems Tigerflow VMS Pump in Pyote Pump House |
| HD061 | Lonestar Taproot | Cooling System - Hydro | 03/14/2022 | 04/01/2022 | 8100709193 | Tigerflow Systems, LLC | Tigerflow Systems Tigerflow VMS Pump in Pyote Pump House |
| HD062 | Lonestar Taproot | Cooling System - Hydro | 03/14/2022 | 04/01/2022 | 8100709193 | Tigerflow Systems, LLC | Tigerflow Systems Tigerflow VMS Pump in Pyote Pump House |
| HD063 | Lonestar Taproot | Cooling System - Hydro | 03/14/2022 | 04/01/2022 | 8100709193 | Tigerflow Systems, LLC | Tigerflow Systems Tigerflow VMS Pump in Pyote Pump House |
| HD064 | Lonestar Taproot | Cooling System - Hydro | 03/31/2022 | 04/01/2022 | ICJE4 | Lonestar Dream Inc. | RO System - Chao Suan Reverse Osmosis Water Purification Equip |
| HD065 | Lonestar Taproot | Cooling System - Hydro | 06/18/2022 | 07/01/2022 | Brackish Water | WLT Trading LLC | RO System - Brackish Water System Purification & MingYaMai Water Treatment Equip $10.382.51 + WLT Logistic $27,662.12 |
| HD066 | Lonestar Taproot | Cooling System - Hydro | Various | 07/01/2022 | 1179 | Westwood Transport, LLC./LIV Consulting/ | Hydro Antboxes installation |
| HD067 | Lonestar Taproot | Cooling System - Hydro | 12/02/2022 | 02/01/2022 | CapLbrRecls | Lonestar Dream Inc. | To Allocate Capitalized Labor to the Cooling Systems |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| IM001 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252869 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM002 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252870 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM003 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252871 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM004 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252872 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM005 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252873 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM006 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252874 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM007 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252875 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM008 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252876 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM009 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252877 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM010 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252878 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM011 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252879 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM012 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252880 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM013 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252881 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM014 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252882 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM015 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252883 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM016 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252884 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| IM017 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252885 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM018 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252886 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM019 | Lonestar Taproot | Cooling System - Immersion | 04/12/2022 | 05/01/2022 | 1412252887 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM020 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252888 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM021 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252889 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM022 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252890 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM023 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252891 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM024 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252892 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM025 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252893 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM026 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252894 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM027 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252895 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM028 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252896 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM029 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252897 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM030 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252898 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM031 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252899 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM032 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252900 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| IM033 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252901 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM034 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252902 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM035 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252903 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM036 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252904 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM037 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252905 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM038 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252906 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM039 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252907 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM040 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252908 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM041 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252909 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM042 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252910 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM043 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252911 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM044 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252912 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM045 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252913 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM046 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252914 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM047 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252915 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM048 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252916 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| IM049 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252917 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM050 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252918 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM051 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252919 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM052 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252920 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM053 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252921 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM054 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252922 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM055 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252923 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM056 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252924 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM057 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252925 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM058 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252926 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM059 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252927 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM060 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252928 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM061 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252929 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM062 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252930 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM063 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252931 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM064 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252932 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| IM065 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252933 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM066 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252934 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM067 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252935 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM068 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252936 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM069 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252937 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM070 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252938 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM071 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252939 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM072 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252940 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM073 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252941 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM074 | Lonestar Taproot | Cooling System - Immersion | 05/01/2022 | 10/01/2023 | 1412252942 | Pennzoil-Quaker State Company | Shell Immersion Cooling Fluid S3X |
| IM108 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-001 |
| IM109 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-002 |
| IM110 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-003 |
| IM111 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-004 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| IM112 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-005 |
| IM113 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-006 |
| IM114 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-007 |
| IM115 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-008 |
| IM116 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-009 |
| IM117 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-010 |
| IM118 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-011 |
| IM119 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-012 |
| IM120 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-013 |
| IM121 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-014 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| IM122 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-015 |
| IM123 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-016 |
| IM124 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-017 |
| IM125 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-018 |
| IM126 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-019 |
| IM127 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-020 |
| IM128 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-021 |
| IM129 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-022 |
| IM130 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-023 |
| IM131 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-024 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| IM132 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-025 |
| IM133 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-026 |
| IM134 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-027 |
| IM135 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-028 |
| IM136 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-029 |
| IM137 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-030 |
| IM138 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-031 |
| IM139 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-032 |
| IM140 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-033 |
| IM141 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-034 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| IM142 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-035 |
| IM143 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-036 |
| IM144 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-040 |
| IM145 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-041 |
| IM146 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-042 |
| IM147 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-043 |
| IM148 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-044 |
| IM149 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-045 |
| IM150 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-046 |
| IM151 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-047 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| IM152 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-048 |
| IM153 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-049 |
| IM154 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-050 |
| IM155 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-051 |
| IM156 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-052 |
| IM157 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-053 |
| IM158 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-054 |
| IM159 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-055 |
| IM160 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-056 |
| IM161 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-057 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| IM162 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-058 |
| IM163 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-059 |
| IM164 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-060 |
| IM165 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-061 |
| IM166 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-062 |
| IM167 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-063 |
| IM168 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-064 |
| IM169 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | 10/01/2023 | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-065 |
| IM170 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-066 |
| IM171 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-067 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| IM172 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-068 |
| IM173 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-069 |
| IM174 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-070 |
| IM175 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-071 |
| IM176 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: HR20211272-072 |
| IM177 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: JJ20240972-001 |
| IM178 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: JJ20240972-002 |
| IM179 | Lonestar Taproot | Cooling System - Immersion | 05/30/2022 | | PALLBAC21FA023 | Shanghai Foreign Trade Enterprises | Dry Cooler HDVD891-0750, 754 kw. Shandong Volks MODEL-HDVD891-0750 SN: JJ20240972-003 |
| IM231 | Lonestar Taproot | Cooling System - Immersion | 03/31/2022 | | | Shandong Volks Air Conditioner / Chao Suan | LQJZ-700 Dry Cooler Chao Suan WK52 |
| IM232 | Lonestar Taproot | Cooling System - Immersion | 04/01/2022 | | | Shandong Volks Air Conditioner / Chao Suan | LQJZ-700 Dry Cooler Chao Suan WK53 |
| IM252 | Lonestar Taproot | Cooling System - Immersion | 08/01/2022 | 01/01/2023 | | Beijing Pin Yue | Oil Tanks - Platform |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| IM253 | Lonestar Taproot | Cooling System - Immersion | 08/01/2022 | 01/01/2023 | | Beijing Pin Yue | Oil Tanks - Platform |
| IM254 | Lonestar Taproot | Cooling System - Immersion | 08/01/2022 | 01/01/2023 | | Beijing Pin Yue | Oil Tanks - Platform |
| IM255 | Lonestar Taproot | Cooling System - Immersion | 08/01/2022 | 01/01/2023 | | Beijing Pin Yue | Oil Tanks - Platform |
| IM256 | Lonestar Taproot | Cooling System - Immersion | 08/01/2022 | 01/01/2023 | | Beijing Pin Yue | Oil Tanks - Platform |
| IM257 | Lonestar Taproot | Cooling System - Immersion | 08/01/2022 | 01/01/2023 | | Beijing Pin Yue | Oil Tanks - Platform |
| IM258 | Lonestar Taproot | Cooling System - Immersion | 08/01/2022 | 01/01/2023 | | | Immersion Cooling Pump |
| IM259 | Lonestar Taproot | Cooling System - Immersion | 02/07/2023 | 03/01/2023 | Ramp13 | | 1,040 ft- 600MCM Alum Wire, Alum wire for Immersion Building 1 |
| IM260 | Lonestar Taproot | Cooling System - Immersion | 04/01/2022 | 05/01/2022 | CapLbrRecls | Lonestar Dream Inc. | To Allocate Capitalized Labor to the Cooling Systems |
| IM291 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM292 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM293 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM294 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM295 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM296 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| IM297 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM298 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM299 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM300 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM301 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM302 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM303 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM304 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM305 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM306 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM307 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM308 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| IM309 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM310 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM311 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM312 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM313 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM314 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM315 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM316 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM317 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM318 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM319 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |
| IM320 | Lonestar Taproot | Fixed Asset Clearing | 04/30/2024 | | | Tianjin Electric Eel Technology Co., Ltd. | 60 Control Cabinet @ $16,841.14 each Immersion Cooling $1,010,468.4 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| AIR001 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100313 Installed Pyote |
| AIR002 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100355 Installed Pyote |
| AIR003 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100530 Installed Pyote |
| AIR004 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100606 Installed Pyote |
| AIR005 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100503 Installed Pyote |
| AIR006 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100519 Installed Pyote |
| AIR007 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100587 Installed Pyote |
| AIR008 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100376 Installed Pyote |
| AIR009 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100442 Installed Pyote |
| AIR010 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100458 Installed Pyote |
| AIR011 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100400 Installed Pyote |
| AIR012 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100490 Installed Pyote |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| AIR013 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100416 Installed Pyote |
| AIR014 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100360 Installed Pyote |
| AIR015 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100437 Installed Pyote |
| AIR016 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100566 Installed Pyote |
| AIR017 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100329 Installed Pyote |
| AIR018 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100463 Installed Pyote |
| AIR019 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100334 Installed Pyote |
| AIR020 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100592 Installed Pyote |
| AIR021 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100545 Installed Pyote |
| AIR022 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100421 Storage Pyote |
| AIR023 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100340 Storage Pyote |
| AIR024 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100397 Storage Pyote |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| AIR025 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100550 Storage Pyote |
| AIR026 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100571 Storage Pyote |
| AIR027 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 5100524 Storage Pyote |
| AIR028 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 Pyote Coms Box |
| AIR108 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 04/01/2022 | 1877 | Tungsten Construction, LLC/LIV Consulting | Setup Antboxes & Connect to the Transformers |
| AIR109 | Lonestar Taproot | Cooling System - Air | 01/31/2022 | 04/01/2022 | 13399&13433&13457 | NTACT Constructors, LTD | Stainless Air Cooler Pipes Fabrication |
| AIR138 | Lonestar Taproot | Cooling System - Air | 04/01/2022 | 02/01/2022 | CapLbrRecls | Lonestar Dream Inc. | To Allocate Capitalized Labor to the Cooling Systems |
| CIP001 | Lonestar Taproot | Construction in Progress | 02/28/2022 | 04/01/2022 | PB50401 | JNL Steel Components, Inc | Building #3 Materials |
| CT001 | Lonestar Taproot | Containers | 05/31/2022 | 06/01/2022 | HON22053101 | HK Honortrans Development LTD | 40HD Container |
| CT003 | Lonestar Taproot | Containers | 03/31/2023 | 04/01/2023 | TMPShanghaiIde | Shanghai Ide Industrial Co., Ltd | 20 Ft Container GESU 3596639 |
| CT004 | Lonestar Taproot | Containers | 03/25/2022 | 04/01/2022 | 77655 | ASC Equipment | ASC Equipment 8'x20' One Trip Containers |
| CT005 | Lonestar Taproot | Containers | 02/14/2022 | 04/01/2022 | 76744 | ASC Equipment | ASC Equipment 8'x40' Used Containers x 2 @ $6,500 |
| CT006 | Lonestar Taproot | Containers | 02/14/2022 | 04/01/2022 | 76744 | ASC Equipment | ASC Equipment 8'x40' Used Containers x 2 @ $6,500 |
| CT007 | Lonestar Taproot | Containers | 02/28/2022 | 04/01/2022 | 77184 | ASC Equipment | ASC Equipment 8'x40' Used Containers x 3 @ $6,500 |
| CT008 | Lonestar Taproot | Containers | 02/28/2022 | 04/01/2022 | 77184 | ASC Equipment | ASC Equipment 8'x40' Used Containers x 3 @ $6,500 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| CT009 | Lonestar Taproot | Containers | 02/28/2022 | 04/01/2022 | 77184 | ASC Equipment | ASC Equipment 8'x40' Used Containers x 3 @ $6,500 |
| CT010 | Lonestar Taproot | Containers | 06/03/2024 | 07/01/2024 | | Mengyue Duan | Qingdao Nuoran 40GP Used Container RMB 13,500 04.24.2024 |
| CT011 | Lonestar Taproot | Containers | 06/03/2024 | 07/01/2024 | | Mengyue Duan | Qingdao Nuoran 40HQ Used Container RMB 16,500 04.24.2024 |
| CT012 | Lonestar Taproot | Containers | 06/03/2024 | 07/01/2024 | | Mengyue Duan | Qingdao Nuoran 40HC Used Container RMB 19,500 05.21.2024 |
| CT013 | Lonestar Taproot | Containers | 06/03/2024 | 07/01/2024 | | Mengyue Duan | Qingdao Nuoran 40HQ Used Container RMB 16,500 04.24.2024 |
| CT014 | Lonestar Taproot | Containers | 06/03/2024 | 07/01/2024 | | Mengyue Duan | Qingdao Nuoran 40HQ Used Container RMB 16,500 04.24.2024 |
| CT015 | Lonestar Taproot | Containers | 06/03/2024 | 07/01/2024 | | Mengyue Duan | Qingdao Nuoran 40HQ Used Container RMB 16,500 04.24.2024 |
| CT016 | Lonestar Taproot | Containers | 06/03/2024 | 07/01/2024 | | Mengyue Duan | Qingdao Nuoran 40HQ Used Container RMB 16,500 04.24.2024 |
| CT017 | Lonestar Taproot | Containers | 07/22/2024 | 09/01/2024 | RJY-LT-202401 | Qingdao Ruijunyuan Industry Trade Ltd | Qingdao Ruijunyuan 40HC New Container Pyote |
| CT018 | Lonestar Taproot | Containers | 08/27/2024 | 09/01/2024 | LTSE20240827C | Shandong Liangtai Logistics Co., Ltd | Shandong Liangtai 20 GP Used Containers Pyote RMB 11,000 |
| CT019 | Lonestar Taproot | Containers | 08/27/2024 | 09/01/2024 | LTSE20240827C | Shandong Liangtai Logistics Co., Ltd | Shandong Liangtai 40 HQ Used Containers Pyote RMB 21,500 |
| CT020 | Lonestar Taproot | Containers | 09/23/2024 | 10/01/2024 | 20240923001 | Qingdao Jinjian Express Logistics | Qingdao Jinjian 40 HQ Used Containers Pyote |
| CT021 | Lonestar Taproot | Containers | 09/23/2024 | 10/01/2024 | 20240923001 | Qingdao Jinjian Express Logistics | Qingdao Jinjian 40 HQ Used Containers Pyote |
| CT022 | Lonestar Taproot | Containers | 09/23/2024 | 10/01/2024 | 20240923001 | Qingdao Jinjian Express Logistics | Qingdao Jinjian 40 HQ Used Containers Pyote |
| CT023 | Lonestar Taproot | Containers | 09/23/2024 | 10/01/2024 | 20240923001 | Qingdao Jinjian Express Logistics | Qingdao Jinjian 40 HQ Used Containers Pyote |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| CT024 | Lonestar Taproot | Containers | 09/23/2024 | 10/01/2024 | 20240923001 | Qingdao Jinjian Express Logistics | Qingdao Jinjian 40 HQ Used Containers Pyote |
| CT025 | Lonestar Taproot | Containers | 09/23/2024 | 10/01/2024 | 20240923001 | Qingdao Jinjian Express Logistics | Qingdao Jinjian 40 HQ Used Containers Pyote |
| CT026 | Lonestar Taproot | Containers | 02/11/2025 | 03/01/2025 | QDNR20241231-01 | Noran Qingdao Supply Chain Mgmt. Co., Ltd | 40 HQ Used Container Tarbush USDT |

**EXHIBIT B**
**Assumed Contracts**

| # | VDR section | Contract / file name | Type | Filename clues / review aid | Location |
|---|---|---|---|---|---|
| 1 | 1. Land and Lease | Pyote - Special Warranty Deed Lonestar Taproot 22.97_62.5 Acres 06.23.23 | PDF | Land deed; Pyote; 62.5 acres; dated 06.23.23 | Pyote |
| 2 | 1. Land and Lease | Pyote - Special Warranty Deed Lonestar Taproot 85.47 Acres 02.25.22 | PDF | Land deed; Pyote; 85.47 acres; dated 02.25.22 | Pyote |
| 27 | 4. Vendors | 11. Tejas Extreme Logistics LLC 01.30.26_Ongoing WO | PDF | Vendor work order; ongoing; dated 01.30.26 | Pyote |

**EXHIBIT C**
**Excluded Assets**

1. All cash and cash equivalents, wherever located.

2. All digital currency and the proceeds thereof.

3. All prepaid expenses, deposits, including Regional Electricity Providers deposits, and retainers.

4. All accounts including accounts receivable

5. The schedule of fixed assets listed in the Excel file labeled 'LDI_LDT Excluded Asset List 12/31/2025' filed in the Data Room.

6. All of Sellers' rights, interests, claims, demands, and causes of action, including but not limited to those under all contracts and leases other than Assumed and Assigned Contracts.

7. All Avoidance Actions, including without limitation, all rights, claims, and causes of action arising under or relating to Chapter 5 of Title 11 of the United States Code, including, without limitation, all avoidance actions and claims arising under Sections 502(d), 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, and any other avoidance, recovery, or related claims or causes of action under the Bankruptcy Code, together with all proceeds, recoveries, and other rights arising therefrom.

8. All claims for and rights to receive tax refunds with respect to taxable periods or portions thereof on or prior to the Closing Date.

9. All the minute books, corporate and ownership books and record and accounting books and records of the Seller and copies of all other Books and Records necessary for Seller to administer its estate.

10. All other assets which are not purchased by a buyer.

**EXHIBIT D**
**Assumed Liabilities**

None.

**EXHIBIT E**
**Litigation Claims**

1. Gao v. Pan et al., Cause No. D-1-GN-24-003302 (98th District Court, Travis County, Texas)

2. Saturn Data LLC v. Lonestar Dream et al., Case No. 493-08827-2025 (493rd District Court, Collin County, Texas)

3. DBR Land LLC v. Lonestar Taproot LLC and Lonestar Dream Inc., Case No. P-13332-112-CV (112th District Court, Pecos County, Texas)

4. SIAC Arbitration No. 532 of 2025 (ARB532/25/ZY): Liang, Lin v. Poolin Technology PTE. LTD., Singapore International Arbitration Centre, Singapore

5. SIAC Arbitration No. 245 of 2022 (ARB/245/22/ALS): Li Bei v. Poolin Technology PTE. LTD., Singapore International Arbitration Centre, Singapore

**EXHIBIT F**
**Environmental Matters**

1. Phase 1 Environmental Site Assessment dated January 23, 2026
2. That certain Landowner Questionnaire dated August 5, 2026

**EXHIBIT G-1**
**Exemption Affidavit**
**(To Be Provided by Seller and Attached At Closing)**

**EXHIBIT G-2**
**Property Manager Lien Waiver**
**(To Be Provided by Seller and Attached At Closing)**

**EXHIBIT H**
**Seller's Representation Update Certificate**
**(To Be Provided by Seller and Attached At Closing)**

**EXHIBIT I**
**Escrow Agreement**

**Escrow Agreement**

This Escrow Agreement ("Agreement") is entered into as of this 23rd day of September, 2026 by and among LONESTAR DREAM INC., a Delaware corporation (the "Seller 1"), and LONESTAR TAPROOT LLC, a Delaware limited liability company ("Seller 2" and together with "Seller 1", each a "Seller", collectively, "Sellers"), MESQUITE FALCON LLC, a Delaware limited liability company ("Buyer") and Archer & Greiner, P.C. ("Escrow Agent"). Any terms not defined herein shall have the meaning ascribed to it in the Purchase Agreement (as defined below).

The Seller and the Buyer intend to enter into an Asset Purchase Agreement, dated as of September 21, 2026 (the "Purchase Agreement") pursuant to which Seller intends to sell and Buyer intends to purchase certain Purchased Assets including personal property, Pyote Property, equipment and other assets located at that certain real property commonly known as and located at 3072 FM 1927, Pyote, TX 79777 in Ward County, Texas. The Seller and the Buyer desire for Escrow Agent to hold in escrow the Good Faith Deposit of $2,775,000.00 (USD) (inclusive of amounts already deposited by Buyer and held by the Escrow Agent) and to disburse the same in accordance with the terms and provisions of this Agreement.

On July 22, 2026 (the "Petition Date"), Seller commenced a voluntary case under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") (the "Bankruptcy Case"). Subject to Seller's receipt of any higher and better offer for the Purchased Assets (as defined in the Purchase Agreement) in accordance with the Bidding Procedures and Bidding Procedures Order, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Purchased Assets in accordance with the Purchase Agreement and sections 105, 363, and 365 of the Bankruptcy Code

1. Delivery of Escrow Funds; Authorization of Escrow Agent. Buyer has delivered $792,500.00 (USD) of the Good Faith Deposit to Escrow Agent via wire transfer and shall deliver the balance of the Good Faith Deposit ($1,982,500.00 (USD)) to Escrow Agent via wire transfer within five (5) days from execution of the Purchase Agreement. The Good Faith Deposit shall be held by Escrow Agent in an interest-bearing account (the "Escrow Account"). The Good Faith Deposit together with any interest accrued thereon are hereinafter collectively referred to as the "Escrow Funds".

2. Release of Escrow Funds. Escrow Agent shall disburse the Escrow Funds in accordance with the provisions of this Agreement and the Purchase Agreement. Upon receipt of joint instructions from and executed by each of Seller and Buyer or their respective attorneys, in accordance with the Purchase Agreement, the Escrow Agent shall disburse the Escrow Funds in accordance with such notice, which shall include the name of each payee, the amount to be paid to each payee and wire instructions, if any. In no event shall the Escrow Agent be required to disburse any of the Escrow Funds unless and until it has confirmed and is reasonably satisfied that they are being disbursed to the proper party pursuant to this Agreement and the Purchase Agreement. All disbursements of the Escrow Funds shall be made via check or wired funds.

3. Disagreements. In the event of a disagreement about the interpretation of this Agreement or about the duties, rights and obligations of any action contemplated by Escrow Agent under this Agreement, or if there is a dispute between Seller and Buyer regarding the Escrow Funds, or the Escrow Agent receives conflicting demands or instructions with respect thereto, Escrow Agent may withhold disbursement or delivery of the same to either Party until Escrow Agent receives either: (a) joint written instructions from Seller and Buyer with respect to the disbursement or delivery of the Escrow Funds or any part thereof; or (b) an order entered by the Bankruptcy Court directing the disbursement or delivery of the Escrow Funds or any part thereof and thirty(30) days have passed since entry of such order without further court order directing the disposition thereof. Escrow Agent shall be entitled to rely upon the decision of

such court with respect to the disposition and entitlement of the Escrow Funds. The Parties acknowledge and agree that the Good Faith Deposit shall not be deemed to constitute property of Seller's bankruptcy estate under the United States Bankruptcy Code, and that such estate shall have no interest of any kind, under Chapter 5 of the Bankruptcy Code or applicable law (whether equitable or otherwise), in and to the Good Faith Deposit absent Bankruptcy Court order directing to the contrary, which order has not been stayed or overturned within 30 days of entry.

4. Scope of Responsibility. Escrow Agent is obligated only to perform the duties specifically set forth in this Agreement, which shall be deemed purely ministerial in nature. Under no circumstances will Escrow Agent be deemed to be a fiduciary to any Party or any other person under this Agreement. Escrow Agent will not be responsible or liable for the failure of any Party to perform in accordance with the Purchase Agreement, this Agreement, or any other agreement. Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the other terms and conditions of the Purchase Agreement or any other instrument or document other than this Agreement, whether or not a copy thereof has been provided to Escrow Agent; and Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of the Purchase Agreement or any other instrument or document. This Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of Escrow Agent shall be inferred or implied from the terms of this Agreement, the Purchase Agreement, or any other agreement.

5. Reliance. Escrow Agent shall not be liable for any action taken or not taken by it in accordance with the direction or consent of the Parties or their respective attorneys (including office staff). Escrow Agent shall not be liable for acting or refraining from acting upon any notice, request, consent, direction, requisition, certificate, order, affidavit, letter, or other paper or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, without further inquiry into the person or persons' authority.

6. Indemnification. The Sellers, jointly and severally, shall indemnify, defend and hold harmless Escrow Agent from and against any and all loss, liability, cost, damage and expense, including, without limitation, in-house and/or outside attorneys' fees and expenses or other professional fees and expenses which Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against Escrow Agent, arising out of or relating in any way to this Agreement, or any transaction to which this Agreement relates, unless such loss, liability, cost, damage or expense shall have been finally adjudicated to have been directly caused by the willful misconduct or gross negligence of Escrow Agent. The provisions of this paragraph shall survive the resignation or removal of Escrow Agent and the termination of this Agreement. In the event Escrow Agent incurs legal fees in connection with the enforcement or interpretation of any provision of this agreement or to defend against any claim or allegation that Escrow Agent breached any duty or obligation under this agreement or otherwise, then Escrow Agent shall be entitled to recover from the Sellers Escrow Agent's actual costs and expenses, including attorneys' fees, incurred by Escrow Agent in connection therewith, with interest thereon from the date incurred. For purposes hereof, costs, expenses, and attorneys' fees shall include, without limitation, the actual costs and expenses, including attorneys' fees, incurred in recovering such costs, expenses, and attorneys' fees (including, without limitation, all judgment enforcement proceedings, contempt proceedings, garnishment, levy, debtor and third-party discovery and examinations, bankruptcy proceedings, and appellate proceedings).

7. Limitation of Liability. Escrow Agent shall not be liable, directly or indirectly, for, and the Parties hereby release Escrow Agent from, any (i) damages, losses or expenses arising out of the services provided hereunder, other than damages, losses or expenses which have been finally adjudicated to have directly resulted from Escrow Agent's gross negligence or willful misconduct, or (ii) special, indirect or consequential damages or losses of any kind whatsoever (including without limitation lost profits), even if the Escrow Agent has been advised of the possibility of such losses or damages and regardless of the form of action.

8. Resignation or Removal. Escrow Agent may resign by furnishing written notice of its resignation to the Parties, and the Parties may remove Escrow Agent by furnishing to Escrow Agent a joint written notice of Escrow Agent's removal along with payment of all fees and expenses to which the Escrow Agent is entitled through the date of termination. Such resignation or removal, as the case may be, shall be effective thirty (30) days after the delivery of such notice or upon the earlier appointment of a successor, and Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Funds and to deliver the same to a successor escrow agent as shall be appointed by the Parties, as evidenced by a joint written notice filed with Escrow Agent or in accordance with a court order. If the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following the delivery of such notice of resignation or removal, Escrow Agent shall have the right, but not the obligation to (a) petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the Parties; (b) deposit the Escrow Funds with the Clerk of the Bankruptcy Court in which any litigation relating to the Purchase Agreement is pending and/or (c) take such reasonable affirmative steps as it may, at its option, elect in order to terminate its duties as Escrow Agent, including, without limitation, the depositing of the Escrow Funds with a court of competent jurisdiction and the commencement of an action for interpleader (and the costs thereof shall be, and thereupon Depositary shall be released of and from all liability hereunder except for any previous gross negligence or willful misconduct.

9. Notices. All notices, requests, demands, and other communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by overnight delivery with a reputable national overnight delivery service, or (iii) by registered mail or by certified mail, return receipt requested, and postage prepaid, all at the addresses set forth below. It shall be the responsibility of each of the Parties to notify Escrow Agent and the other Parties in writing of any name or address changes. Communications shall be deemed to have been given on the date received.

Notices to Seller:

Lonestar Dream Inc.
Lonestar Taproot LLC

Attn: Michael DuFrayne, CRO
Email: mdufrayne@dufraynellc.com

and a copy to:

Archer & Greiner, P.C.

Attn: Stephen M. Packman, Esq.
Email: spackman@archerlaw.com

If to Buyer:
Attn: Jimmy Martini
Hut 8 Corp.
777 Brickell Ave, Floor 2
Miami, FL 33131
(jimmy.martini@hut8.com)

With a copy to:

Andrew M. Carty
Brown Rudnick LLP

Seven Times Square
New York, NY 10036
(acarty@brownrudnick.com)

If to Escrow Agent:

Archer & Greiner, P.C.

Attention: Stephen M. Packman, Esq.
Email: spackman@archerlaw.com

10. Amendments. This Agreement may not be changed, modified or terminated, nor may any provision hereunder be waived, except by an instrument executed by the parties hereto.

11. Counterparts. This Agreement may be executed in several counterparts, and all counterparts so executed shall constitute one agreement, binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart. The exchange of copies of this agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or via email transmission in Portable Document Format (.pdf) shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes.

12. Controlling Law. This Agreement shall be construed and enforced in accordance with the laws of the State of New York.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the day and year first written above.

**SELLER:**

LONESTAR DREAM INC.

By: ______________________
Name: Kathy Zhang
Title: COO

LONESTAR TAPROOT LLC

By: ______________________
Name: Kathy Zhang
Title: COO

**BUYER:**

MESQUITE FALCON LLC

By: ______________________
Name:
Title:

[Signatures continue on following page]

**ESCROW AGENT:**

Archer & Greiner, P.C.

By: /s/ Stephen M Packman
Name: Stephen M. Packman
Title: Partner

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** ("Agreement"), dated as of September 21, 2026 (the "Effective Date"), is made by and between LONESTAR DREAM INC., a Delaware corporation (the "Seller 1") and LONESTAR TAPROOT LLC, A Delaware Limited Liability Company (the "Seller 2" together with Seller 1, each a "Seller" and collectively, the "Sellers"), and RAPTOR BASIN LLC, a Delaware limited liability company (the "Buyer" and, together with Seller, collectively, the "Parties" and, individually, a "Party"). Capitalized terms used in this Agreement are as defined herein.

## RECITALS

**WHEREAS**, Seller was engaged in the business of, *inter alia*, crypto mining and hosting operations (the "Business") at the Tarbush Property set forth below through July 10, 2026.

**WHEREAS**, Seller is the occupant of that certain real property located at 4143 US Hwy 285, Fort Stockton, TX 79735 in Pecos County, Texas, (known as the "Tarbush Property").

**WHEREAS**, Seller is the owner of certain personal property, equipment and other assets located at the Tarbush Property and set forth on the **Exhibit "A"** attached hereto (the "Purchased Assets").

**WHEREAS**, on July 22, 2026 (the "Petition Date"), Seller commenced a voluntary case under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") (the "Bankruptcy Case").

**WHEREAS**, subject to Seller's receipt of any higher and better offer for the Purchased Assets (as defined herein) in accordance with the Bidding Procedures and Bidding Procedures Order, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Purchased Assets in accordance with this Agreement and sections 105, 363, and 365 of the Bankruptcy Code.

**WHEREAS,** the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement, are subject to entry of the Sale Approval Order and closing of the Adjacent Property PSA.

**NOW THEREFORE,** in consideration of the mutual covenants, representations, warranties, and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the Parties hereto agree as follows:

## ARTICLE I
## SALE OF ASSETS

I.1 Sale of Purchased Assets.

(a) On the Closing Date and subject to the terms and conditions and exclusions contained in this Agreement (including but not limited to Section I.3) and subject to Permitted Liens as defined herein, each Seller will sell, transfer, convey, assign, and deliver all of Seller's right, title, and interest in and to the Purchased Assets, free and clear of any and all interests, Claims, obligations, rights, encumbrances, pledges, and liens in, against or with respect to any of the Purchased Assets or each Seller having arisen, existed or accrued prior to and through the Closing Date, whether direct or indirect, absolute or contingent, choate or inchoate, known or unknown, matured or unmatured, liquidated or unliquidated, arising or imposed by agreement, understanding, law, equity, statute or otherwise and whether arising prior to, on or after the petition sate, including claims or liabilities otherwise arising under doctrines of successor liability, *de facto* merger or substantial continuity or liabilities or obligations arising under any law or orders (collectively, "Liens").

(b) The Purchased Assets include the following assets of Seller:

(i) The assets set forth on **Exhibit "A"** hereto;

(ii) the Power Rights associated with the Tarbush Property;

(iii) all rights under those executory contracts (the "Contracts") and personal property and commercial real property leases (the "Leases") set forth on **Exhibit "B"** attached hereto. The Contracts and Leases are herein, at times, collectively referred to as the "Assumed Contracts" and, individually, as an "Assumed Contract"; provided however, that Buyer may at any time prior to Closing remove any Assumed Contracts from **Exhibit "B"**. Upon removal, such Contracts or Leases shall no longer be an Assumed Contract;

(iv) all claims under existing insurance policies to the extent such policies may provide coverage or a defense with respect to the Purchased Assets;

(v) any and all transferable federal, state, local and foreign governmental Permits, authorizations, and approvals of Seller related to the Purchased Assets;

(vi) copies of documents relating to the Purchased Assets.

I.2 Instruments of Conveyance and Transfer.

(a) Upon the Closing, Seller shall deliver to Buyer possession of the Purchased Assets and convey to Buyer clear title to all of the Purchased Assets.

(b) At the Closing, Seller shall execute and deliver to Buyer a bill of sale and such endorsements, assignments, and other good and sufficient instruments of conveyance and transfer as are reasonably necessary to transfer, convey, and assign good and marketable title to Buyer of the Purchased Assets, free and clear of any and all Liens except for Permitted Liens.

I.3 Excluded Assets.

The Purchased Assets shall exclude all assets and interests of the Seller set forth on **Exhibit "C"** hereto (collectively, the "Excluded Assets").

I.4 Assumed Liabilities. As of the Closing, Buyer shall assume, and pay when due, all Cure Costs due on the Assumed Contracts and any other liabilities of Seller which Buyer has expressly agreed in writing to assume as set forth on **Exhibit "D"** (collectively, the "Assumed Liabilities"); provided however, that Buyer may at any time prior to Closing remove any Assumed Liabilities from Exhibit "D". Upon removal, such liabilities shall no longer be an Assumed Liability.

I.5 Excluded Liabilities. Notwithstanding anything to the contrary in this Agreement, except for the Assumed Liabilities set forth herein, Buyer shall not assume, or become obligated in any way to pay, any of Seller's liabilities, obligations, or debts of any kind whatsoever, whether accrued, absolute, contingent, or otherwise, whether known or unknown, whether due or to become due, and regardless of when or by whom asserted, including, without limitation, to the following (collectively, the "Excluded Liabilities"):

(a) any of Seller's liabilities under this Agreement, and any other agreements (written or oral) entered into by Seller other than the Assumed Contracts.

(b) any liabilities from the Seller's business ("Business") that took place prior to the Closing;

(c) any note payable in favor of, or any other amount owed to, any of Seller's lenders or creditors;

(d) any liability of Seller with respect to any Taxes;

(e) any of Seller's liabilities (i) arising by reason of any violation or alleged violation of any federal, state, or foreign law, or any requirement of any Governmental Entity, (ii) arising by reason of any breach or alleged breach by Seller of any contract, agreement, license, commitment, instrument, judgment, order, or decree, (iii) arising under any environmental, health, and safety laws, regulations, and/or requirements;

(f) any liability of Seller arising out of the injury to or death of any individual, or damage to or destruction of any property, whether based on negligence, breach of warranty, strict liability, enterprise liability, or any other legal or equitable theory, and arising from or related to products (or parts or components thereof) distributed or otherwise disposed of or for services performed by Seller, to the extent any of such Liabilities result from or arise out of events, facts, or circumstances occurring or existing on or prior to the Closing, notwithstanding that the date on which any Proceeding or Claim therefor is commenced or made after the Closing;

(g) any of Seller's liabilities, including legal fees and expenses, for vacation pay, sick pay, holiday pay, salary, bonuses, severance pay, workers' compensation, benefits, fringe benefits or other payments or liabilities of any kind to any current or former employee of, or any

party who was hired or engaged by, Seller, or under any employee benefit or employee benefit plan, resulting from Seller's conduct before the Closing Date;

(h) any of Seller's liability for any expenses or fees related to the negotiation, preparation, approval, or execution of this Agreement or its transactions (including attorneys', accountants', and brokerage fees incurred by or charged to Seller);

(i) any of Seller's liabilities arising from conduct before the Closing, or the actions of its officers, directors, shareholders, employees, consultants, contractors, agents, or advisors; and

(j) any of Seller's other liabilities other than the Assumed Liabilities.

Seller acknowledges that it retains the Excluded Liabilities.

I.6 Purchase Price. The purchase price to be paid by Buyer to Seller for the Purchased Assets shall be One Hundred and Three Million U.S. Dollars ($103,000,000.00) (the "Purchase Price"). The Purchase Price shall be paid as follows:

(a) A deposit of 7.5% of the Purchase Price in the amount of Seven Million, Seven-Hundred and Twenty-Five Thousand Dollars ($7,725,000.00) (with crediting for the funds previously deposited with Seller's escrow agent, Archer & Greiner, from Buyer in the amount of $1,981,625.00) shall be paid by Buyer to Seller within five (5) days of signing this Agreement ("Good Faith Deposit"), to be held in an interest-bearing escrow account by Seller's counsel (the "Escrow Agent") and pursuant to an escrow agreement in form and substance reasonably acceptable to Buyer and Seller, attached hereto as **Exhibit "G"** (the "Escrow Agreement") until Closing, with the funds (including any interest earned thereon) to be applied to the Purchase Price on a dollar-for-dollar basis at Closing. The Escrow Agent shall not release, transfer, apply or otherwise dispose of the Good Faith Deposit except (i) at Closing, in accordance with joint written instructions from Buyer and Seller, (ii) pursuant to a written agreement executed by Buyer and Seller, or (iii) pursuant to a final, non-appealable order of a court of competent jurisdiction. The Escrow Agent shall have no discretion or authority to determine entitlement to the Good Faith Deposit. All escrow fees and costs shall be borne by Seller unless otherwise agreed by the parties;

(b) The balance of the Purchase Price shall be paid by Buyer to Seller at Closing (the "Closing Payment"); and

(c) The Good Faith Deposit shall be fully refundable (with interest) as set forth herein. The Parties acknowledge and agree that the Good Faith Deposit shall not be deemed to constitute property of the Estate under the Bankruptcy Code, that Seller's Estate shall have no interest of any kind under Chapter 5 of the Bankruptcy Code or applicable law (equitable or otherwise) in and to the Good Faith Deposit and the Escrow Agent shall hold the Good Faith Deposit in trust in accordance with this Agreement. In the event that Buyer purchases the Purchased Assets and the sale closes, then all Good Faith Deposit payments made by Buyer pursuant to the terms of this Agreement (together with any interest earned thereon) shall be credited to and offset against the Purchase Price and paid to the credit of Seller at the Closing.

I.7 Allocation of Purchase Price. The Allocation of the Purchase Price shall be determined by the Buyer as soon as commercially practicable, but no later than one hundred and eighty (180) days after the Closing. The Parties hereby agree that they shall file all federal, state, and local Tax Returns and reports in a manner consistent with such allocation, and that neither Party will assert or maintain a position inconsistent with such allocation in any administrative or judicial proceeding, including any tax audit or tax proceeding.

I.8 Transfer Taxes. The Party that is required by applicable Law to pay any and all bulk sale, stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or other non-income Tax, fee, or governmental charge imposed under applicable Law in connection with the transactions contemplated hereby (the "Transfer Taxes") shall be responsible for paying that Party's Transfer Taxes. The Party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall prepare and timely file such Tax Returns. Seller shall timely provide Buyer with all information and documentation reasonably requested by Buyer in connection with such Tax Returns and shall execute any documents reasonably requested by Buyer in connection therewith. Buyer shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by the Seller, but not less than ten (10) Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to Buyer's approval, which shall not be unreasonably withheld, delayed, or conditioned. Buyer and Seller shall cooperate in making, in a timely manner, all Tax Returns, filings, reports, forms and other documentation as are necessary or appropriate to comply with all applicable Laws in connection with the payment of Transfer Taxes and shall cooperate in good faith to minimize, to the fullest extent possible under such Laws, the amount of any such Transfer Taxes. Seller shall take all actions reasonably requested by Buyer to obtain any available exemption, reduction or refund of any Transfer Taxes.

I.9 Proration. All monthly payments (the "Prorated Charges") for the month in which the Closing occurs (including utility charges) shall be apportioned and prorated between Seller and Buyer as of the Closing Date with (i) Buyer bearing the expense of Buyer's proportionate share of such Prorated Charges that shall be equal to the product obtained by multiplying (A) a fraction, the numerator being the amount of the Prorated Charges and the denominator being the total number of days in the month in which the Closing occurs, times (B) the number of days following the day that immediately precedes the Closing Date and paying such amount to Seller to the extent payment for such Prorated Charges has been made by Seller prior to the Closing, and (ii) Seller bearing the remaining portion of such Prorated Charges (and paying the amounts thereof to Buyer to the extent payment for such Prorated Charges has not been previously made by Seller). Seller shall be responsible for any and all taxes and assessments, including any interest, penalties or fees, incurred prior to the Closing and any transfer taxes associated with the transfer of the Real Property to Buyer. Buyer shall be responsible for all taxes and assessments accruing after the Closing. The Closing statement to be prepared by Buyer's title company (the "Title Company") shall reflect such proration based on the most recent and available tax rate and valuation. Any other costs or expenses, if any, shall be allocated between and charged to Buyer and Seller in accordance with the Title Company's usual practices. Seller shall be responsible for the cost of the preparation and delivery of all documents to be furnished by Seller. Buyer shall be responsible for the cost of recording the deed and the cost of purchasing a title insurance policy. The Closing fee of the Title Company will be paid by Buyer. Except as set forth herein, no amounts paid or payable under or

in respect of any Purchased Asset or group of Purchased Assets shall be apportioned and prorated between Seller and Buyer.

I.10 Sales Tax. Buyer shall be responsible for and pay any and all sales tax due and payable arising from the transactions contemplated by this Agreement.

## ARTICLE II CLOSING

II.1 Closing. The consummation of the transactions contemplated hereby (the "Closing") shall take place on December 15, 2026, pursuant to the Sale Approval Order (or on such other date as may be agreed by the Parties and/or ordered by the Bankruptcy Court (conditioned, if applicable, upon the Bankruptcy Court making a finding under Fed. R. Bankr. P. 6004(h)) (the "Closing Date")). Upon written notice to Buyer prior to the Closing Date, the Sellers may extend the Closing Date to January 14, 2027 (the "January Closing Date"), provided that the Purchase Price shall be reduced by $175,000. Upon written notice to Buyer prior to the January Closing Date, the Sellers may extend the Closing Date to February 13, 2027 (the "February Closing Date"), provided that the Purchase Price shall be reduced by an additional $350,000. Upon written notice to Buyer prior to the February Closing Date, the Sellers may extend the Closing Date to March 15, 2027 (the "March Closing Date"), provided that the Purchase Price shall be reduced by an additional $500,000. Unless otherwise agreed in writing by the Parties, the Closing Date shall not extend subsequent to the March Closing Date.

II.2 Deliveries to be Made by Seller at Closing. At the Closing, Seller shall deliver the following to Buyer free and clear of Liens, except Permitted Liens, all of which shall be properly authorized and executed by Seller and acceptable to Buyer in its reasonable discretion:

(a) possession of the Purchased Assets;

(b) a bill of sale and/or such endorsements, assignments, and other good and sufficient instruments of conveyance and transfer as Buyer may deem desirable in a form reasonably satisfactory to Buyer, conveying title from Seller to Buyer to the Purchased Assets, free and clear of any and all Liens, except Permitted Liens;

(c) the Assignment and Assumption Agreement;

(d) such affidavits, certifications and other documentation evidencing the authority of the person executing the subject documents on behalf of Seller in a form acceptable to Buyer;

(e) if the Sale Approval Order does not authorize a sale free and clear of all Liens (other than any liens for *ad valorem* taxes falling due after Closing or any additional exceptions approved by Buyer in writing herein or otherwise, or as otherwise required by law (collectively, "Permitted Liens")) affecting the Purchased Assets to the maximum extent permitted by Section 363 of the Bankruptcy Code, such releases and termination statements with respect to all Liens (other than Permitted Liens) on the Purchased Assets as may be necessary and required by Buyer; provided, however, nothing herein shall obligate Buyer to proceed to Closing if the Sale Approval Order does not authorize a sale free and clear of all Liens (other than Permitted Liens) to the maximum extent permitted by Section 363 of the Bankruptcy Code;

(f) such other documents of assignment and transfer as may be reasonably required to vest all right, title, and interest of Seller in and to the Purchased Assets in Buyer;

(g) an assignment and assumption agreement relating to the Assumed Contracts in a form reasonably satisfactory to Buyer (the "Assignment and Assumption Agreement") duly executed by Seller;

(h) resolution of the board of directors of Seller authorizing the execution and delivery of this Agreement and all documents contemplated hereby and consummation of the transaction contemplated herein;

(i) an executed certificate of Seller to the effect that, as of the Closing Date, all representations and warranties of Seller contained in this Agreement are true and correct in all respects and that all of the covenants and agreements of Seller contained in this Agreement to be performed or satisfied before the Closing Date have been performed or satisfied before the Closing Date;

(j) an information reporting form for purposes of preparing an IRS Form 1099-S;

(k) such other documents as shall be reasonably requested by Buyer or its counsel in connection with the transactions contemplated by this Agreement.

II.3 Deliveries to be Made by Buyer at the Closing. At the Closing, Buyer shall deliver the following to Seller:

(a) the Closing Payment;

(b) the Assignment and Assumption Agreement;

(c) resolutions of the Buyer authorizing the execution and delivery of this Agreement and of all documents contemplated hereby and consummation of the transaction contemplated herein;

(d) an executed certificate of Buyer to the effect that, as of the Closing Date, all representations and warranties of Buyer contained in this Agreement are true and correct in all respects and that all of the covenants and agreements of Buyer contained in this Agreement to be performed or satisfied before the Closing Date have been performed or satisfied before the Closing Date; and

(e) such other documents as shall be reasonably requested by Seller or its counsel in connection with the transactions contemplated by this Agreement. and closing of the sale transactions herein.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Buyer to enter into this Agreement, each Seller jointly and severally hereby represents and warrants to the Buyer as of the Effective Date and as of the Closing Date, as if such representations and warranties had been made at the Closing Date, as follows:

III.1 Organization and Authority. Seller 1 is a corporation and Seller 2 is a limited liability company, and each Seller is duly organized, validly existing, and in good standing under the laws of the State of Delaware. This Agreement and Seller's execution thereof has been duly authorized by all necessary corporate action. Seller has obtained and currently maintains all qualifications to do business as a foreign entity in all other jurisdictions in which the character of Seller's properties or the nature of Seller's activities require it to be so qualified. Subject to entry of the Sale Approval Order by the Bankruptcy Court, Seller has the full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated herein. Subject to entry of the Sale Approval Order by the Bankruptcy Court, this Agreement constitutes a legal, valid, and binding agreement of Seller that is enforceable in accordance with its terms.

III.2 Governmental Authorization. The execution, delivery, and performance by Seller of this Agreement requires no action by, or filing with, any governmental body, agency, or official, other than approvals of authorization by the Bankruptcy Court and Approvals set forth in Section 7.2(e), and all such approvals, authorizations, consents, notices and filings necessary for Seller to consummate the transactions contemplated hereby shall have been duly obtained, made or given prior to the Closing and shall be in full force and effect. No other consent, approval, authorization, order, permit or filing is required that would prevent, delay or impair Seller's ability to consummate the transactions contemplated hereby or Buyer's ownership or use of the Purchased Assets following the Closing.

III.3 No Conflict. Subject to entry of the Sale Approval Order, the execution, delivery and performance of this Agreement by Sellers do not and will not (a) violate each Seller's Organizational Documents, (b) violate any applicable Law or Order applicable to each Seller or the Purchased Assets, (c) result in any breach or default under any material Contract relating to the Purchased Assets, or (d) result in the creation of any Lien on the Purchased Assets other than Permitted Liens.

III.4 Litigation. Except as disclosed in the Bankruptcy Case or on **Exhibit "E"** there is no action, suit, proceeding, arbitration, investigation or governmental inquiry pending or, to Seller's knowledge, threatened against Seller or affecting the Purchased Assets that would reasonably be expected to materially impair the Purchased Assets or prevent or delay the consummation of the transactions contemplated hereby.

III.5 Sufficiency of and Title to the Purchased Assets. Each Seller has and, pursuant to the Sale Approval Order and upon Closing, Buyer shall acquire good, valid and marketable title in and to the Purchased Assets, free and clear of all Liens, other than Permitted Liens expressly assumed by Buyer pursuant to this Agreement. Seller has good and valid title to, or a valid and enforceable right to transfer, each of the Purchased Assets. None of the Purchased

Assets is subject to any restriction on transfer or other agreement that would impair Buyer's ownership, use or enjoyment thereof following the Closing.

III.6 Required Consents. Except for consents, approvals or authorizations of, or declarations or filings with the Bankruptcy Court and Approvals, there is no agreement or other instrument binding upon Sellers requiring any consent, approval, notification, filing, registration, authorization, permission, license, requirement, or action by any third-party resulting from the execution, delivery, and performance of this Agreement.

III.7 Utilities. Seller has not received any written notice that any electrical service, power allocation, interconnection rights, utility service, water, sewer, telecommunications or other utility serving the Purchased Assets will be reduced, terminated or materially modified. To Seller’s knowledge, there exists no condition that would materially impair the transfer or continued availability of such utility rights following Closing.

III.8 Assumed Contracts. Each Seller has made available to Buyer a copy of all Assumed Contracts, together with all amendments, exhibits, attachments, waivers, or other changes thereto and, to Seller's knowledge, such copies are true, correct and complete in all material respects and constitute all documents comprising the Assumed Contracts. Sellers have not received any written notice of any material default by any party under any Assumed Contract that remains uncured, except as disclosed to Buyer in writing. Each Seller represents that it has not taken or failed to take any action that would impair its ability to assume and assign any Assumed Contract designated for assumption and assignment pursuant to this Agreement. Sellers shall use commercially reasonable efforts to obtain entry of all orders and take all actions reasonably necessary to facilitate the assumption and assignment of the Assumed Contracts designated by Buyer. Buyer acknowledges that the Bankruptcy Court may not approve assumption and assignment of all contracts designated by the Buyer hereunder provided, however, that Buyer shall not be obligated to close if the failure to assume and assign any Assumed Contract designated by Buyer would reasonably be expected to have a Material Adverse Effect on the Purchased Assets.

III.9 Certain Fees. Other than DuFrayne LLC and Manning Land and Manning Mineral LLC, Seller has not employed any broker, finder, investment banker, or other intermediary or has not incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders’ fees, or other similar fees in connection with this Agreement or any transactions contemplated by this Agreement or the transactions this Agreement contemplates.

III.10 Notices of Certain Events. Sellers shall promptly notify Buyer of:

(a) Any notice or other written communication from any third-party alleging that the consent of such third-party is or may be required in connection with the consummation of the transactions contemplated by this Agreement; and

(b) Any material written communication from any governmental or regulatory agency or authority in connection with or relating to the transactions contemplated by this Agreement.

III.11 Equipment. All of Seller's equipment ("Equipment") is owned by the Sellers and, when conveyed by Sellers to Buyer, will be owned by Buyer free and clear of all Liens except Permitted Liens. The Equipment constitutes all material equipment owned by Seller and used in connection with the Purchased Assets and is in substantially the same condition as of the Effective Date, ordinary wear and tear excepted. Seller has not leased, licensed or otherwise granted any third party any right to possess or use any Equipment, except as disclosed in this Agreement or the Disclosure Schedules. Upon the Closing, Buyer shall acquire good and marketable title to the Equipment, free and clear of all Liens other than Permitted Liens, together with all warranties, guarantees and similar rights, to the extent transferable.

III.12 Permits. Sellers possess all material permits, licenses, approvals and governmental authorizations necessary for the ownership and operation of the Purchased Assets as presently conducted, and such permits are in full force and effect.

III.13 Taxes. Each Seller has timely filed (or caused to be timely filed) all material Tax Returns required to be filed with respect to the Purchased Assets and has timely paid, or will timely pay, all Taxes required to be paid by each Seller with respect to the Purchased Assets for all taxable periods ending on or before the Closing Date, other than Taxes being contested in good faith by appropriate proceedings. There are no Liens for Taxes upon any of the Purchased Assets, other than Permitted Liens arising by operation of applicable Law for Taxes not yet due and payable. Sellers have not received any written notice of any pending audit, examination or proceeding by any taxing authority relating to Taxes that would result in a Lien on, or otherwise materially adversely affect, the Purchased Assets.

III.14 Financial Information.

(a) Seller has made available to Buyer all financial statements, operating statements, utility billing records, capital expenditure information, and other financial or operating information relating to the Purchased Assets, that are in Seller's possession or control and have been requested by Buyer (collectively, the "Financial Information").

(b) To Seller's knowledge, the Financial Information delivered or made available to Buyer has been prepared in good faith from the books and records of Seller, is true, correct and complete in all material respects, and fairly presents, in all material respects, the information purported to be reflected therein for the applicable periods. Seller has not knowingly omitted any material information necessary to make the Financial Information, taken as a whole, not misleading.

(c) Since the date of the most recent Financial Information made available to Buyer, Seller has not become aware of any material adverse change in the financial condition or operation of the Purchased Assets that has not been disclosed to Buyer in writing. Seller has made available to Buyer true, correct and complete copies, in all material respects, of all books, records, utility information, correspondence, reports, contracts and other documents in Seller's possession or control relating to the Purchased Assets that have been requested by Buyer. To Seller's knowledge, such books and records accurately reflect the information they purport to contain in all material respects, and Seller has not knowingly withheld any material information relating to the Purchased Assets requested by Buyer.

III.15 Environmental Matters. Except as set forth on **Exhibit "F"** to Seller's knowledge: (a) Each Seller is, and during Seller's ownership of the Purchased Assets has been, in material compliance with all applicable Environmental Laws with respect to the Purchased Assets; (b) Seller has not received any written notice, demand, claim, request for information or other written communication from any governmental authority or third party alleging any material violation of, or material liability under, any Environmental Law with respect to the Purchased Assets that remains unresolved; (c) there has been no release, discharge, disposal or threatened release of any Hazardous Substance at, on, under or from the Purchased Assets in violation of applicable Environmental Laws that would reasonably be expected to result in material liability relating to the Purchased Assets; (d) Seller has not received any written notice of the presence of any underground storage tanks, asbestos-containing materials, polychlorinated biphenyls or other regulated Hazardous Substances at the Purchased Assets, except as disclosed on **Exhibit "F"**; (e) Seller has obtained and is in material compliance with all material permits, licenses and other governmental authorizations required under applicable Environmental Laws with respect to the ownership and operation of the Purchased Assets; and (f) there is no pending or, to Seller's knowledge, threatened investigation, action or proceeding under any Environmental Law relating to the Purchased Assets that would reasonably be expected to result in material liability or materially impair Buyer's ownership, development or use of the Purchased Assets following the Closing. For purposes of this Agreement, "Environmental Laws" means all applicable federal, state and local Laws relating to pollution, the protection of human health or the environment, or the manufacture, generation, use, handling, storage, treatment, transportation, release or disposal of Hazardous Substances, each as amended from time to time. "Hazardous Substances" means any substance, material or waste that is regulated under any Environmental Law, excluding quantities of substances customarily used, stored or maintained in compliance with applicable Environmental Laws.

III.16 General Warranty. None of the representations or warranties contained herein by Seller, nor any exhibit, schedule, statement, or certificate furnished to or to be furnished by Seller to Buyer pursuant to the terms hereof or in connection with the transactions contemplated herein, contains or will contain any knowingly untrue statement of a material fact or knowingly omits or will omit to state a material fact necessary to make the statements contained or incorporated herein or therein not misleading.

III.17 Seller represents and warrants that: (i) it is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986 (the "Code"), which is subject to Section 4975 of the Code; and (ii) the assets of Seller do not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA or Section 4975 of the Code; and (iii)(a) Seller is not a "governmental plan" within the meaning of Section 3(32) of ERISA, and the assets of Seller do not constitute plan assets of one or more such plans; or (b) transactions by or with Seller are not in violation of state statutes applicable to Seller regulating investments of and fiduciary obligations with respect to governmental plans.

III.18 Neither Seller, nor any ERISA Affiliates (as hereinafter defined) has, within the last six (6) years, made a "partial withdrawal" or a "complete withdrawal" (within the meaning of Sections 4205 and 4203 of ERISA) from any "multiemployer plan," nor incurred any liability on account of a "partial withdrawal" or a "complete withdrawal" from any "multiemployer

plan”, no such liability has been asserted through a “Notice of Assessment” or any similar correspondence, and there are no events or circumstances which could result in any such parti~~al or~~ complete withdrawal, neither Seller, the Property Manager nor any ERISA Affiliate has incurred or could be subjected to any liability under Title IV or Section 302 of ERISA that could reasonably be expected to result in liability to the Buyer (“ERISA Affiliate” means, at any time, each trade or business (whether or not incorporated) that would, at the time, be treated together with either Seller or the Property Manager as a single employer under Title IV or Section 302 of ERISA or Sections 414(b) or 414(c) of the Code.

III.19 Seller covenants and warrants that all of the representations and warranties set forth in this Agreement shall be true and correct at, and as of, the Closing Date, but not thereafter. The covenants and agreements of the Parties that by their terms contemplate performance after the Closing (including Section 5.4 and Section 10.6) shall survive the Closing in accordance with their terms.

III.20 No Other Representations or Warranties. Other than as set forth herein, the Purchased Assets are being sold “as is,” “where is,” and “with all faults,” and Buyer, or any ultimate highest bidder pursuant to any Auction or order of the Bankruptcy Court, hereby acknowledges and agrees that Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets. Buyer will accept the Purchased Assets “as is” and “where is” at closing.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

IV.1 Organization and Authority. Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware. Buyer has the full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated herein and have been duly authorized by all necessary action on the part of Buyer. Subject to entry of the Sale Approval Order by the Bankruptcy Court, this Agreement constitutes a legal, valid, and binding agreement of Buyer that is enforceable in accordance with its terms.

IV.2 No Conflicts. The execution, delivery, and performance of this Agreement by Buyer will not (i) violate any provision of any existing law, statute, rule, regulation, or ordinance, or (ii) conflict with, result in a breach of, or constitute a default under (a) any certificate or articles of incorporation or by-laws of Buyer, (b) any order, judgment, award or decree of any court, governmental authority, bureau or agency, or (v) any mortgage, indenture, lease, contract or other agreement, or undertaking to which Buyer is a party or by which Buyer or its properties or assets may be bound.

IV.3 Investigation by Buyer. Buyer is conducting its own independent review and analysis of the Purchased Assets, the Assumed Liabilities, and the Assumed Contracts. Buyer acknowledges that it has until 10:00 a.m. September 10, 2026 (“Due Diligence Expiration Date”) to conduct such diligence as it deems necessary or appropriate in connection with the transactions contemplated hereby. Notwithstanding the foregoing, Buyer’s investigation

shall not limit, diminish or otherwise affect Seller's representations, warranties, covenants or obligations under this Agreement, any Seller Disclosure Schedule or any other document delivered in connection herewith. Buyer shall be entitled to rely upon the accuracy and completeness of the Seller's representations and warranties expressly set forth herein, and Seller shall remain liable for any breach thereof. Buyer shall complete its due diligence by the Due Diligence Expiration Date.

IV.4 Nothing herein shall waive or limit any rights or remedies of Buyer arising from Seller's fraud, willful misconduct, intentional misrepresentation or breach of this Agreement. Buyer is capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts and Assumed Liabilities.

IV.5 Litigation. As of the date hereof, there is no action, suit, investigation or proceeding pending, against or, to the knowledge of Buyer, threatened against or affecting Buyer before any court or arbitrator or any governmental body, agency, or official, which in any manner challenges or seeks to prevent, enjoin, alter, or materially delay any transactions contemplated by this Agreement.

IV.6 Certain Fees. Buyer has not employed any broker, finder, investment banker, or other intermediary or has not incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or any transactions contemplated by this Agreement.

IV.7 Required Consents. Except for consents, approvals or authorizations of, or declarations or filings with the Bankruptcy Court, there is no agreement or other instrument binding upon Buyer requiring any consent, approval, notification, filing, registration, authorization, permission, license, requirement, or action by any third-party resulting from the execution, delivery, and performance of this Agreement.

IV.8 General Warranty. None of the representations or warranties contained herein by Buyer, nor any exhibit, schedule, statement, or certificate furnished or to be furnished by Buyer to Seller pursuant to the terms hereof or in connection with the transactions contemplated herein, contains or will contain any knowingly untrue statement of a material fact or knowingly omits or will omit to state a material fact necessary to make the statements contained or incorporated herein or therein not misleading.

## ARTICLE V
## COVENANTS OF SELLER AND BUYER

V.1 Efforts; Further Assurances. Seller and Buyer will use commercially reasonable efforts to take any and all actions and to do all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated in this Agreement. Seller and Buyer agree to execute and deliver such other documents, certificates, agreements, and other writings and to take such other actions as may be necessary or desirable in order to vest marketable title to the Purchased Assets in Buyer.

V.2 Notices. If (i) Buyer becomes aware of any material breach by Seller of any representation, warranty, covenant, or agreement contained herein and such breach is capable of being cured by Seller, or (ii) Seller becomes aware of any material breach by Buyer of any representation, warranty, covenant, or agreement contained herein and such breach is capable of being cured by Buyer, the Party becoming aware of such breach shall promptly notify the other Party in writing, in accordance with the notice provisions of this Agreement. Upon such notice of breach, the breaching Party shall have five (5) days to cure such breach before the exercise of any remedies in connection therewith.

V.3 Pre-Closing Covenants. As material terms of this Agreement:

(a) From the Effective Date until the Closing Date, Seller will maintain the Purchased Assets in the manner consistent with its standards of maintenance prevailing immediately prior to the Effective Date and it will not commit or permit to be committed any waste or change in the condition or appearance of the Purchased Assets, or convey any other right with respect to the Purchased Assets except with the written consent and joinder of Buyer. Seller shall operate, manage and maintain the Purchased Assets in the ordinary course consistent with past practice and shall promptly notify Buyer of any material damage, casualty, condemnation, governmental action or other event affecting the Purchased Assets. Seller will keep all current insurance policies concerning the Purchased Assets in full force and effect until Closing and shall not modify, cancel, terminate or permit any lapse in coverage without Buyer's prior written consent. Buyer and Seller, or its representative, shall have the right to walk the Tarbush Property the day before the Closing Date, unless otherwise waived by Buyer in writing, to confirm the condition of the Purchased Assets .

(b) Seller must not transfer any of the Purchased Assets, create any Lien on the Purchased Assets, grant any easements or rights-of-way, or enter into any contract, lease, license, agreement, commitment or other arrangement affecting the Purchased Assets or Buyer's intended use thereof, which is not cancelable on and as of the Closing Date without Buyer's prior written consent. Seller shall not take any action, or fail to take any action, that would reasonably be expected to adversely affect Buyer's rights in or to the Purchased Assets, the value thereof, or the ability to consummate the transactions contemplated hereby.

(c) Seller shall operate, manage and maintain the Purchased Assets in the ordinary course of business consistent with past practice and shall use commercially reasonable efforts to preserve intact the Purchased Assets and the goodwill associated therewith. Seller shall not take, or omit to take, any action that would reasonably be expected to materially impair the value of the Purchased Assets or Buyer's ability to consummate the transactions contemplated by this Agreement.

(d) Seller shall not amend, modify, terminate, renew, extend, waive any material rights under, or enter into any new Assumed Contract, or consent to any amendment, modification or termination of any Assumed Contract, without the prior written consent of Buyer.

(e) Seller shall use commercially reasonable efforts to preserve and maintain in full force and effect all permits, approvals, authorizations, licenses, utility allocations, interconnection rights, governmental approvals and other rights relating to the Purchased Assets, and

shall not take any action, or fail to take any action, that would reasonably be expected to adversely affect the transferability, availability or use thereof by Buyer following the Closing.

(f) Seller shall promptly notify Buyer in writing of (i) any material damage to or destruction of the Purchased Assets, (ii) any condemnation or threatened condemnation affecting the Purchased Assets, (iii) any written notice of violation, default, investigation or enforcement action relating to the Purchased Assets, (iv) any material claim, action or proceeding affecting the Purchased Assets, or (v) any event or circumstance that would reasonably be expected to result in a Material Adverse Effect or prevent or materially delay the consummation of the transactions contemplated hereby.

(g) Seller shall provide Buyer and its representatives with reasonable access, upon reasonable prior notice and during normal business hours, to the Purchased Assets, the Assumed Contracts, books and records, and such other information relating to the Purchased Assets as Buyer may reasonably request in connection with the transactions contemplated hereby.

(h) Seller shall use commercially reasonable efforts to obtain entry of the Bid Procedures Order and the Sale Approval Order and to satisfy all conditions to Closing within Seller's control and shall not take any action that would reasonably be expected to delay, impair or prevent the consummation of the transactions contemplated hereby.

(i) Seller shall preserve all books, records, files and other documents relating to the Purchased Assets and shall not destroy, discard or materially alter any such books, records or documents prior to the Closing, except in the ordinary course of business and in accordance with applicable Law.

(j) Seller shall not settle, compromise or release any material insurance claim, condemnation award or other claim relating to the Purchased Assets without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed.

(k) Buyer waives any Title Objections (as defined in the Pyote Agreement) on the Adjacent Property related to or based upon mineral rights, including but not limited to mineral reservations, leases and other mineral rights exceptions.

V.4 Post-Closing Covenants. As material terms of this Agreement:

(a) Immediately upon the consummation of the Closing, the Parties agree to cooperate with one another and use all good faith efforts to take (or cause to be taken) all actions, and to do (or cause to be done) all things reasonably necessary or proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement, including, without limitation, (i) providing access and title to the Purchased Assets to Buyer; and (ii) assisting Buyer with obtaining access and control over the Purchased Assets.

## ARTICLE VI
## BANKRUPTCY MATTERS; BIDDING PROCEDURES

VI.1 Bankruptcy Filings. Seller shall deliver or cause to be delivered to Buyer for review and comment, as soon as commercially reasonable and in any event not less than



4938-3798-3442.4

two (2) business days prior to the filing thereof, all documents to be filed on behalf of Seller with the Bankruptcy Court, including all motions, applications, petitions, schedules, and supporting papers prepared by Seller (including forms of orders and notices to interested parties) that relate to, or that may affect, the Purchased Assets or the transactions contemplated hereby. All motions, applications, petitions, schedules, and supporting papers prepared by Seller and relating to the transactions contemplated hereby or the Purchased Assets to be filed with the Bankruptcy Court on behalf of Seller must be reasonably satisfactory in form and substance to Buyer and Seller.

VI.2 Sale Approval Order. Seller and Buyer shall use commercially reasonable efforts to cooperate, assist and consult with each other to secure the entry of the Sale Approval Order following the date hereof, and to consummate the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes of, among others, providing necessary assurances of performance by Buyer under this Agreement and furnishing any testimony regarding the transactions contemplated hereby, including to support the good-faith nature of the negotiations leading to this Agreement.

## ARTICLE VII
## CLOSING CONDITIONS

VII.1 Conditions to Obligations of Buyer and Seller. The obligations of Buyer and Seller to consummate the transactions contemplated in this Agreement are subject to the satisfaction of the following conditions:

(a) The Bankruptcy Court shall have entered the Sale Approval Order and, as of the Closing Date, the Sale Approval Order shall be in full force and effect and shall not have been stayed, vacated, or reversed. The Sale Approval Order shall be in form and substance reasonably acceptable to Buyer and shall, *inter alia*:

(i) Authorize the Seller's execution and delivery of this Agreement and approve the transactions contemplated herein;

(ii) Find that the transfer of the Purchased Assets is legal, valid, and enforceable and vests Buyer with valid title to the Purchased Assets, free and clear of all Liens (except for any Permitted Liens);

(iii) Find that the Purchase Price and other consideration provided by Buyer hereunder constitute fair and reasonable consideration for the Purchased Assets;

(iv) Provide that Buyer is a good faith purchaser of the Purchased Assets pursuant to Section 363(m) of the Bankruptcy Code and none of the grounds set forth in Section 363(n) exists with respect to the sale;

(v) Authorize Buyer to file, if desired in its discretion, terminations or cancellations of any recorded Liens (except for Permitted Liens or to the extent required by law) against the Purchased Assets and require secured parties or lienholders, where required by applicable non-bankruptcy law or requested by Buyer, to execute documents of release,

cancellation or satisfaction prepared by Buyer, to be filed by Buyer to clear any Liens of record (other than Permitted Liens) from the Purchased Assets;

(vi) Approve the assumption and assignment of any Assumed Contracts and provide that upon payment of the applicable Cure Costs (or other such agreed amount) by the Buyer or Seller, as applicable, such counterparty shall not have any remaining claim against Seller, its Estate or creditors, or Buyer related to any pre-Closing default under any such Assumed Contract;

(vii) Find that Buyer has not assumed, and has no responsibility or liability for any of Seller's liabilities of any description whatsoever, including any liability of Seller with respect to any Taxes or any pre-Closing liabilities (other than Cure Costs for the Assumed Contracts or other Assumed Liability), whether known or unknown as of the Closing, whether fixed or contingent, or whether existing at the time of or arising after the Closing, including successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, alter ego, successor or transferee liability, de facto merger, mere or substantial continuation; and

(viii) Waive any stay that would otherwise be applicable pursuant to Rules 6004(h) or 6006(d) of the Federal Rules of Bankruptcy Procedure.

(b) No injunction, stay, or similar order or decree issued by any court, tribunal or governmental entity, shall be in effect that restrains, enjoins, stays, or prohibits the consummation of the transactions contemplated by this Agreement.

VII.2 Conditions to Obligations of Buyer. The obligation of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Buyer) of the following conditions:

(a) Seller shall have performed in all material respects all its obligations hereunder required to be performed by it at, or before, the Closing Date; and

(b) The representations and warranties of Seller contained in this Agreement shall be true and correct at, and as of the Closing Date, as if made at, and as of, the Closing Date, but not thereafter.

(c) Closing of the purchase and sale agreement (the "Adjacent Property PSA"), on terms and conditions reasonably acceptable to Buyer, for the acquisition by Buyer of the real property parcels (collectively, the "Adjacent Property") identified on the assessor tax parcel map for Reeves County by Parcel ID No. 0014468 and on the assessor tax parcel map for Pecos County by Parcel ID No. 00049-08031-00100-000000. The closing of the Adjacent Property PSA shall have occurred, or shall occur substantially concurrently with the Closing hereunder, on terms and conditions reasonably satisfactory to Buyer.

(d) The acquisition of the Adjacent Property by the Buyer at Closing may, at the Buyer's election, be effectuated through an assignment of the Sellers' rights and interests under that certain Option Assignment Agreement, dated June 11, 2026, by and between Lonestar Dream, Inc. and Lonestar Taproot LLC, and Manning Minerals, LLC (as amended pursuant to that certain Amendment to Option Assignment Agreement, dated as of July 1, 2026) (the "Option Assignment Agreement"), pursuant to which the Sellers are assigned, among other things, rights under that certain Amended and Restated Option Agreement, dated as of July 28, 2026 to be effective as of July 1, 2026, by and between Jeff Lindsay (the "Optioner") and Manning Minerals, LLC (the "Optionee"), a Texas limited liability company (the "Option Agreement"). In the event that the Buyer elects to take an assignment of the Option Assignment Agreement, then a further condition to Closing shall be Buyer's receipt of (x) written confirmation (in form and substance acceptable to Buyer) from the Sellers and the Optionee, that, as of the Closing, both the Option Assignment Agreement and the Option Agreement are in full force and effect and are legal, valid, binding and enforceable against the parties thereto; and (y) an estoppel certificate executed by the Optioner certifying that, as of the assignment of the Option Assignment Agreement to Buyer, the Option Agreement is in full force and effect, is legal, valid, binding and enforceable against the Optioner and that there is no default by Optioner or Optionee under the Option Agreement or other existing conditions, which upon the giving of notice or lapse of time, or both, would constitute a default under the Option Agreement.

(e) Buyer shall have received, in form and substance reasonably satisfactory to Buyer, all governmental and third-party permits, approvals, consents, authorizations and agreements necessary ("Approvals") to (i) transfer to Buyer the current and anticipated future electrical power allocation and related power rights associated with the Tarbush Property (to 176MW, with future potential increase up to 300MW) (the "Power Rights"), by the dates set forth below, without material reduction or restriction; (ii) construct, interconnect, energize, operate and maintain the substation and related electrical infrastructure necessary to utilize such electrical power on the Adjacent Property for the development and operation of a Data Center, including without limitation any facilities extension agreement with Texas-New Mexico Power Company that may be necessary for substation relocation or construction; and (iii) interconnect and receive (a) an available allocation as of the Closing Date, of 176 MW of electronic load on the Adjacent Property, provided that for the purposes of this subclause (a) such Approval can be satisfied through written confirmation from ERCOT and Texas-New Mexico Power following ERCOT's completion of the ongoing Batch Zero eligibility verification process unconditionally confirming that the project load limit is 176MW as of the Closing Date, and (b) a future anticipated allocation, if any is permitted, pursuant to a final ramp milestone of up to 300 MW by December 31, 2029, without the necessity of posting any financial security to the transmission service provider for system power upgrade approvals or use of the 176MW upgrade. All costs, expenses and fees related to electrical connections, lines, substations, equipment, transformers, switchgear, electrical distribution

systems, transmission and distribution facilities, cabling, cooling infrastructure, buildings, and other customer-side improvements and the like and all Data Center infrastructure buildout, in order for Buyer to use such increased power, shall be paid by Buyer, shall not be a liability of Seller and shall not be an offset to the Purchase Price at closing. All such required Approvals shall be in full force and effect and shall not contain any condition or limitation that would materially impair Buyer's access to and use of 176MW of power at the Adjacent Property, in connection with Buyer's intended use of the Adjacent Property as a Data Center, by the Closing Date. For the avoidance of doubt, Seller makes no representation or warranty regarding any future requirements imposed by ERCOT, TNMP, or any other governmental authority or utility provider as to any future expansion of power beyond 176 MW, including, without limitation, any Facilities Extension Agreement, relocation of the point of interconnection, transmission or distribution system upgrades, capacitor banks, substation modifications, construction costs, deposits, prepayments, security requirements, CIAC, Minimum Revenue Commitments, or any other utility-imposed fees, costs, or financial obligations associated with such potential increase of power up to 300MW.

(f) Since the Effective Date, no event, change, circumstance or condition shall have occurred that has had, or would reasonably be expected to have, a Material Adverse Effect on the Purchased Assets, the utility rights associated therewith, or Buyer's intended use of the Adjacent Property to develop or operate as a Data Center, including any material casualty, condemnation, loss of utility capacity, material governmental action or material termination of any Assumed Contract.

(g) All necessary governmental approvals, permits, authorizations, consents and filings required for the consummation of the transactions contemplated by this Agreement shall have been obtained or made and shall be in full force and effect.

(h) All material third-party consents required for the consummation of the transactions contemplated by this Agreement (other than those to be obtained through the Bankruptcy Court process) shall have been obtained and shall be in full force and effect.

(i) The Closing (as defined in the Pyote Agreement) of the Pyote Agreement shall have occurred substantially contemporaneous with the Closing hereunder.

VII.3 Conditions to Obligations of Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Seller) of the following further conditions:

(a) Buyer shall have performed in all material respects all its obligations hereunder required to be performed by it at, or before, the Closing Date; and

(b) The representations and warranties of Buyer contained in this Agreement shall be true and correct at, and as of the Closing Date, as if made at, and as of, the Closing Date.

## ARTICLE VIII
## TERMINATION

VIII.1 Grounds for Termination. This Agreement may be terminated at any time before Closing by:

(a) mutual written agreement of Seller and Buyer;

(b) either Buyer or Seller, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; provided that no Party may terminate this Agreement under this Section if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c) either Buyer or Seller, if the Closing shall not have occurred on or before December 15, 2026, or such later date that is provided for herein or otherwise agreed to by the parties (the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d) Buyer, if any material condition set forth in this Agreement has not been satisfied by Seller or if the conditions of Section VII.2 have not been satisfied, and such condition is incapable of being satisfied, unless Buyer elects to waive such satisfaction;

(e) Seller, if Buyer fails to consummate the Closing in accordance with this Agreement due to Buyer's default, unless Seller elects to waive such default; provided, however, that Seller shall not be entitled to terminate this Agreement or retain the Deposit unless Buyer has failed to consummate the Closing as a result of Buyer's default under this Agreement. For the avoidance of doubt, Buyer shall be entitled to the return of the Deposit if Buyer's failure to consummate the Closing is due to Seller's breach, failure to perform, failure to satisfy a condition to Closing, or any other circumstance not caused by Buyer's default under this Agreement;

(f) Buyer, if Buyer is not the successful bidder or the backup bidder at the Auction and Seller enters into a Competing Transaction with the successful bidder or the backup bidder;

(g) Buyer, if the Bankruptcy Case is dismissed or converted to a case or cases under chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Seller is appointed in the Bankruptcy Case;

(h) Buyer if Seller withdraws or seeks authority to withdraw the Bidding Procedures/Sale Motion.

(i) Buyer, upon the occurrence of a material casualty or condemnation affecting the Purchased Assets.

(j) Buyer, at any time prior to the expiration of the Due Diligence Expiration Date, if Buyer determines, in its sole and absolute discretion, that the results of its due diligence investigation of the Purchased Assets are unsatisfactory or unacceptable for any reason or no reason, including, without limitation, matters relating to the condition, title, operation, value, financial performance, environmental condition, zoning, permits, entitlements, contracts, liabilities, legal requirements or any other matter affecting the Purchased Assets or the transactions contemplated hereby. Upon any such termination, the Good Faith Deposit shall be promptly returned to Buyer, and neither party shall have any further obligations under this Agreement except for those obligations that expressly survive termination.

The Party desiring to terminate this Agreement under this section shall give notice of such termination to the other Party in accordance with the notice provisions herein. Notwithstanding the foregoing, except in connection with a termination of this Agreement by Seller pursuant to Section VIII.1(e), Buyer shall be entitled to receive the Good Faith Deposit in full, and Seller shall have no right to retain, apply or otherwise claim any portion of the Good Faith Deposit.

VIII.2 Effect of Termination.

(a) If this Agreement is terminated by Buyer in accordance with Section VIII.1(d), Buyer shall be entitled to the return of the Good Faith Deposit (with interest) within three (3) business days of such termination.

(b) If this Agreement is terminated by Seller in accordance with Section VIII.1(e), Buyer shall forfeit the Good Faith Deposit and the Good Faith Deposit shall become property of Seller's Estate as liquidated damages.

(c) If this Agreement is terminated in accordance with any other subsection of Section VIII.1, such termination shall be without liability of any Party to the other Party to this Agreement, and the Good Faith Deposit (with interest) shall be returned to Buyer within three (3) business days of such termination.

## ARTICLE IX
## ASSUMPTION OF EXECUTORY CONTRACTS OF THE SELLER

IX.1 Assumed Contracts. Buyer shall be solely responsible for and shall pay or cause to be paid at or prior to Closing, all Cure Costs related to the Assumed Contracts. Buyer shall have no obligation to pay any Cure Costs except to the extent expressly set forth on Exhibit "B". Seller represents and warrants that Exhibit "B" sets forth a complete and accurate list of all known Cure Costs for each Assumed Contract.

## ARTICLE X
## MISCELLANEOUS

X.1 Further Assurances. After the Closing Date, each Party shall execute and deliver such further documents, and perform such acts, as may be reasonably necessary to transfer and convey the Purchased Assets to Buyer on the terms contained herein, and to otherwise comply with the terms of this Agreement and to carry out the transactions provided for herein.

X.2 Notices. All notices, requests, and other communications to any Party hereunder shall be in writing, via e-mail transmission, and shall be given:

| | |
|---|---|
| If to Seller, to: | Lonestar Dream Inc. and Lonestar Taproot LLC<br>Attn: Michael DuFrayne, CRO<br>(mdufrayne@dufraynellc.com) |
| With a copy to: | Stephen M. Packman, Esq.<br>(spackman@archerlaw.com) |
| If to Buyer, to | Attn: Jimmy Martini<br>Hut 8 Corp.<br>777 Brickell Ave, Floor 2<br>Miami, FL 33131<br>(jimmy.martini@hut8.com) |
| With a copy to | Andrew M. Carty<br>Brown Rudnick LLP<br>Seven Times Square<br>New York, NY 10036<br>(acarty@brownrudnick.com) |

All such notices, requests, and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request, or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

X.3 Bulk Sales Laws. The Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer, or similar laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

X.4 Expenses. Except as otherwise provided herein, each of the Parties shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including, without limitation, any legal, accounting and other professional fees, whether or not the transactions contemplated hereby are consummated.

X.5 Waivers. No failure or delay by any Party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise

thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

X.6 Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. Notwithstanding anything to the contrary herein, Buyer shall have the right, in its sole and absolute discretion and without the prior consent of Seller, to assign this Agreement, and its rights and obligations hereunder, in whole or in part, to one or more affiliates of Buyer or to one or more designees (including, without limitation, any entity formed for the purpose of consummating the transactions contemplated hereby); provided, however, that such assignment shall not release Buyer from its obligations hereunder. Seller may not assign, in whole or in part, this Agreement or its rights hereunder without the prior written consent of Buyer.

X.7 Assumption of Risk. Seller agrees to assume the risk of loss or damage to the Purchased Assets occurring on or before the date on which title thereof is conveyed to Buyer. If, prior to its conveyance, any part of the Purchased Assets which constitutes Equipment has been substantially damaged, lost or destroyed, or if there has been a material condemnation affecting the Purchased Assets, Seller shall notify Buyer of such fact and Buyer may elect to either (i) accept all insurance or condemnation proceeds payable as a result of such destruction, damage or, loss or condemnation and any deductible due from Seller or, (ii) agree to a reduction of the Purchase Price by the current mutually agreed value of the lost, damaged or destroyed Purchased Asset, or (iii) terminate this Agreement and receive the prompt return of the Good Faith Deposit (with interest).

X.8 Governing Law. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of State of New York, without giving effect to the principles of conflicts of laws thereof) (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York, except to the extent that such laws are superseded by the Bankruptcy Code. The parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court and waive any right to a jury trial regarding the same.

EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ITS RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY OR ANY ASSIGNEE THEREOF, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.

X.9 Entire Agreement; Amendments; Counterparts. This Agreement sets forth the entire agreement between the Parties with respect to the subject matter hereof and may be amended only by in writing, executed by Seller and Buyer. This Agreement may be executed in counterparts, each of which shall constitute an original, and all of which together shall constitute one and the same instrument. This Agreement shall become effective when the Parties hereto shall have received a counterpart hereof signed by the other Party hereto.

X.10 Captions; Headings; Interpretation. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. The headings contained in this Agreement are for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement. Whenever the words “include,” “includes,” or “including” are used in this Agreement, they shall be deemed to be followed by the words “without limitation.” In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

X.11 Parties Bound. The terms and conditions of this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, executors, successors, and permitted assigns.

X.12 Severability. Except as otherwise provided herein, if any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable, such provision shall be automatically reformed and construed so as to be valid, operative, and enforceable to the maximum extent permitted by law or equity while preserving its original intent. The invalidity of any part or provision of this Agreement shall not render the remainder of this Agreement invalid.

X.13 Retention of Jurisdiction. ANY AND ALL DISPUTES, DISAGREEMENTS, INTERPRETATIONS, OR OTHER MATTERS CONCERNING THE FINAL CONSUMMATION AND ENFORCEMENT OF THIS AGREEMENT SHALL BE AND REMAIN IN THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, AS A RESULT THEREOF, ANY PLEADINGS, CAUSES OF ACTION OR OTHER REQUESTS FOR RELIEF MUST BE BROUGHT BEFORE SAID COURT BY THE PARTY SEEKING SUCH RELIEF.

X.14 [Buyer agrees to the terms and conditions of the first amended asset purchase agreement annexed hereto as Exhibit “H.”]

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the date first written above.

**SELLER:**

**Lonestar Dream Inc.**

By: ___________________________________
Name: Kevin Pan
Title: CEO

**SELLER:**

**Lonestar Taproot LLC**

By: ___________________________________
Name: Kevin Pan, CEO
Title: CEO of Lonestar Dream Inc., sole member of Lonestar Taproot LLC

**BUYER: RAPTOR BASIN LLC**

By: ___________________________________

Name:
Title:

**ANNEX I**
**CERTAIN DEFINITIONS**

"Auction" means an auction to be held by the Seller in the event higher and better bids are submitted in accordance with the Bidding Procedures.

"Bidding Procedures" means the procedures governing the proposed marketing of, auction of, and bidding for the Purchased Assets pursuant, and attached, to the Bidding Procedures Order.

"Bidding Procedures/Sale Motion" means the motion seeking entry of (i) the Bidding Procedures Order and (ii) Sale Approval Order, which shall be in form and substance reasonably satisfactory to Buyer.

"Bidding Procedures Order" means an Order of the Bankruptcy Court approving the Bidding Procedures, which shall include approval of the Breakup Fee and Expense Reimbursement., and which shall be in form and substance acceptable to Buyer in its reasonable discretion and shall include, at a minimum, customary bid protections, including: (i) a minimum initial overbid in an amount equal to the sum of the Breakup Fee, Expense Reimbursement and an initial overbid increment to be agreed by the parties; (ii) minimum subsequent overbid increments to be agreed by the parties; (iii) requirements that any competing bidder qualify as a "Qualified Bidder" (including delivery of a binding mark-up of the APA with no fewer terms or conditions, proof of financial wherewithal to close, and a non-refundable deposit at least equal to the Good Faith Deposit); (iv) restrictions on credit bidding by any party with disputed liens; (v) payment of the Breakup Fee and Expense Reimbursement on the closing of any alternative transaction with a competing bidder; and (vi) such other customary stalking horse protections as Buyer may reasonably require.

"Business Day" means any day that is not a Saturday, Sunday, or a day on which banking institutions in New York, New York are not required to be open.

"Claim" means any claim, demand, assessment, judgment, order, decree, action, cause of action, litigation, suit, investigation, or other Proceeding.

"Competing Transaction" shall mean a transaction with a bidder who has offered Seller a higher and better purchase price for the Purchased Assets to that offered by Seller, which higher and better bid is approved by order of the Bankruptcy Court.

"Cure Costs" means all amounts payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by Debtor and assignment to Buyer of the Assumed Contracts.

"Data Center" means any facility that is intended to be used, in whole or in part, for the housing, powering, cooling, interconnection or operation of computing, data processing, data

storage, networking, telecommunications or similar information technology or electronic equipment, for high-performance computing, artificial intelligence, machine learning, cloud, hosting or colocation operations, which shall, for the avoidance of doubt, exclude such a facility operated primarily for the purposes of mining Bitcoin or other cryptocurrencies, digital assets, tokens or similar blockchain-based assets.

"Debtor" means Lonestar Dream, Inc. and Lonestar Taproot LLC.

"Estate" shall mean the Seller's bankruptcy estate consisting of all assets, rights and interests of the Debtor on the Petition Date in the Bankruptcy Case.

"Final Order" means an order or judgment, the operation or effect of which is not stayed, and as to which order or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired, and as to which no appeal or petition for review or motion for re-argument has been taken or been made and is pending for argument.

"Governmental Entity" means any federal, state, local or foreign political subdivision, court, administrative agency, board, bureau, commission, or department or other governmental authority or instrumentality.

"Law" means any law, statute, treaty, rule, directive, or regulation or Order of any Governmental Entity.

"Liability" means any liability or obligation, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due, regardless of when asserted.

"Material Adverse Effect" means any event, change, circumstance, occurrence, effect, development or state of facts that, individually or in the aggregate, (a) has had, or would reasonably be expected to have, a material adverse effect on the Purchased Assets or (b) would reasonably be expected to prevent, materially delay or materially impair the ability of Seller to consummate the transactions contemplated by this Agreement; *provided*, *however*, that none of the following, alone or in combination, shall be deemed to constitute, or be taken into account in determining whether there has been, a Material Adverse Effect: (i) changes in general economic, regulatory or political conditions or the financial, credit or securities markets in general (including changes in interest rates or exchange rates); (ii) changes generally affecting the industry in which the Business operates; (iii) changes in Law or GAAP (or authoritative interpretations thereof); (iv) any natural disaster, act of God, epidemic, pandemic or disease outbreak; (v) any act of terrorism, sabotage, cyberattack, military action or war; or (vi) the announcement or pendency of the transactions contemplated by this Agreement or the Bankruptcy Case; *provided*, *further*, that any event, change, circumstance, occurrence, effect, development or state of facts referred to in clauses (i) through (v) may be taken into account in determining whether a Material Adverse Effect has occurred to the extent such event, change, circumstance, occurrence, effect, development or state of facts has a disproportionate adverse effect on the Purchased Assets.

"Orders" means judgments, writs, decrees, compliance agreements, injunctions, rules, awards, settlement agreements, or orders of any Governmental Entity or arbitrator.

"Permits" means all permits, licenses, authorizations, registrations, franchises, approvals, certificates, variances, and similar rights obtained, or required to be obtained, from Governmental Entities.

"Proceeding" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, audit, examination, or investigation commenced, brought, conducted, or heard by or before, or otherwise involving, any court or other Governmental Entity or any arbitrator or arbitration panel.

"Person" shall be construed broadly and shall include an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or another entity including a Governmental Entity (or any department, agency, or political subdivision thereof).

"Pyote Agreement" means that certain Aset Purchase Agreement, dated as of September 21, 2026, by and between LONESTAR DREAM INC., a Delaware corporation, as seller, and LONESTAR TAPROOT LLC, a Delaware limited liability company, as seller, and MESQUITE FALCON LLC, a Delaware limited liability company, as buyer, executed substantially contemporaneous herewith.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Sale Approval Order" means an order of the Bankruptcy Court in form and substance acceptable to Buyer, *inter alia*, (a) approving (i) this Agreement and the execution, delivery, and performance by Debtor of this Agreement and the other instruments and agreements contemplated hereby; (ii) the sale of the Purchased Assets to Buyer free and clear of all Liens; (iii) the assumption and assignment to Buyer of the Assumed Contracts on the terms set forth herein; and (b) determining that Buyer is a good faith purchaser.

**EXHIBIT A**
**Purchased Assets**

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| F004 | Lonestar Taproot | Furniture & Fixtures | 08/21/2024 | 08/21/2024 | | Fucheng Huaying Integrated Housing CO. | Steel Mobile Home |
| F005 | Lonestar Taproot | Furniture & Fixtures | 08/21/2024 | 08/21/2024 | | Fucheng Huaying Integrated Housing CO. | Steel Mobile Home |
| V003 | Lonestar Dream | Vehicles Dream | 07/11/2023 | 08/01/2023 | Silverado | Ram Country Fort Stockton | 2015 Chevrolet White Silverado15 Serial #: 3GCPCREC0FG222815 |
| LI002 | Lonestar Taproot | Land Improvements | 06/01/2022 | 09/01/2022 | 25308Tarbush | All State Fence Company | 6'11 Gauge Chain Link Fence Installed with Three Strands of Barbed Wire Tarbush |
| LI004 | Lonestar Taproot | Land Improvements | 07/31/2022 | 09/01/2022 | 1001Tarbush | Blue Bison Industrial Services, LLC | Water Line Project Contractors & Materials Tarbush |
| LI005 | Lonestar Taproot | Land Improvements | 05/05/2022 | 09/01/2022 | 522001 | Boland Field Services LLC | ROW Seeding |
| LI006 | Lonestar Taproot | Land Improvements | 07/22/2022 | 09/01/2022 | 51612Tarbush | Bullseye Field Services LLC | 100 Tons of River Rock Gravel Work |
| LI008 | Lonestar Taproot | Land Improvements | 12/31/2021 | 09/01/2022 | 2130-002 | Charis Engineering, LLC | Charis Engineering Civil, Mechanical, and Electrical Design |
| LI009 | Lonestar Taproot | Land Improvements | 08/31/2022 | 09/01/2022 | INV0024174 | DBR Land LLC | Damages Caliche Settlement Payment |
| LI012 | Lonestar Taproot | Land Improvements | 04/18/2022 | 09/01/2022 | Change Order 3 | Westwood Transport, LLC. | Add 80'x150x Pad with Ramps Tarbush |
| LI015 | Lonestar Taproot | Land Improvements | 07/01/2022 | 09/01/2022 | 1246 | Westwood Transport, LLC. | 50 Loads of Peagravel Delivery & Spread with Backhoe |
| LI016 | Lonestar Taproot | Land Improvements | 08/03/2023 | 09/01/2022 | 4529 | Chatos Aggregate Hauling, LLC | To Haul 25 Loads of Gravel Around the Antboxes GDA |
| LI017 | Lonestar Taproot | Land Improvements | 02/28/2022 | 09/01/2022 | 86442 & 86937 | DBR Engineering Consultants, Inc. | Engineering for Power Distribution & Connection from Company's Feeder Line to 72 Sets Mining System |
| BD008 | Lonestar Taproot | Land Improvements | 05/04/2022 | 09/01/2022 | Chge Order 4Tarbush | Westwood Transport, LLC. | 12 Lights Poles Tarbush |
| AIR140 | Lonestar Taproot | Land Improvements | 06/02/2022 | 09/01/2022 | 08Tarbush | West Tex Field Services, LLC | 12 Lights Poles & Sitting 22 Transformers |
| R001 | Lonestar Taproot | Right of Use Asset | 12/02/2021 | 08/01/2022 | | DBR Land LLC | Pecos Tarbush Land Lease 20 Years |
| BD003 | Lonestar Taproot | Buildings | 03/31/2022 | 09/01/2022 | ICJE4 | Lonestar Dream Inc. | Chao Suan Tarbush Site 3D Model |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| TF002 | Lonestar Taproot | Transformers | 09/30/2021 | 09/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | Jiangsu Huapeng 193MVA, 3P, 60HZ |
| TF005 | Lonestar Taproot | Transformers | 01/25/2022 | 09/01/2022 | INV-85345 | Maddox Industrial Transformer | MT13797-S 500 kVA Padmount Transformer HV: 24940 GY 14400 LV: 480 Y 277 Not Installed |
| TF006 | Lonestar Taproot | Transformers | 01/25/2022 | 09/01/2022 | INV-85345 | Maddox Industrial Transformer | MT13799-S 500 kVA Padmount Transformer HV: 24940 Y 14400 LV: 208 Y 120 Installed in Tarbush Substation |
| TF007 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100145 Installed in Tarbush Substation |
| TF008 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100128 Installed in Tarbush Substation |
| TF009 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100119 Installed in Tarbush Substation |
| TF010 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100131 Installed in Tarbush Substation |
| TF011 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100135 Installed in Tarbush Substation |
| TF012 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100124 Installed in Tarbush Substation |
| TF013 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100142 Installed in Tarbush Substation |
| TF014 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100122 Installed in Tarbush Substation |
| TF015 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100140 Installed in Tarbush Substation |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| TF016 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100146 Installed in Tarbush Substation |
| TF017 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100133 Installed in Tarbush Substation |
| TF018 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100144 Installed in Tarbush Substation |
| TF019 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100126 Installed in Tarbush Substation |
| TF020 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100139 Installed in Tarbush Substation |
| TF021 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100121 Installed in Tarbush Substation |
| TF022 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100136 Installed in Tarbush Substation |
| TF023 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100143 Installed in Tarbush Substation |
| TF024 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100127 Installed in Tarbush Substation |
| TF025 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100138 Installed in Tarbush Substation |
| TF026 | Lonestar Taproot | Transformers | 08/14/2021 | 09/01/2022 | YJ0001200003-20210728 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100129 Installed in Tarbush Substation |
| TF027 | Lonestar Taproot | Transformers | 09/20/2021 | 09/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100117 Installed in Tarbush Substation |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| TF028 | Lonestar Taproot | Transformers | 09/20/2021 | 09/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100130 Installed in Tarbush Substation |
| TF029 | Lonestar Taproot | Transformers | 09/20/2021 | 09/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100275 Installed in Tarbush Substation |
| TF030 | Lonestar Taproot | Transformers | 09/20/2021 | 09/01/2022 | YJ0001200004-20210920 | Jiangsu Huapeng Transformer Co., LTD. | JSHP 24.94kV, 2.5MVA SN: HPT003100111 Installed in Tarbush Substation |
| ST001 | Lonestar Taproot | Substations Infrastructure | Various | 09/01/2023 | | Priority Power Management LLC & Various | Tarbush Substation |
| CN019 | Lonestar Taproot | Computer & Network Equipment | 02/28/2022 | 09/01/2022 | INV0112&0116 &117 | CNO Technologies, LLC | Fiber & Cat6 Cable & SonicWall Firewall |
| TM005 | Lonestar Dream | Tools, Machinery & Equipment | 05/09/2022 | 09/01/2022 | OrderSP6734 | MotoBuys | TrailMaster Taurus 200GX Golf Cart |
| TM007 | Lonestar Taproot | Tools, Machinery & Equipment | 04/01/2022 | 09/01/2022 | TAPROOT001 | Coastal Power & Equipment | Atlas Copco QAS120 JDS Trailer Mounted Generator Serial HOP100994 |
| TM008 | Lonestar Taproot | Tools, Machinery & Equipment | 05/25/2022 | 09/01/2022 | 206725063-001 | United Rentals Power & HVAC | Compressor XAS185KD7 CFM Tier4 Serial #: 4500A1019FR051101 |
| V006 | Lonestar Taproot | Vehicles Taproot | 05/31/2022 | 09/01/2022 | 09-494694 | National Storage Tank, Inc. | Nationwide Trailers Look CP,CR,7X16 Yr: 2023 S/N: 53BMTEA25PR010746 |
| V008 | Lonestar Taproot | Vehicles Taproot | 02/28/2022 | 04/01/2022 | 338255 | Out West Feed & Supply | Kubota RTV-XG850WLH22 S/N: A5KH1PGNCNG030387 |
| V009 | Lonestar Taproot | Vehicles Taproot | 04/12/2022 | 09/01/2022 | 01-98181 | Ag. Equipment Inc. | Kubota RTV-XG850WGLA22 S/N: A5KH1PGNENG030288 |
| V011 | Lonestar Taproot | Vehicles Taproot | 04/22/2022 | 09/01/2022 | | Driscoll Motors | 2015 F350 Purchased from Driscoll Motors |
| HD052 | Lonestar Taproot | Cooling System - Hydro | 03/14/2022 | 09/01/2022 | 8100709193 | Tigerflow Systems, LLC | Tigerflow Systems Tigerflow VMS Pump in Tarbush Pump House |
| HD053 | Lonestar Taproot | Cooling System - Hydro | 03/14/2022 | 09/01/2022 | 8100709193 | Tigerflow Systems, LLC | Tigerflow Systems Tigerflow VMS Pump in Tarbush Pump House |
| HD054 | Lonestar Taproot | Cooling System - Hydro | 03/14/2022 | 09/01/2022 | 8100709193 | Tigerflow Systems, LLC | Tigerflow Systems Tigerflow VMS Pump in Tarbush Pump House |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| AIR029 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500755-6 Installed Tarbush A1 |
| AIR030 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500816-7 Installed Tarbush A2 |
| AIR031 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500689-0 Installed Tarbush A3 |
| AIR032 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500823-3 Installed Tarbush A4 |
| AIR033 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500686-3 Installed Tarbush A5 |
| AIR034 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500717-6 Installed Tarbush A6 |
| AIR035 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500719-7 Installed Tarbush A7 |
| AIR036 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500693-0 Installed Tarbush A8 |
| AIR037 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500720-0 Installed Tarbush A9 |
| AIR038 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500818-8 Installed Tarbush A10 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| AIR039 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500289-4 Installed Tarbush A11 |
| AIR040 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500607-7 Installed Tarbush A12 |
| AIR041 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500340-0 Installed Tarbush A13 |
| AIR042 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500345-8 Installed Tarbush A14 |
| AIR043 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500240-4 Installed Tarbush A15 |
| AIR044 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500531-6 Installed Tarbush A16 |
| AIR045 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500238-5 Installed Tarbush A17 |
| AIR046 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500278-6 Installed Tarbush A18 |
| AIR047 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500311-8 Installed Tarbush B1 |
| AIR048 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500251-2 Installed Tarbush B2 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| AIR049 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500696-6 Installed Tarbush B3 |
| AIR050 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500347-9 Installed Tarbush B4 |
| AIR051 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500316-5 Installed Tarbush B5 |
| AIR052 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500335-5 Installed Tarbush B6 |
| AIR053 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500610-1 Installed Tarbush B7 |
| AIR054 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500379-8 Installed Tarbush B8 |
| AIR055 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500818-5 Installed Tarbush B9 |
| AIR056 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500655-0 Installed Tarbush B10 |
| AIR057 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500688-4 Installed Tarbush B11 |
| AIR058 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500694-5 Installed Tarbush B12 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| AIR059 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500698-7 Installed Tarbush B13 |
| AIR060 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500642-0 Installed Tarbush B14 |
| AIR061 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500692-4 Installed Tarbush B15 |
| AIR062 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500317-0 Installed Tarbush B16 |
| AIR063 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500638-0 Installed Tarbush B17 |
| AIR064 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500617-0 Installed Tarbush B18 |
| AIR065 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500257-5 Installed Tarbush C1 |
| AIR066 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500697-1 Installed Tarbush C2 |
| AIR067 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500815-1 Installed Tarbush C3 |
| AIR068 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500712-9 Installed Tarbush C4 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| AIR069 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500613-8 Installed Tarbush C5 |
| AIR070 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500372-0 Installed Tarbush C6 |
| AIR071 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500606-1 Installed Tarbush C7 |
| AIR072 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500723-7 Installed Tarbush C8 |
| AIR073 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500822-8 Installed Tarbush C9 |
| AIR074 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500804-3 Installed Tarbush C10 |
| AIR075 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500369-5 Installed Tarbush C11 |
| AIR076 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500820-7 Installed Tarbush C12 |
| AIR077 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500614-3 Installed Tarbush C13 |
| AIR078 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500314-4 Installed Tarbush C14 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| AIR079 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500260-0 Installed Tarbush C15 |
| AIR080 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500346-3 Installed Tarbush C16 |
| AIR081 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500620-4 Installed Tarbush C17 |
| AIR082 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500342-1 Installed Tarbush C18 |
| AIR083 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500338-1 Installed Tarbush D1 |
| AIR084 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500611-7 Installed Tarbush D2 |
| AIR085 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500624-7 Installed Tarbush D3 |
| AIR086 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500341-6 Installed Tarbush D4 |
| AIR087 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500616-4 Installed Tarbush D5 |
| AIR088 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500824-9 Installed Tarbush D6 |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| AIR089 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500339-7 Installed Tarbush D7 |
| AIR090 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500628-8 Installed Tarbush D8 |
| AIR091 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500261-5 Installed Tarbush D9 |
| AIR092 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500295-5 Installed Tarbush D10 |
| AIR093 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500320-5 Installed Tarbush D11 |
| AIR094 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500623-0 Installed Tarbush D12 |
| AIR095 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500622-5 Installed Tarbush D13 |
| AIR096 | Lonestar Taproot | Cooling System - Air | 12/31/2021 | 09/01/2022 | 420211114001 | Bitmain | Air-Cooled Antbox N5 V2 x 100+30 Bitmain T04SJYX-25S4 BTMU 500603-5 Installed Tarbush D14 |
| AIR107 | Lonestar Taproot | Cooling System - Air | 04/18/2022 | 09/01/2022 | 3 | West Tex Field Services, LLC | Setup Antboxes & Connect to the Transformers |
| AIR110 | Lonestar Taproot | Cooling System - Air | 04/12/2022 | 09/01/2022 | 6019 | Elite Drillers Corporation | Tarbush Water Well - Drilling of Water Well and Pump Installation |
| AIR111 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank (hold & recycle water for water curtains that cool the miners) |



4938-3798-3442.4

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| AIR112 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR113 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR114 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR115 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR116 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR117 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR118 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR119 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR120 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR121 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR122 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR123 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR124 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR125 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR126 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR127 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR128 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR129 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR130 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR131 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR132 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR133 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |
| AIR134 | Lonestar Taproot | Cooling System - Air | 05/07/2022 | 09/01/2022 | 100004 | Sims Plastics | 1000 Gal Low Pro Plmb Tank |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| AIR135 | Lonestar Taproot | Cooling System - Air | Various | 09/01/2023 | 4523 | Chatos Aggregate Hauling, LLC/ 51 Oilfield Services LLC | Water Pit GDA |
| AIR136 | Lonestar Taproot | Cooling System - Air | Various | 09/01/2023 | GDA | Bullseye Field Services LLC/Childs Corporation/IMG Foam Installation | Tarbush Site Modification GDA |
| AIR137 | Lonestar Taproot | Cooling System - Air | 07/03/2023 | 08/01/2023 | 1003 | Steady Arms Service LLC | Exhaust Fans System |
| AIR139 | Lonestar Taproot | Cooling System - Air | 04/01/2022 | 02/01/2022 | CapLbrRecls | Lonestar Dream Inc. | To Allocate Capitalized Labor to the Cooling Systems |
| CIP002 | Lonestar Taproot | Construction in Progress | 03/31/2022 | 09/01/2022 | PB50402 | JNL Steel Components, Inc | Building #4 Materials |
| CIP003 | Lonestar Taproot | Construction in Progress | 06/27/2022 | 09/01/2022 | 1192Tarbush | Westwood Transport, LLC. | Pad 1100'x25' for Immersion Buildings Tarbush |
| EL001 | Lonestar Taproot | Electrical Systems | 04/06/2022 | 09/01/2022 | #1 Mobalization | Ortiz Electric, LLC | Labor, material, subs & equipment Tarbush |
| EL002 | Lonestar Taproot | Electrical Systems | 05/01/2022 | 09/01/2022 | #2 | Ortiz Electric, LLC | UG Dondult Tarbush |
| EL003 | Lonestar Taproot | Electrical Systems | 05/01/2022 | 09/01/2022 | #2 | Ortiz Electric, LLC | Grounding Tarbush |
| EL004 | Lonestar Taproot | Electrical Systems | 05/19/2022 | 09/01/2022 | #3 Change Order 1 | Ortiz Electric, LLC | Labor-Equipment-Per Diem |
| EL005 | Lonestar Taproot | Electrical Systems | 05/25/2022 | 09/01/2022 | #7 Change Order 4 | Ortiz Electric, LLC | Lugs and mounting hardware for the XFMR secondary and ant box power landing point Tarbush |
| EL006 | Lonestar Taproot | Electrical Systems | 05/25/2022 | 09/01/2022 | #6 Change Order 3 | Ortiz Electric, LLC | Sitework, Civil, and UG Conduit Installation Tarbush |
| EL007 | Lonestar Taproot | Electrical Systems | 05/25/2022 | 09/01/2022 | #5 Change Order 2 | Ortiz Electric, LLC | Deadbreak Elbows Purchase and Installation Tarbush |
| EL008 | Lonestar Taproot | Electrical Systems | 05/31/2022 | 09/01/2022 | #4 | Ortiz Electric, LLC | Labor, material, subs & equipment Tarbush |
| EL009 | Lonestar Taproot | Electrical Systems | 06/10/2022 | 09/01/2022 | #8 | Ortiz Electric, LLC | Bi-Weekly Progress Billing (SOV004) Tarbush |
| EL010 | Lonestar Taproot | Electrical Systems | 06/10/2022 | 09/01/2022 | #9 | Ortiz Electric, LLC | Labor, Material, Subs & Equipment Tarbush |
| EL011 | Lonestar Taproot | Electrical Systems | 06/15/2022 | 09/01/2022 | #10 | Ortiz Electric, LLC | Tarbush Pump House & Power Circuits Installation |

| Asset # | Entity | GL Account | Invoice Date | Place in Srv | Doc Num | Vendor Name | Asset Description |
|---|---|---|---|---|---|---|---|
| EL012 | Lonestar Taproot | Electrical Systems | 06/27/2022 | 09/01/2022 | #11 | Ortiz Electric, LLC | Labor, Material, Subs & Equipment Tarbush |
| EL013 | Lonestar Taproot | Electrical Systems | 07/12/2022 | 09/01/2022 | Change Order 9 | Ortiz Electric, LLC | Unused Material Credit Tarbush |
| EL014 | Lonestar Taproot | Electrical Systems | 07/19/2022 | 09/01/2022 | Change Order #7 | Ortiz Electric, LLC | 228ea-2H 600 MCM Aluminum Lugs & 60ea-1H 600MCM Mechanical Lugs Tarbush |
| EL015 | Lonestar Taproot | Electrical Systems | 07/25/2022 | 09/01/2022 | #16 | Ortiz Electric, LLC | Labor, Material, Subs & Equipment Tarbush |
| EL016 | Lonestar Taproot | Electrical Systems | 07/25/2022 | 09/01/2022 | #14 | Ortiz Electric, LLC | T&M 7/7/22 - 7/13/22 |
| EL017 | Lonestar Taproot | Electrical Systems | 07/26/2022 | 09/01/2022 | #13 | Ortiz Electric, LLC | Labor, Material & Equipment Tarbush |
| EL018 | Lonestar Taproot | Electrical Systems | 08/11/2022 | 09/01/2022 | #17 | Ortiz Electric, LLC | Time and Materials for Week Ending 7/25/22 & 8/5/22 |
| EL019 | Lonestar Taproot | Electrical Systems | 08/16/2022 | 09/01/2022 | #18 | Ortiz Electric, LLC | Time and Materials for Week Ending 8/8/22 & 8/12/22 |
| EL020 | Lonestar Taproot | Electrical Systems | 08/31/2022 | 09/01/2022 | #19 | Ortiz Electric, LLC | Progress Billing SOV #8 |
| EL021 | Lonestar Taproot | Electrical Systems | 08/31/2022 | 09/01/2022 | #20 | Ortiz Electric, LLC | Time and Materials for Week Ending 8/21/22 & 8/28/22 |
| EL022 | Lonestar Taproot | Electrical Systems | 08/31/2022 | 09/01/2022 | #21 | Ortiz Electric, LLC | Change Order - Material Reimbursement |
| EL023 | Lonestar Taproot | Electrical Systems | 07/21/2023 | 08/01/2023 | 24488 | KTX Electric LLC | Meter Installation GDA |
| EL024 | Lonestar Taproot | Electrical Systems | 12/04/2024 | 01/01/2025 | | THI Energy Consultants, LLC | Electrical Upgrade |
| CT002 | Lonestar Taproot | Containers | 03/31/2023 | 04/01/2023 | TMPShanghaiIde | Shanghai Ide Industrial Co., Ltd | 20 Ft Container GESU 3596639 |

**EXHIBIT B**
**Assumed Contracts**

1. Master Services Agreement between Lonestar Taproot LLC and Tejas Extreme Logistics dated effective 1/30/2026

2. FiberLight contract for Dedicated Internet Access Product Order No. OPP-170487-066778 and OPP-170487-066779

3. Option Assignment Agreement dated June 11, 2026, between Lonestar Dream, Inc and Lonestar Taproot LLC and Manning Minerals, LLC as subsequently amended pursuant to that certain Amendment to Option Assignment Agreement dated July 1, 2026

**EXHIBIT C**
**Excluded Assets**

1. All cash and cash equivalents, wherever located.

2. All digital currency and the proceeds thereof.

3. All prepaid expenses, deposits, including Regional Electricity Providers deposits, and retainers.

4. All accounts including accounts receivable

5. The schedule of fixed assets listed in the Excel file labeled 'LDI_LDT Excluded Asset List 12/31/2025' filed in the Data Room.

6. All of Sellers' rights, interests, claims, demands, and causes of action, including but not limited to those under all contracts and leases other than Assumed and Assigned Contracts.

7. All Avoidance Actions, including without limitation, all rights, claims, and causes of action arising under or relating to Chapter 5 of Title 11 of the United States Code, including, without limitation, all avoidance actions and claims arising under Sections 502(d), 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, and any other avoidance, recovery, or related claims or causes of action under the Bankruptcy Code, together with all proceeds, recoveries, and other rights arising therefrom.

8. All claims for and rights to receive tax refunds with respect to taxable periods or portions thereof on or prior to the Closing Date.

9. All the minute books, corporate and ownership books and record and accounting books and records of the Seller and copies of all other Books and Records necessary for Seller to administer its estate.

10. All other assets which are not purchased by a buyer.

**EXHIBIT D**
**Assumed Liabilities**

None.

**EXHIBIT E**
**Litigation Claims**

1. Gao v. Pan et al., Cause No. D-1-GN-24-003302 (98th District Court, Travis County, Texas)

2. Saturn Data LLC v. Lonestar Dream et al., Case No. 493-08827-2025 (493rd District Court, Collin County, Texas)

3. DBR Land LLC v. Lonestar Taproot LLC and Lonestar Dream Inc., Case No. P-13332-112-CV (112th District Court, Pecos County, Texas)

4. SIAC Arbitration No. 532 of 2025 (ARB532/25/ZY): Liang, Lin v. Poolin Technology PTE. LTD., Singapore International Arbitration Centre, Singapore

5. SIAC Arbitration No. 245 of 2022 (ARB/245/22/ALS): Li Bei v. Poolin Technology PTE. LTD., Singapore International Arbitration Centre, Singapore

**EXHIBIT F**
**Environmental Matters**

None.

**EXHIBIT G**
**Escrow Agreement**

**Escrow Agreement**

This Escrow Agreement ("Agreement") is entered into as of this 23rd day of September, 2026 by and among LONESTAR DREAM INC., a Delaware corporation (the "Seller 1"), and LONESTAR TAPROOT LLC, a Delaware limited liability company ("Seller 2" and together with "Seller 1", each a "Seller", collectively, "Sellers"), RAPTOR BASIN LLC, a Delaware limited liability company ("Buyer") and Archer & Greiner, P.C. ("Escrow Agent"). Any terms not defined herein shall have the meaning ascribed to it in the Purchase Agreement (as defined below).

The Seller and the Buyer intend to enter into an Asset Purchase Agreement, dated as of September 21, 2026 (the "Purchase Agreement") pursuant to which Seller intends to sell and Buyer intends to purchase certain Purchased Assets including personal property, equipment and other assets located at that certain real property commonly known as and located at 4143 US Hwy 285, Fort Stockton, TX 79735, Pecos County, Texas. The Seller and the Buyer desire for Escrow Agent to hold in escrow the Good Faith Deposit of $7,725,000.00 (USD) (inclusive of amounts already deposited by Buyer and held by the Escrow Agent) and to disburse the same in accordance with the terms and provisions of this Agreement.

On July 22, 2026 (the "Petition Date"), Seller commenced a voluntary case under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") (the "Bankruptcy Case"). Subject to Seller's receipt of any higher and better offer for the Purchased Assets (as defined in the Purchase Agreement) in accordance with the Bidding Procedures and Bidding Procedures Order, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Purchased Assets in accordance with the Purchase Agreement and sections 105, 363, and 365 of the Bankruptcy Code

1. Delivery of Escrow Funds; Authorization of Escrow Agent. Buyer has delivered $1,981,625.00 (USD) of the Good Faith Deposit to Escrow Agent via wire transfer and shall deliver the balance of the Good Faith Deposit ($5,743,375.00 (USD)) to Escrow Agent via wire transfer within five (5) days from execution of the Purchase Agreement. The Good Faith Deposit shall be held by Escrow Agent in an interest-bearing account (the "Escrow Account"). The Good Faith Deposit together with any interest accrued thereon are hereinafter collectively referred to as the "Escrow Funds".

2. Release of Escrow Funds. Escrow Agent shall disburse the Escrow Funds in accordance with the provisions of this Agreement and the Purchase Agreement. Upon receipt of joint instructions from and executed by each of Seller and Buyer or their respective attorneys, in accordance with the Purchase Agreement, the Escrow Agent shall disburse the Escrow Funds in accordance with such notice, which shall include the name of each payee, the amount to be paid to each payee and wire instructions, if any. In no event shall the Escrow Agent be required to disburse any of the Escrow Funds unless and until it has confirmed and is reasonably satisfied that they are being disbursed to the proper party pursuant to this Agreement and the Purchase Agreement. All disbursements of the Escrow Funds shall be made via check or wired funds.

3. Disagreements. In the event of a disagreement about the interpretation of this Agreement or about the duties, rights and obligations of any action contemplated by Escrow Agent under this Agreement, or if there is a dispute between Seller and Buyer regarding the Escrow Funds, or the Escrow Agent receives conflicting demands or instructions with respect thereto, Escrow Agent may withhold disbursement or delivery of the same to either Party until Escrow Agent receives either: (a) joint written instructions from Seller and Buyer with respect to the disbursement or delivery of the Escrow Funds or any part thereof; or (b) an order entered by the Bankruptcy Court directing the disbursement or delivery of the Escrow Funds or any part thereof and thirty(30) days have passed since entry of such order without further court order directing the disposition thereof. Escrow Agent shall be entitled to rely upon the decision of

such court with respect to the disposition and entitlement of the Escrow Funds. The Parties acknowledge and agree that the Good Faith Deposit shall not be deemed to constitute property of Seller's bankruptcy estate under the United States Bankruptcy Code, and that such estate shall have no interest of any kind, under Chapter 5 of the Bankruptcy Code or applicable law (whether equitable or otherwise), in and to the Good Faith Deposit absent Bankruptcy Court order directing to the contrary, which order has not been stayed or overturned within 30 days of entry.

4. Scope of Responsibility. Escrow Agent is obligated only to perform the duties specifically set forth in this Agreement, which shall be deemed purely ministerial in nature. Under no circumstances will Escrow Agent be deemed to be a fiduciary to any Party or any other person under this Agreement. Escrow Agent will not be responsible or liable for the failure of any Party to perform in accordance with the Purchase Agreement, this Agreement, or any other agreement. Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the other terms and conditions of the Purchase Agreement or any other instrument or document other than this Agreement, whether or not a copy thereof has been provided to Escrow Agent; and Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of the Purchase Agreement or any other instrument or document. This Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of Escrow Agent shall be inferred or implied from the terms of this Agreement, the Purchase Agreement, or any other agreement.

5. Reliance. Escrow Agent shall not be liable for any action taken or not taken by it in accordance with the direction or consent of the Parties or their respective attorneys (including office staff). Escrow Agent shall not be liable for acting or refraining from acting upon any notice, request, consent, direction, requisition, certificate, order, affidavit, letter, or other paper or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, without further inquiry into the person or persons' authority.

6. Indemnification. The Sellers, jointly and severally, shall indemnify, defend and hold harmless Escrow Agent from and against any and all loss, liability, cost, damage and expense, including, without limitation, in-house and/or outside attorneys' fees and expenses or other professional fees and expenses which Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against Escrow Agent, arising out of or relating in any way to this Agreement, or any transaction to which this Agreement relates, unless such loss, liability, cost, damage or expense shall have been finally adjudicated to have been directly caused by the willful misconduct or gross negligence of Escrow Agent. The provisions of this paragraph shall survive the resignation or removal of Escrow Agent and the termination of this Agreement. In the event Escrow Agent incurs legal fees in connection with the enforcement or interpretation of any provision of this agreement or to defend against any claim or allegation that Escrow Agent breached any duty or obligation under this agreement or otherwise, then Escrow Agent shall be entitled to recover from the Sellers Escrow Agent's actual costs and expenses, including attorneys' fees, incurred by Escrow Agent in connection therewith, with interest thereon from the date incurred. For purposes hereof, costs, expenses, and attorneys' fees shall include, without limitation, the actual costs and expenses, including attorneys' fees, incurred in recovering such costs, expenses, and attorneys' fees (including, without limitation, all judgment enforcement proceedings, contempt proceedings, garnishment, levy, debtor and third-party discovery and examinations, bankruptcy proceedings, and appellate proceedings).

7. Limitation of Liability. Escrow Agent shall not be liable, directly or indirectly, for, and the Parties hereby release Escrow Agent from, any (i) damages, losses or expenses arising out of the services provided hereunder, other than damages, losses or expenses which have been finally adjudicated to have directly resulted from Escrow Agent's gross negligence or willful misconduct, or (ii) special, indirect or consequential damages or losses of any kind whatsoever (including without limitation lost profits), even if the Escrow Agent has been advised of the possibility of such losses or damages and regardless of the form of action.

8. Resignation or Removal. Escrow Agent may resign by furnishing written notice of its resignation to the Parties, and the Parties may remove Escrow Agent by furnishing to Escrow Agent a joint written notice of Escrow Agent's removal along with payment of all fees and expenses to which the Escrow Agent is entitled through the date of termination. Such resignation or removal, as the case may be, shall be effective thirty (30) days after the delivery of such notice or upon the earlier appointment of a successor, and Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Funds and to deliver the same to a successor escrow agent as shall be appointed by the Parties, as evidenced by a joint written notice filed with Escrow Agent or in accordance with a court order. If the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following the delivery of such notice of resignation or removal, Escrow Agent shall have the right, but not the obligation to (a) petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the Parties; (b) deposit the Escrow Funds with the Clerk of the Bankruptcy Court in which any litigation relating to the Purchase Agreement is pending and/or (c) take such reasonable affirmative steps as it may, at its option, elect in order to terminate its duties as Escrow Agent, including, without limitation, the depositing of the Escrow Funds with a court of competent jurisdiction and the commencement of an action for interpleader (and the costs thereof shall be, and thereupon Depositary shall be released of and from all liability hereunder except for any previous gross negligence or willful misconduct.

9. Notices. All notices, requests, demands, and other communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by overnight delivery with a reputable national overnight delivery service, or (iii) by registered mail or by certified mail, return receipt requested, and postage prepaid, all at the addresses set forth below. It shall be the responsibility of each of the Parties to notify Escrow Agent and the other Parties in writing of any name or address changes. Communications shall be deemed to have been given on the date received.

Notices to Seller:

Lonestar Dream Inc.
Lonestar Taproot LLC

Attn: Michael DuFrayne, CRO
Email: mdufrayne@dufraynellc.com

and a copy to:

Archer & Greiner, P.C.

Attn: Stephen M. Packman, Esq.
Email: spackman@archerlaw.com

If to Buyer:
Attn: Jimmy Martini
Hut 8 Corp.
777 Brickell Ave, Floor 2
Miami, FL 33131
(jimmy.martini@hut8.com)

With a copy to:

Andrew M. Carty
Brown Rudnick LLP

Seven Times Square
New York, NY 10036
(acarty@brownrudnick.com)

If to Escrow Agent:

Archer & Greiner, P.C.

Attention: Stephen M. Packman, Esq.
Email: spackman@archerlaw.com

10. Amendments. This Agreement may not be changed, modified or terminated, nor may any provision hereunder be waived, except by an instrument executed by the parties hereto.

11. Counterparts. This Agreement may be executed in several counterparts, and all counterparts so executed shall constitute one agreement, binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart. The exchange of copies of this agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or via email transmission in Portable Document Format (.pdf) shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes.

12. Controlling Law. This Agreement shall be construed and enforced in accordance with the laws of the State of New York.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the day and year first written above.

**SELLER:**

LONESTAR DREAM INC.

By: ______________________
Name: Kathy Zhang
Title: COO

LONESTAR TAPROOT LLC

By: ______________________
Name: Kathy Zhang
Title: COO

**BUYER:**

RAPTOR BASIN LLC

By: ______________________
Name:
Title:

[Signatures continue on following page]

**ESCROW AGENT:**

Archer & Greiner, P.C.

By: /s/ Stephen M Packman
Name: Stephen M. Packman
Title: Partner

# EXHIBIT H
# FIRST AMENDED ASSET PURCHASE AGREEMENT

232730422 v1

# FIRST AMENDED ASSET PURCHASE AGREEMENT (TARBUSH)

**THIS FIRST AMENDED ASSET PURCHASE AGREEMENT** ("First Amended Agreement"), dated as of August 24, 2026 (the "Effective Date"), is made by and between LONESTAR DREAM INC., a Delaware corporation (the "Seller 1") and LONESTAR TAPROOT LLC, a Delaware limited liability company (the "Seller 2" together with Seller 1, each a "Seller" and collectively, the "Sellers"), and THOR CALAP, LLC, a Delaware Limited Liability Company, for itself and any designees (collectively, the "Buyer" and, together with Seller, collectively, the "Parties" and, individually, a "Party"). Capitalized terms not defined herein are defined in the Agreement below, which definitions are incorporated herein by reference.

## RECITALS

**WHEREAS**, Sellers and Buyer executed and entered into an Asset Purchase Agreement ("Agreement"), dated as of July 22, 2026.

**WHEREAS**, pursuant to the terms of the Agreement, Sellers agreed to sell and Buyer agreed to purchase from Sellers the Purchased Assets, as defined in and attached to the Agreement.

**NOW THEREFORE,** in consideration of the mutual covenants, representations, warranties, and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the Sellers and Buyer agree as follows:

1. The Agreement is amended as set forth herein. No term or provision of the Agreement is amended, modified or abrogated except as set forth herein.

2. The Purchase Price set forth in section 1.6 of the Agreement is increased to $37,750,000 on account of Buyer's agreement to pay $750,000 of the Settlement Payment under the settlement agreement between Sellers and DBR Land, LLC.

3. The terms and provisions of the Indemnity Agreement between Sellers and Buyer annexed hereto as Exhibit "A" are hereby incorporated into the Agreement and this First Amended Agreement, and are agreed to by Sellers and Buyer, as if full set forth at length herein.

4. Seller agrees to promptly provide Buyer with an executed estoppel certificate in the form of that annexed hereto at Exhibit "B" (the "DBR Estoppel") from Delaware Basin Ranches Inc., and that it shall be a condition to the Buyer's obligation to close the transaction that is the subject of the Agreement that the executed DBR Estoppel is provided to Buyer at least ten (10) Business Days prior to the closing under the Agreement.

5. The terms and provisions of Section 10.8 through Section 10.23 of the Agreement are incorporated by reference as if fully set forth herein, except that all references in such Sections, as so incorporated by reference, to the "Agreement" are hereby replaced by references to this First Amended Agreement.

[Remainder of Page Intentionally Left Blank –
Signatures on Following Page(s)]

**IN WITNESS WHEREOF**, the Parties have duly executed this First Amended Agreement as of the date first written above.

**SELLER:**

**Lonestar Dream Inc.**

By: ______________________

Name: Kevin Pan
Title: CEO

**SELLER:**

**Lonestar Taproot LLC**

By: ______________________

Name: Kevin Pan
Title: CEO of Lonestar Dream Inc., sole member of Lonestar Taproot LLC

**BUYER: THOR CALAP LLC**
on behalf of itself and its designees

By: ______________________

Name: Morris Missry
Title: Authorized Signatory

# INDEMNITY AGREEMENT OF BUYER

Sellers, LONESTAR DREAM INC. and LONESTAR TAPROOT LLC (collectively, "Sellers") and THOR CALAP LLC ("Buyer"), agree, as of August 24, 2026, to the terms and provisions of this Indemnity Agreement of Buyer ("Indemnity Agreement"), including but not limited to attachment of it to the Tarbush APA as an Exhibit thereto.

1. Buyer's access to and entry upon the Tarbush Property is expressly conditioned upon and subject to, inter alia, Buyer's agreement, on the terms and conditions set forth herein, to indemnify the Sellers and Sellers' bankruptcy estates, respective affiliates, partners, shareholders, officers, members, directors, agents and employees and their successors in interest and assigns, including any creditor trust, plan trust and/or fiduciary successor (collectively, "Seller Indemnified Parties", and each a "Seller Indemnified Party"). Buyer agrees to indemnify, defend, and hold harmless the Seller Indemnified Parties from and against any and all claims, liens, demands, losses, damages (excluding consequential, exemplary, punitive and special damages, unless asserted against a Seller Indemnified Party by a third party), liabilities, lawsuits, causes of action, judgments, costs, and expenses (including reasonable attorneys' fees and legal costs) caused by the Buyer's and its agents, employees, contractors, invitees or licensees (collectively, the "Buyer Representatives") activities in and upon the Tarbush Property, including but not limited to, (i) Buyer's removal of the Purchased Assets located at the Tarbush Property, (ii) the restoration of the portion of the Tarbush Property from which the Purchased Assets are removed as required by Paragraph 4(b) of that certain Term Surface Use Agreement dated November 234, 2021, as modified and amended by that certain Amendment No. 1 to Term Surface Use Agreement dated January 1, 2024 (such agreement, as so modified and amended, the "TSUA") between Seller and DBR Land, LLC ("DBR"), and (iii) in the event the removal of the Purchased Assets and other activities of Buyer or Buyer Representatives on the Tarbush Property cause any contamination of the Tarbush Property by materials or substances regulated under applicable statutes, laws, codes, rules, regulations, orders and degrees of governmental or quasi-governmental authorities exercising jurisdiction (collectively, "Environmental Laws") as toxic or otherwise posing a risk to human health or the environment (collectively, "Hazardous Substances"), all remediation of such Hazardous Substances and restoration under Environmental Laws required under Section 3(c) of the TSUA. The indemnity obligation from Buyer to the Seller Indemnified Parties includes, but is not limited to, claims for personal injury, death, or property damage caused by the Buyer Representatives, or any of them. Buyer's indemnity shall exclude any such loss arising from the negligence or willful misconduct of Sellers or any other Seller Indemnified Party or the mere discovery of any pre-existing condition or latent defect on the Tarbush Property which is not exacerbated by Buyer.

2. The Buyer agrees that its access to and activities upon the Tarbush Property are subject to the terms and conditions of the TSUA, including, without limitation, those applicable to the removal of the Purchased Assets located at the Tarbush Property. In addition, Buyer agrees to (i) restore the portion of the Tarbush Property from which the Purchased Assets are removed as required by Section 4(b) of the TSUA, and (iii)

in the event the removal of the Purchased Assets and other activities of Buyer or Buyer Representatives on the Tarbush Property cause any contamination of the Tarbush Property by Hazardous Substances, all remediation of such Hazardous Substances and restoration under Environmental Laws required under Section 3(c) of the TSUA. Buyer agrees not to breach the terms and conditions of the TSUA in connection with its access to and activities upon the Tarbush Property. The Buyer shall, at its sole cost and expense, maintain Commercial General Liability insurance, on an occurrence basis, with a minimum limit of $10,000,000 per occurrence, $10,000,000 in the aggregate. Such policy or policies shall name the Seller Indemnified Parties as additional insureds and provide a Certificate of Insurance to the Seller Indemnified Parties prior to entering upon the Tarbush Property. In addition, Buyer shall cause any contractors, riggers, representatives and agents engaged by or on behalf of the Buyer or Buyer Representatives and entering upon the Tarbush Property to maintain insurance as required under the TSUA. Buyer's obligations to the Seller Indemnified Parties under this Indemnity Agreement are in no way limited by the coverage amount(s) of the required insurance or the amounts available under such insurance.

3. Buyer agrees to (i) the following provisions of the Stipulation and Agreed Order ("DBR Settlement Order") between Sellers and DBR and (ii) the inclusion of the indemnity and other obligations herein and in paragraph 6 of the DBR Settlement Order set forth below, in the Order of the Bankruptcy Court approving the sale of the Purchased Assets to Buyer ("Sale Order"):

    a. (4) The purchaser of the Purchased Assets (the "Purchaser") and Debtors will have nine (9) months from the closing of the Tarbush sale (or, if the Tarbush sale closing does not occur prior to November 30, 2026, nine (9) months from the date that the Settlement Payment is made to DBR) to remove the Assets and any other Remaining Property from the Land (other than the water well and associated equipment) and to remediate the site as required in the TSUA. Purchaser's and Debtors' remediation obligations will not apply to the freshwater well and the related improvements for its operation. Purchaser and Debtors will be obligated to remove and remediate the cement pads on the Land unless the parties agree on an amount for Purchaser to pay to DBR to waive the remediation obligation for removal of the cement pads, the amount for which will be based on third party bids obtained by DBR for the removal of the pads; and

    b. (6) The Sale Order must include an obligation of the Purchaser to indemnify DBR for any damages to DBR's property in the form of the Indemnity Agreement of Buyer attached as Exhibit A to the First Amended Asset Purchase Agreement (Tarbush), including the Land, or to personnel working on behalf of Purchaser for the removal of the Assets, the Remaining Property, and/or remediation of the Land that occur prior to Closing and during the removal and remediation process.

4. Upon completion of Buyer's access to and use of the Tarbush Property, including removal of all Purchased Assets, Buyer agrees to and shall restore the areas of the Tarbush Property from which the Purchased Assets were removed to their original

condition, as required under Section 4(b) of the TSUA, at the Buyer's sole cost and expense.

5. The indemnity and additional obligations of Buyer under this Indemnity Agreement shall survive termination or expiration of the access rights granted to Buyer pursuant to the DBR Settlement Order and constitute a continuing, agreed obligation of Buyer to Seller subsequent to closing of the Tarbush APA; the terms and provisions of the Tarbush APA are incorporated herein by reference.

6. Notwithstanding anything under this Indemnity Agreement or the Tarbush APA to the contrary, (i) Buyer shall not be obligated to restore any portions of the Tarbush Property other than the portions of the Tarbush Property from which the Purchased Assets are removed by Buyer or the Buyer Representatives, (ii) Buyer shall have no obligation to remove or remediate any Hazardous Substances or contamination by Hazardous Substances the presence of which was not caused by Buyer or the Buyer Representatives, and (iii) Buyer shall not have any liability with respect to Hazardous Substances other than Hazardous Substances, and contamination by Hazardous Substances, the presence of which was caused by Buyer or the Buyer Representatives. Notwithstanding anything in this Indemnity Agreement to the contrary, Buyer will be responsible for pre-existing Hazardous Substances that are disclosed to Buyer in writing prior to Buyer or the Buyer Representatives conducting their applicable activities at the Tarbush Property, or that Buyer or the Buyer Representatives would have discovered if it or the Buyer Representatives had exercised industry-standard care and practice, to the extent they are exacerbated by Buyer's or the Buyer's Representatives access to or activities upon the Tarbush Property.

[Remainder of Page Intentionally Left Blank –
Signatures on Following Page(s)]

**SELLER:**

**LONESTAR DREAM INC.**

By:____________________________
Name: Kevin Pan
Title: CEO

**SELLER:**

**LONESTAR TAPROOT LLC**

By:____________________________
Name: Kevin Pan
Title: CEO of Lonestar Dream Inc., sole member of Lonestar Taproot LLC

**BUYER:**

**THOR CALAP LLC**
on behalf of itself and its designees

By:____________________________
Name: Morris Missry
Title: Authorized Signatory

SimplyAgree Sign signature packet ID: 5c7dcc50-65e4-41e1-883b-e8b7abc8471b


# Delaware Basin Ranches Inc.

840 Gessner, Suite 100
Houston, Texas 77024

August 25, 2026

Thor CALAP, LLC
c/o Thor Equities, LLC
25 West 39th Street
New York, NY 10018

Re: 4143 US Hwy 285, Fort Stockton (Pecos County), TX 79735

Dear Ladies and Gentlemen:

Reference is made to that certain Master Lease, effective as of October 15, 2021 (the "Master Lease"), by and between Delaware Basin Ranches Inc. (together with its successors and assigns, "DBR Inc."), as lessor, and DBR Land LLC (together with its successors and assigns, "DBR Land"), as lessee, and that certain Term Surface Use Agreement dated November 24, 2021 (the "TSUA"), by and between DBR Land, as grantor, and Lonestar Dream Inc. (together with its successors and assigns, "Lonestar"), as lessee.

DBR Inc. hereby certifies and confirms to Thor CALAP, LLC and its investors and lenders, and their respective successors and assigns (collectively, "Thor"), that (i) as between DBR Inc. and DBR Land, DBR Land had and has all authority and right to enter into the TSUA and to perform its obligations thereunder, and (ii) nothing in the Master Lease contradicts any of the terms and provisions of the TSUA or prevents or otherwise interferes with DBR Land's performance of its covenants and obligations under the TSUA, or Lonestar's rights and remedies under and with respect to the TSUA.

DBR Inc. further acknowledges and agrees that Thor will be relying upon DBR Inc.'s certifications herein in determining whether to enter into a transaction with Lonestar involving the TSUA, and that DBR Inc. is hereby estopped from making any claim or asserting any factual claims against Thor that contradicts such certifications.

Delaware Basin Ranches Inc.

By: Harrison Bolling
Name: Harrison Bolling
Title: EVP, General Counsel

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** ("Agreement"), dated as of September ~~8~~21, 2026 (the "Effective Date"), is made by and between LONESTAR DREAM INC., a Delaware corporation (the "Seller 1") and LONESTAR TAPROOT LLC, A Delaware Limited Liability Company (the "Seller 2" together with Seller 1, each a "Seller" and collectively, the "Sellers"), and ~~a subsidiary or affiliate of Hut 8 Corp. organized under the laws of the State of Delaware and to be formed at or prior to Closing~~MESQUITE FALCON LLC, a Delaware limited liability company (the "Buyer" and, together with Seller, collectively, the "Parties" and, individually, a "Party"). Capitalized terms used in this Agreement are as defined herein.

## RECITALS

**WHEREAS**, Seller was engaged in the business of, *inter alia*, crypto mining and hosting operations (the "Business") at the Pyote Property set forth below through July 10, 2026.

**WHEREAS**, Seller is the owner of that certain real property located at 3072 FM 1927, Pyote, TX 79777 in Ward County, Texas, (known as the "Pyote Property").

**WHEREAS**, Seller is the owner of certain personal property, equipment and other assets located at the Pyote Property and set forth on the **Exhibit "A"** attached hereto (together with the Pyote Property, the "Purchased Assets").

**WHEREAS**, on July 22, 2026 (the "Petition Date"), Seller commenced a voluntary case under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") (the "Bankruptcy Case").

**WHEREAS**, subject to Seller's receipt of any higher and better offer for the Purchased Assets (as defined herein) in accordance with the Bidding Procedures and Bidding Procedures Order, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Purchased Assets in accordance with this Agreement and sections 105, 363, and 365 of the Bankruptcy Code.

**WHEREAS,** the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement, are subject to entry of the Sale Approval Order.

**NOW THEREFORE,** in consideration of the mutual covenants, representations, warranties, and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the Parties hereto agree as follows:

## ARTICLE IARTICLE I
## SALE OF ASSETS AND REAL PROPERTY

I.1 Sale of Purchased Assets.

(a) On the Closing Date and subject to the terms and conditions and exclusions contained in this Agreement (including but not limited to Section 1.3) and subject to Permitted Liens as defined herein, each Seller will sell, transfer, convey, assign, and deliver all of Seller's right, title, and interest in and to the Purchased Assets, free and clear of any and all interests, Claims, obligations, rights, encumbrances, pledges, and liens in, against or with respect to any of the Purchased Assets or each Seller having arisen, existed or accrued prior to and through the Closing Date, whether direct or indirect, absolute or contingent, choate or inchoate, known or unknown, matured or unmatured, liquidated or unliquidated, arising or imposed by agreement, understanding, law, equity, statute or otherwise and whether arising prior to, on or after the petition sate, including claims or liabilities otherwise arising under doctrines of successor liability, *de facto* merger or substantial continuity or liabilities or obligations arising under any law or orders (collectively, "Liens").

(b) The Purchased Assets include the following assets of Seller:

(i) The Pyote Property and additional assets set forth on **Exhibit "A"** hereto;

(ii) the **power rights**Power Rights associated with the Pyote Property;

(iii) all rights under those executory contracts (the "Contracts") and personal property and commercial real property leases (the "Leases") set forth on **Exhibit "B"** attached hereto. The Contracts and Leases are herein, at times, collectively referred to as the "Assumed Contracts" and, individually, as an "Assumed Contract"; provided however, that Buyer may at any time prior to Closing remove any Assumed Contracts from **Exhibit "B"**. Upon removal, such Contracts or Leases shall no longer be an Assumed Contract;

(iv) all claims under existing insurance policies to the extent such policies may provide coverage or a defense with respect to the Purchased Assets;

(v) any and all transferable federal, state, local and foreign governmental Permits, authorizations, and approvals of Seller related to the Purchased Assets;

(vi) copies of documents relating to the Purchased Assets.

I.2 Instruments of Conveyance and Transfer.

(a) Upon the Closing, Seller shall deliver to Buyer possession of the Purchased Assets and convey to Buyer clear title to all of the Purchased Assets.

(b) At the Closing, Seller shall execute and deliver to Buyer a bill of sale and such endorsements, assignments, and other good and sufficient instruments of conveyance and transfer as are reasonably necessary to transfer, convey, and assign good and marketable title to Buyer of the Purchased Assets, free and clear of any and all Liens except for Permitted Liens.

(c) At the Closing, Seller shall convey the Pyote Property to Buyer pursuant to a Special Warranty Deed ("Warranty Deed") in the form customarily used in similar transactions in Texas and approved and prepared by Buyer and such endorsements, assignments, and other good and sufficient instruments of conveyance and transfer as Buyer reasonably deems desirable to for Seller to transfer, convey, and assign its good and marketable title to the Pyote Property to Buyer, free and clear of any and all Liens except Permitted Liens.

I.3 Excluded Assets. The Purchased Assets shall exclude all assets and interests of the Seller set forth on **Exhibit "C"** hereto (collectively, the "Excluded Assets").

I.4 Assumed Liabilities. As of the Closing, Buyer shall assume, and pay when due, all Cure Costs due on the Assumed Contracts and any other liabilities of Seller which Buyer has expressly agreed in writing to assume as set forth on **Exhibit "D"** (collectively, the "Assumed Liabilities"); provided however, that Buyer may at any time prior to Closing remove any Assumed Liabilities from **Exhibit "D"**. Upon removal, such liabilities shall no longer be an Assumed Liability.

I.5 Excluded Liabilities Notwithstanding anything to the contrary in this Agreement, except for the Assumed Liabilities set forth herein, Buyer shall not assume, or become obligated in any way to pay, any of Seller's liabilities, obligations, or debts of any kind whatsoever, whether accrued, absolute, contingent, or otherwise, whether known or unknown, whether due or to become due, and regardless of when or by whom asserted, including, without limitation, to the following (collectively, the "Excluded Liabilities"):

(a) any of Seller's liabilities under this Agreement, and any other agreements (written or oral) entered into by Seller other than the Assumed Contracts.

(b) any liabilities from the Seller's business ("Business") that took place prior to the Closing;

(c) any note payable in favor of, or any other amount owed to, any of Seller's lenders or creditors;

(d) any liability of Seller with respect to any Taxes;

(e) any of Seller's liabilities (i) arising by reason of any violation or alleged violation of any federal, state, or foreign law, or any requirement of any

Governmental Entity, (ii) arising by reason of any breach or alleged breach by Seller of any contract, agreement, license,

commitment, instrument, judgment, order, or decree, (iii) arising under any environmental, health, and safety laws, regulations, and/or requirements;

(f) any liability of Seller arising out of the injury to or death of any individual, or damage to or destruction of any property, whether based on negligence, breach of warranty, strict liability, enterprise liability, or any other legal or equitable theory, and arising from or related to products (or parts or components thereof) distributed or otherwise disposed of or for services performed by Seller, to the extent any of such Liabilities result from or arise out of events, facts, or circumstances occurring or existing on or prior to the Closing, notwithstanding that the date on which any Proceeding or Claim therefor is commenced or made after the Closing;

(g) any of Seller's liabilities, including legal fees and expenses, for vacation pay, sick pay, holiday pay, salary, bonuses, severance pay, workers' compensation, benefits, fringe benefits or other payments or liabilities of any kind to any current or former employee of, or any party who was hired or engaged by, Seller, or under any employee benefit or employee benefit plan, resulting from Seller's conduct before the Closing Date;

(h) any of Seller's liability for any expenses or fees related to the negotiation, preparation, approval, or execution of this Agreement or its transactions (including attorneys', accountants', and brokerage fees incurred by or charged to Seller);

(i) any of Seller's liabilities arising from conduct before the Closing, or the actions of its officers, directors, shareholders, employees, consultants, contractors, agents, or advisors; and

(j) any of Seller's other liabilities other than the Assumed Liabilities.

~~(j)~~ Seller acknowledges that it retains the Excluded Liabilities.

I.6 Purchase Price. The purchase price to be paid by Buyer to Seller for the Purchased Assets shall be ~~**Fifteen**~~Thirty-Seven Million~~**, Eight-Hundred and Fifty Thousand**~~ U.S. Dollars ($~~**15,850,000**~~37,000,000.00) (the "Purchase Price"). The Purchase Price shall be paid as follows:

(a) A deposit of ~~**5**~~7.5% of the Purchase Price in the amount of Two Million, Seven-Hundred and ~~**Ninety-Two Thousand, Five Hundred Dollars ($792,500**~~Seventy-Five Thousand U.S. Dollars ($2,775,000.00) (with crediting for the funds previously deposited with Seller's escrow agent, Archer & Greiner, from Buyer in the amount of $792,500.00) shall be paid by Buyer to Seller within five (5) days of signing this Agreement ("Good Faith Deposit"), to be held in an interest-bearing escrow account by Seller's counsel (the "Escrow Agent") and pursuant to an escrow agreement in form

and substance reasonably acceptable to Buyer and Seller, attached hereto as **Exhibit "I"** (the "Escrow Agreement") until Closing, with the funds (including any interest earned thereon) to be applied to the Purchase Price on a dollar-for-dollar basis at Closing. The Escrow Agent shall not release, transfer, apply or otherwise dispose of the Good Faith Deposit except (i) at Closing, in accordance with joint written instructions from Buyer and Seller, (ii) pursuant to a written agreement executed by Buyer and Seller, or (iii) pursuant to a final, non-appealable order of a court of competent jurisdiction. The

Escrow Agent shall have no discretion or authority to determine entitlement to the Good Faith Deposit. All escrow fees and costs shall be borne by Seller unless otherwise agreed by the parties;

(b) The balance of the Purchase Price ~~of~~ shall be paid by Buyer to Seller at Closing (the "Closing Payment")~~.~~; and

(c) The Good Faith Deposit shall be fully refundable (with interest) as set forth herein. The Parties acknowledge and agree that the Good Faith Deposit shall not be deemed to constitute property of the Estate under the Bankruptcy Code, that Seller's Estate shall have no interest of any kind under Chapter 5 of the Bankruptcy Code or applicable law (equitable or otherwise) in and to the Good Faith Deposit and the Escrow Agent shall hold the Good Faith Deposit in trust in accordance with this Agreement. In the event that Buyer purchases the Purchased Assets and the sale closes, then all Good Faith Deposit payments made by Buyer pursuant to the terms of this Agreement (together with any interest earned thereon) shall be credited to and offset against the Purchase Price and paid to the credit of Seller at the Closing.

I.7 Allocation of Purchase Price. The Allocation of the Purchase Price shall be determined by the Buyer as soon as commercially practicable, but no later than one hundred and eighty (180) days after the Closing. The Parties hereby agree that they shall file all federal, state, and local Tax Returns and reports in a manner consistent with such allocation, and that neither Party will assert or maintain a position inconsistent with such allocation in any administrative or judicial proceeding, including any tax audit or tax proceeding.

I.8 Transfer Taxes. The Party that is required by applicable Law to pay any and all bulk sale, stamp, documentary, filing, recording, registration, sales, use, transfer, ~~**added- value**~~added-value or other non-income Tax, fee, or governmental charge imposed under applicable Law in connection with the transactions contemplated hereby (the "Transfer Taxes") shall be responsible for paying that Party's Transfer Taxes. ~~**Notwithstanding the foregoing, Seller shall be solely responsible for and shall pay all Transfer Taxes. To the extent applicable Law imposes liability for any Transfer Taxes on Buyer, Seller shall promptly reimburse Buyer for any such amounts paid by Buyer.**~~ The Party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall prepare and timely file such Tax Returns. Seller shall timely provide Buyer with all information and documentation reasonably requested by Buyer in connection with such

Tax Returns and shall execute any documents reasonably requested by Buyer in connection therewith. Buyer shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by the Seller, but not less than ten (10) Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to Buyer's approval, which shall not be unreasonably withheld, delayed, or conditioned. Buyer and Seller shall cooperate in making, in a timely manner, all Tax Returns, filings, reports, forms and other documentation as are necessary or appropriate to comply with all applicable Laws in connection with the payment of Transfer Taxes and shall cooperate in good faith to minimize, to the fullest extent possible under such

Laws, the amount of any such Transfer Taxes. Seller shall take all actions reasonably requested by Buyer to obtain any available exemption, reduction or refund of any Transfer Taxes.

I.9 Proration. All monthly payments (the "Prorated Charges") for the month in which the Closing occurs (including utility charges) shall be apportioned and prorated between Seller and Buyer as of the Closing Date with (i) Buyer bearing the expense of Buyer's proportionate share of such Prorated Charges that shall be equal to the product obtained by multiplying (A) a fraction, the numerator being the amount of the Prorated Charges and the denominator being the total number of days in the month in which the Closing occurs, times (B) the number of days following the day that immediately precedes the Closing Date and paying such amount to Seller to the extent payment for such Prorated Charges has been made by Seller prior to the Closing, and (ii) Seller bearing the remaining portion of such Prorated Charges (and paying the amounts thereof to Buyer to the extent payment for such Prorated Charges has not been previously made by Seller). Seller shall be responsible for any and all taxes and assessments, including any interest, penalties or fees, incurred prior to the Closing and any transfer taxes associated with the transfer of the Real Property to Buyer. Buyer shall be responsible for all taxes and assessments accruing after the Closing. The Closing statement to be prepared by Buyer's title company (the "Title Company") shall reflect such proration based on the most recent and available tax rate and valuation. Any other costs or expenses, if any, shall be allocated between and charged to Buyer and Seller in accordance with the Title Company's usual practices. Seller shall be responsible for the cost of the preparation and delivery of all documents to be furnished by Seller. Buyer shall be responsible for the cost of recording the deed and the cost of purchasing a title insurance policy. The Closing fee of the Title Company will be paid by Buyer. Except as set forth herein, no amounts paid or payable under or in respect of any Purchased Asset or group of Purchased Assets shall be apportioned and prorated between Seller and Buyer.

I.10 Sales Tax. Buyer shall be responsible for and pay any and all sales tax due and payable arising from the transactions contemplated by this Agreement.

I.11 Title Commitment/Survey.

~~(a)~~ (a) Within five (5) days after the Effective Date, Seller shall deliver to Buyer:

(i) copies of all existing owner's and lender's title policies relating to the Pyote Property; (ii) all existing surveys of the Pyote Property; and (iii) all engineering, environmental, geotechnical, wetlands, seismic, structural, zoning and other third-party reports concerning the Pyote Property in Seller's possession or control.

~~(b)~~ (b) Buyer shall obtain a title commitment for the Pyote Property (the "Title Commitment"). Buyer may object ("Title Objection") in writing to any title matter disclosed in the Title Commitment or any amendment, update or continuation thereof **~~at any time prior to the expiration of the Due Diligence Expiration Date (or, as to any liens or other encumbrances that come of record after the effective date of the last Title Commitment or title update obtained by Buyer during the Due Diligence Period, which last title update shall not be earlier than August 4, 2026, at any time prior to the Closing)~~**through October 15, 2026. Seller shall, on or before Closing, with respect to a Title

Objection, use its reasonable best efforts to remove all liens, claims, encumbrances, title defects and other title exceptions affecting the Pyote Property, excluding Permitted Liens such as mineral rights, rights of way and easements granted to public utilities and for gas or electric, including any disclosed in any update to the Title Commitment, except Permitted Liens and those Title Objections expressly approved in writing by Buyer. Notwithstanding the foregoing, Seller shall be required to cause to be released, satisfied, and removed of record as of the Closing: (i) any title defects which have been voluntarily recorded or otherwise placed, or permitted to be placed, by Seller against the Pyote Property on or following the Effective Date (other than with the prior written approval of Buyer); and (ii) any mortgages, deeds of trust, security instruments, financing statements, or other instruments which evidence or secure indebtedness, judgments, and liens against the Pyote Property of a definite and ascertainable amount, including, without limitation, mechanics' liens, tax liens and real estate taxes, water rates, and sewer rents and taxes, in each case, which are due and payable but which remain unpaid and/or of record as of the Closing (collectively, the "Mandatory Title Removal Items"). Buyer shall have no obligation to accept any title exception subject to a timely raised Title Objection **~~raised before the Due Diligence Expiration Date,~~** not expressly approved by Buyer in writing.

~~(c)~~ (c) If Seller is unable or unwilling to convey title to the Pyote Property in accordance with this Agreement on or before Closing, Buyer may, at its sole option: (i) terminate this Agreement and receive the immediate return of the Good Faith Deposit, whereupon neither party shall have any further obligations hereunder except those that expressly survive termination; or (ii) waive such objection and proceed to Closing without waiving any other rights or remedies available under this Agreement or applicable law.

~~(d)~~ (d) Seller may satisfy and discharge Mandatory Title Removal Items from the proceeds of Closing, provided that the Title Company issues the Title Policy without exception for such Mandatory Title Removal Items or other title defects subject to a Title Objection.

(e) (e) Seller shall execute and deliver all affidavits, releases, payoff letters, curative documents and other instruments reasonably required by Buyer or the Title Company to permit issuance of an owner's title insurance policy (the "Title Policy") insuring fee simple title to the Pyote Property, effective as of Closing, free and clear of all liens, claims, encumbrances and title exceptions raised by Buyer as Title Objections, other than Permitted Liens and those expressly approved herein and otherwise in writing by Buyer.

(f) (f) If requested by Buyer, and pursuant to a Title Objection, Seller shall use commercially reasonable efforts to obtain and deliver any estoppel certificates, lien waivers, subordinations, non-disturbance agreements or other documentation relating to the Pyote Property reasonably required by Buyer or the Title Company.

(g) (g) Notwithstanding anything herein to the contrary, Seller shall convey the Pyote Property pursuant to the Sale Approval Order free and clear of all liens, claims, interests, encumbrances and title exceptions to the fullest extent authorized under the Bankruptcy Code, except only those matters raised as Title Objections unless Permitted Liens or otherwise expressly

approved herein and otherwise in writing by Buyer, with all such liens, claims and interests attaching solely to the proceeds of sale to the extent provided in the Sale Approval Order.

## ARTICLE II ~~CLOSING~~
## CLOSING

II.1 Closing. The consummation of the transactions contemplated hereby (the "Closing") shall take place on ~~or before November 30~~December 15, 2026, pursuant to the Sale Approval Order (or on such other date as may be agreed by the Parties and/or ordered by the Bankruptcy Court (conditioned, if applicable, upon the Bankruptcy Court making a finding under Fed. R. Bankr. P. 6004(h)) (the "Closing Date")). Upon written notice to Buyer prior to the Closing Date, the Sellers may extend the Closing Date to January 14, 2027 (the "January Closing Date"), provided that the Purchase Price shall be reduced by $75,000. Upon written notice to Buyer prior to the January Closing Date, the Sellers may extend the Closing Date to February 13, 2027 (the "February Closing Date"), provided that the Purchase Price shall be reduced by an additional $150,000. Upon written notice to Buyer prior to the February Closing Date, the Sellers may extend the Closing Date to March 15, 2027 (the "March Closing Date"), provided that the Purchase Price shall be reduced by an additional $250,000. Unless otherwise agreed to in writing by the Parties, the Closing Date shall not extend subsequent to the March Closing Date.

II.2 Deliveries to be Made by Seller at Closing. At the Closing, Seller shall deliver the following to Buyer free and clear of Liens, except Permitted Liens, all of which shall be properly authorized and executed by Seller and acceptable to Buyer in its ~~sole and absolute~~reasonable discretion:

(a) possession of the Purchased Assets;

(b) a bill of sale and/or such endorsements, assignments, and other good and sufficient instruments of conveyance and transfer as Buyer may deem desirable in a form reasonably satisfactory to Buyer, conveying title from Seller to Buyer to the Purchased Assets, free and clear of any and all Liens, except Permitted Liens;

(c) the Assignment and Assumption Agreement;

(d) such affidavits, certifications and other documentation evidencing the authority of the person executing the subject documents on behalf of Seller in a form acceptable to Buyer;

(e) An Owner's title affidavit (the "Title Affidavit"), affidavit of Seller's Residence ("Seller's Residence Affidavit"), Broker's affidavit ("Broker's Affidavit"), Broker's lien waiver ("Broker's Lien Waiver"), 1099-S certification ("1099-S Certification") and, if applicable, an Affidavit of Exemption from Withholding ("Exemption Affidavit") in the forms annexed hereto as **Exhibit "G-1"** and, if Seller has retained a person or entity (other than an employee of Seller) to manage the Pyote Property or any portion thereof and does not include in the Title Affidavit such certifications as the Title Company shall reasonably require to omit from the Purchaser's title policy exceptions for possible liens of the property manager, and, if applicable, a Property Manager Lien Waiver (the "Property Manager Lien Waiver") duly executed by Seller and the property manager in the form annexed hereto as **Exhibit "G-2"**.

(f) Such other documents, instruments or agreements as may be reasonably requested by Buyer or the Title Company to consummate the Closing of the Pyote Property in accordance with the terms of this Agreement;

(g) if the Sale Approval Order does not authorize a sale free and clear of all Liens (other than any liens for *ad valorem* taxes falling due after Closing or any additional exceptions approved by Buyer in writing herein or otherwise, or as otherwise required by law ~~or permitted under this Agreement~~ (collectively, "Permitted Liens")) affecting the Purchased Assets to the maximum extent permitted by Section 363 of the Bankruptcy Code, such releases and termination statements with respect to all Liens (other than Permitted Liens) on the Purchased Assets as may be necessary and required by Buyer; provided, however, nothing herein shall obligate Buyer to proceed to Closing if the Sale Approval Order does not authorize a sale free and clear of all Liens (other than Permitted Liens) to the maximum extent permitted by Section 363 of the Bankruptcy Code;

(h) such other documents of assignment and transfer as may be reasonably required to vest all right, title, and interest of Seller in and to the Purchased Assets in Buyer;

(i) an assignment and assumption agreement relating to the Assumed Contracts in a form reasonably satisfactory to Buyer (the "Assignment and Assumption Agreement") duly executed by Seller;

(j) resolution of the board of directors of Seller authorizing the execution and delivery of this Agreement and all documents contemplated hereby and consummation of the transaction contemplated herein;

(k) A certificate (the "Seller's Representation Update Certificate") stating that all of Seller's representations and warranties set forth in this Agreement remain true and correct in all respects at and as of Closing, except as otherwise set forth in such certificate and in the form annexed hereto as **Exhibit "H"**, subject to modifications to reflect facts and circumstances existing as of the Closing Date for reasons other than Seller's breach of this Agreement

(l) an executed certificate of Seller to the effect that, as of the Closing Date, all representations and warranties of Seller contained in this Agreement are true and correct in all respects and that all of the covenants and agreements of Seller contained in this Agreement to be performed or satisfied before the Closing Date have been performed or satisfied before the Closing Date;

(m) an information reporting form for purposes of preparing an IRS Form 1099-S;

~~S;~~

~~(n) proof, in form and substance satisfactory to Buyer, of satisfaction of the Mineral Rights Condition; and~~

(n) ~~(o)~~ such other documents as shall be reasonably requested by Buyer, its counsel or its title company in connection with the transactions contemplated by this Agreement.

II.3 Deliveries to be Made by Buyer at the Closing. At the Closing, Buyer shall deliver the following to Seller:

(a) the Closing Payment;

(b) the Assignment and Assumption Agreement;

(c) resolutions of the Buyer authorizing the execution and delivery of this Agreement and of all documents contemplated hereby and consummation of the transaction contemplated herein;

(d) an executed certificate of Buyer to the effect that, as of the Closing Date, all representations and warranties of Buyer contained in this Agreement are true and correct in all respects and that all of the covenants and agreements of Buyer contained in this Agreement to be performed or satisfied before the Closing Date have been performed or satisfied before the Closing Date; and

(e) such other documents as shall be reasonably requested by Seller or its counsel in connection with the transactions contemplated by this Agreement. and closing of the sale transactions herein.

## ARTICLE IIIARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Buyer to enter into this Agreement, each Seller jointly and severally hereby represents and warrants to the Buyer as of the Effective Date and as of the Closing Date, as if such representations and warranties had been made at the Closing Date, as follows:

III.1 Organization and Authority. Seller 1 is a corporation and Seller 2 is a limited liability company, and each Seller is duly organized, validly existing, and in good standing under the laws of the State of Delaware. This Agreement and Seller's execution thereof has been duly authorized by all necessary corporate action. Seller has obtained and currently maintains all qualifications to do business as a foreign entity in all other jurisdictions in which the character of Seller's properties or the nature of Seller's activities require it to be so qualified. Subject to entry of the Sale Approval Order by the Bankruptcy Court, Seller has the full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated herein. Subject to entry of the Sale Approval Order by the Bankruptcy Court, this Agreement constitutes a legal, valid, and binding agreement of Seller that is enforceable in accordance with its terms.

III.2 Governmental Authorization. The execution, delivery, and performance by Seller of this Agreement requires no action by, or filing with, any governmental body, agency, or official, other than approvals of authorization by the Bankruptcy Court. and Approvals as set forth in Section 7.2(c), and all such approvals, authorizations, consents, notices and filings necessary for Seller to consummate the transactions contemplated hereby shall have been duly obtained, made or given prior to the Closing and shall be in full force and effect. No other consent, approval, authorization, order, permit or filing

is required that would prevent, delay or impair Seller's ability to consummate the transactions contemplated hereby or Buyer's ownership or use of the Purchased Assets following the Closing.

III.3 No Conflict. Subject to entry of the Sale Approval Order, the execution, delivery and performance of this Agreement by Sellers do not and will not (a) violate each Seller's Organizational Documents, (b) violate any applicable Law or Order applicable to each Seller or the Purchased Assets, (c) result in any breach or default under any material Contract relating to the Purchased Assets, or (d) result in the creation of any Lien on the Purchased Assets other than Permitted Liens.

III.4 Litigation. Except as disclosed in the Bankruptcy Case or on **Exhibit "E"** there is no action, suit, proceeding, arbitration, investigation or governmental inquiry pending or, to Seller's knowledge, threatened against Seller or affecting the Purchased Assets that would reasonably be expected to materially impair the Purchased Assets or prevent or delay the consummation of the transactions contemplated hereby.

III.5 Sufficiency of and Title to the Purchased Assets. Each Seller has and, pursuant to the Sale Approval Order and upon Closing, Buyer shall acquire good, valid and marketable title in and to the Purchased Assets, free and clear of all Liens, other than Permitted Liens expressly assumed by Buyer pursuant to this Agreement. Seller has good and valid title to, or a valid and enforceable right to transfer, each of the Purchased Assets. None of the Purchased Assets is subject to any restriction on transfer or other agreement that would impair Buyer's ownership, use or enjoyment thereof following the Closing. For the avoidance of doubt, to the extent anyone asserts a fractional ownership interest in the Pyote Property, Seller shall deliver the Pyote Property to Buyer free and clear of all such Fractional Ownership Interests at Closing, unless otherwise agreed to by Buyer in writing.

III.6 Required Consents. Except for consents, approvals or authorizations of, or declarations or filings with the Bankruptcy Court and Approvals, there is no agreement or other instrument binding upon Sellers requiring any consent, approval, notification, filing, registration, authorization, permission, license, requirement, or action by any third-party resulting from the execution, delivery, and performance of this Agreement.

III.7 Utilities. Seller has not received any written notice that any electrical service, power allocation, interconnection rights, utility service, water, sewer, telecommunications or other utility serving the Purchased Assets will be reduced, terminated or materially modified. To Seller's knowledge, there exists no condition that would materially impair the transfer or continued availability of such utility rights following Closing.

III.8 Assumed Contracts. Each Seller has made available to Buyer a copy of all Assumed Contracts, together with all amendments, exhibits, attachments, waivers, or other changes thereto and, to Seller's knowledge, such copies are true, correct and complete in all material respects and constitute all documents comprising the Assumed Contracts. Sellers have not received any written notice of any material default by any party under any Assumed Contract that remains uncured, except as disclosed to Buyer in writing. Each Seller represents that it has not taken or failed to take any action that would impair its ability to assume and assign any Assumed Contract designated for assumption and assignment pursuant to this Agreement. Sellers shall use

commercially reasonable efforts to obtain entry of all orders and take all actions reasonably necessary to facilitate the assumption and assignment of the Assumed Contracts designated by Buyer. Buyer acknowledges that the Bankruptcy Court may not approve assumption and assignment of all contracts designated by the Buyer hereunder provided, however, that Buyer

shall not be obligated to close if the failure to assume and assign any Assumed Contract designated by Buyer would reasonably be expected to have a Material Adverse Effect on the Purchased Assets.

III.9 Certain Fees. Other than DuFrayne LLC, Seller has not employed any broker, finder, investment banker, or other intermediary or has not incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or any transactions contemplated by this Agreement or the transactions this Agreement contemplates.

III.10 Notices of Certain Events. Sellers shall promptly notify Buyer of:

(a) Any notice or other written communication from any third-party alleging that the consent of such third-party is or may be required in connection with the consummation of the transactions contemplated by this Agreement; and

(b) Any material written communication from any governmental or regulatory agency or authority in connection with or relating to the transactions contemplated by this Agreement.

III.11 Equipment. All of Seller's equipment ("Equipment") is owned by the Sellers and, when conveyed by Sellers to Buyer, will be owned by Buyer free and clear of all Liens except Permitted Liens. The Equipment constitutes all material equipment owned by Seller and used in connection with the Purchased Assets and is in substantially the same condition as of the Effective Date, ordinary wear and tear excepted. Seller has not leased, licensed or otherwise granted any third party any right to possess or use any Equipment, except as disclosed in this Agreement or the Disclosure Schedules. Upon the Closing, Buyer shall acquire good and marketable title to the Equipment, free and clear of all Liens other than Permitted Liens, together with all warranties, guarantees and similar rights, to the extent transferable.

III.12 Permits. Sellers possess all material permits, licenses, approvals and governmental authorizations necessary for the ownership and operation of the Purchased Assets as presently conducted, and such permits are in full force and effect.

III.13 Taxes. Each Seller has timely filed (or caused to be timely filed) all material Tax Returns required to be filed with respect to the Purchased Assets and has timely paid, or will timely pay, all Taxes required to be paid by each Seller with respect to the Purchased Assets for all taxable periods ending on or before the Closing Date, other than Taxes being contested in good faith by appropriate proceedings. There are no Liens for Taxes upon any of the Purchased Assets, other than Permitted Liens arising by operation of applicable Law for Taxes not yet due and payable. Sellers have not received any written notice of any pending audit, examination or

proceeding by any taxing authority relating to Taxes that would result in a Lien on, or otherwise materially adversely affect, the Purchased Assets.

III.14 Financial Information.

(a) Seller has made available to Buyer all financial statements, operating statements, utility billing records, capital expenditure information, and other financial or operating information relating to the Purchased Assets, that are in Seller's possession or control and have been requested by Buyer (collectively, the "Financial Information").

(b) To Seller's knowledge, the Financial Information delivered or made available to Buyer has been prepared in good faith from the books and records of Seller, is true, correct and complete in all material respects, and fairly presents, in all material respects, the information purported to be reflected therein for the applicable periods. Seller has not knowingly omitted any material information necessary to make the Financial Information, taken as a whole, not misleading.

(c) Since the date of the most recent Financial Information made available to Buyer, Seller has not become aware of any material adverse change in the financial condition or operation of the Purchased Assets that has not been disclosed to Buyer in writing. Seller has made available to Buyer true, correct and complete copies, in all material respects, of all books, records, utility information, correspondence, reports, contracts and other documents in Seller's possession or control relating to the Purchased Assets that have been requested by Buyer. To Seller's knowledge, such books and records accurately reflect the information they purport to contain in all material respects, and Seller has not knowingly withheld any material information relating to the Purchased Assets requested by Buyer.

III.15 Environmental Matters. Except as set forth on **Exhibit "F"** to Seller's knowledge: (a) Each Seller is, and during Seller's ownership of the Purchased Assets has been, in material compliance with all applicable Environmental Laws with respect to the Purchased Assets;

(b) Seller has not received any written notice, demand, claim, request for information or other written communication from any governmental authority or third party alleging any material violation of, or material liability under, any Environmental Law with respect to the Purchased Assets that remains unresolved; (c) there has been no release, discharge, disposal or threatened release of any Hazardous Substance at, on, under or from the Purchased Assets in violation of applicable Environmental Laws that would reasonably be expected to result in material liability relating to the Purchased Assets; (d) Seller has not received any written notice of the presence of any underground storage tanks, asbestos-containing materials, polychlorinated biphenyls or other regulated Hazardous Substances at the Purchased Assets, except as disclosed on **Exhibit "F"**; (e) Seller has obtained and is in material compliance with all material permits, licenses and other governmental authorizations required under applicable Environmental Laws with respect to the ownership and operation of the Purchased Assets; and (f) there is no pending or, to Seller's knowledge, threatened investigation, action or proceeding under any Environmental Law relating to the Purchased Assets that would reasonably be expected to result in material

liability or

materially impair Buyer's ownership, development or use of the Purchased Assets following the Closing. For purposes of this Agreement, "Environmental Laws" means all applicable federal, state and local Laws relating to pollution, the protection of human health or the environment, or the manufacture, generation, use, handling, storage, treatment, transportation, release or disposal of Hazardous Substances, each as amended from time to time. "Hazardous Substances" means any substance, material or waste that is regulated under any Environmental Law, excluding quantities of substances customarily used, stored or maintained in compliance with applicable Environmental Laws.

III.16 General Warranty. None of the representations or warranties contained herein by Seller, nor any exhibit, schedule, statement, or certificate furnished to or to be furnished by Seller to Buyer pursuant to the terms hereof or in connection with the transactions contemplated herein, contains or will contain any knowingly untrue statement of a material fact or knowingly omits or will omit to state a material fact necessary to make the statements contained or incorporated herein or therein not misleading.

III.17 Real Property.

(a) Except for certain fractional ownership rights which may be asserted, Seller is the sole owner of the Pyote Property and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this Agreement; for the avoidance of doubt, Seller agrees to deliver the Pyote Property to Buyer free and clear of all fractional ownership rights at Closing unless otherwise agreed to by Buyer in writing;

(b) Seller is not a "foreign person", as that term is defined for purposes of the FIRPTA;

~~FIRPTA;~~

(c) Seller has been known by no other name for the past ten years, except

Lonestar Dream Inc. and Lonestar Taproot LLC;

(d) The Pyote Property is not serviced by municipal sewer and water systems. The water and electrical and other mechanical and utility systems serving the Pyote Property is, to the best of Seller's reasonable knowledge, in sound operating condition;

(e) There are no assessments, charges, paybacks, or obligations for improvements or services affecting the Pyote Property;

(f) There are no persons employed at the Pyote Property in connection with the ownership, use, operation, maintenance, repair and/or replacement of the Pyote Property who will be binding upon Buyer after the Closing;

(g) There are no collective bargaining agreements, management agreements or other employee agreements affecting the Pyote Property or which would bind Buyer after the Closing;

(h) Seller has not received any written notice of any lawsuits, tax appeals, condemnation proceedings, or environmental investigations pending or, to Seller's best knowledge, affecting the Pyote Property.

(i) Other than for the leases identified as potential Assumed Contracts, there are no leases, licenses or other occupancy and/or use agreements, written or oral, affecting the Pyote Property or any portion thereof to which Seller is a party or by which Seller or any future owner of the Pyote Property through Seller is or will be bound, and Seller has delivered a true, correct and complete copy of the Leases to Buyer prior to Buyer's execution and delivery of this Agreement.

(j) There are no contracts or agreements affecting the Pyote Property which will survive Closing and be binding upon Buyer except the Assumed Contracts and in the Title Commitment;

(k) Excluding the right of bidders to bid at bankruptcy auction on the Pyote Property and Purchased Assets, no person, firm or entity, except for the Buyer, has any rights in, or rights to purchase or acquire all, or any part of the Pyote Property, including, without limitation, a right of first refusal or option to purchase with respect thereto.

(l) Seller has not received any written notice from any governmental authority or other person claiming or alleging that the Pyote Property or any portion thereof, or any properties in the vicinity of the Pyote Property, is contaminated by hazardous materials or substances in violation of any federal, state and local laws, statutes, ordinances and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S. §§ 6901 et seq.), the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), as amended, and any

state or local counterpart or equivalent of any of the foregoing, and any federal, state or local transfer of ownership notification or approval statutes.

(m) There are no current or pending litigation(s), lawsuits, actions, investigations, grievances, complaints, charges, or proceedings against Seller, or with respect to the Pyote Property, either filed individually, jointly or by class, in a federal, state or municipal court, of any jurisdiction whatsoever, or before any administrative agency or arbitral tribunal, involving any federal, state or municipal labor, employment or benefits law (as those terms are

most broadly defined); including, but not limited to, the National Labor Relations Act, 29 U.S.C. §§151, et seq., the Fair Labor Standards Act, 29 U.S.C. §§201, et seq., ERISA, Section 1981 through 1988 of Title 42 of the United States Code, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000(e), et seq., the Americans With Disabilities Act of 1990, 42 U.S.C. §§12101, et seq., the Family and Medical Leave Act of 1993, 29 U.S.C. §§2601, et seq., the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621, et seq., the Genetic Information Nondiscrimination Act of 2008, Uniformed Services Employment and Reemployment Rights Act, the Fair Credit Reporting Act, the Rehabilitation Act of 1973, 29 U.S.C. §§701, et seq., the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. §§1161, et seq., the Occupational Safety and Health Act, 29 U.S.C. §§651, et seq., the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§621, et seq., the federal and state Worker Adjustment and Retraining Notification Acts (collectively, the "WARN Acts") any State of Texas labor, employment, discrimination law, sexual harassment, or wage and hour law, or any other federal, state or local human rights, civil rights, wage-hour, wage-payment, pension, labor or employment-related laws, or their respective implementing laws, rules and/or regulation(s), or with respect to an alleged breach or violation of any collective bargaining agreement, union agreement, labor agreement, benefits agreement, or employment contract of any kind (as those terms are most broadly defined), or which arise under the common law or in equity (including claims for wrongful discharge or otherwise) (collectively, "Labor and Employment Laws").

III.18 Seller represents and warrants that: (i) it is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986 (the "Code"), which is subject to Section 4975 of the Code; and (ii) the assets of Seller do not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA or Section 4975 of the Code; and (iii)(a) Seller is not a "governmental plan" within the meaning of Section 3(32) of ERISA, and the assets of Seller do not constitute plan assets of one or more such plans; or (b) transactions by or with Seller are not in violation of state statutes applicable to Seller regulating investments of and fiduciary obligations with respect to governmental plans.

III.19 Neither Seller, nor any ERISA Affiliates (as hereinafter defined) has, within the last six (6) years, made a "partial withdrawal" or a "complete withdrawal" (within the meaning of Sections 4205 and 4203 of ERISA) from any "multiemployer plan," nor incurred any

liability on account of a "partial withdrawal" or a "complete withdrawal" from any "multiemployer plan", no such liability has been asserted through a "Notice of Assessment" or any similar correspondence, and there are no events or circumstances which could result in any such partial or complete withdrawal, neither Seller, the Property Manager nor any ERISA Affiliate has incurred or could be subjected to any liability under Title IV or Section 302 of ERISA that could reasonably be expected to result in liability to the Buyer ("ERISA Affiliate" means, at any time, each trade or business (whether or not incorporated) that would, at the time, be treated together with either Seller or the Property Manager as a single employer under Title IV or Section 302 of ERISA or Sections 414(b) or 414(c) of the Code.

III.20 Seller covenants and warrants that all of the representations and warranties set forth in this Agreement shall be true and correct at ~~Closing.~~, and as of, the Closing Date, but not thereafter. The covenants and agreements of the Parties that by their terms contemplate performance after the Closing (including Section 5.4 and Section 10.6) shall survive the Closing in accordance with their terms.

III.21 No Other Representations or Warranties. Other than as set forth herein, the Purchased Assets are being sold "as is," "where is," and "with all faults," and Buyer, or any ultimate highest bidder pursuant to any Auction or order of the Bankruptcy Court, hereby acknowledges and agrees that Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets. Buyer will accept the Purchased Assets "as is" and "where is" at closing.

## ARTICLE IV ~~ARTICLE IV~~
## REPRESENTATIONS AND WARRANTIES OF BUYER

IV.1 Organization and Authority. Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware. Buyer has the full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated herein and have been duly authorized by all necessary action on the part of Buyer. Subject to entry of the Sale Approval Order by the Bankruptcy Court, this Agreement constitutes a legal, valid, and binding agreement of Buyer that is enforceable in accordance with its terms.

IV.2 No Conflicts. The execution, delivery, and performance of this Agreement by Buyer will not (i) violate any provision of any existing law, statute, rule, regulation, or ordinance, or (ii) conflict with, result in a breach of, or constitute a default under (a) any certificate or articles of incorporation or by-laws of Buyer, (b) any order, judgment, award or decree of any court, governmental authority, bureau or agency, or (v) any mortgage, indenture, lease, contract or other agreement, or undertaking to which Buyer is a party or by which Buyer ~~of any of~~or its properties or assets may be bound.



(Del) 32473248 v1

IV.3 Investigation by Buyer. Buyer is conducting its own independent review and analysis of the Purchased Assets, the Assumed Liabilities, and the Assumed Contracts. Buyer acknowledges that it has until 10:00 a.m. September ~~18~~10, 2026 ("Due Diligence Expiration Date") to conduct such diligence as it deems necessary or appropriate in connection with the transactions contemplated hereby. Notwithstanding the foregoing, Buyer's investigation shall not limit, diminish or otherwise affect Seller's representations, warranties, covenants or obligations under this Agreement, any Seller Disclosure Schedule or any other document delivered in connection herewith. Buyer shall be entitled to rely upon the accuracy and completeness of the Seller's representations and warranties expressly set forth herein, and Seller shall remain liable for any breach thereof. Buyer shall complete its due diligence by the Due Diligence Expiration Date.

IV.4 Nothing herein shall waive or limit any rights or remedies of Buyer arising from Seller's fraud, willful misconduct, intentional misrepresentation or breach of this

Agreement. Buyer is capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts and Assumed Liabilities.

IV.5 Litigation. As of the date hereof, there is no action, suit, investigation or proceeding pending, against or, to the knowledge of Buyer, threatened against or affecting Buyer before any court or arbitrator or any governmental body, agency, or official, which in any manner challenges or seeks to prevent, enjoin, alter, or materially delay any transactions contemplated by this Agreement.

IV.6 Certain Fees. Buyer has not employed any broker, finder, investment banker, or other intermediary or has not incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or any transactions contemplated by this Agreement.

IV.7 Required Consents. Except for consents, approvals or authorizations of, or declarations or filings with the Bankruptcy Court, there is no agreement or other instrument binding upon Buyer requiring any consent, approval, notification, filing, registration, authorization, permission, license, requirement, or action by any third-party resulting from the execution, delivery, and performance of this Agreement.

IV.8 General Warranty. None of the representations or warranties contained herein by Buyer, nor any exhibit, schedule, statement, or certificate furnished or to be furnished by Buyer to Seller pursuant to the terms hereof or in connection with the transactions contemplated herein, contains or will contain any knowingly untrue statement of a material fact or knowingly omits or will omit to state a material fact necessary to make the statements contained or incorporated herein or therein not misleading.

# ARTICLE VARTICLE V
## COVENANTS OF SELLER AND BUYER

V.1 Efforts; Further Assurances. Seller and Buyer will use commercially reasonable efforts to take any and all actions and to do all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated in this Agreement. Seller and Buyer agree to execute and deliver such other documents, certificates, agreements, and other writings and to take such other actions as may be necessary or desirable in order to vest marketable title to the Purchased Assets in Buyer.

V.2 Notices. If (i) Buyer becomes aware of any material breach by Seller of any representation, warranty, covenant, or agreement contained herein and such breach is capable of being cured by Seller, or (ii) Seller becomes aware of any material breach by Buyer of any

representation, warranty, covenant, or agreement contained herein and such breach is capable of being cured by Buyer, the Party becoming aware of such breach shall promptly notify the other Party in writing, in accordance with the notice provisions of this Agreement. Upon such notice of breach, the breaching Party shall have five (5) days to cure such breach before the exercise of any remedies in connection therewith.

V.3 Pre-Closing Covenants. As material terms of this Agreement:

(a) From the Effective Date until the Closing Date, Seller will maintain the Purchased Assets in the manner consistent with its standards of maintenance prevailing immediately prior to the Effective Date and it will not commit or permit to be committed any waste or change in the condition or appearance of the Purchased Assets, or convey any other right with respect to the Purchased Assets except with the written consent and joinder of Buyer. Seller shall operate, manage and maintain the Purchased Assets in the ordinary course consistent with past practice and shall promptly notify Buyer of any material damage, casualty, condemnation, governmental action or other event affecting the Purchased Assets. Seller will keep all current insurance policies concerning the Purchased Assets in full force and effect until Closing and shall not modify, cancel, terminate or permit any lapse in coverage without Buyer's prior written consent. Buyer and Seller, or its representative, shall have the right to walk the Pyote Property the day before the Closing Date, unless otherwise waived by Buyer in writing, to confirm the condition of the Purchased Assets .

(b) Seller must not transfer any of the Purchased Assets, create any Lien on the Purchased Assets, grant any easements or rights-of-way, or enter into any contract, lease, license, agreement, commitment or other arrangement affecting the Purchased Assets or Buyer's intended use thereof, which is not cancelable on and as of the Closing Date without Buyer's prior written consent. Seller shall not take any action, or fail to take any action, that would reasonably be expected

to adversely affect Buyer's rights in or to the Purchased Assets, the value thereof, or the ability to consummate the transactions contemplated hereby.

(c) Seller shall operate, manage and maintain the Purchased Assets in the ordinary course of business consistent with past practice and shall use commercially reasonable efforts to preserve intact the Purchased Assets and the goodwill associated therewith. Seller shall not take, or omit to take, any action that would reasonably be expected to materially impair the value of the Purchased Assets or Buyer's ability to consummate the transactions contemplated by this Agreement.

(d) Seller shall not amend, modify, terminate, renew, extend, waive any material rights under, or enter into any new Assumed Contract, or consent to any amendment, modification or termination of any Assumed Contract, without the prior written consent of Buyer.

(e) Seller shall use commercially reasonable efforts to preserve and maintain in full force and effect all permits, approvals, authorizations, licenses, utility allocations, interconnection rights, governmental approvals and other rights relating to the Purchased Assets, and

shall not take any action, or fail to take any action, that would reasonably be expected to adversely affect the transferability, availability or use thereof by Buyer following the Closing.

(f) Seller shall promptly notify Buyer in writing of (i) any material damage to or destruction of the Purchased Assets, (ii) any condemnation or threatened condemnation affecting the Purchased Assets, (iii) any written notice of violation, default, investigation or enforcement action relating to the Purchased Assets, (iv) any material claim, action or proceeding affecting the Purchased Assets, or (v) any event or circumstance that would reasonably be expected to result in a Material Adverse Effect or prevent or materially delay the consummation of the transactions contemplated hereby.

(g) Seller shall provide Buyer and its representatives with reasonable access, upon reasonable prior notice and during normal business hours, to the Purchased Assets, the Assumed Contracts, books and records, and such other information relating to the Purchased Assets as Buyer may reasonably request in connection with the transactions contemplated hereby.

(h) Seller shall use commercially reasonable efforts to obtain entry of the Bid Procedures Order and the Sale Approval Order and to satisfy all conditions to Closing within Seller's control and shall not take any action that would reasonably be expected to delay, impair or prevent the consummation of the transactions contemplated hereby.

(i) Seller shall preserve all books, records, files and other documents relating to the Purchased Assets and shall not destroy, discard or materially alter any such books, records or documents prior to the Closing, except in the ordinary course of business and in accordance with applicable Law.

(j) Seller shall not settle, compromise or release any material insurance claim, condemnation award or other claim relating to the Purchased Assets without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed.

(k) From the Effective Date through the Closing or earlier termination of this Agreement, Seller shall preserve the Pyote Property in substantially the same condition as exists on the Effective Date, ordinary wear and tear and casualty excepted, and shall not, without the prior written consent of Buyer, which may be granted or withheld in Buyer's sole discretion:

~~(i)~~ (i) create, incur, assume or permit any lien, claim, encumbrance, easement, covenant, restriction, license or other interest affecting the Pyote Property, transfer any development or similar rights relating to the Pyote Property, or otherwise take or omit to take any action that has a material adverse effect on the Pyote Property, including title thereto;

~~(ii)~~ (ii) demolish, remove, alter or materially modify any improvements located on the Pyote Property, or remove, sell, transfer or dispose of any fixtures,

equipment or personal property used in connection with the Pyote Property, except for replacements of equal or greater quality made in the ordinary course of business;

~~(iii)~~ (iii) enter into, amend, extend, renew, terminate or modify any lease, license, occupancy agreement or other agreement granting any possessory rights in or to the Pyote Property;

~~(iv)~~ (iv) enter into, amend, terminate or modify any contract, service agreement, management agreement or other agreement affecting the ownership, operation, maintenance or use of the Pyote Property that is to be assumed by Buyer and will survive Closing;

~~(v)~~ (v) seek, permit or consent to any change in the zoning, land use designation, subdivision status, permits, entitlements or other governmental approvals affecting the Pyote Property, or voluntarily initiate or consent to any governmental action affecting the Pyote Property;

~~(vi)~~ (vi) take any action, or fail to take any action, that would cause any representation or warranty of Seller contained in this Agreement to be inaccurate as of Closing or result in a breach of any covenant of Seller under this Agreement; or

~~(vii)~~ (vii) settle, compromise, waive or release any claim, litigation, insurance claim, condemnation claim or other material right relating to the Pyote

Property without Buyer's prior written consent, unless to clear title to the Pyote Property.

~~(viii)~~ (viii) provide Buyer with copies of any material notices that Seller receives from any governmental authority or third party with respect to the Pyote Property;

~~(ix)~~ (ix) advise Buyer promptly of any litigation or arbitration proceeding relating to the Pyote Property or that might affect Seller's ability to perform its obligations under this Agreement, or notices that allege a claim that could result in such litigation.

V.4 Post-Closing Covenants. As material terms of this Agreement:

(a) ~~**(a)**~~ Immediately upon the consummation of the Closing, the Parties agree to cooperate with one another and use all good faith efforts to take (or cause to be taken) all actions, and to do (or cause to be done) all things reasonably necessary or proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement, including, without limitation, (i) providing access and title to the Purchased Assets to Buyer; and (ii) assisting Buyer with obtaining access and control over the Purchased Assets.

V.5 Fire or Casualty.

(a) Seller shall promptly notify Buyer in writing of any fire, flood, storm, casualty or other damage affecting the Pyote Property occurring prior to Closing.

(b) If, prior to Closing, all or any portion of the Pyote Property is damaged or destroyed by fire, flood or other casualty, Buyer may, in its sole discretion, by written notice delivered to Seller at any time prior to Closing:

(i) terminate this Agreement, in which event the Good Faith Deposit shall be immediately returned to Buyer and neither party shall have any further obligations hereunder except those expressly stated to survive termination; or

(ii) proceed to Closing, in which event Seller shall assign to Buyer, at Closing, all insurance proceeds and claims relating to such casualty, transfer any insurance proceeds previously received by Seller, credit Buyer at Closing for all applicable deductibles and uninsured losses, and assign all rights, claims and causes of action arising from such casualty.

(c) Seller shall not settle, compromise or release any insurance claim relating to the Pyote Property after the Effective Date without Buyer's prior written consent.

(d) Seller shall maintain all property and casualty insurance covering the Pyote Property in full force and effect through Closing.

V.6 Condemnation.

(a) Seller shall promptly notify Buyer in writing upon learning of any pending, threatened or completed condemnation, eminent domain proceeding or conveyance in lieu of condemnation affecting all or any portion of the Pyote Property.

(b) If, prior to Closing, all or any portion of the Pyote Property becomes subject to any condemnation, eminent domain proceeding or conveyance in lieu thereof, Buyer may, in its sole discretion, by written notice delivered to Seller prior to Closing: (i) terminate this Agreement, in which event the Good Faith Deposit shall be immediately returned to Buyer and neither party shall have any further obligations hereunder except those expressly stated to survive termination; or (ii) proceed to Closing, in which event Seller shall assign to Buyer all condemnation awards, settlement proceeds, claims, rights and causes of action relating to such condemnation or taking, whether received before or after Closing.

(c) Seller shall not settle, compromise or consent to any condemnation proceeding or conveyance in lieu thereof without Buyer's prior written consent.

(d) The provisions of this Section shall survive the Closing.

## ARTICLE VI~~ARTICLE VI~~
## BANKRUPTCY MATTERS; BIDDING PROCEDURES

VI.1 Bankruptcy Filings. Seller shall deliver or cause to be delivered to Buyer for review and comment, as soon as commercially reasonable and in any event not less than two (2) business days prior to the filing thereof, all documents to be filed on behalf of Seller with the Bankruptcy Court, including all motions, applications, petitions, schedules, and supporting papers prepared by Seller (including forms of orders and notices to interested parties) that relate to, or that may affect, the Purchased Assets or the transactions contemplated hereby. All motions, applications, petitions, schedules, and supporting papers prepared by Seller and relating to the transactions contemplated hereby or the Purchased Assets to be filed with the Bankruptcy Court on behalf of Seller must be reasonably satisfactory in form and substance to Buyer and Seller.

VI.2 Sale Approval Order. Seller and Buyer shall use commercially reasonable efforts to cooperate, assist and consult with each other to secure the entry of the Sale Approval Order following the date hereof, and to consummate the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes of, among others, providing necessary assurances of performance by Buyer under this Agreement and furnishing any testimony regarding the

transactions contemplated hereby, including to support the good-faith nature of the negotiations leading to this Agreement.

## ARTICLE VII~~ARTICLE VII~~
## CLOSING CONDITIONS

VII.1 Conditions to Obligations of Buyer and Seller. The obligations of Buyer and Seller to consummate the transactions contemplated in this Agreement are subject to the satisfaction of the following conditions:

(a) The Bankruptcy Court shall have entered the Sale Approval Order and, as of the Closing Date, the Sale Approval Order shall be in full force and effect and shall not have been stayed, vacated, or reversed. The Sale Approval Order shall be in form and substance reasonably acceptable to Buyer and shall, *inter alia*:

(i) Authorize the Seller's execution and delivery of this Agreement and approve the transactions contemplated herein;

(ii) Find that the transfer of the Purchased Assets is legal, valid, and enforceable and vests Buyer with valid title to the Purchased Assets, free and clear of all Liens (except for any Permitted Liens);

(iii) Find that the Purchase Price and other consideration provided by Buyer hereunder constitute fair and reasonable consideration for the Purchased Assets;

(iv) Provide that Buyer is a good faith ~~**Buyer**~~purchaser of the Purchased Assets pursuant to Section 363(m) of the Bankruptcy Code and none of the grounds set forth in Section 363(n) exists with respect to the sale;

(v) Authorize Buyer to file, if desired in its discretion, terminations or cancellations of any recorded Liens (except for Permitted Liens or to the extent required by law) against the Purchased Assets and require secured parties or lienholders, where required by applicable non-bankruptcy law or requested by Buyer, to execute documents of release, cancellation or satisfaction prepared by Buyer, to be filed by Buyer to clear any Liens of record (other than Permitted Liens) from the Purchased Assets;

(vi) Approve the assumption and assignment of any Assumed Contracts and provide that upon payment of the applicable Cure Costs (or other such agreed amount) by the Buyer or Seller, as applicable, such counterparty shall not have any remaining claim against Seller, its Estate or creditors, or Buyer related to any ~~**pre-Closing**~~pre-Closing default under any such Assumed Contract;

(vii) Find that Buyer has not assumed, and has no responsibility or liability for any of Seller's liabilities of any description whatsoever, including any liability of Seller with respect to any Taxes or any pre-Closing liabilities (other than Cure Costs for the Assumed Contracts or other Assumed Liability), whether known or unknown as of the Closing, whether fixed or contingent, or whether existing at the time of or arising after the Closing, including successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, alter ego, successor or transferee liability, de facto merger, mere or substantial continuation; and

(viii) Waive any stay that would otherwise be applicable pursuant to Rules 6004(h) or 6006(d) of the Federal Rules of Bankruptcy Procedure.[8]

(b) No injunction, stay, or similar order or decree issued by any court, tribunal or governmental entity, shall be in effect that restrains, enjoins, stays, or prohibits the consummation of the transactions contemplated by this Agreement.

VII.2 Conditions to Obligations of Buyer. The obligation of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Buyer) of the following conditions:

(a) Seller shall have performed in all material respects all of its obligations hereunder required to be performed by it at, or before, the Closing Date; and

(b) The representations and warranties of Seller contained in this Agreement shall be true and correct at, and as of the Closing Date, as if made at, and as of, the Closing Date.

(c) Buyer shall have received written confirmation, in form and substance satisfactory to Buyer, in its ~~sole and absolute~~reasonable discretion~~, from the applicable utility provider(s), Qualified Scheduling Entity (QSE), and any other relevant governmental or third-party entities~~, of the electrical power supply available to the Pyote Property (i) in the firm allocated and available amount of not less than 54MW of electrical capacity (ii) with the applicable voltage and at the approved point of interconnection for use of such power, (iii) and is available without any known condition, restriction or third-party approval (including that of the retail electricity provider and QSE) which would materially impair the availability, allocation, or delivery of electrical service to the Pyote Property (collectively, the "Power Rights").

(d) Buyer shall have received, in form and substance reasonably satisfactory to Buyer, all governmental and third-party permits, approvals, consents, authorizations and agreements necessary ("Approvals") to ~~(i)~~ transfer to Buyer the electrical power allocation and related ~~power rights~~Power Rights associated with the Pyote Property, without material reduction or restriction. All such permits, approvals, consents, authorizations, and agreements shall be in full force and effect and shall not contain any condition or limitation that would materially impair Buyer's intended use of the Approvals and associated ~~power rights~~Power Rights.

~~(e) Buyer shall have received any of the following at or prior to closing: (a) a written surface use waiver and/or agreement from each holder of mineral rights, leasehold rights, or other mineral grants or interests affecting the Pyote Property of record ("Mineral Rights"), in form and substance satisfactory to Buyer to permit its intended use of the Pyote Property as an AI data center and acceptable for recordation in the county deed records; or (b) a conveyance in fee, an assignment of, or a lease interest in, the Mineral Rights in form and substance satisfactory to Buyer to permit its intended use of the Pyote Property as an AI data center and acceptable for recordation in the county deed records; or (c) satisfactory proof that such Mineral Rights have been removed, released, terminated from or otherwise amended, subordinated or resolved as to and upon the record of title for the Pyote Property, to the satisfaction of Buyer to permit its intended use of the Pyote Property as an AI data center, at Closing; or (d) the parties shall have agreed upon such other resolution of a title issue on the Pyote Property (collectively, the "Mineral Rights Condition"). Seller shall use commercially reasonable efforts to assist Buyer in identifying the applicable Mineral Right's holders and obtaining the requisite documentation or agreements prior to Closing. All costs and other consideration of obtaining the signed title documents, consents and agreements referenced in this subparagraph, shall be borne by the Buyer.~~

(e) Buyer waives any Title Objection pertaining to the Pyote Property based upon mineral rights (reservations, leases or other mineral rights rights), whether of record or not.

(f) Since the Effective Date, no event, change, circumstance or condition shall have occurred that has had, or would reasonably be expected to have, a Material Adverse Effect on the Purchased Assets, the utility rights associated therewith, or Buyer's intended use of the Pyote

Property as an AI data center, including any material casualty, condemnation, loss of utility capacity, material governmental action or material termination of any Assumed Contract.

(g) All necessary governmental approvals, permits, authorizations, consents and filings required for the consummation of the transactions contemplated by this Agreement shall have been obtained or made and shall be in full force and effect.

(h) Other than for payment of the title premium, endorsement fees and other charges of the Title Company to be paid by Buyer, and Buyer's satisfaction of any other conditions of the Title Company to issuance of the Title Policy that can only be satisfied by Buyer, the Title Company is unconditionally committed to issuing an owner's policy of title insurance for the Pyote Property (the "Title Insurance") on such form and with such endorsements as shall be available in the State of Texas and acceptable to Buyer, insuring Buyer's title to the Pyote Property for the full amount of the Purchase Price and free of any liens or other encumbrances other than Permitted Liens and those accepted by Buyer in accordance with the terms of the Agreement.

(i) All material third-party consents required for the consummation of the transactions contemplated by this Agreement (other than those to be obtained through the Bankruptcy Court process) shall have been obtained and shall be in full force and effect.

(j) The ~~Buyer shall have obtained or received a Phase I environmental site assessment, in form and substance satisfactory to Buyer in its sole discretion, respecting the Pyote~~

Property (a "Phase I Report"), the results of which Phase I Report shall be satisfactory to Buyer in its sole discretion.Closing (as defined in the Tarbush Agreement) of the Tarbush Agreement shall have occurred substantially contemporaneous with the Closing hereunder.

VII.3 Conditions to Obligations of Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Seller) of the following further conditions:

(a) Buyer shall have performed in all material respects all of its obligations hereunder required to be performed by it at, or before, the Closing Date; and

(b) The representations and warranties of Buyer contained in this Agreement shall be true and correct at, and as of the Closing Date, as if made at, and as of, the Closing Date.

**ARTICLE VIII** **ARTICLE VIII**
**TERMINATION**

VIII.1 Grounds for Termination. This Agreement may be terminated at any time before Closing by:

(a) mutual written agreement of Seller and Buyer;

(b) either Buyer or Seller, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; provided that no Party may terminate this Agreement under this Section **8.18.1(b)** if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c) either Buyer or Seller, if the Closing shall not have occurred on or before **November 30**December 15, 2026, or such later date that is provided for herein or otherwise agreed to by the parties (the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section **8.1(c)** if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d) Buyer, if any material condition set forth in this Agreement has not been satisfied by Seller or if the conditions of Section **7.2(c)**VII.2 have not been satisfied, and such condition is incapable of being satisfied, unless Buyer elects to waive such satisfaction;

(e) Seller, if Buyer fails to consummate the Closing in accordance with this Agreement due to Buyer's default, unless Seller elects to waive such default; provided, however, that Seller shall not be entitled to terminate this Agreement or retain the Deposit unless Buyer has failed to consummate the Closing as a result of Buyer's default under this Agreement. For the

avoidance of doubt, Buyer shall be entitled to the return of the Deposit if Buyer's failure to consummate the Closing is due to Seller's breach, failure to perform, failure to satisfy a condition to Closing, or any other circumstance not caused by Buyer's default under this Agreement;

(f) Buyer, if Buyer is not the successful bidder or the backup bidder at the Auction and Seller enters into a Competing Transaction with the successful bidder or the backup bidder;

(g) Buyer, if the Bankruptcy Case is dismissed or converted to a case or cases under chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Seller is appointed in the Bankruptcy Case;

(h) Buyer if Seller withdraws or seeks authority to withdraw the Bidding Procedures/Sale Motion.

(i) ~~(d)~~ Buyer, upon the occurrence of a material casualty or condemnation affecting the Purchased Assets.

~~(e) Buyer, at any time prior to the Due Diligence Expiration Date, if Buyer determines, in its sole and absolute discretion, that the results of its due diligence investigation of the Purchased Assets are unsatisfactory or unacceptable for any reason or no reason, including, without limitation, matters relating to the condition, title, operation, value, financial performance, environmental condition, zoning, permits, entitlements, contracts, liabilities, legal requirements or any other matter affecting the Purchased Assets or the transactions contemplated hereby. Upon any such termination, the Good Faith Deposit shall be promptly returned to Buyer, and neither party shall have any further obligations under this Agreement except for those obligations that expressly survive termination~~

The Party desiring to terminate this Agreement under this section shall give notice of such termination to the other Party in accordance with the notice provisions herein. Notwithstanding the foregoing, except in connection with a termination of this Agreement by Seller pursuant to Section ~~8.1~~VIII.1(e), Buyer shall be entitled to receive the Good Faith Deposit in full, and Seller shall have no right to retain, apply or otherwise claim any portion of the Good Faith Deposit.

VIII.2 Effect of Termination.

(a) If this Agreement is terminated by Buyer in accordance with Section ~~8.1~~VIII.1(d), Buyer shall be entitled to the return of the Good Faith Deposit (with interest) within three (3) business days of such termination.

(b) If this Agreement is terminated by Seller in accordance with Section ~~8.1~~VIII.1(e), Buyer shall forfeit the Good Faith Deposit and the Good Faith Deposit shall become property of Seller's Estate as liquidated damages.

(c) If this Agreement is terminated in accordance with any other subsection of Section ~~8.1~~VIII.1, such termination shall be without liability of any Party to the other Party to this Agreement ~~(except as set forth in Section 8.2(d) and (e) below)~~, and the Good Faith Deposit (with interest) shall be returned to Buyer within three (3) business days of such termination.

## ARTICLE IX~~ARTICLE IX~~
## ASSUMPTION OF EXECUTORY CONTRACTS OF THE SELLER

IX.1 Assumed Contracts. Buyer shall be solely responsible for and shall pay or cause to be paid at or prior to Closing, all Cure Costs related to the Assumed Contracts. Buyer shall have no obligation to pay any Cure Costs except to the extent expressly set forth on Exhibit

B. Seller represents and warrants that Exhibit B sets forth a complete and accurate list of all known Cure Costs for each Assumed Contract.

## ARTICLE X~~ARTICLE X~~
## MISCELLANEOUS

X.1 Further Assurances. After the Closing Date, each Party shall execute and deliver such further documents, and perform such acts, as may be reasonably necessary to transfer and convey the Purchased Assets to Buyer on the terms contained herein, and to otherwise comply with the terms of this Agreement and to carry out the transactions provided for herein.

X.2 Notices. All notices, requests, and other communications to any Party hereunder shall be in writing, via e-mail transmission, and shall be given:

If to Seller, to: Lonestar Dream Inc. and Lonestar Taproot LLC
Attn: Michael DuFrayne, CRO;
~~(mdufrayne@dufraynellc.com)~~(mdufrayne@dufraynellc.com)

With a copy to: Stephen M. Packman, Esq. ~~(spackman@archerlaw.com) If to Buyer, to Attn: Jimmy Martini~~(spackman@archerlaw.com)

If to Buyer, to Attn: Jimmy Martini
Hut 8 Corp.
777 Brickell Ave, Floor 2
Miami, FL 33131
(jimmy.martini@hut8.com)
~~Miami, FL 33131~~
~~(jimmy.martini@hut8.com)~~

With a copy to Andrew M. Carty

Brown Rudnick LLP
Seven Times Square
New York, NY 10036
~~(acarty@brownrudnick.com)~~
(acarty@brownrudnick.com)

All such notices, requests, and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request, or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

X.3 Bulk Sales Laws. The Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer, or similar laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

X.4 Expenses. Except as otherwise provided herein, each of the Parties shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including, without limitation, any legal, accounting and other professional fees, whether or not the transactions contemplated hereby are consummated.

X.5 Waivers. No failure or delay by any Party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

X.6 Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. Notwithstanding anything to the contrary herein, Buyer shall have the right, in its sole and absolute

discretion and without the prior consent of Seller, to assign this Agreement, and its rights and obligations hereunder, in whole or in part, to one or more affiliates of Buyer or to one or more designees (including, without limitation, any entity formed for the purpose of consummating the transactions contemplated hereby); provided, however, that such assignment shall not release Buyer from its obligations hereunder. Seller may not assign, in whole or in part, this Agreement or its rights hereunder without the prior written consent of Buyer.

X.7 Assumption of Risk. Seller agrees to assume the risk of loss or damage to the Purchased Assets occurring on or before the date on which title thereof is conveyed to Buyer. If, prior to its conveyance, all or any material portion of the Pyote Property is the subject of a pending or contemplated taking by eminent domain which has not been consummated or if the Pyote Property has been substantially damaged or destroyed, Seller shall notify Buyer of such fact and Buyer shall have the option to terminate this Agreement and, in the event Buyer shall elect to

terminate this Agreement, the Good Faith Deposit together with all interest earned thereon shall promptly be returned to Buyer. If this Agreement is terminated and the Good Faith Deposit together with accrued interest is returned, as aforesaid, neither Party shall have any further rights or obligations hereunder. If, after receipt of Seller's notice, as aforesaid, Buyer does not exercise its option to terminate this Agreement, the Parties hereto shall remain bound hereunder and Seller shall assign and turn over, and Buyer shall be entitled to receive and keep, all awards for the taking by eminent domain described in said notice or all insurance proceeds payable as a result of such destruction or damage and any deductible due from Seller If, prior to its conveyance, any part of the Purchased Assets which constitutes Equipment has been substantially damaged, lost or destroyed, or if there has been a material condemnation affecting the Purchased Assets, Seller shall notify Buyer of such fact and Buyer may elect to either (i) accept all insurance or condemnation proceeds payable as a result of such destruction, damage or, loss or condemnation and any deductible due from Seller or, (ii) agree to a reduction of the Purchase Price by the current mutually agreed value of the lost, damaged or destroyed Purchased Asset, or (iii) terminate this Agreement and receive the prompt return of the Good Faith Deposit (with interest).

X.8 Governing Law. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of State of New York, without giving effect to the principles of conflicts of laws thereof) (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York, except to the extent that such laws are superseded by the Bankruptcy Code. The parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court and waive any right to a jury trial regarding the same.

EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ITS RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST ANY OTHER

PARTY OR ANY ASSIGNEE THEREOF, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.

X.9 Entire Agreement; Amendments; Counterparts. This Agreement sets forth the entire agreement between the Parties with respect to the subject matter hereof and may be amended only by in writing, executed by Seller and Buyer. This Agreement may be executed in counterparts, each of which shall constitute an original, and all of which together shall constitute one and the same instrument. This Agreement shall become effective when the Parties hereto shall have received a counterpart hereof signed by the other Party hereto.

X.10 Captions; Headings; Interpretation. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. The

headings contained in this Agreement are for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement. Whenever the words "include," "includes," or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

X.11 Parties Bound. The terms and conditions of this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, executors, successors, and permitted assigns.

X.12 Severability. Except as otherwise provided herein, if any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable, such provision shall be automatically reformed and construed so as to be valid, operative, and enforceable to the maximum extent permitted by law or equity while preserving its original intent. The invalidity of any part or provision of this Agreement shall not render the remainder of this Agreement invalid.

X.13 Retention of Jurisdiction. ANY AND ALL DISPUTES, DISAGREEMENTS, INTERPRETATIONS, OR OTHER MATTERS CONCERNING THE FINAL CONSUMMATION AND ENFORCEMENT OF THIS AGREEMENT SHALL BE AND REMAIN IN THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, AS A RESULT THEREOF, ANY PLEADINGS, CAUSES OF ACTION OR OTHER REQUESTS FOR RELIEF MUST BE BROUGHT BEFORE SAID COURT BY THE PARTY SEEKING SUCH RELIEF.

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the date first written above.

**SELLER:**

**Lonestar Dream Inc.**

By: ___________________ ~~Name: Kevin Pan~~

Name: Kevin Pan
Title: CEO

**SELLER:**

**Lonestar Taproot LLC**

By: ___________________ ~~Name: Kevin Pan~~

Name: Kevin Pan
Title: CEO of Lonestar Dream Inc., sole member of Lonestar Taproot LLC

**BUYER:** ~~**HUT 8 CORP.,** on behalf of itself and its designees~~**MESQUITE FALCON LLC**

By: ____________________________ ~~Name:~~

Name:
Title:

**ANNEX I**
**CERTAIN DEFINITIONS**

"Auction" means an auction to be held by the Seller in the event higher and better bids are submitted in accordance with the Bidding Procedures.

"Bidding Procedures" means the procedures governing the proposed marketing of, auction of, and bidding for the Purchased Assets pursuant, and attached, to the Bidding Procedures Order.

"Bidding Procedures/Sale Motion" means the motion seeking entry of (i) the Bidding Procedures Order and (ii) Sale Approval Order, which shall be in form and substance reasonably satisfactory to Buyer.

"Bidding Procedures Order" means an Order of the Bankruptcy Court approving the Bidding Procedures, which shall include approval of the Breakup Fee and Expense Reimbursement., and which shall be in form and substance acceptable to Buyer in its reasonable discretion and shall include, at a minimum, customary bid protections, including: (i) a minimum initial overbid in an amount equal to the sum of the Breakup Fee, Expense Reimbursement and an initial overbid increment to be agreed by the parties; (ii) minimum subsequent overbid increments to be agreed by the parties; (iii) requirements that any competing bidder qualify as a "Qualified Bidder" (including delivery of a binding mark-up of the APA with no fewer terms or conditions, proof of financial wherewithal to close, and a non-refundable deposit at least equal to the Good Faith Deposit); (iv) restrictions on credit bidding by any party with disputed liens; (v) payment of the Breakup Fee and Expense Reimbursement on the closing of any alternative transaction with a competing bidder; and (vi) such other customary stalking horse protections as Buyer may reasonably require.

"Business Day" means any day that is not a Saturday, Sunday, or a day on which banking institutions in New York, New York are not required to be open.

"Claim" means any claim, demand, assessment, judgment, order, decree, action, cause of action, litigation, suit, investigation, or other Proceeding.

"Competing Transaction" shall mean a transaction with a bidder who has offered Seller a higher and better purchase price for the Purchased Assets to that offered by Seller, which higher and better bid is approved by order of the Bankruptcy Court.

"Cure Costs" means all amounts payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by Debtor and assignment to Buyer of the Assumed Contracts.

"Debtor" means Lonestar Dream, Inc. and Lonestar Taproot LLC.

"Estate" shall mean the Seller's bankruptcy estate consisting of all assets, rights and interests of the Debtor on the Petition Date in the Bankruptcy Case.

"Final Order" means an order or judgment, the operation or effect of which is not stayed, and as to which order or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired, and as to which no appeal or petition for review or motion for re-argument has been taken or been made and is pending for argument.

"Governmental Entity" means any federal, state, local or foreign political subdivision, court, administrative agency, board, bureau, commission, or department or other governmental authority or instrumentality.

"Law" means any law, statute, treaty, rule, directive, or regulation or Order of any Governmental Entity.

"Liability" means any liability or obligation, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due, regardless of when asserted.

"Material Adverse Effect" means any event, change, circumstance, occurrence, effect, development or state of facts that, individually or in the aggregate, (a) has had, or would reasonably be expected to have, a material adverse effect on the Purchased Assets or (b) would reasonably be expected to prevent, materially delay or materially impair the ability of Seller to consummate the transactions contemplated by this Agreement; *provided*, *however*, that none of the following, alone or in combination, shall be deemed to constitute, or be taken into account in determining whether there has been, a Material Adverse Effect: (i) changes in general economic, regulatory or political conditions or the financial, credit or securities markets in general (including changes in interest rates or exchange rates); (ii) changes generally affecting the industry in which the Business operates; (iii) changes in Law or GAAP (or authoritative interpretations thereof); (iv) any natural disaster, act of God, epidemic, pandemic or disease outbreak; (v) any act of terrorism, sabotage, cyberattack, military action or war; or (vi) the announcement or pendency of the transactions contemplated by this Agreement or the Bankruptcy Case; *provided*, *further*, that any event, change, circumstance, occurrence, effect, development or state of facts referred to in clauses

(i) through (v) may be taken into account in determining whether a Material Adverse Effect has occurred to the extent such event, change, circumstance, occurrence, effect, development or state of facts has a disproportionate adverse effect on the Purchased Assets.

"Orders" means judgments, writs, decrees, compliance agreements, injunctions, rules, awards, settlement agreements, or orders of any Governmental Entity or arbitrator.

"Permits" means all permits, licenses, authorizations, registrations, franchises, approvals, certificates, variances, and similar rights obtained, or required to be obtained, from Governmental Entities.

"Proceeding" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, audit, examination, or investigation commenced, brought, conducted, or heard by or before, or otherwise involving, any court or other Governmental Entity or any arbitrator or arbitration panel.

"Person" shall be construed broadly and shall include an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or another entity including a Governmental Entity (or any department, agency, or political subdivision thereof).

"Tarbush Agreement" means that certain Aset Purchase Agreement, dated as of September 21, 2026, by and between LONESTAR DREAM INC., a Delaware corporation, as seller, and LONESTAR TAPROOT LLC, a Delaware limited liability company, as seller, and RAPTOR BASIN LLC, a Delaware limited liability company, as buyer, executed substantially contemporaneous herewith.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Sale Approval Order" means an order of the Bankruptcy Court in form and substance acceptable to Buyer, *inter alia*, (a) approving (i) this Agreement and the execution, delivery, and performance by Debtor of this Agreement and the other instruments and agreements contemplated hereby; (ii) the sale of the Purchased Assets to Buyer free and clear of all Liens; (iii) the assumption and assignment to Buyer of the Assumed Contracts on the terms set forth herein; and (b) determining that Buyer is a good faith purchaser.

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** ("Agreement"), dated as of September ~~8~~21, 2026 (the "Effective Date"), is made by and between LONESTAR DREAM INC., a Delaware corporation (the "Seller 1") and LONESTAR TAPROOT LLC, A Delaware Limited Liability Company (the "Seller 2" together with Seller 1, each a "Seller" and collectively, the "Sellers"), and ~~a subsidiary or affiliate of Hut 8 Corp. organized under the laws of the State of~~RAPTOR BASIN LLC, a Delaware ~~and to be formed at or prior to Closing~~limited liability company (the "Buyer" and, together with Seller, collectively, the "Parties" and, individually, a "Party"). Capitalized terms used in this Agreement are as defined herein.

## RECITALS

**WHEREAS**, Seller was engaged in the business of, *inter alia*, crypto mining and hosting operations (the "Business") at the Tarbush Property set forth below through July 10, 2026.

**WHEREAS**, Seller is the occupant of that certain real property located at 4143 US Hwy 285, Fort Stockton, TX 79735 in Pecos County, Texas, (known as the "Tarbush Property").

**WHEREAS**, Seller is the owner of certain personal property, equipment and other assets located at the Tarbush Property and set forth on the **Exhibit "A"** attached hereto (the "Purchased Assets").

**WHEREAS**, on July 22, 2026 (the "Petition Date"), Seller commenced a voluntary case under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") (the "Bankruptcy Case").

**WHEREAS**, subject to Seller's receipt of any higher and better offer for the Purchased Assets (as defined herein) in accordance with the Bidding Procedures and Bidding Procedures Order, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Purchased Assets in accordance with this Agreement and sections 105, 363, and 365 of the Bankruptcy Code.

**WHEREAS,** the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement, are subject to entry of the Sale Approval Order and closing of the Adjacent Property PSA.

**NOW THEREFORE,** in consideration of the mutual covenants, representations, warranties, and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the Parties hereto agree as follows:

## ARTICLE IARTICLE I
## SALE OF ASSETS

I.1 Sale of Purchased Assets.

(a) On the Closing Date and subject to the terms and conditions and exclusions contained in this Agreement (including but not limited to Section 1.3I.3) and subject to Permitted Liens as defined herein, each Seller will sell, transfer, convey, assign, and deliver all of Seller's right, title, and interest in and to the Purchased Assets, free and clear of any and all interests, Claims, obligations, rights, encumbrances, pledges, and liens in, against or with respect to any of the Purchased Assets or each Seller having arisen, existed or accrued prior to and through the Closing Date, whether direct or indirect, absolute or contingent, choate or inchoate, known or unknown, matured or unmatured, liquidated or unliquidated, arising or imposed by agreement, understanding, law, equity, statute or otherwise and whether arising prior to, on or after the petition sate, including claims or liabilities otherwise arising under doctrines of successor liability, *de facto* merger or substantial continuity or liabilities or obligations arising under any law or orders (collectively, "Liens").

(b) The Purchased Assets include the following assets of Seller:

(i) The assets set forth on **Exhibit "A"** hereto;

(ii) the **power rights**Power Rights associated with the Tarbush Property;

(iii) all rights under those executory contracts (the "Contracts") and personal property and commercial real property leases (the "Leases") set forth on **Exhibit "B"** attached hereto. The Contracts and Leases are herein, at times, collectively referred to as the "Assumed Contracts" and, individually, as an "Assumed Contract"; provided however, that Buyer may at any time prior to Closing remove any Assumed Contracts from **Exhibit "B"**. Upon removal, such Contracts or Leases shall no longer be an Assumed Contract;

(iv) all claims under existing insurance policies to the extent such policies may provide coverage or a defense with respect to the Purchased Assets;

(v) any and all transferable federal, state, local and foreign governmental Permits, authorizations, and approvals of Seller related to the Purchased Assets;

(vi) copies of documents relating to the Purchased Assets.

I.2 Instruments of Conveyance and Transfer.

(a) Upon the Closing, Seller shall deliver to Buyer possession of the Purchased Assets and convey to Buyer clear title to all of the Purchased Assets.

(b) At the Closing, Seller shall execute and deliver to Buyer a bill of sale and
such endorsements, assignments, and other good and sufficient instruments of conveyance

and

transfer as are reasonably necessary to transfer, convey, and assign good and marketable title to Buyer of the Purchased Assets, free and clear of any and all Liens except for Permitted Liens.

I.3 Excluded Assets.

The Purchased Assets shall exclude all assets and interests of the Seller set forth on **Exhibit "C"** hereto (collectively, the "Excluded Assets").

I.4 Assumed Liabilities. As of the Closing, Buyer shall assume, and pay when due, all Cure Costs due on the Assumed Contracts and any other liabilities of Seller which Buyer has expressly agreed in writing to assume as set forth on **Exhibit "D"** (collectively, the "Assumed Liabilities"); provided however, that Buyer may at any time prior to Closing remove any Assumed Liabilities from Exhibit "D". Upon removal, such liabilities shall no longer be an Assumed Liability.

I.5 Excluded Liabilities. Notwithstanding anything to the contrary in this Agreement, except for the Assumed Liabilities set forth herein, Buyer shall not assume, or become obligated in any way to pay, any of Seller's liabilities, obligations, or debts of any kind whatsoever, whether accrued, absolute, contingent, or otherwise, whether known or unknown, whether due or to become due, and regardless of when or by whom asserted, including, without limitation, to the following (collectively, the "Excluded Liabilities"):

(a) any of Seller's liabilities under this Agreement, and any other agreements (written or oral) entered into by Seller other than the Assumed Contracts.

(b) any liabilities from the Seller's business ("Business") that took place prior

to the Closing;

(c) any note payable in favor of, or any other amount owed to, any of Seller's

lenders or creditors;

(d) any liability of Seller with respect to any Taxes;

(e) any of Seller's liabilities (i) arising by reason of any violation or alleged violation of any federal, state, or foreign law, or any requirement of any Governmental Entity, (ii) arising by reason of any breach or alleged breach by Seller of any contract, agreement, license, commitment, instrument, judgment, order, or decree, (iii) arising under any environmental, health, and safety laws, regulations, and/or requirements;

(f) any liability of Seller arising out of the injury to or death of any individual, or damage to or destruction of any property, whether based on negligence, breach of warranty, strict liability, enterprise liability, or any other legal or equitable theory, and arising from or related to products (or parts or components thereof) distributed or otherwise disposed of or for services

performed by Seller, to the extent any of such Liabilities result from or arise out of events, facts, or circumstances occurring or existing on or prior to the Closing, notwithstanding that the date on which any Proceeding or Claim therefor is commenced or made after the Closing;

(g) any of Seller's liabilities, including legal fees and expenses, for vacation pay, sick pay, holiday pay, salary, bonuses, severance pay, workers' compensation, benefits, fringe benefits or other payments or liabilities of any kind to any current or former employee of, or any party who was hired or engaged by, Seller, or under any employee benefit or employee benefit plan, resulting from Seller's conduct before the Closing Date;

(h) any of Seller's liability for any expenses or fees related to the negotiation, preparation, approval, or execution of this Agreement or its transactions (including attorneys', accountants', and brokerage fees incurred by or charged to Seller);

(i) any of Seller's liabilities arising from conduct before the Closing, or the actions of its officers, directors, shareholders, employees, consultants, contractors, agents, or advisors; and

(j) any of Seller's other liabilities other than the Assumed Liabilities.

~~(j)~~ Seller acknowledges that it retains the Excluded Liabilities.

I.6 Purchase Price. The purchase price to be paid by Buyer to Seller for the Purchased Assets shall be ~~**Thirty-Nine Million, Six**~~One Hundred and ~~**Thirty-Two Thousand, and Five Hundred**~~Three Million U.S. Dollars ($~~**39,632,500.00**~~103,000,000.00) (the "Purchase Price"). The Purchase Price shall be paid as follows:

(a) A deposit of ~~**5**~~7.5% of the Purchase Price in the amount of ~~**One Million, Nine Hundred and Eighty-One Thousand, Six-Hundred and Twenty-Five Dollars ($1,981,625**~~Seven Million, Seven-Hundred and Twenty-Five Thousand Dollars ($7,725,000.00) (with crediting for the funds previously deposited with Seller's escrow agent, Archer & Greiner, from Buyer in the amount of $1,981,625.00) shall be paid by Buyer to Seller within five (5) days of signing this Agreement ("Good Faith Deposit"), to be held in an interest-bearing escrow account by Seller's counsel (the "Escrow Agent") and pursuant to an escrow agreement in form and substance reasonably acceptable to Buyer and Seller, attached hereto as **Exhibit "G"** (the "Escrow Agreement") until Closing, with the funds (including any interest earned thereon) to be applied to the Purchase Price on a dollar-for-dollar basis at Closing. The Escrow Agent shall not release, transfer, apply or otherwise dispose of the Good Faith Deposit except (i) at Closing, in accordance with joint written instructions from Buyer and Seller, (ii) pursuant to a written agreement executed by Buyer and Seller, or (iii) pursuant to a final, non-appealable order of a court of competent jurisdiction. The Escrow Agent shall have no discretion or authority to determine entitlement to the Good Faith Deposit. All escrow fees and costs shall be borne by Seller unless otherwise agreed by the parties;

(b) The balance of the Purchase Price ~~**of**~~ shall be paid by Buyer to Seller at Closing (the "Closing Payment"); and

(c) The Good Faith Deposit shall be fully refundable (with interest) as set

forth herein. The Parties acknowledge and agree that the Good Faith Deposit shall not be deemed to constitute property of the Estate under the Bankruptcy Code, that Seller's Estate shall have no interest of any kind under Chapter 5 of the Bankruptcy Code or applicable law (equitable or otherwise) in and to the Good Faith Deposit and the Escrow Agent shall hold the Good Faith Deposit in trust in accordance with this Agreement. In the event that Buyer purchases the

Purchased Assets and the sale closes, then all Good Faith Deposit payments made by Buyer pursuant to the terms of this Agreement (together with any interest earned thereon) shall be credited to and offset against the Purchase Price and paid to the credit of Seller at the Closing.

I.7 Allocation of Purchase Price. The Allocation of the Purchase Price shall be determined by the Buyer as soon as commercially practicable, but no later than one hundred and eighty (180) days after the Closing. The Parties hereby agree that they shall file all federal, state, and local Tax Returns and reports in a manner consistent with such allocation, and that neither Party will assert or maintain a position inconsistent with such allocation in any administrative or judicial proceeding, including any tax audit or tax proceeding.

I.8 Transfer Taxes. The Party that is required by applicable Law to pay any and all bulk sale, stamp, documentary, filing, recording, registration, sales, use, transfer, ~~**added-value**~~added-value or other non-income Tax, fee, or governmental charge imposed under applicable Law in connection with the transactions contemplated hereby (the "Transfer Taxes") shall be responsible for paying that Party's Transfer Taxes. ~~**Notwithstanding the foregoing, Seller shall be solely responsible for and shall pay all Transfer Taxes, To the extent applicable Law imposes liability for any Transfer Taxes on Buyer, Seller shall promptly reimburse Buyer for any such amounts paid by Buyer.**~~ The Party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall prepare and timely file such Tax Returns. Seller shall timely provide Buyer with all information and documentation reasonably requested by Buyer in connection with such Tax Returns and shall execute any documents reasonably requested by Buyer in connection therewith. Buyer shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by the Seller, but not less than ten (10) Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to Buyer's approval, which shall not be unreasonably withheld, delayed, or conditioned. Buyer and Seller shall cooperate in making, in a timely manner, all Tax Returns, filings, reports, forms and other documentation as are necessary or appropriate to comply with all applicable Laws in connection with the payment of Transfer Taxes and shall cooperate in good faith to minimize, to the fullest extent possible under such Laws, the amount of any such Transfer Taxes. Seller shall take all actions reasonably requested by Buyer to obtain any available exemption, reduction or refund of any Transfer Taxes.

I.9 Proration. All monthly payments (the "Prorated Charges") for the month in which the Closing occurs (including utility charges) shall be apportioned and prorated between Seller and Buyer as of the Closing Date with (i) Buyer bearing the expense of Buyer's proportionate share of such Prorated Charges that shall be equal to the product obtained by multiplying (A) a fraction, the numerator being the amount of the Prorated Charges and the denominator being the total number of days in the month in which the Closing occurs, times

(B) the number of days following the day that immediately precedes the Closing Date and paying such amount to Seller to the extent payment for such Prorated Charges has been made by Seller prior to the Closing, and (ii) Seller bearing the remaining portion of such Prorated Charges (and paying the amounts thereof to Buyer to the extent payment for such Prorated Charges has not been previously made by Seller). Seller shall be responsible for any and all taxes and assessments, including any interest, penalties or fees, incurred prior to the Closing and any transfer taxes associated with the transfer of the Real Property to Buyer. Buyer shall be responsible for all taxes and assessments accruing after the

Closing. The Closing statement to be prepared by Buyer's title company (the "Title Company") shall reflect such proration based on the most recent and available tax rate and valuation. Any other costs or expenses, if any, shall be allocated between and charged to Buyer and Seller in accordance with the Title Company's usual practices. Seller shall be responsible for the cost of the preparation and delivery of all documents to be furnished by Seller. Buyer shall be responsible for the cost of recording the deed and the cost of purchasing a title insurance policy. The Closing fee of the Title Company will be paid by Buyer. Except as set forth herein, no amounts paid or payable under or in respect of any Purchased Asset or group of Purchased Assets shall be apportioned and prorated between Seller and Buyer.

I.10 Sales Tax. Buyer shall be responsible for and pay any and all sales tax due and payable arising from the transactions contemplated by this Agreement.

## ARTICLE II ~~ARTICLE II~~ CLOSING

II.1 Closing. The consummation of the transactions contemplated hereby (the "Closing") shall take place on ~~or before November 30~~December 15, 2026, pursuant to the Sale Approval Order (or on such other date as may be agreed by the Parties and/or ordered by the Bankruptcy Court (conditioned, if applicable, upon the Bankruptcy Court making a finding under Fed. R. Bankr. P. 6004(h)) (the "Closing Date")). Upon written notice to Buyer prior to the Closing Date, the Sellers may extend the Closing Date to January 14, 2027 (the "January Closing Date"), provided that the Purchase Price shall be reduced by $175,000. Upon written notice to Buyer prior to the January Closing Date, the Sellers may extend the Closing Date to February 13, 2027 (the "February Closing Date"), provided that the Purchase Price shall be reduced by an additional $350,000. Upon written notice to Buyer prior to the February Closing Date, the Sellers may extend the Closing Date to March 15, 2027 (the "March Closing Date"), provided that the Purchase Price shall be reduced by an additional $500,000. Unless otherwise agreed in writing by the Parties, the Closing Date shall not extend subsequent to the March Closing Date.

II.2 Deliveries to be Made by Seller at Closing. At the Closing, Seller shall deliver the following to Buyer free and clear of Liens, except Permitted Liens, all of which shall be properly authorized and executed by Seller and acceptable to Buyer in its ~~sole and absolute~~reasonable discretion:

(a) possession of the Purchased Assets;

(b) a bill of sale and/or such endorsements, assignments, and other good and sufficient instruments of conveyance and transfer as Buyer may deem desirable in a form

reasonably satisfactory to Buyer, conveying title from Seller to Buyer to the Purchased Assets, free and clear of any and all Liens, except Permitted Liens;

(c) the Assignment and Assumption Agreement;

(d) such affidavits, certifications and other documentation evidencing the authority of the person executing the subject documents on behalf of Seller in a form acceptable to Buyer;

(e) if the Sale Approval Order does not authorize a sale free and clear of all Liens (other than any liens for *ad valorem* taxes falling due after Closing or any additional exceptions approved by Buyer in writing ~~or~~herein or otherwise, or as otherwise required by law (collectively, "Permitted Liens")) affecting the Purchased Assets to the maximum extent permitted by Section 363 of the Bankruptcy Code, such releases and termination statements with respect to all Liens (other than Permitted Liens) on the Purchased Assets as may be necessary and required by Buyer; provided, however, nothing herein shall obligate Buyer to proceed to Closing if the Sale Approval Order does

not authorize a sale free and clear of all Liens (other than Permitted Liens) to the maximum extent permitted by Section 363 of the Bankruptcy Code;

(f) such other documents of assignment and transfer as may be reasonably required to vest all right, title, and interest of Seller in and to the Purchased Assets in Buyer;

(g) an assignment and assumption agreement relating to the Assumed Contracts in a form reasonably satisfactory to Buyer (the "Assignment and Assumption Agreement") duly executed by Seller;

(h) resolution of the board of directors of Seller authorizing the execution and delivery of this Agreement and all documents contemplated hereby and consummation of the transaction contemplated herein;

(i) an executed certificate of Seller to the effect that, as of the Closing Date, all representations and warranties of Seller contained in this Agreement are true and correct in all respects and that all of the covenants and agreements of Seller contained in this Agreement to be performed or satisfied before the Closing Date have been performed or satisfied before the Closing Date;

(j) an information reporting form for purposes of preparing an IRS Form 1099-S;

~~S;~~

~~(k) proof, in form and substance satisfactory to Buyer, of satisfaction of the Mineral Rights Condition; and~~

(k) ~~(l)~~ such other documents as shall be reasonably requested by Buyer or its counsel in connection with the transactions contemplated by this Agreement.

II.3 Deliveries to be Made by Buyer at the Closing. At the Closing, Buyer shall deliver the following to Seller:

(a) the Closing Payment;

(b) the Assignment and Assumption Agreement;

(c) resolutions of the Buyer authorizing the execution and delivery of this Agreement and of all documents contemplated hereby and consummation of the transaction contemplated herein;

(d) an executed certificate of Buyer to the effect that, as of the Closing Date, all representations and warranties of Buyer contained in this Agreement are true and correct in all respects and that all of the covenants and agreements of Buyer contained in this Agreement to be performed or satisfied before the Closing Date have been performed or satisfied before the Closing Date; and

(e) such other documents as shall be reasonably requested by Seller or its counsel in connection with the transactions contemplated by this Agreement. and closing of the sale transactions herein.

## ARTICLE IIIARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Buyer to enter into this Agreement, each Seller jointly and severally hereby represents and warrants to the Buyer as of the Effective Date and as of the Closing Date, as if such representations and warranties had been made at the Closing Date, as follows:

III.1 Organization and Authority. Seller 1 is a corporation and Seller 2 is a limited liability company, and each Seller is duly organized, validly existing, and in good standing under the laws of the State of Delaware. This Agreement and Seller's execution thereof has been duly authorized by all necessary corporate action. Seller has obtained and currently maintains all qualifications to do business as a foreign entity in all other jurisdictions in which the character of Seller's properties or the nature of Seller's activities require it to be so qualified. Subject to entry of the Sale Approval Order by the Bankruptcy Court, Seller has the full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated herein. Subject to entry of the Sale Approval Order by the Bankruptcy Court, this Agreement constitutes a legal, valid, and binding agreement of Seller that is enforceable in accordance with its terms.

III.2 Governmental Authorization. The execution, delivery, and performance by Seller of this Agreement requires no action by, or filing with, any governmental body, agency, or official, other than approvals of authorization by the Bankruptcy Court. and Approvals set forth in Section 7.2(e), and all such approvals, authorizations, consents, notices and filings necessary for Seller to consummate the transactions contemplated hereby shall have been duly obtained, made or given prior to the Closing and shall be in full force and effect. No other consent, approval, authorization, order, permit or filing is required that would prevent, delay or impair Seller's ability to consummate the transactions contemplated hereby or Buyer's ownership or use of the Purchased Assets following the Closing.

III.3 No Conflict. Subject to entry of the Sale Approval Order, the execution, delivery and performance of this Agreement by Sellers do not and will not (a) violate each Seller's Organizational Documents, (b) violate any applicable Law or Order applicable to each Seller or the Purchased Assets, (c) result in any breach or default under any material Contract relating to the Purchased Assets, or (d) result in the creation of any Lien on the Purchased Assets other than Permitted Liens.

III.4 Litigation. Except as disclosed in the Bankruptcy Case or on **Exhibit "E"** there is no action, suit, proceeding, arbitration, investigation or governmental inquiry pending or, to Seller's knowledge, threatened against Seller or affecting the Purchased Assets that would reasonably be expected to materially impair the Purchased Assets or prevent or delay the consummation of the transactions contemplated hereby.

III.5 Sufficiency of and Title to the Purchased Assets. Each Seller has and, pursuant to the Sale Approval Order and upon Closing, Buyer shall acquire good, valid and

marketable title in and to the Purchased Assets, free and clear of all Liens, other than Permitted Liens expressly assumed by Buyer pursuant to this Agreement. Seller has good and valid title to, or a valid and enforceable right to transfer, each of the Purchased Assets. None of the Purchased Assets is subject to any restriction on transfer or other agreement that would impair Buyer's ownership, use or enjoyment thereof following the Closing.

III.6 Required Consents. Except for consents, approvals or authorizations of, or declarations or filings with the Bankruptcy Court and Approvals, there is no agreement or other instrument binding upon Sellers requiring any consent, approval, notification, filing, registration, authorization, permission, license, requirement, or action by any third-party resulting from the execution, delivery, and performance of this Agreement.

III.7 Utilities. Seller has not received any written notice that any electrical service, power allocation, interconnection rights, utility service, water, sewer, telecommunications or other utility serving the Purchased Assets will be reduced, terminated or materially modified. To Seller's knowledge, there exists no condition that would materially impair the transfer or continued availability of such utility rights following Closing.

III.8 Assumed Contracts. Each Seller has made available to Buyer a copy of all Assumed Contracts, together with all amendments, exhibits, attachments, waivers, or other changes thereto and, to Seller's knowledge, such copies are true, correct and complete in all material respects and constitute all documents comprising the Assumed Contracts. Sellers have not received any written notice of any material default by any party under any Assumed Contract that remains uncured, except as disclosed to Buyer in writing. Each Seller represents that it has not taken or failed to take any action that would impair its ability to assume and assign any Assumed Contract designated for assumption and assignment pursuant to this Agreement. Sellers shall use commercially reasonable efforts to obtain entry of all orders and take all actions reasonably necessary to facilitate the assumption and assignment of the Assumed Contracts designated by Buyer. Buyer acknowledges that the Bankruptcy Court may not approve assumption and assignment of all contracts designated by the Buyer hereunder provided, however, that Buyer shall not be

obligated to close if the failure to assume and assign any Assumed Contract designated by Buyer would reasonably be expected to have a Material Adverse Effect on the Purchased Assets.

III.9 Certain Fees. Other than DuFrayne LLC and Manning Land and Manning Mineral LLC, Seller has not employed any broker, finder, investment banker, or other intermediary or has not incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or any transactions contemplated by this Agreement or the transactions this Agreement contemplates.

III.10 Notices of Certain Events. Sellers shall promptly notify Buyer of:

(a) Any notice or other written communication from any third-party alleging that the consent of such third-party is or may be required in connection with the consummation of the transactions contemplated by this Agreement; and

(b) Any material written communication from any governmental or regulatory agency or authority in connection with or relating to the transactions contemplated by this Agreement.

III.11 Equipment. All of Seller's equipment ("Equipment") is owned by the Sellers and, when conveyed by Sellers to Buyer, will be owned by Buyer free and clear of all Liens except Permitted Liens. The Equipment constitutes all material equipment owned by Seller and used in connection with the Purchased Assets and is in substantially the same condition as of the Effective Date, ordinary wear and tear excepted. Seller has not leased, licensed or otherwise granted any third party any right to possess or use any Equipment, except as disclosed in this Agreement or the Disclosure Schedules. Upon the Closing, Buyer shall acquire good and marketable title to the Equipment, free and clear of all Liens other than Permitted Liens, together with all warranties, guarantees and similar rights, to the extent transferable.

III.12 Permits. Sellers possess all material permits, licenses, approvals and governmental authorizations necessary for the ownership and operation of the Purchased Assets as presently conducted, and such permits are in full force and effect.

III.13 Taxes. Each Seller has timely filed (or caused to be timely filed) all material Tax Returns required to be filed with respect to the Purchased Assets and has timely paid, or will timely pay, all Taxes required to be paid by each Seller with respect to the Purchased Assets for all taxable periods ending on or before the Closing Date, other than Taxes being contested in good faith by appropriate proceedings. There are no Liens for Taxes upon any of the Purchased Assets, other than Permitted Liens arising by operation of applicable Law for Taxes not yet due and payable. Sellers have not received any written notice of any pending audit, examination or proceeding by any taxing authority relating to Taxes that would result in a Lien on, or otherwise materially adversely affect, the Purchased Assets.

III.14 Financial Information.

(a) Seller has made available to Buyer all financial statements, operating statements, utility billing records, capital expenditure information, and other financial or operating

information relating to the Purchased Assets, that are in Seller's possession or control and have been requested by Buyer (collectively, the "Financial Information").

(b) To Seller's knowledge, the Financial Information delivered or made available to Buyer has been prepared in good faith from the books and records of Seller, is true, correct and complete in all material respects, and fairly presents, in all material respects, the information purported to be reflected therein for the applicable periods. Seller has not knowingly omitted any material information necessary to make the Financial Information, taken as a whole, not misleading.

(c) Since the date of the most recent Financial Information made available to Buyer, Seller has not become aware of any material adverse change in the financial condition or operation of the Purchased Assets that has not been disclosed to Buyer in writing. Seller has made available to Buyer true, correct and complete copies, in all material respects, of all books, records,

utility information, correspondence, reports, contracts and other documents in Seller's possession or control relating to the Purchased Assets that have been requested by Buyer. To Seller's knowledge, such books and records accurately reflect the information they purport to contain in all material respects, and Seller has not knowingly withheld any material information relating to the Purchased Assets requested by Buyer.

III.15 Environmental Matters. Except as set forth on **Exhibit "F"** to Seller's knowledge: (a) Each Seller is, and during Seller's ownership of the Purchased Assets has been, in material compliance with all applicable Environmental Laws with respect to the Purchased Assets;

(b) Seller has not received any written notice, demand, claim, request for information or other written communication from any governmental authority or third party alleging any material violation of, or material liability under, any Environmental Law with respect to the Purchased Assets that remains unresolved; (c) there has been no release, discharge, disposal or threatened release of any Hazardous Substance at, on, under or from the Purchased Assets in violation of applicable Environmental Laws that would reasonably be expected to result in material liability relating to the Purchased Assets; (d) Seller has not received any written notice of the presence of any underground storage tanks, asbestos-containing materials, polychlorinated biphenyls or other regulated Hazardous Substances at the Purchased Assets, except as disclosed on **Exhibit "F"**; (e) Seller has obtained and is in material compliance with all material permits, licenses and other governmental authorizations required under applicable Environmental Laws with respect to the ownership and operation of the Purchased Assets; and (f) there is no pending or, to Seller's knowledge, threatened investigation, action or proceeding under any Environmental Law relating to the Purchased Assets that would reasonably be expected to result in material liability or materially impair Buyer's ownership, development or use of the Purchased Assets following the Closing. For purposes of this Agreement, "Environmental Laws" means all applicable federal, state and local Laws relating to pollution, the protection of human health or the environment, or the manufacture, generation, use, handling, storage, treatment, transportation, release or disposal of Hazardous Substances, each as amended from time to time. "Hazardous Substances" means any substance, material or waste that is regulated under any Environmental

Law, excluding quantities of substances customarily used, stored or maintained in compliance with applicable Environmental Laws.

III.16 General Warranty. None of the representations or warranties contained herein by Seller, nor any exhibit, schedule, statement, or certificate furnished to or to be furnished by Seller to Buyer pursuant to the terms hereof or in connection with the transactions contemplated herein, contains or will contain any knowingly untrue statement of a material fact or knowingly omits or will omit to state a material fact necessary to make the statements contained or incorporated herein or therein not misleading.

III.17 Seller represents and warrants that: (i) it is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986 (the "Code"), which is subject to Section 4975 of the Code; and (ii) the assets of Seller do not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA or Section 4975 of the Code; and (iii)(a) Seller is not a "governmental plan" within the meaning of Section 3(32) of ERISA, and the assets of Seller do not constitute plan assets of one or more such plans; or (b) transactions by or with Seller are not

in violation of state statutes applicable to Seller regulating investments of and fiduciary obligations with respect to governmental plans.

III.18 Neither Seller, nor any ERISA Affiliates (as hereinafter defined) has, within the last six (6) years, made a "partial withdrawal" or a "complete withdrawal" (within the meaning of Sections 4205 and 4203 of ERISA) from any "multiemployer plan," nor incurred any liability on account of a "partial withdrawal" or a "complete withdrawal" from any "multiemployer plan", no such liability has been asserted through a "Notice of Assessment" or any similar correspondence, and there are no events or circumstances which could result in any such partial or complete withdrawal, neither Seller, the Property Manager nor any ERISA Affiliate has incurred or could be subjected to any liability under Title IV or Section 302 of ERISA that could reasonably be expected to result in liability to the Buyer ("ERISA Affiliate" means, at any time, each trade or business (whether or not incorporated) that would, at the time, be treated together with either Seller or the Property Manager as a single employer under Title IV or Section 302 of ERISA or Sections 414(b) or 414(c) of the Code.

III.19 Seller covenants and warrants that all of the representations and warranties set forth in this Agreement shall be true and correct at ~~Closing.~~, and as of, the Closing Date, but not thereafter. The covenants and agreements of the Parties that by their terms contemplate performance after the Closing (including Section 5.4 and Section 10.6) shall survive the Closing in accordance with their terms.

III.20 No Other Representations or Warranties. Other than as set forth herein, the Purchased Assets are being sold "as is," "where is," and "with all faults," and Buyer, or any ultimate highest bidder pursuant to any Auction or order of the Bankruptcy Court, hereby acknowledges and agrees that Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets. Buyer will accept the Purchased Assets "as is" and "where is" at closing.

## ARTICLE IV~~ARTICLE IV~~
## REPRESENTATIONS AND WARRANTIES OF BUYER

IV.1 Organization and Authority. Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware. Buyer has the full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated herein and have been duly authorized by all necessary action on the part of Buyer. Subject to entry of the Sale Approval Order by the Bankruptcy Court, this Agreement constitutes a legal, valid, and binding agreement of Buyer that is enforceable in accordance with its terms.

IV.2 No Conflicts. The execution, delivery, and performance of this Agreement by Buyer will not (i) violate any provision of any existing law, statute, rule, regulation, or ordinance, or (ii) conflict with, result in a breach of, or constitute a default under (a) any certificate or articles of incorporation or by-laws of Buyer, (b) any order, judgment, award or decree of any court, governmental authority, bureau or agency, or (v) any mortgage, indenture, lease, contract or other agreement, or undertaking to which Buyer is a party or by which Buyer or its properties or assets may be bound.

IV.3 Investigation by Buyer. Buyer is conducting its own independent review and analysis of the Purchased Assets, the Assumed Liabilities, and the Assumed Contracts. Buyer acknowledges that it has until 10:00 a.m. September ~~30~~10, 2026 ("Due Diligence Expiration Date") to conduct such diligence as it deems necessary or appropriate in connection with the transactions contemplated hereby. Notwithstanding the foregoing, Buyer's investigation shall not limit, diminish or otherwise affect Seller's representations, warranties, covenants or obligations under this Agreement, any Seller Disclosure Schedule or any other document delivered in connection herewith. Buyer shall be entitled to rely upon the accuracy and completeness of the Seller's representations and warranties expressly set forth herein, and Seller shall remain liable for any breach thereof. Buyer shall complete its due diligence by the Due Diligence Expiration Date.

IV.4 Nothing herein shall waive or limit any rights or remedies of Buyer arising from Seller's fraud, willful misconduct, intentional misrepresentation or breach of this Agreement. Buyer is capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts and Assumed Liabilities.

IV.5 Litigation. As of the date hereof, there is no action, suit, investigation or proceeding pending, against or, to the knowledge of Buyer, threatened against or affecting Buyer before any court or arbitrator or any governmental body, agency, or official, which in any manner challenges or seeks to prevent, enjoin, alter, or materially delay any transactions contemplated by this Agreement.

IV.6 Certain Fees. Buyer has not employed any broker, finder, investment banker, or other intermediary or has not incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or any transactions contemplated by this Agreement.

IV.7 Required Consents. Except for consents, approvals or authorizations of, or declarations or filings with the Bankruptcy Court, there is no agreement or other instrument binding upon Buyer requiring any consent, approval, notification, filing, registration, authorization, permission, license, requirement, or action by any third-party resulting from the execution, delivery, and performance of this Agreement.

IV.8 General Warranty. None of the representations or warranties contained herein by Buyer, nor any exhibit, schedule, statement, or certificate furnished or to be furnished by Buyer to Seller pursuant to the terms hereof or in connection with the transactions contemplated herein, contains or will contain any knowingly untrue statement of a material fact or knowingly omits or will omit to state a material fact necessary to make the statements contained or incorporated herein or therein not misleading.

## ARTICLE VARTICLE V
## COVENANTS OF SELLER AND BUYER

V.1 Efforts; Further Assurances. Seller and Buyer will use commercially reasonable efforts to take any and all actions and to do all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated in this Agreement. Seller and Buyer agree to execute and deliver such other documents, certificates, agreements, and other writings and to take such other actions as may be necessary or desirable in order to vest marketable title to the Purchased Assets in Buyer.

V.2 Notices. If (i) Buyer becomes aware of any material breach by Seller of any representation, warranty, covenant, or agreement contained herein and such breach is capable of being cured by Seller, or (ii) Seller becomes aware of any material breach by Buyer of any representation, warranty, covenant, or agreement contained herein and such breach is capable of being cured by Buyer, the Party becoming aware of such breach shall promptly notify the other Party in writing, in accordance with the notice provisions of this Agreement. Upon such notice of breach, the breaching Party shall have five (5) days to cure such breach before the exercise of any remedies in connection therewith.

V.3 Pre-Closing Covenants. As material terms of this Agreement:

(a) From the Effective Date until the Closing Date, Seller will maintain the Purchased Assets in the manner consistent with its standards of maintenance prevailing immediately prior to the Effective Date and it will not commit or permit to be committed any waste or change in the condition or appearance of the Purchased Assets, or convey any other right with respect to the Purchased Assets except with the written consent and joinder of Buyer. Seller shall operate, manage and maintain the Purchased Assets in the ordinary course consistent with past practice and shall promptly notify Buyer of any material damage, casualty, condemnation, governmental action or other event affecting the Purchased Assets. Seller will keep all current insurance policies concerning the Purchased Assets in full force and effect until Closing and shall not modify, cancel, terminate or permit any lapse in coverage without Buyer's prior written consent. Buyer and Seller, or its representative, shall have the right to walk the Tarbush Property

the day before the Closing Date, unless otherwise waived by Buyer in writing, to confirm the condition of the Purchased Assets .

(b) Seller must not transfer any of the Purchased Assets, create any Lien on the Purchased Assets, grant any easements or rights-of-way, or enter into any contract, lease, license, agreement, commitment or other arrangement affecting the Purchased Assets or Buyer's intended use thereof, which is not cancelable on and as of the Closing Date without Buyer's prior written consent. Seller shall not take any action, or fail to take any action, that would reasonably be expected to adversely affect Buyer's rights in or to the Purchased Assets, the value thereof, or the ability to consummate the transactions contemplated hereby.

(c) Seller shall operate, manage and maintain the Purchased Assets in the ordinary course of business consistent with past practice and shall use commercially reasonable efforts to preserve intact the Purchased Assets and the goodwill associated therewith. Seller shall not take, or omit to take, any action that would reasonably be expected to materially impair the value of the Purchased Assets or Buyer's ability to consummate the transactions contemplated by this Agreement.

(d) Seller shall not amend, modify, terminate, renew, extend, waive any material rights under, or enter into any new Assumed Contract, or consent to any amendment, modification or termination of any Assumed Contract, without the prior written consent of Buyer.

(e) Seller shall use commercially reasonable efforts to preserve and maintain in full force and effect all permits, approvals, authorizations, licenses, utility allocations, interconnection rights, governmental approvals and other rights relating to the Purchased Assets, and shall not take any action, or fail to take any action, that would reasonably be expected to adversely affect the transferability, availability or use thereof by Buyer following the Closing.

(f) Seller shall promptly notify Buyer in writing of (i) any material damage to or destruction of the Purchased Assets, (ii) any condemnation or threatened condemnation affecting the Purchased Assets, (iii) any written notice of violation, default, investigation or enforcement action relating to the Purchased Assets, (iv) any material claim, action or proceeding affecting the Purchased Assets, or (v) any event or circumstance that would reasonably be expected to result in a Material Adverse Effect or prevent or materially delay the consummation of the transactions contemplated hereby.

(g) Seller shall provide Buyer and its representatives with reasonable access, upon reasonable prior notice and during normal business hours, to the Purchased Assets, the Assumed Contracts, books and records, and such other information relating to the Purchased Assets as Buyer may reasonably request in connection with the transactions contemplated hereby.

(h) Seller shall use commercially reasonable efforts to obtain entry of the Bid Procedures Order and the Sale Approval Order and to satisfy all conditions to Closing within Seller's control and shall not take any action that would reasonably be expected to delay, impair or prevent the consummation of the transactions contemplated hereby.

(i) Seller shall preserve all books, records, files and other documents relating to the Purchased Assets and shall not destroy, discard or materially alter any such books, records

or documents prior to the Closing, except in the ordinary course of business and in accordance with applicable Law.

(j) Seller shall not settle, compromise or release any material insurance claim, condemnation award or other claim relating to the Purchased Assets without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed.

(k) Buyer waives any Title Objections (as defined in the Pyote Agreement) on the Adjacent Property related to or based upon mineral rights, including but not limited to mineral reservations, leases and other mineral rights exceptions.

V.4 Post-Closing Covenants. As material terms of this Agreement:

(a) ~~(a)~~ Immediately upon the consummation of the Closing, the Parties agree to cooperate with one another and use all good faith efforts to take (or cause to be taken) all actions, and to do (or cause to be done) all things reasonably necessary or proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement, including, without limitation, (i) providing access and title to the Purchased Assets to Buyer; and (ii) assisting Buyer with obtaining access and control over the Purchased Assets.

## ARTICLE VI ~~ARTICLE VI~~
## BANKRUPTCY MATTERS; BIDDING PROCEDURES

VI.1 Bankruptcy Filings. Seller shall deliver or cause to be delivered to Buyer for review and comment, as soon as commercially reasonable and in any event not less than two (2) business days prior to the filing thereof, all documents to be filed on behalf of Seller with the Bankruptcy Court, including all motions, applications, petitions, schedules, and supporting papers prepared by Seller (including forms of orders and notices to interested parties) that relate to, or that may affect, the Purchased Assets or the transactions contemplated hereby. All motions, applications, petitions, schedules, and supporting papers prepared by Seller and relating to the transactions contemplated hereby or the Purchased Assets to be filed with the Bankruptcy Court on behalf of Seller must be reasonably satisfactory in form and substance to Buyer and Seller.

VI.2 Sale Approval Order. Seller and Buyer shall use commercially reasonable efforts to cooperate, assist and consult with each other to secure the entry of the Sale Approval Order following the date hereof, and to consummate the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes of, among others, providing necessary assurances of performance by Buyer under this Agreement and furnishing any testimony regarding the transactions contemplated hereby, including to support the good-faith nature of the negotiations leading to this Agreement.

## ARTICLE VII ~~ARTICLE VII~~
## CLOSING CONDITIONS

VII.1 Conditions to Obligations of Buyer and Seller. The obligations of Buyer and Seller to consummate the transactions contemplated in this Agreement are subject to the satisfaction of the following conditions:

(a) The Bankruptcy Court shall have entered the Sale Approval Order and, as of the Closing Date, the Sale Approval Order shall be in full force and effect and shall not have been stayed, vacated, or reversed. The Sale Approval Order shall be in form and substance reasonably acceptable to Buyer and shall, *inter alia*:

(i) Authorize the Seller's execution and delivery of this Agreement and approve the transactions contemplated herein;

(ii) Find that the transfer of the Purchased Assets is legal, valid, and enforceable and vests Buyer with valid title to the Purchased Assets, free and clear of all Liens (except for any Permitted Liens);

(iii) Find that the Purchase Price and other consideration provided by Buyer hereunder constitute fair and reasonable consideration for the Purchased Assets;

(iv) Provide that Buyer is a good faith purchaser of the Purchased Assets pursuant to Section 363(m) of the Bankruptcy Code and none of the grounds set forth in Section 363(n) exists with respect to the sale;

(v) Authorize Buyer to file, if desired in its discretion, terminations or cancellations of any recorded Liens (except for Permitted Liens or to the extent required by law) against the Purchased Assets and require secured parties or lienholders, where required by applicable non-bankruptcy law or requested by Buyer, to execute documents of release, cancellation or satisfaction prepared by Buyer, to be filed by Buyer to clear any Liens of record (other than Permitted Liens) from the Purchased Assets;

(vi) Approve the assumption and assignment of any Assumed Contracts and provide that upon payment of the applicable Cure Costs (or other such agreed amount) by the Buyer or Seller, as applicable, such counterparty shall not have any remaining claim against Seller, its Estate or creditors, or Buyer related to any pre-Closing default under any such Assumed Contract;

(vii) Find that Buyer has not assumed, and has no responsibility or liability for any of Seller's liabilities of any description whatsoever, including any liability of Seller with respect to any Taxes or any pre-Closing liabilities (other than Cure Costs for the Assumed Contracts or other Assumed Liability), whether known or unknown as of the Closing, whether fixed or contingent, or whether existing at the time of or arising after the Closing, including successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, alter ego, successor or transferee liability, de facto merger, mere or substantial continuation; and

(viii) Waive any stay that would otherwise be applicable pursuant to Rules 6004(h) or 6006(d) of the Federal Rules of Bankruptcy Procedure.

(b) No injunction, stay, or similar order or decree issued by any court, tribunal or governmental entity, shall be in effect that restrains, enjoins, stays, or prohibits the consummation of the transactions contemplated by this Agreement.

VII.2 Conditions to Obligations of Buyer. The obligation of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Buyer) of the following conditions:

(a) Seller shall have performed in all material respects all its obligations hereunder required to be performed by it at, or before, the Closing Date; and

(b) The representations and warranties of Seller contained in this Agreement shall be true and correct at, and as of the Closing Date, as if made at, and as of, the Closing Date, but not thereafter.

(c) Closing of the purchase and sale agreement (the "Adjacent Property PSA"), on terms and conditions reasonably acceptable to Buyer~~, in its sole and absolute discretion~~, for the acquisition by Buyer of the real property parcels (collectively, the "Adjacent Property") identified on the assessor tax parcel map for Reeves County by Parcel ID No. 0014468 and on the assessor tax parcel map for Pecos County by Parcel ID No. 00049-08031-00100-000000. The closing of the Adjacent Property PSA shall have occurred, or shall occur substantially concurrently with the Closing hereunder, on terms and conditions reasonably satisfactory to Buyer~~ in its sole discretion~~.

(d) The acquisition of the Adjacent Property by the Buyer at Closing may, at the Buyer's election, be effectuated through an assignment of the Sellers' rights and interests under that certain Option Assignment Agreement, dated June 11, 2026, by and between Lonestar Dream, Inc. and Lonestar Taproot LLC, and Manning Minerals, LLC (as amended pursuant to that certain Amendment to Option Assignment Agreement, ~~dates~~dated as of July 1, 2026) (the "Option Assignment Agreement"), pursuant to which the Sellers are assigned, among other things, rights under that certain Amended and Restated Option Agreement, dated as of July 28, 2026 to be effective as of July 1, 2026, by and between Jeff Lindsay (the "Optioner") and Manning Minerals, LLC (the "Optionee"), a Texas limited liability company (the "Option Agreement"). In the event that the Buyer elects to take an assignment of the Option Assignment Agreement, then a further condition to Closing shall be Buyer's receipt of (x) written confirmation (in form and substance acceptable to Buyer) from the Sellers and the Optionee, that, as of the Closing, both the Option Assignment Agreement and the Option Agreement are in full force and effect and are legal, valid, binding and enforceable against the parties thereto; and (y) an estoppel certificate executed by the Optioner certifying that, as of the assignment of the Option Assignment Agreement to Buyer, the Option Agreement is in full force and effect, is legal, valid, binding and enforceable against the Optioner and that there is no default by Optioner or Optionee under the Option Agreement or other existing conditions, which upon the giving of notice or lapse of time, or both, would constitute a default under the Option Agreement.

(e) Buyer shall have received, in form and substance reasonably satisfactory to Buyer, all governmental and third-party permits, approvals, consents, authorizations and agreements necessary ("Approvals") to (i) transfer to Buyer the current and anticipated future electrical power allocation and related power rights associated with the Tarbush Property (to 176MW, with future potential increase up to 300MW) (the "Power

Rights”), by the dates set forth below, without material reduction or restriction; (ii) construct, interconnect, energize, operate and maintain the substation and related electrical infrastructure necessary to utilize such electrical power on the Adjacent Property for the development and operation of ~~an AI data center~~a Data Center, including without limitation any facilities extension agreement with Texas-New Mexico Power Company that may be necessary for substation relocation or construction; and (iii) interconnect and receive (a) an available allocation as of the Closing Date, of 176 MW of electronic load on the Adjacent Property, ~~in accordance with the load commissioning plan for ERCOT Batch Zero load BZ-650, achieving an interim ramp milestone of 176 MW, by December 31, 2028 (“176MW Approval~~provided that for the purposes of this subclause (a) such Approval can be satisfied through written confirmation from ERCOT and Texas-New Mexico Power following ERCOT’s completion of the ongoing Batch Zero eligibility verification process unconditionally confirming that the project load limit is 176MW as of the Closing Date~~”)~~, and (b) a future anticipated allocation, if any is permitted, pursuant to a final ramp milestone of up to 300 MW by December 31, 2029, without the necessity of posting any financial security to the transmission service provider for system power upgrade approvals or use~~, solely as to~~ of the 176MW upgrade. All costs, expenses and fees related to electrical connections, lines, substations, equipment, transformers, switchgear, electrical distribution systems, transmission and distribution facilities, cabling, cooling infrastructure,

buildings, and other customer-side improvements and the like and all ~~AI~~Data Center infrastructure buildout, in order for Buyer to use such increased power, shall be paid by Buyer, shall not be a liability of Seller and shall not be an offset to the Purchase Price at closing. All such required Approvals shall be in full force and effect and shall not contain any condition or limitation that would materially impair Buyer's access to and use of 176MW of power at the Adjacent Property, in connection with Buyer’s intended use of the Adjacent Property as ~~an AI data center~~a Data Center, by the ~~176MW Approval~~Closing Date. For the avoidance of doubt, Seller makes no representation or warranty regarding any future requirements imposed by ERCOT, TNMP, or any other governmental authority or utility provider as to any future expansion of power beyond 176 MW, including, without limitation, any Facilities Extension Agreement, relocation of the point of interconnection, transmission or distribution system upgrades, capacitor banks, substation modifications, construction costs, deposits, prepayments, security requirements, CIAC, Minimum Revenue Commitments, or any other utility-imposed fees, costs, or financial obligations associated with such potential increase of power up to 300MW.

~~(f) Buyer shall have received any of the following at or prior to closing: (a) a written surface use waiver and/or agreement from each holder of mineral rights, leasehold rights, or other mineral grants or interests affecting the Adjacent Property of record (“Mineral Rights”), in form and substance satisfactory to Buyer to permit its intended use of the Adjacent Property as an AI data center and acceptable for recordation in the county deed records; or (b) a conveyance in fee, an assignment of, or a lease interest in, the Mineral Rights in form and substance satisfactory to Buyer to permit its intended use of the Adjacent Property as an AI data center and acceptable for recordation in the county deed records; or (c) satisfactory proof that such Mineral Rights have been removed, released, terminated from or otherwise amended, subordinated or resolved as to and upon the record of title for the Adjacent Property, to the satisfaction of Buyer to permit its intended use of the Adjacent Property as an AI data center, at Closing; or (d) the parties shall have agreed upon such other resolution of a title issue on the Adjacent Property (collectively, the “Mineral Rights Condition”). Seller shall use commercially reasonable efforts to assist Buyer in identifying the applicable Mineral Right’s holders and obtaining the requisite documentation or agreements prior to Closing. All costs and other consideration of obtaining the signed title documents, consents and agreements referenced in this subparagraph, shall be borne by the Buyer.~~

(f) (g) Since the Effective Date, no event, change, circumstance or condition shall have occurred that has had, or would reasonably be expected to have, a Material Adverse Effect on the Purchased Assets, the utility rights associated therewith, or Buyer's intended use of the Adjacent Property to develop or operate as **an AI data center**a Data Center, including any material casualty, condemnation, loss of utility capacity, material governmental action or material termination of any Assumed Contract.

(g) (h) All necessary governmental approvals, permits, authorizations, consents and filings required for the consummation of the transactions contemplated by this Agreement shall have been obtained or made and shall be in full force and effect.

(h) (i) All material third-party consents required for the consummation of the transactions contemplated by this Agreement (other than those to be obtained through the Bankruptcy Court process) shall have been obtained and shall be in full force and effect.

(j) The Buyer shall have obtained or received a Phase I environmental site assessment, in form and substance satisfactory to Buyer in its sole discretion, respecting the Adjacent Property (a "Phase I Report"), the results of which Phase I Report shall be satisfactory to Buyer in its sole discretion.

(i) The Closing (as defined in the Pyote Agreement) of the Pyote Agreement shall have occurred substantially contemporaneous with the Closing hereunder.

VII.3 Conditions to Obligations of Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Seller) of the following further conditions:

(a) **(a)** Buyer shall have performed in all material respects all its obligations hereunder required to be performed by it at, or before, the Closing Date; and

(b) The representations and warranties of Buyer contained in this Agreement shall be true and correct at, and as of the Closing Date, as if made at, and as of, the Closing Date.

## ARTICLE VIII ARTICLE VIII
## TERMINATION

VIII.1 Grounds for Termination. This Agreement may be terminated at any time before Closing by:

(a) mutual written agreement of Seller and Buyer;

(b) either Buyer or Seller, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; provided that no Party may terminate this Agreement under this Section **8.1(b)** if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c) either Buyer or Seller, if the Closing shall not have occurred on or before **November 30**December 15, 2026, or such later date that is provided for herein or otherwise agreed

to by the parties (the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section ~~8.1(c)~~ if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d) Buyer, if any material condition set forth in this Agreement has not been satisfied by Seller or if the conditions of Section ~~7.2(c)~~VII.2 have not been satisfied, and such condition is incapable of being satisfied, unless Buyer elects to waive such satisfaction;

(e) Seller, if Buyer fails to consummate the Closing in accordance with this Agreement due to Buyer's default, unless Seller elects to waive such default; provided, however, that Seller shall not be entitled to terminate this Agreement or retain the Deposit unless Buyer has failed to consummate the Closing as a result of Buyer's default under this Agreement. For the avoidance of doubt, Buyer shall be entitled to the return of the Deposit if Buyer's failure to consummate the Closing is due to Seller's breach, failure to perform, failure to satisfy a condition to Closing, or any other circumstance not caused by Buyer's default under this Agreement;

(f) Buyer, if Buyer is not the successful bidder or the backup bidder at the Auction and Seller enters into a Competing Transaction with the successful bidder or the backup bidder;

(g) Buyer, if the Bankruptcy Case is dismissed or converted to a case or cases under chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Seller is appointed in the Bankruptcy Case;

(h) Buyer if Seller withdraws or seeks authority to withdraw the Bidding Procedures/Sale Motion.

(i) Buyer, upon the occurrence of a material casualty or condemnation affecting the Purchased Assets.

(j) Buyer, at any time prior to the expiration of the Due Diligence Expiration Date, if Buyer determines, in its sole and absolute discretion, that the results of its due diligence investigation of the Purchased Assets are unsatisfactory or unacceptable for any reason or no reason, including, without limitation, matters relating to the condition, title, operation, value, financial performance, environmental condition, zoning, permits, entitlements, contracts, liabilities, legal requirements or any other matter affecting the Purchased Assets or the transactions contemplated hereby. Upon any such termination, the Good Faith Deposit shall be promptly returned to Buyer, and neither party shall have any further obligations under this Agreement except for those obligations that expressly survive termination.

The Party desiring to terminate this Agreement under this section shall give notice of such termination to the other Party in accordance with the notice provisions herein. Notwithstanding the foregoing, except in connection with a termination of this Agreement by Seller pursuant to Section ~~8.1~~VIII.1(e), Buyer shall be entitled to receive the Good Faith Deposit in full, and Seller shall have no right to retain, apply or otherwise claim any portion of the Good Faith Deposit.

VIII.2 Effect of Termination.

(a) If this Agreement is terminated by Buyer in accordance with Section ~~8.1~~VIII.1(d), Buyer shall be entitled to the return of the Good Faith Deposit (with interest) within three (3) business days of such termination.

(b) If this Agreement is terminated by Seller in accordance with Section ~~8.1~~VIII.1(e), Buyer shall forfeit the Good Faith Deposit and the Good Faith Deposit shall become property of Seller's Estate as liquidated damages.

(c) If this Agreement is terminated in accordance with any other subsection of Section ~~8.1~~VIII.1, such termination shall be without liability of any Party to the other Party to this Agreement ~~(except as set forth in Section 8.2(d) and (e) below)~~, and the Good Faith Deposit (with interest) shall be returned to Buyer within three (3) business days of such termination.

## ARTICLE IX ~~ARTICLE IX~~
## ASSUMPTION OF EXECUTORY CONTRACTS OF THE SELLER

IX.1 Assumed Contracts. Buyer shall be solely responsible for and shall pay or cause to be paid at or prior to Closing, all Cure Costs related to the Assumed Contracts. Buyer shall have no obligation to pay any Cure Costs except to the extent expressly set forth on Exhibit "B". Seller represents and warrants that Exhibit "B" sets forth a complete and accurate list of all known Cure Costs for each Assumed Contract.

## ARTICLE X ~~ARTICLE X~~
## MISCELLANEOUS

X.1 Further Assurances. After the Closing Date, each Party shall execute and deliver such further documents, and perform such acts, as may be reasonably necessary to transfer and convey the Purchased Assets to Buyer on the terms contained herein, and to otherwise comply with the terms of this Agreement and to carry out the transactions provided for herein.

X.2 Notices. All notices, requests, and other communications to any Party hereunder shall be in writing, via e-mail transmission, and shall be given:

| | |
|---|---|
| If to Seller, to: | Lonestar Dream Inc. and Lonestar Taproot LLC<br>Attn: Michael DuFrayne, CRO<br>~~(mdufrayne@dufraynellc.com)~~(mdufrayne@dufraynellc.com) |
| With a copy to: | Stephen M. Packman, Esq. ~~(spackman@archerlaw.com)~~ (spackman@archerlaw.com) |
| If to Buyer, to | Attn: Jimmy Martini |

Hut 8 Corp.
777 Brickell Ave, Floor 2
Miami, FL 33131
(jimmy.martini@hut8.com)
Miami, FL 33131
(jimmy.martini@hut8.com)

With a copy to Andrew M. Carty
Brown Rudnick LLP
Seven Times Square
New York, NY 10036
(acarty@brownrudnick.com)
(acarty@brownrudnick.com)

All such notices, requests, and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request, or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

X.3 Bulk Sales Laws. The Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer, or similar laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

X.4 Expenses. Except as otherwise provided herein, each of the Parties shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including, without limitation, any legal, accounting and other professional fees, whether or not the transactions contemplated hereby are consummated.

X.5 Waivers. No failure or delay by any Party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

X.6 Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. Notwithstanding anything to the contrary herein, Buyer shall have the right, in its sole and absolute discretion and without the prior consent of Seller, to assign this Agreement, and its rights and obligations hereunder, in whole or in part, to one or more affiliates of Buyer or to one or more designees (including, without limitation, any entity formed for the purpose of consummating the transactions contemplated hereby); provided, however, that such assignment shall not release Buyer from its obligations hereunder. Seller may not assign, in whole or in part, this Agreement or its rights hereunder without the prior written consent of Buyer.

X.7 Assumption of Risk. Seller agrees to assume the risk of loss or damage to the Purchased Assets occurring on or before the date on which title thereof is conveyed to Buyer.

If, prior to its conveyance, any part of the Purchased Assets which constitutes Equipment has been substantially damaged, lost or destroyed, or if there has been a material condemnation affecting the Purchased Assets, Seller shall notify Buyer of such fact and Buyer may elect to either (i) accept all insurance or condemnation proceeds payable as a result of such destruction, damage or, loss or condemnation and any deductible due from Seller or, (ii) agree to a reduction of the Purchase Price by the current mutually agreed value of the lost, damaged or destroyed Purchased Asset, or (iii) terminate this Agreement and receive the prompt return of the Good Faith Deposit (with interest).

X.8 Governing Law. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of State of New York, without giving effect to the principles of conflicts of laws thereof) (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York, except to the extent that such laws are superseded by the Bankruptcy Code. The parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court and waive any right to a jury trial regarding the same.

EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ITS RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF

ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY OR ANY ASSIGNEE THEREOF, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.

X.9 Entire Agreement; Amendments; Counterparts. This Agreement sets forth the entire agreement between the Parties with respect to the subject matter hereof and may be amended only by in writing, executed by Seller and Buyer. This Agreement may be executed in counterparts, each of which shall constitute an original, and all of which together shall constitute one and the same instrument. This Agreement shall become effective when the Parties hereto shall have received a counterpart hereof signed by the other Party hereto.

X.10 Captions; Headings; Interpretation. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. The headings contained in this Agreement are for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement. Whenever the words “include,” “includes,” or “including” are used in this Agreement, they shall be deemed to be followed by the words “without limitation.” In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

X.11 Parties Bound. The terms and conditions of this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, executors, successors, and permitted assigns.

X.12 Severability. Except as otherwise provided herein, if any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable, such provision shall be automatically reformed and construed so as to be valid, operative, and enforceable to the maximum extent permitted by law or equity while preserving its original intent. The invalidity of any part or provision of this Agreement shall not render the remainder of this Agreement invalid.

X.13 Retention of Jurisdiction. ANY AND ALL DISPUTES, DISAGREEMENTS, INTERPRETATIONS, OR OTHER MATTERS CONCERNING THE FINAL CONSUMMATION AND ENFORCEMENT OF THIS AGREEMENT SHALL BE AND REMAIN IN THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, AS A RESULT THEREOF, ANY PLEADINGS, CAUSES OF ACTION OR OTHER REQUESTS FOR RELIEF MUST BE BROUGHT BEFORE SAID COURT BY THE PARTY SEEKING SUCH RELIEF.

X.14 [Buyer agrees to the terms and conditions of the first amended asset purchase agreement annexed hereto as Exhibit "H."]

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the date first written above.

**SELLER:**

**Lonestar Dream Inc.**

By: ________________________________
By: ___ -Name: Kevin Pan
Title: CEO

**SELLER:**

**Lonestar Taproot LLC**

By: ________________________________
By: ___ -Name: Kevin Pan, CEO
Title: CEO of Lonestar Dream Inc., sole member of Lonestar Taproot LLC

**BUYER:** **HUT 8 CORP.,** on behalf of itself and its designees**RAPTOR BASIN LLC**

By: ___________________________ Name:

Name:
Title:

**ANNEX I**
**CERTAIN DEFINITIONS**

~~"Alternative Transaction" means an approved sale to a higher bidder other than the Stalking Horse Bidder subject to the terms and conditions of the Agreement and Court.~~

"Auction" means an auction to be held by the Seller in the event higher and better bids are submitted in accordance with the Bidding Procedures.

"Bidding Procedures" means the procedures governing the proposed marketing of, auction of, and bidding for the Purchased Assets pursuant, and attached, to the Bidding Procedures Order.

"Bidding Procedures/Sale Motion" means the motion seeking entry of (i) the Bidding Procedures Order and (ii) Sale Approval Order, which shall be in form and substance reasonably satisfactory to Buyer.

"Bidding Procedures Order" means an Order of the Bankruptcy Court approving the Bidding Procedures, which shall include approval of the Breakup Fee and Expense Reimbursement., and which shall be in form and substance acceptable to Buyer in its reasonable discretion and shall include, at a minimum, customary bid protections, including: (i) a minimum initial overbid in an amount equal to the sum of the Breakup Fee, Expense Reimbursement and an initial overbid increment to be agreed by the parties; (ii) minimum subsequent overbid increments to be agreed by the parties; (iii) requirements that any competing bidder qualify as a "Qualified Bidder" (including delivery of a binding mark-up of the APA with no fewer terms or conditions, proof of financial wherewithal to close, and a non-refundable deposit at least equal to the Good Faith Deposit); (iv) restrictions on credit bidding by any party with disputed liens; (v) payment of the Breakup Fee and Expense Reimbursement on the closing of any alternative transaction with a competing bidder; and (vi) such other customary stalking horse protections as Buyer may reasonably require.

"Business Day" means any day that is not a Saturday, Sunday, or a day on which banking institutions in New York, New York are not required to be open.

"Claim" means any claim, demand, assessment, judgment, order, decree, action, cause of action, litigation, suit, investigation, or other Proceeding.

"Competing Transaction" shall mean a transaction with a bidder who has offered Seller a higher and better purchase price for the Purchased Assets to that offered by Seller, which higher and better bid is approved by order of the Bankruptcy Court.

"Cure Costs" means all amounts payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by Debtor and assignment to Buyer of the Assumed Contracts.

"Data Center" means any facility that is intended to be used, in whole or in part, for the housing, powering, cooling, interconnection or operation of computing, data processing, data storage, networking, telecommunications or similar information technology or electronic equipment, for high-performance computing, artificial intelligence, machine learning, cloud, hosting or colocation operations, which shall, for the avoidance of doubt, exclude such a facility operated primarily for the purposes of mining Bitcoin or other cryptocurrencies, digital assets, tokens or similar blockchain-based assets.

"Debtor" means Lonestar Dream, Inc. and Lonestar Taproot LLC.

"Estate" shall mean the Seller's bankruptcy estate consisting of all assets, rights and interests of the Debtor on the Petition Date in the Bankruptcy Case.

"Final Order" means an order or judgment, the operation or effect of which is not stayed, and as to which order or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired, and as to which no appeal or petition for review or motion for re-argument has been taken or been made and is pending for argument.

"Governmental Entity" means any federal, state, local or foreign political subdivision, court, administrative agency, board, bureau, commission, or department or other governmental authority or instrumentality.

"Law" means any law, statute, treaty, rule, directive, or regulation or Order of any Governmental Entity.

"Liability" means any liability or obligation, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due, regardless of when asserted.

"Material Adverse Effect" means any event, change, circumstance, occurrence, effect, development or state of facts that, individually or in the aggregate, (a) has had, or would reasonably be expected to have, a material adverse effect on the Purchased Assets or (b) would reasonably be expected to prevent, materially delay or materially impair the ability of Seller to consummate the transactions contemplated by this Agreement; *provided*, *however*, that none of the following, alone or in combination, shall be deemed to constitute, or be taken into account in determining whether there has been, a Material Adverse Effect: (i) changes in general economic, regulatory or political conditions or the financial, credit or securities markets in general (including changes in interest rates or exchange rates); (ii) changes generally affecting the industry in which the Business operates; (iii) changes in Law or GAAP (or authoritative interpretations thereof); (iv) any natural disaster, act of God, epidemic, pandemic or disease outbreak; (v) any act of terrorism, sabotage, cyberattack, military action or war; or (vi) the announcement or pendency of the transactions contemplated by this Agreement or the Bankruptcy Case; *provided*, *further*, that any event, change, circumstance, occurrence, effect, development or state of facts referred to in clauses

(i) through

(v) may be taken into account in determining whether a Material Adverse Effect has occurred to the extent such event, change, circumstance, occurrence, effect, development or state of facts has a disproportionate adverse effect on the Purchased Assets.

"Orders" means judgments, writs, decrees, compliance agreements, injunctions, rules, awards, settlement agreements, or orders of any Governmental Entity or arbitrator.

"Permits" means all permits, licenses, authorizations, registrations, franchises, approvals, certificates, variances, and similar rights obtained, or required to be obtained, from Governmental Entities.

"Proceeding" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, audit, examination, or investigation commenced, brought, conducted, or heard by or before, or otherwise involving, any court or other Governmental Entity or any arbitrator or arbitration panel.

"Person" shall be construed broadly and shall include an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or another entity including a Governmental Entity (or any department, agency, or political subdivision thereof).

"Pyote Agreement" means that certain Aset Purchase Agreement, dated as of September 21, 2026, by and between LONESTAR DREAM INC., a Delaware corporation, as seller, and LONESTAR TAPROOT LLC, a Delaware limited liability company, as seller, and MESQUITE FALCON LLC, a Delaware limited liability company, as buyer, executed substantially contemporaneous herewith.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Sale Approval Order" means an order of the Bankruptcy Court in form and substance acceptable to Buyer, *inter alia*, (a) approving (i) this Agreement and the execution, delivery, and performance by Debtor of this Agreement and the other instruments and agreements contemplated hereby; (ii) the sale of the Purchased Assets to Buyer free and clear of all Liens; (iii) the assumption